**In The Matter Of:**

*UNITED STATES OF AMERICA v.*
*COLLIN GARRETT HAYDEN*

---

*JASON McLEMORE*
*March 03, 2020*

---

*Donald Court Reporting & Transcription, LLC*
*P.O. Box 1640*
*Springdale, AR 72765*
*(888) 438-7836*
*donaldcrt@gmail.com*

Original File McLemoreJason03032020.txt
Min-U-Script®

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) CAUSE NO. 5:17cr9(6)
)
COLLIN GARRETT HAYDEN )
)
Defendant. )
)

TESTIMONY OF JASON McLEMORE

BEFORE THE HONORABLE ROBERT W. SCHROEDER, III

March 3, 2020

1:33 p.m.

APPEARANCES

MR. JONATHAN HORNOK FOR THE PLAINTIFF
MR. DONALD CARTER
U. S. Attorney's Office E/TX-Texarkana
500 State Line Avenue N, No. 402
Texarkana, Texas 75501
(903) 794-9481
jonathan.hornok@usdoj.gov
donnie.carter@usdoj.gov

MR. L. CHARLES VAN CLEEF FOR THE DEFENDANT
Van Cleef Law Office
P. O. Box 2432
Longview, Texas 75606-2432
(903) 248-8244
charles@vancleef.pro

I N D E X


| TESTIMONY BY JASON McLEMORE | Page |
|---|---|
| Direct Examination by Mr. Hornok -------------- | 4 |
| Cross-Examination by Mr. Van Cleef ------------ | 33 |
| Redirect Examination by Mr. Hornok ------------ | 81 |
| Recross-Examination by Mr. Van Cleef ---------- | 83 |


E X H I B I T S


| Plaintiff's Exhibit | | Referenced |
|---|---|---|
| 44 | (Jason McLemore's Federal Conviction Documents) ---------------------------------- | 6 |
| 45 | (Jason McLemore's SEALED plea agreement) ------- | 7 |
| 46 | (Jason McLemore's Proffer Letter) -------------- | 9 |
| 47 | (Picture Identification by Jason McLemore) ----- | 25 |

MR. HORNOK: Your Honor call Jason McLemore.

MS. SCHROEDER: Do you solemnly swear that the testimony you're about to give in the case before the court is the truth, the whole truth, and nothing but the truth, so help you God.

MR. McLEMORE: I do.

JUDGE SCHROEDER: All right. You may proceed.

MR. HORNOK: Thank you, Your Honor.

JASON McLEMORE, having been called upon to testify in the form of a hearing and having been duly sworn, testified as follows, to wit:

DIRECT EXAMINATION

BY MR. HORNOK:

Q. Would you please state your name for the jury.
A. Jason McLemore.
Q. Mr. McLemore, you're a former drug addict; correct?
A. Yes, sir.
Q. And did you ever deal drugs?
A. Yes, sir.
Q. And have you ever been convicted of a felony?
A. Yes, sir.
Q. In fact, why are you in chains here before the jury today?
A. I was convicted of selling drugs. Conspiracy.

Q. In this case?
A. Yes, sir.
Q. What were you sentenced to prison -- or how long were you sentenced to prison for?
A. One hundred and fifty-one months.
Q. Let me direct your attention there -- in front of you there's -- there's a book with a lot of different stuff. I've opened it to Exhibit 44.
Have you seen Exhibit 44? And if you need to kind of flip through or -- there you can --
A. I've seen it.
Q. Okay. What -- what is Exhibit 44?
A. That's my plea agreement.
Q. Are there other documents there associated with your -- your criminal conviction?
A. Looks like my plea agreement. Oh, there's more. An addendum, a plea addendum, a factual basis.
Q. Is there a judgment at the very back of...
A. Yes.
Q. And is that your judgment?
A. It is.
Q. And is -- pursuant to that judgment, you were incarcerated for 151 months?
A. Yes, sir.
MR. HORNOK: Your Honor, at this time I move

to admit Exhibit 44.

JUDGE SCHROEDER: Any objection.

MR. VAN CLEEF: No, Your Honor.

JUDGE SCHROEDER: All right. It will be received.

(Exhibit 44 was received.)

Q. (Mr. Hornok continued.) Now, in this agreement with the Government, what did -- generally, what did you agree to do? You agreed to plead guilty to what?

A. That was part of a conspiracy to sell drugs that were in question.

Q. And so as a part of that, did you have to take responsibility for your actions?

A. I did.

Q. Let me direct your attention to the next tab. It's Exhibit 45. Do you recognize that document?

A. It's my plea agreement with the USA Attorney.

Q. So this is another document associated with your -- your criminal conviction.

A. Yes.

MR. HORNOK: Your Honor, at this time I move to admit Exhibit 45.

MR. VAN CLEEF: No objection, Your Honor.

JUDGE SCHROEDER: Very well. It will be received.

(Exhibit 45 was received.)

MR. HORNOK: Your Honor, if we could display for the jury -- sorry, let me step back -- Exhibit 44.

Q. (Mr. Hornok continued.) Sorry, this is the document that you looked at just a second ago, your plea agreement with the Government.

A. Yes, sir.

Q. And in this you had to plead guilty to -- kind of under that, number 2, what does it -- what does it say?

A. Uh --

Q. The defendant waives --

A. Count 1 of the indictment with charges of violation, conspiracy to possess with intent to distribute at least 500 grams of a mixture containing methamphetamine.

Q. Okay. So now let me direct your attention to Exhibit 45. Is this an addition to that agreement with the Government?

A. Yes.

Q. There is -- there's a sentence -- the very last sentence on this page, could you read that sentence for us?

A. "It is entirely within the court's discretion as to what, if any, reduction in sentence will be" -- "the defendant will receive."

Q. It talks about a reduction in sentence. Would you

like to have your 151 months of prison reduced?
A. Yes.
Q. And, in fact, is that part of the reason that you're here today?
A. Yes.
Q. And you hope that your being here today could lead to a reduced sentence.
A. Yes, sir.
Q. What do you understand as to how that could happen?
A. That the decision ultimately lies with the judge.
Q. Okay. And how will the judge make the decision as to whether you should receive some kind of sentence reduction?
A. Based on my honesty.
Q. Your honesty when?
A. When I'm asked questions. Right now.
Q. So if you are -- if the judge were to find you dishonest on the stand, what is your understanding as to whether you would likely receive a sentence reduction?
A. Nothing would change.
Q. Nothing would change? Is that what --
A. I wouldn't get a discount.
Q. Let me direct your attention now to Exhibit 46, it's the next tab there. Do you recognize this document?
A. It's my proffer agreement.

Q. And when -- when was this proffer agreement signed?
A. August 29th, 2019.
Q. Was this before or after you were convicted?
A. After.
MR. HORNOK: Okay. Your Honor, at this time I would move to admit Exhibit 46.
MR. VAN CLEEF: No objection, Your Honor.
JUDGE SCHROEDER: Very well. It will be received.
(Wherein Exhibit 46 was received.)
MR. HORNOK: If we could direct the jury's attention to 46, page 1. Focus in on paragraph one.
Q. (Mr. Hornok continued.) Now, this agreement includes a number of provisions, but it includes this one. Can you read paragraph 1 for the jury?
A. "You will completely and truthfully answer all questions with complete and truthful information and will not consider any information or make false statements. You will not attempt to protect any person or entity, nor will you falsely implicate any person or entity."
Q. Now, was this letter signed based on a meeting with the investigators in this case?
A. Yes.
Q. And was that an agreement that you made, or a promise you made at that time?

A. Yes.
Q. And did you abide by that agreement at that time?
A. Yes, sir.
Q. And so on the basis of telling the truth there in this letter, were there any promises made to you with respect to any kind of sentence reduction in this letter?
A. No, sir.
Q. What is -- what is your understanding with respect to if you were to tell the truth on the stand, but the jury were to, say, acquit the defendant, find him not guilty, how does that change the outcome as to whether you may or may not receive a sentence reduction?
A. My understanding, as long as I tell the truth, it will be weighed as telling the truth.
Q. So does it matter what the jury decides?
A. No.
Q. Are you nervous to be here today?
A. Yeah.
Q. Why -- why are you so nervous?
A. Well, I think it goes without saying what happens to people who tell on people in prison. I mean, so...
Q. For those of the -- the members of the jury who -- who aren't familiar with that, what happens to people who do what you're doing?
A. They're often beat up or sometimes killed.

Q. So is that a risk that you're considering as you're -- you made the decision whether to testify today?
A. Absolutely.
Q. In 2016 did you at some point meet an individual named Collin Hayden?
A. Yes, sir.
Q. And what was the context of that meeting?
A. I was selling methamphetamines, and the guy that I was getting it from, I couldn't find him anymore, and I had met a guy named Jason Terrell earlier in the year who was buying from me, and he said he knew somebody that could get me access to it. And I met up with Jason Terrell and that guy. His name was Tim. And Mr. Hayden was there as well.
Q. And was there some kind of drug transaction that occurred at that time or --
A. Yes, sir.
Q. -- around that time? What happened?
A. Tim and I left to go pick up the meth and came back to the apartment.
Q. And how much methamphetamine did you purchase then?
A. It was between half a kilo and a kilo. I think it was a kilo.
Q. Did Mr. Hayden know what was -- what was going on?
A. Yes.

Q. Did he -- was he present when the drugs were there with you?
A. When they came back, yes, sir.
Q. Now, after you purchased the kilogram of -- or the methamphetamine, what happened to the methamphetamine?
A. I broke it up and sold it.
Q. Okay. Did you sell to it any -- Mr. Harper or Mr. Hayden or Mr. Terrell?
A. Everybody that was there got some.
Q. So did you sell some cocaine -- or some methamphetamine to Mr. Hayden?
A. Yes.
Q. Do you see Mr. Hayden here in the courtroom today?
A. Yes.
Q. Can you point out an article of clothing that Mr. or describe an article of clothing that Mr. Hayden is wearing and where generally in the courtroom he's sitting.
A. A blue tie sitting next to his attorney.

MR. HORNOK: Okay. Your Honor, may the record reflect that the witness has ID'd the defendant.

JUDGE SCHROEDER: Yes, it will.

Q. (Mr. Hornok continued.) Now, in the fall of 2016, were you selling methamphetamine on some kind of a regular basis?
A. Yes.

Q. Approximately how many kilograms of methamphetamine were you moving each week?
A. At that point, probably about seven. One a day.
Q. And by December had that amount gone up or gone down?
A. It had gone up to about two, two to three a day.
Q. Okay. At some point in -- or by the time May, 2017 rolled around when you were arrested, how many kilograms a week were you moving of methamphetamine?
A. At least 14. At least -- I was still selling at least two a day. Sometimes more.
Q. And at that time, what was -- what was the value of a kilo of methamphetamine, approximately?
A. I was paying about $6,000 probably.
Q. And how much were you selling it for?
A. Eleven thousand.
Q. So you were making approximately $5,000 per kilogram?
A. Yes, sir.
Q. So during that time, from fall 2016 to May 2017, how much profit would you estimate that you -- that you had made?
A. Probably between two and three thousand -- hundred thousand dollars. Two or three hundred thousand.
Q. Did you ever file any taxes on this?

A. No.
Q. Did you ever have bank statements that recorded all of this wealth?
A. No.
Q. So this is just kind of an estimate based on the cash. You don't have documents that kind of show how much.
A. Yeah, no documents.
Q. What did you do with all of that money that you made?
A. I tried to spend it. Bought cars and furniture and nice apartment, furniture for that apartment.
Q. What kind of cars did you buy?
A. I had a BMW convertible and a Mercedes Benz SUV.
Q. And this -- this SUV that you're describing, was it -- what did it look like?
A. It was silver. Mid-size.
Q. Were these expensive vehicles?
A. Yes, sir.
Q. And how did you pay for them?
A. In cash.
Q. Even though you had purchased these expensive vehicles and the apartment and the furniture, did you still have cash that was just there?
A. I did, yes.

Q. And did -- was -- did that pose a problem for you?
A. Of course. Having that much money is always dangerous.
Q. Why is it dangerous?
A. Someone could rob you and, you end up dead. I mean, people want it.
Q. So what other steps did you take to get the cash out of your hands?
A. Oh, I had a friend that I gave money to hold onto, which I never got back. But he washed it in his business.
Q. What do you mean by "washed it in his business"?
A. He just absorbed it into his business, like income.
Q. So is that -- when you say, "wash," is that kind of like money laundering?
A. Yes, sir.
Q. What was the name of this friend?
A. Jonathan Beck.
Q. And approximately how much money did you give him?
A. At least $120,000.
Q. Now, after you gave him that money, what, if anything -- what, if any, big purchases did he make after that?
A. He bought a nice car. Also a --- I think it was a BMW or a Mercedes Benz convertible.
Q. And you mentioned something about not getting your

money back. Did -- did he rip you off?
A. Yes.
Q. At some point in the fall of 2016, fall or winter 2016, did you begin working with Mr. Harper on a daily basis on drug deals?
A. Yes.
Q. Tell us about that.
A. Well, he was -- the guy I was going to, to get -- I was using this guy to get the methamphetamine. And as part of his payment, I sold him at cost.
Q. And what kind of units were you purchasing this methamphetamine in?
A. Kilos.
Q. And how many kilos would you purchase at a given time?
A. Started out at one, but it was up to two or three sometimes.
Q. And how often were these transactions occurring?
A. Not every other day -- if not every day, every other day.
Q. At some point did you engage in a multi-kilo transaction with somebody named -- with a last name of Montes-Munoz?
A. It wasn't a direct transaction, but we went -- Tim and I went to pick up -- I think it was three kilos, two

or three kilos, and the guy we were getting it from didn't have it, and he was at a hotel. And so we hung out there for a little bit, and then he asked us to step out, and we stepped out, and some other guy walked in who was identified as Munoz. And came back out with nothing. He walked in with a big bag and came out with nothing, so that was my --
Q. And you -- did you at some point learn that -- his name?
A. Yes. Through Tim.
Q. And what -- what did you learn that his name was?
A. Munoz was his last name.
Q. Do you know what his first name was?
A. I don't. I don't remember.
Q. Who was the individual inside the hotel that you were dealing with directly?
A. His name was Junior. That's how I know him by.
Q. And so was -- what did you conclude about where your methamphetamine was coming in that transaction?
A. Well, given that it wasn't there, and then after he left, I assumed it was Munoz.
Q. At some point did your relationship with Mr. Harper turn sour?
A. Yeah.
Q. Why?

A. I kind of got tired of giving him money for not doing anything. You know, getting him drugs at cost, and he was also taking a thousand dollars off the top of what Junior was telling him, in order to make money, I guess. I just wasn't going to have any more, so I went over and started using Junior myself.
Q. So you just cut Harp -- Mr. Harper out of the drug transaction.
A. Yes, sir.
Q. Was that something that he appreciated?
A. Probably not. In fact, I think he was pretty upset.
Q. And what was the motivation for you to do that, other than just making more money?
A. Well, he had -- he made everything really hard. It was always complicated trying to get ahold of him and make these transactions, and I just -- I didn't have the time for it. So it was just easier for me to do it myself.
Q. Now, at some point did Junior rip you off as well?
A. Yes.
Q. How did that happen?
A. We usually met somewhere in public, and I would give -- we would trade cash for the drugs. And I guess he was struggling. He asked me a while back -- he told me he was struggling with something and wanted some cash, and I gave it to him. And he came back some money, and then, like a

month later, he told me he had a deal for me, and I took him up on that deal and ended up with a box of spaghetti sauce and cheese.
Q. And what --
A. Kind of funny. Now it's funny, but not funny then.
Q. What did you give him for the spaghetti sauce?
A. $15,000.
Q. Was it $15,000 worth of spaghetti sauce and cheese?
A. Evidently, it was to him.
Q. But was it to you?
A. No.
Q. Okay. So these -- these two interactions, you cutting Harper out, Junior giving you spaghetti sauce and cheese instead of the drugs, is this the kind of activity that occurs in the drug trafficking world?
A. It happens a lot. People lie a lot, people try to trick people a lot, yeah.
Q. People try and steal customers?
A. Steal customers, steal drugs, steal girlfriends, whatever.
Q. Now, at some point did you -- did Mr. Hayden reach out to you with respect to cocaine?
A. Yes.
Q. What -- why did he reach out to you?
A. Well, I was moving a lot of drugs and I -- and I

pretty much could find anything that anybody needed. And we had a conversation, and he told me that he was interested in finding it, and so I did. I went and found it, I went and made a connection. In fact, I had to buy enough to make it worth my while, not just for him but to start selling to other people as well.
Q. So based on Mr. Hayden's requests, you kind of established a new business line?
A. Yes, sir.
Q. What was Mr. Hayden -- based on your conversations with Mr. Hayden, what was he doing with the cocaine he was buying from you?
A. Considering that many of our conversations were him telling me that he couldn't make money off the amount that I was charging him for, I assumed that he was selling it at the strip club he was working at. Which, in fact, is where Jason Terrell -- Jason Terrell hung out with all those guys, and that's -- he was buying from me to sell to them to, so I just figured it was Jason didn't want to deal with that amount, and so he wanted me to go directly to him.
Q. Did Mr. Hayden have any preferences with respect to the kind of cocaine or the quality of cocaine that you sold him?
A. Yeah. I mean, the general consensus was that pearly

in color, scaly in a rock was considered what the quality would be.
Q. So these -- these things that you've described, pearly in color, did you say scaly?
A. Yeah, looked like fish scales, purple and -- purple and pink. Just kind of like a shim -- a shimmer. Excuse me.
Q. What do those things indicate about cocaine?
A. Usually that is pretty high quality, and it hasn't been stepped on.
Q. And what do you mean by "stepped on"?
A. Like some people add niacin to it to give you a basic -- give you that buzz, and so it feels like you're getting high real quick. But they'd use to step on it. So the more -- the less it doesn't look like that, the more stepped on it is, the more not good.
Q. So, basically, the idea is they take a kilogram of cocaine, a kilogram of something else, mix the two together, and resell it as two kilograms of cocaine?
A. Yes.
MR. VAN CLEEF: Objection. Leading, Your Honor.
MR. HORNOK: The question's already been answered.
JUDGE SCHROEDER: I agree. Overruled.

Q. (Mr. Hornok continued.) These -- these requests by Mr. Hayden about the color and the texture, what did they -- what did you understand them to mean? Or how did you interpret them with respect to his knowledge of cocaine?
A. Well, he knew what he was looking for, so I figured he -- he knew what he wanted.
Q. And did he have good taste?
A. I would say so.
Q. Did he ever purchase methamphetamine?
A. Yes.
Q. And the methamphetamine and the cocaine that he purchased, were these amounts consistent with personal use, or were they consistent with distributing?
A. Unless someone used two to three ounces of cocaine a week, I would think they were selling it.
Q. What would happen to somebody if they used two to three ounces of cocaine in a week?
A. I imagine they'd be geeked out somewhere. Like, probably in a hospital.
Q. How much were you charging -- or what was the most that you were charging for an ounce of cocaine when you were selling it to Mr. Hayden?
A. About $1200.
Q. And what was -- what was the most you were charging for an ounce of meth?

A. $425.
Q. And when Mr. Hayden would buy drugs from you, approximately how many ounces of drugs would he buy?
A. Two to three usually every week, but sometimes it was a hit or miss a week.
Q. Now, did he ever buy in quantities smaller than an ounce?
A. No.
Q. And do you recall any transactions where he purchased less than two ounces of drugs?
A. Not that I recall.
Q. And what was the most -- most amount of drugs that he purchased at any one time?
A. Probably three or four ounces.
Q. And approximately how often was he engaging in these transactions with you?
A. Usually was weekly. Sometimes it was every other week.
Q. In total, approximately how many ounces of cocaine would you estimate that you had sold to -- you sold to Mr. Hayden over the course of your relationship?
A. It probably only lasted like three or four months, so -- so maybe 40-ounces, 48-ounces.
Q. Okay. If on a previous occasion you had indicated 12-ounces, would that have also been correct?

A. Yes.
Q. But it could have been more than 12-ounces? Is that what you're --
A. Yeah. I mean, just -- really just -- that's -- that's if it was every week, but I don't think it was every week. I mean, I'm certain it wasn't every week. It was --
Q. What would you --
A. -- sometimes yes, sometimes no.
Q. What -- what would you estimate to be the minimum amount? I mean, if you're just going to go conservative, is it the 12-ounce number, or is it the 40-ounce number?
A. Oh, there were three months, so 16 times three or four months or 16 times three, whatever. 36-ounces. So about 36-ounces. 36- or 48-ounces, yeah.
Q. Okay. And approximately how much methamphetamine did you sell him over the course of your relationship?
A. Not as much. Not nearly as much. Maybe 8- or 12-ounces.
Q. How -- how much would that be in pounds? Half pound? Whole pound? Less than a pound?
A. Oh, it's less than a pound.
Q. Okay. More or less than a half a pound?
A. More.
Q. In the book there in front you, let me direct your

attention to Exhibit 47. Do you recognize this?
A. That's Collin Hayden.
Q. And if you can flip through, what -- what are the things that you're seeing in -- what are these documents?
A. These are pictures with my signature on the back, talking about how much stuff I sold to him.
Q. And at a previous time did you use these photos to identify the defendant?
A. I did, yes.
MR. HORNOK: Your Honor, at this time I move to admit Exhibit 47.
JUDGE SCHROEDER: Any objection?
MR. VAN CLEEF: No, Your Honor.
JUDGE SCHROEDER: Very well. It will be received.
(Wherein Exhibit 47 was received.)
MR. HORNOK: If we could display for the jury page No. 1 of Exhibit 47.
Q. (Mr. Hornok continued.) Who is depicted in this picture?
A. That would be Collin Hayden.
Q. And this is the defendant who you've identified in court today?
A. Yes, sir.
Q. Let me direct your attention to page 2. If we could

focus in on the bottom of that.
Is this how you -- is this a statement that you wrote on August 29th of 2019?
A. Yes, sir.
Q. Could you read what you said there?
A. "This is Collin, and I sold him a total of approximately 12-ounces of cocaine and half a pound of meth over four months about once a week. He never purchased less than one-ounce of either." Signed, August 29th.
Q. Let me direct your attention now to page 3. Who is the individual depicted in this picture?
A. That would be Mr. Munoz.
Q. Okay. And what did you say here?
A. "This man was present at a five to six kilo meth transaction with Harper, myself, and Junior at a Motel 6 on Jim Miller Road.
Q. And so this identification that you did here, is that related to the transaction you described at the hotel?
A. Yes, that's him.
Q. Okay. Now, at some point during your work -- well, during your criminal activity as a drug dealer, did you supply an individual named Paul Brown?
A. I did.

Q. And where -- about how much at any given time would you sell to Paul Brown in a transaction?
A. He usually bought four-ounces or sometimes -- sometimes he -- it just depended on who he was seeing. He had a guy that lived in Longview or Daingerfield, or somewhere, that bought a kilo every now and then. But most of the time it was four to eight.
Q. And so some of those drugs that you were selling to him were going to the Daingerfield area?
A. Yes.
Q. Do you know whether Daingerfield is located in the Eastern District of Texas?
A. I have no idea where it's located.
Q. Okay.
A. I saw a sign for it on the highway on the way here, but I don't know where it's at.
Q. Fair enough. The methamphetamine that you were selling to Mr. Brown, where were you purchasing it from?
A. From Junior.
Q. And at that time was Mr. Montes-Munoz involved as well?
A. Yeah, it was all around the same time, yes, sir.
Q. So the methamphetamine was going from Mr. Montes-Munoz to Junior, to you, to Mr. Brown, to Daingerfield?

A. Yes.
Q. At some point did you learn that Mr. Brown had been stopped by police?
A. Yes. I heard that to someone else that he was -- had been arrested, and it was like the fourth or fifth time that he was arrested. This time rumor had it that he had a syringe in his car that was loaded. And I subsequently found out that he got out of jail the same day, after the fifth arrest, so I kind of figured something was up.
Q. What did you figure was up?
A. I -- I figured he was probably helping the police, so I stopped talking to him.
Q. What, if any, kind of interactions did you have with Mr. Brown after that occurred?
A. We had one, maybe two texts. I think it was just one text where he was asking me questions about -- not texts, but conversations. He was asking about the prices and -- and whatnot, and I told him I didn't want to talk about it. I don't talk about that by text. And after that, I didn't talk to him anymore.
Q. How would you characterize his -- that conversation -- his perspective in that conversation? Or attitude in that conversation.
A. He was real pushy for information for me to say

something. He kept asking me over and over again, and I was, like, "Well, I'm not" -- "you're asking me over and over again. I'm not going to say anything."
Q. What did you think -- based on what'd you'd learned, what was going through your head as to what was happening during this conversation?
A. If figured he was trying to set me up. He was trying to get me to either give him something by text or to set up a time to meet so I could be arrested.
Q. Based on that, what did you -- what did you do?
A. Jonathan and I concocted a plan to move out of the apartment that I was living in and to sublet it. And I moved into another apartment.
Q. And did your suspicions about law enforcement involvement with Mr. Brown end up proving true?
A. They sure did.
Q. What happened to the old apartment that you had been leasing?
A. I sublet it to Mr. Harper and Mr. Hayden.
Q. And the Mr. Hayden that you're speaking of, is he the defendant who's here in the room?
A. Yes, sir.
Q. Did you lease the apartment to anyone besides Mr. Harper and the defendant Mr. Hayden?
A. No.

Q. So anybody -- any third person also with the name of Hayden?
A. No. I mean, not that I know of. Mr. Hayden came by to look at the apartment and realized it was me that he was going to be renting it from. So that's how I knew it was him moving in.
Q. And what, if anything, did he say to you at the time that you met with him at the apartment?
A. He wanted direct access to pay the rent online because he was convinced that I was going to steal his money and leave him with no place to live.
Q. Did eventually he sublease the apartment from you?
A. He did, yes, sir.
Q. And where did you move?
A. I moved into an apartment at uptown Sky, the Sky Building. Sky Towers, Sky Building. Something like that.
Q. And whose name was on the paperwork for that?
A. Jonathan Beck.
Q. Now, at the time that Mr. Hayden came and checked out the apartment, were you still engaged in -- were you still selling him cocaine?
A. Yes.
Q. Now, at some point later did you learn about a raid on the apartment?
A. I did, yes.

Q. Were you at the apartment that day?
A. No.
Q. How did you learn about the raid on the apartment?
A. Jonathan and his partner were over at my new apartment helping me unpack stuff, and Jonathan received a phone call from Tim, I believe, or somebody, saying that it had happened.
Q. Now, at some point -- well, after that, did you kind of continue with your criminal activity?
A. Yeah. All the way up until May when I was arrested.
Q. So let's talk about when you were arrested. When was it that you ran into law enforcement?
A. I believe it was May 1st.
Q. Okay. And tell us -- tell us about how that -- that day worked.
A. I had just moved for the third time into a new apartment and was unpacking, and I was waiting for my new dealer to come over with delivery. And Jonathan had text me, wanted to talk about me getting out of the business and moving into his backyard -- a guest house in his backyard. And so I told him to come over, and when I went down the elevator to meet him, the DPS agents were there and asked me who I was. And, of course, I lied, and they arrested me there.
Q. Do you see any of the DPS agents who arrested you

here in the courtroom today?
A. Those two right there (indicating).
Q. After they arrested you, what happened?
A. They took me around, and I ended up in Titus County and then came here for court.
Q. Did they ask you whether they could search your house, your apartment?
A. Yes.
Q. And what did you say?
A. First I told them it wasn't my apartment. Well, it wasn't in my name, so I told them it wasn't mine.
Q. And then what did you tell them?
A. I don't really remember. I was probably pretty high the day. I know eventually they went in, so I know we sat down outside on the balcony, and I smoked a bunch of cigarettes while they looked at everything.
Q. So they did search your apartment that day?
A. They did, yes.
Q. And what kind of drug-related items did you have in your apartment that day?
A. Probably really hard to know exactly, but, I mean, I know I had ecstasy pills and Xanax and meth and GHB for sure.
Q. Did you have a safe in your apartment at the time?
A. Yes.

Q. And is that where you kept your methamphetamine?
A. Yes.
Q. Now, if law enforcement had waited 15, 20 minutes, what would they have found at your apartment?
A. They would have found a bunch more, and my other dealer, my new dealer.
Q. And at that time approximately how many kilograms of methamphetamine were you moving?
A. Probably -- at least two or three a day.
MR. HORNOK: May I have a moment, Your Honor?
JUDGE SCHROEDER: Yes.
MR. HORNOK: Pass the witness, Your Honor.
MR. VAN CLEEF: I'll have to retrieve the exhibits from the witness stand.
JUDGE SCHROEDER: Oh, yes.
MR. HORNOK: Also, if you want to display it, we could do that, too, electronically.
MR. VAN CLEEF: Oh, thank you. That's it Exhibit 45. Thank you very much. May I proceed, Your Honor?
JUDGE SCHROEDER: Yes, you may proceed.
MR. VAN CLEEF: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. VAN CLEEF:

Q. Mr. McLemore, I'm -- you should see right on the screen, but also I left it open in your notebook there, Exhibit 45, which you've discussed with Mr. Hornok.
A. Yes.
Q. Do you understand Mr. Hornok is the lawyer here to my right.
A. Yes, sir.
Q. And you've met him before, have you not?
A. Yes, sir.
Q. When did you meet him last?
A. The last?
Q. Yeah.
A. Last week.
Q. Did you -- have you met him before last week?
A. Yes.
Q. When?
A. They came and asked me what information I -- if I -- to identify Collin Hayden and asked me what information I knew when I signed these papers in August.
Q. Of 2019? Was that Mr. Hornok as well?
A. Yes, sir.
Q. Prior to that, have you ever met with Mr. Hornok?
A. No. I mean, not -- I -- I'm assuming he was the counsel in my case back when I was sentenced, but to be honest, it's all kind of a blur. That's -- I don't

remember if it was him or not, but...
Q. Well, I can help you with that. If you'll look at the very next page of Exhibit 45, do you see a signature down there at the bottom?
A. Jonathan Ross?
Q. Yes. And this is Jonathan Hornok. They both have the same first name.
A. Yeah.
Q. So just to clear that up, other than the two times you've already mentioned, you haven't actually met with Mr. Hornok before; correct?
A. No, just then.
Q. And did -- have you met with Mr. -- had you met with Mr. Ross prior to that?
A. Yes, sir.
Q. Okay. Do you remember meeting with Mr. Hornok twice in the last couple of weeks?
A. Yeah. Sorry. It was -- there was -- both times I was in Titus County, so, yeah, two times, and then the one time in -- at Seagoville.
Q. Okay. So you've been housed at the Titus County Jail, which is at Mount Pleasant; correct?
A. Yes, sir.
Q. Sort of in preparation for this trial.
A. For the -- the trial, yes, sir.

Q. You wouldn't have been otherwise because you're in federal prison; correct?
A. Yes.
Q. All right. So you were brought to Mount Pleasant for preparation for trial, and that's when you met with Mr. Hornok two times there within the last couple of weeks.
A. Yes.
Q. Okay. Prior to that, you never met with Mr. Hornok, you -- I was going to ask you about Mr. Ross. Am I right about that?
A. We met at Seagoville.
Q. At Seagoville.
A. So that's three. And then -- I only met with this guy to sign the papers, yeah.
Q. Okay. So you didn't really have a big conversation with Jonathan Ross, then.
A. No, not really.
Q. So the first time you had a conversation with a federal prosecutor would have been in August of 2017 -- I'm sorry, '19, which is reflected on that -- on that proffer letter that you testified about.
A. In regards to this case or --
Q. Yeah, sir.
A. Oh. Yes.

Q. Okay. And you would agree with me that then the first time you met with a federal prosecutor about this case was -- well, do you remember -- do you remember what dates Mr. Harper's apartment, your former apartment, was -- was searched?
A. It was in January, 2017. I don't know the exact date.
Q. Okay. Would -- would February 9th of 2017 --
A. It could be.
Q. -- sound right to you?
A. I mean, yeah.
Q. Okay. So when you -- the first time you met with a prosecutors to discuss this federal prosecutor to discuss this taste, being Mr. Hornok here to my right, your left, was approximately two years after that event; correct?
A. Well, I mean -- no, because it was part of the same conspiracy that I am. So when we talked to -- when I talked to him before, we was talking about my involvement in the conspiracy and no one else's.
Q. You're talking about in August of 2019; right?
A. No. In August 2019 I only met with Jonathan Hornok once.
Q. Okay. What other federal prosector did you meet with between February of 2017 and August of 2019?
A. To give my proffer agreement.

Q. Okay. And the proffer agreement is dated when? It's right there in front of you. I'll help you. It's Exhibit 46, if that helps.
A. Thank you. Oh, it is August 29th, 2019.
Q. Okay. So are we on the same page now?
A. Yeah. Sorry.
Q. All right.
A. All the pages, I just get confused.
Q. Well, me -- me too. Okay. So -- so just to make sure we're -- we're on the same -- same wavelength right now.
A. Yes. Please.
Q. All right. So these events that you've just testified about occurred in late 2016, early 2017.
A. Yes.
Q. Okay. And the first time you talked with federal prosecutor was in -- about these events was approximately two years later, August of 2019. Is that fair to say?
A. Yes.
Q. Okay. All right. Now, on the screen in front of you should be Exhibit 45. Do you see that?
A. Yes.
Q. Okay. And you've described your understanding of that agreement. I want to ask you to look at the paragraph that's got bold in front of it. It says,

"substantial assistance."

Now, did -- is that -- thank you very much. Does that make it better to see?

A. Yes.

Q. Sure does for me too. You testified earlier that it was your understanding that you were -- were required to testify truthfully, which, of course, is true; correct?

A. Yes.

Q. And that you understood that if you testified truthfully, you would be under consideration for a lower sentence; correct?

A. Sure. Yes.

Q. Which is what everyone would want. I can't fault you for that. Is that true?

A. Yes.

Q. All right. Now, if you'll look at that first sentence for me, I'm just going to read it out loud for you. "If in its sole discretion the Government" -- let's stop there. Who's your understanding who the Government is for purposes of requesting a reduction of your sentence?

A. The Government? The Government of the United States.

Q. Is it -- is it Mr. Hornok?

A. My lawyer, his -- Mr. Hornok, my lawyer, the judge.

But the judge is the one with the ultimate decision.
Q. Right. And that's what I was getting at. You testified the judge has the ultimate decision, and it says so right at the last part of the paragraph. You read that out loud, didn't you?
A. Yes.
Q. But the first part of the paragraph, it says, "If in its sole discretion the Government" -- that's Mr. Hornok. Would you agree with that?
A. No, I would say it would be the judge. The judge has the ultimate decision. That would be the Government, the person making the decision.
Q. Okay. Well, let's read on a little bit further and see if it makes more sense. -- "determines that the defendant has provided substantial assistance in the investigation or prosecution of others, and has otherwise complied with the terms of the agreement," and here's where I want you to pay special attention, "the Government may file a motion for downward departure pursuant to," and there's a citation there.
Now, does that help you out in understanding who the Government is? Do you think the judge files motions for you?
A. I mean, the judge would have to file -- sign off on the motion.

Q. Right. That's not my question. Who do you understand files motions who works for the Government?
A. Lawyers file motions.
Q. All right. Who's the lawyer in this room who works for the Government who would file the motion?
A. Mr. Hornok.
Q. And do you understand it's within his sole discretion whether not to file that motion?
A. Sure. Yes.
Q. All right. We're on the same page again. So let's look at that first line again. With that understanding, is it your understanding -- right by substantial assistance, that the person, meaning the Government, who would have to determine that you provided it substantial assistance in its sole discretion, that's Mr. Hornok; right?
A. Well, at the bottom it says it entirely was in the court's discretion as to what, if any -- he can make a recommendation, but the ultimate decision's always with him.
Q. Right. My question is who -- who files the motion?
A. Mr. Hornok.
Q. Right. And he's the guy that you met with a couple of times in the last two weeks; right?
A. Yes.

Q. And what were the purpose of those meetings?
A. To discuss what I knew about the case.
Q. Well, in August of 2019 you already talked to Mr. Hornok about whether you knew something about the case, didn't you?
A. That was when I first talked to him about this case, yes.
Q. Right. So did he come back and ask you again the same question, "Do you know anything about the case?" a couple of weeks ago?
A. He came back to clarify my understanding of what -- what the -- what I knew.
Q. Who else was present for that meeting?
A. The DPS agents.
Q. Mr. Kelly?
A. I'm not sure their names, but, yeah.
Q. Mr. Kelly and Mr. Vera?
A. Yes, sir.
Q. There were both present?
A. Yes, sir. And that one right there.
Q. Who?
A. Sitting next to Jonathan.
Q. Oh, I'm sorry. Mr. Carter.
A. Yes.
Q. Mr. Donald Carter? So -- okay. So that makes it

easy. All these people here to my right were at these two meetings with you at the Mount Pleasant jail.
A. Yes.
Q. Within the last two weeks they met with you twice.
A. Yes.
Q. They already knew that you knew something about the case. Would you agree with that?
A. Yes.
Q. All right. Because the first time you told them you knew something about the case was just late last year, August of 2019.
A. Yes.
Q. And -- and then what was the purpose of the meeting, now that we've gotten on the same page?
A. To clarify my understanding, make sure that I had -- that I knew if what I was saying was true. That I knew what I was talking about.
Q. Okay. How did they determine whether you knew what you were talking about? What's your perception of how they determined whether you knew what you were talking about?
A. They asked me -- told them the same information -- well, basically, they told me to tell the story again to make sure that it would jive with the one before, I'm assuming.

Q. Okay. And as they asked you to tell you that story again, did it resemble the kind of questioning you received here in court today?
A. Somewhat, yeah.
Q. All right. So let's get back to the question. What was your understanding of the purpose of the meetings twice for the last two weeks, with all of these people to my right?
A. To clarify my understanding and clarify my testimony.
Q. Would it be fair to say it was to prepare your testimony?
A. I guess you could say that.
Q. Would you say that?
A. Sure.
Q. I mean --
A. Yeah, just make sure that I knew what I was talking about when I got up here, yeah. So, yeah, prepare myself for --
Q. Were you --
A. -- my testimony.
Q. I'm sorry. I didn't meant to interrupt you.
A. No, you're fine. Yeah.
Q. Are you finished? Were you offered the opportunity to meet with me?

A. It was mentioned that you wanted to meet with me.
Q. And you didn't want to meet with me; correct?
A. I never really thought about it. I didn't see any reason to.
Q. So did you tell someone that you were willing to meet with me? Yes or no?
A. My lawyer asked me if I -- and I said I didn't want to.
Q. Okay. So you did say that you didn't want to meet with me; correct?
A. With my lawyer.
Q. All right. Now, you've testified about selling -- I got -- I got a little bit lost in the dates. But two kilograms a day. But -- okay. In -- in the drug world -- and this is all in Dallas, Texas; correct?
A. Yes.
Q. Or Dallas area.
A. In Dallas, yes.
Q. Okay. You -- weren't --
A. No.
Q. -- you didn't come -- you didn't know where Daingerfield was, so you don't spend a lot of time in east Texas; correct?
A. No. I had people that brought it out here for me.
Q. Okay. So -- so you -- the sales that you talked

about where you're selling to someone, those transactions occurred within Dallas, Texas; correct?
A. Yes.
Q. All right. And those occurred at a specific apartment.
A. Yes.
Q. And do you recall the address of the apartment?
A. No, I don't.
Q. Well, I don't either, but is it the address that Mr. Harper took over?
A. Yes.
Q. And you said that there was a sublease between you and Mr. Harper; correct?
A. I mean, it was a verbal. It wasn't like anything signed, or anything like that.
Q. Well, what were the terms of the sublease, then?
A. That they were going to pay the rent until the end of the lease, or whatever. I mean, I never -- I was just anxious to get away from the apartment. I didn't really care. I wasn't even really going to rent it to them, and Jonathan talked me into it.
Q. You know, there's a lot of Jonathans around here, and I'm sure Mr. Hornok --
A. Oh, sorry.
Q. -- doesn't want to be the one.

A. Sorry. Jonathan Beck. Jonathan Beck.
Q. Jonathan Beck.
A. Talked me -- told me it would be a good idea to do it, and so I was just, like, whatever, it doesn't matter.
Q. Jonathan Beck, he's the realtor that got you in the elevator with these two guys over here; correct?
A. Yes.
Q. All right. I just wanted to make sure we're talking about the same person.
And who's Junior? You said Junior a couple of times. Who's that?
A. Junior was Timothy's connection for methamphetamine.
Q. Okay. All right. So on what date did you enter into the sublease with Mr. Harper?
A. That would have been in January.
Q. And approximately --
A. I mean, they lasted about a month or so. Somewhere around there. I mean, I don't know the exact time, but I think it was about a month.
Q. Okay. So sometime in January. Do you remember the first part of January? The last part of January?
A. No, I don't -- no.
Q. Okay. So up to -- well --
A. I know that I moved into my new apartment somewhere around January. The first or second week in January. And

so they assumed the lease probably that week or maybe after that.

Q. Okay. Did you move from one apartment to the next, or did you move somewhere in between?

A. I moved from one apartment to another apartment, and then another apartment when I got arrested. I was actually in the process of moving in when I got arrested.

Q. I'm just trying to figure out the timeframe.

A. Everything's convoluted.

Q. Help me with that.

A. Everything happened so fast in the drug world, it's hard to keep track of all of it.

Q. Well, and I think i heard you say that when the officers came and arrested you, that you were -- I think I heard say that you were high that day. Is that right?

A. Sure. Yeah.

Q. Okay. And was that a normal mode, for you to be high?

A. Yeah.

Q. You use a lot of drugs.

A. Yes.

Q. And you sold a lot of drugs.

A. Yes.

Q. And what exactly were the general categories of drugs that you sold? I'm talking about this timeframe

2016 to 2017.
A. Mostly it was GHB and methamphetamines.
Q. Okay. For the jury's benefit, what is GHB?
A. They call it water. It's like a -- I don't know how to describe it. It's a liquid that you drink. It kind of makes you forget. It's kind of like -- they call it liquid ecstasy, so it's like taking ecstasy pill kind of. I don't know. I never really got that much enjoyment out of it.
Q. Okay. So were you selling those three things out of the location that Mr. Harper took -- subsequently took over by sublease?
A. Yes.
Q. Okay. So is the best you can do first or second week of January when the sublease occurred?
A. Yes.
Q. And that would have been when Mr. Harper moved in?
A. Yeah, somewhere. Yes.
Q. Okay. Do you know if -- did -- you -- there was kind of a falling out between you and Mr. Harper at that time as well, wasn't there?
A. I mean, the falling out happened a little bit before in December/November, somewhere around there. Because he was -- well, earlier than that because he was upset with me because I'd went over his head and went to Junior

without him. So it'd been some time.
Q. And the falling out was essentially that you cut Mr. Harper out of the middle of a transaction; right?
A. Yes, sir.
Q. And so for the jury's benefit, does that mean that Mr. Harper was formerly making some money off of every time you bought drugs, but not anymore because you went around him?
A. Yes.
Q. And who did you go around him to?
A. Junior.
Q. And then when you were selling two kilograms of methamphetamine, did you say a week or a day?
A. A day.
Q. A day? All right. Even in Dallas that's a pretty big quantity, isn't it?
A. No.
Q. No?
A. There are people that sell a lot more in Dallas.
Q. Okay. All right. When you were selling two kilograms a day, where were you obtaining that methamphetamine from?
A. From Junior up until a point, and then I had met somebody else and was getting it from him.
Q. Okay. So to be clear, you were buying

methamphetamine from Mr. Harper originally within our timeframe; correct?
A. Yes.
Q. And then you figured out where he was getting it, and then he brought it from Junior; correct?
A. Yes.
Q. And that's what caused the conflict between you and Mr. Harper.
A. Yes.
Q. All right. And then after that, you bought it from somebody else; correct?
A. Yes.
Q. And about what timeframe did you start buying from somebody else? Was it when they moved into your old apartment?
A. I was still living in the other apartment when Junior ripped me off, so that would have been probably December or November when I stopped using Junior and had moved on to the next person.
Q. Okay. So that was actually well before Mr. Harper would have moved into the apartment in January; right?
A. Yeah. I mean, a month or so before, yeah.
Q. Okay. All right. Well, that helps me with the timeframe then.
Does that refresh your recollection at all on when

Mr. Harper moved into that apartment?
A. I said it was January sometime.
Q. Okay. Mid-January? Late January? Early January?
A. I really don't know, sir. I mean, I moved from one apartment to the other apartment. I didn't even move my old stuff. Somebody else moved it. I don't -- I couldn't tell you exactly.
Q. So you weren't there, then -- if someone else was moving your stuff, who was moving your stuff?
A. The moving company.
Q. So you hired a moving company to get your things out?
A. Yes.
Q. And then that means you wouldn't have been present, then, when Mr. Harper moved in or Mr. Hayden moved in.
A. When they exactly moved in, no, but Hayden came over to the apartment and saw the apartment, so I knew it was him moving in.
Q. Okay. I'm sorry. I'm trying to get a timeframe here. There's no dispute over the fact that Mr. Hayden lived there. You understood that Mr. Hayden lived in that apartment; right?
A. Yes.
Q. Okay.
A. But it doesn't have anything to do with the

timeframe, no.
Q. I mean -- okay, it doesn't? All right. But Mr. Hayden and Mr. Harper were roommates in the apartment that you formerly lived in after you had a problem with Mr. Harper because you went around him. Is that a good summary?
A. Sure.
Q. All right.
A. Yeah.
Q. Who's the third person that you started buying methamphetamine from?
A. A guy name Cappy. He lived in North Dallas.
Q. Captain?
A. Cappy.
Q. Cappy?
A. A Mexican guy that lived in North Dallas.
Q. Okay. Have you debriefed with the Government on that person?
A. Yes. He's not part of this case though.
Q. Is that part of some other case that you're actively engaged in?
A. No.
Q. Are there any other cases that you're actively engaged in?
A. No.

Q. When --

JUDGE SCHROEDER: Mr. Van Cleef.

MR. VAN CLEEF: Yes, sir.

JUDGE SCHROEDER: Hold on just a moment.

MR. VAN CLEEF: Yes, sir. All right.

(Wherein an off-the-record discussion was held.)

Q. (Mr. Van Cleef continued.) You've testified that you were selling two kilograms a day for how long?

A. For at least seven or eight months. I mean, until I got arrested in May.

Q. And what --

A. Six months.

Q. I didn't mean to interrupt you. I thought you were done.

A. Six to eight months. I really don't remember. I know that it was a significant amount of time. It was at least six months.

Q. When the officers arrested you, did they have you sign a form that said that they could search your apartment?

A. I don't remember.

Q. Why not?

A. I just don't remember. That's a long time ago. I don't remember signing anything, but I could have.

Q. When you -- where were you purchasing your cocaine

from?
A. The first couple of times I did get it from Junior, and then I got it from -- I can't remember. This Mexican guy that used to come over to the -- the old apartment. I don't remember his name though. It escapes me his name. I don't know.
Q. How long were you purchasing cocaine for the quantities that you discussed with Mr. Hornok? Same, six, seven months?
A. No, less than that. Maybe four, three or -- maybe five or six months, yeah.
Q. Towards the beginning or towards the end of the period with methamphetamine?
A. Probably around the middle. I had no interest in selling it before the need arose.
Q. And when you made the -- oh, I forgot one. GHB. Where did you get that? Or did you make it?
A. No, I got it from somebody who lived in Fort Worth.
Q. Who was that?
A. I don't remember her name. It was a girl. I can't remember her name right now. Jennifer something. Maybe Jennifer.
Q. What quantity of GHB were you selling on a daily basis?
A. Probably two or three gallons.

Q. Is that a lot in Dallas?
A. Probably not. I mean, there's a lot of people in Dallas that deal -- sold a lot more than I did.
Q. Did you have a roommate in the apartment that Harper subsequently took over by sublease?
A. No.
Q. So you lived there by yourself.
A. Yes.
Q. Do you remember the layout of that apartment?
A. Yes.
Q. It had two bedrooms; correct?
A. Yes.
Q. And I call it a Jack and Jill bathroom, but there -- some kind of bathroom that stretched between the two bedrooms. Is that a --
A. No.
Q. No?
A. No, you walk in down the hallway and there's a bathroom on the right -- or excuse me, the left, and then the bedroom, then the living space, the living room, then the kitchen, and then down another hall is the master bedroom.
Q. Okay. So how many bathrooms did the apartment have?
A. Two.
Q. All right. Was there -- do you have any

understanding which bedroom Mr. Harper was in versus which bedroom Mr. Hayden was in?
A. I have no idea.
Q. Do you have any knowledge of Mr. Hayden's brother living in that apartment?
A. No, I did not know that.
Q. Or anyone else living there.
A. No.
Q. So once you left that apartment, you probably didn't go visit it very often, would be my guess. Is that right?
A. I didn't talk to anybody that lived there, so I had no need to.
Q. Okay. When you were making your purchases of methamphetamine, cocaine -- I'm talking about your purchases of methamphetamine, cocaine, and GHB, how did you arrange for those purchases?
A. Well, it usually depended. With Junior, I used to just text him, and he would tell me whether he was coming to me or I would go to him, or sometimes we met in a public place. Usually toward the end we met in public. But he was staying at a hotel on Jim Miller Road. First we used to go there and pick it up, and then he brought it to me, and then we started meeting out in public.
Q. What about cocaine? How did you make arrangements to purchase it?

A. Same thing. By text, by phone call. Just "Are you ready?"
Q. How about GHB? How did you make arrangements to purchase it?
A. Same. Phone call, text.
Q. So, basically, your -- your business was on your cell phone, in other words; right?
A. Yes.
Q. Did you use any other electronic means to make your transactions to purchase?
A. No.
Q. Okay. Let's talk about your transactions to sell. How did you make -- what -- by what means did you make your transactions to sell methamphetamine?
A. Mostly was cash, but PayPal or Google Wallet, some other payment device.
Q. Not your fault. I asked a bad question. My question was by what means --
A. Oh.
Q. -- that you were paid.
A. Same. By text, by phone call.
Q. Okay. By text, by phone call. So, again, through your cellphone?
A. Yes.
Q. And that would be the -- you'd give me -- would you

give me the same answer as to cocaine and GHB sales --
A. Yeah.
Q. -- that it was by --
A. Yeah.
Q. -- text and phone call?
A. Yes.
Q. All right. Did you use Facebook or any other electronic means to facilitate those transactions, either purchasing to come in or selling to go out?
A. I mean, I did -- I chatted online with some people, and not like regular customers, and I would sell stuff to people online, but not -- it wasn't a regular thing. Is that what you mean? Or are you talking about just like my regular customers? My regular customers I'd talk to by text and by phone only.
Q. I -- I don't know how it works because I've never done it before. That's why you're here, Mr. McLemore. So I'm asking you how did the trans -- did all the transactions in these three kinds of drugs, were they done on your cellphone, or were there any other electronic means used as well?
A. Oh, no. I mean -- no, in my cellphone.
Q. Okay.
A. Yes, sir.
Q. I mean, I could see someone would walk up to you and

ask you something.
A. Probably not going to happen. I was confused because I was -- you were asking more broad about how I was -- like the chat sites and whatnot, but you could do those on your phone, so, yeah it was through my phone.
Q. Well, there's a difference between a chat site and a text message. You'd agree with that, wouldn't you?
A. Sure. Yes.
Q. And so did you use chat sites as well?
A. On my phone, yes.
Q. What chat sites?
A. Grinder, Adam for Adam. They're just chat sites.
Q. But specifically -- I don't know what Grinder is, and I don't want to know what the other one is either.
A. It's like Tinder. Like, you swipe right, swipe left kind of thing.
Q. Okay. But that's for meeting people; right?
A. Sure. And selling drugs.
Q. Oh. Okay. So how do you do a drug sale on Tinder then? Just educate me a moment.
A. Just certain things you say in your profile message. Looking to party, or P&P or whatever.
Q. What kind of phone did you use?
A. I had a iPhone and a S10, a Samsung.
Q. Do you recall what the telephone numbers were for

them?
A. No. I changed them once a month, or once every couple of months.
Q. When you were arrested, was your cell phone -- were both of your cell phones taken?
A. Yes.
Q. By whom?
A. By GPS agents.
Q. Do you recall if you signed any consent for those things to be searched?
A. I did, because I opened them for them. I gave them the -- I opened them up for them, so I signed -- yeah, I remember signing for that. Or if I didn't sign it for them, I opened it up for them, so same thing.
Q. And what -- what date was that on?
A. May 1st.
Q. How long had you had those phones?
A. Funnily enough, I'd just bought both of them, like, that day, that morning, I think, or the morning before.
Q. When you said May 1st, just to keep the record clear, that's 2017?
A. Yes.
Q. Okay. And what happened to your other phones? Were they at your apartment as well?
A. Yes.

Q. Okay. What happened to those?
A. As far as I know, they didn't take those. They were probably in a drawer in a desk or in the kitchen. But I don't think -- they didn't ask about those. They just took the ones that I was actively using.
Q. So you never went back to your apartment after that arrest?
A. No. Once they arrested me, I've been in custody ever since.
Q. Well, I asked if you didn't -- okay. So you didn't -- you don't know what happened to those phones, then?
A. No.
Q. Okay. After your arrest, were you interviewed by any officers?
A. Not until I came to court, no.
Q. To court where?
A. Like when I came up here, they asked me questions when we did the -- the paperwork. But between my arrest and then, no.
Q. So the day -- or the moment of your arrest, you were not interviewed by any officers, and you've not been interviewed by or with any officers such as the gentleman to my right, until Seagoville.
A. Right.
Q. And then really, everybody altogether at Mount

Pleasant a week or two ago.
A. Right.
Q. Okay. Do you still have access to your -- your chat apps? Would you know how to get into them?
A. I mean, I -- no. I mean, I probably could, but I don't know the passwords or anything like that.
Q. So how -- sorry. How would you have communicated with Mr. Hayden during these alleged sales? Would it also be by text message and --
A. Yeah, we texted.
Q. When was the last time you texted with Mr. Hayden?
A. The last text message I got from Collin Hayden was telling me that the FBI was looking for me after the raid on the apartment.
Q. Was it Collin Hayden who spoke with Mr. Beck, or do you -- do you even know?
A. Probably Timothy -- probably Tim and John. They both talked to Beck. They were both talking to Beck, so it could have been either of them.
Q. So you --
A. I don't know specifically which one.
Q. Okay. Earlier when you testified I heard you a say that you knew who had spoken with Mr. Beck, but you really don't know who had spoken to Mr. Beck about your imminent arrest, do you?

A. Repeat that question.
Q. You don't know who was speaking with Mr. Beck about your imminent arrest, do you?
A. I don't think anybody was talking about my imminent arrest.
Q. What quan -- you said you sell in two kilograms a day? What quantity of drugs did you plead to in this case? This very case.
A. The case was at least 500 grams.
Q. Five hundred grams?
A. I think that's what it was.
Q. And do you recall what amount you were sentenced on?
A. No. I don't know the specifics. I mean, I haven't seen the paperwork between then and now.
Q. I mean, that is an important figure, though, for you, isn't it?
A. Sure. But I never -- I don't have the information. I never had it.
Q. Do you know if you were sentenced on multiple kilograms or less than a kilogram?
A. I don't know.
Q. Five --
A. I mean, I think I was sentenced to the guidelines for the charge.
Q. Okay. Five hundred grams, that's a lot less than

even one kilogram, isn't it?
A. Yes.
Q. It's half; right?
A. Right.
Q. And as you described, two kilograms is not even a large amount; right?
A. I mean, it depends on your point of view.
Q. Well, it was your point of view that I asked about.
A. Well, mine was not a lot, no.
Q. Paul Brown is -- the jury's heard testimony about Paul Brown. He's the person who -- who set you up; right?
A. Yes.
Q. And when did you -- when did you first believe that Paul Brown was setting you up for an arrest?
A. After I heard that he had been arrested in Titus County, from a friend of mine, and it had come to light that it was like his fifth time being arrested for the same thing, and so I figured someone getting arrested five time for the same thing, and getting out that quickly, probably something is not right.
Q. Okay. And the reason I asked you about that is I didn't hear you give a timeframe for that, and I'm all about the timeframes.
Do you remember the timeframe for that understanding of yours?

A. Probably -- maybe been November. Maybe November. December. I really don't know. Some time toward the end of the year.
Q. November or December of 2017?
A. Yeah.
Q. Do you recall texting with Mr. Brown?
A. Yeah, he texted me and wanted to talk about prices I was going to charge him, if he could get some stuff, get some meth from me.
Q. You know what, I sometimes misspeak. Let me -- let me jump back to the question prior.
November or December of 2016 would have been the timeframe --
A. Sorry.
Q. -- when you had the bad feeling about Brown?
A. Yes.
Q. Okay. Now, as -- as to that, how did you find out about -- where do you get that bad feeling from specifically?
A. This guy that we both knew named Adrian, I -- had called me and told me that he was arrested and that he got out and to be careful.
Q. Is that somebody here in East Texas, or is that somebody in Dallas?
A. Somebody in Dallas.

Q. So as you sit here today, are you aware of any electronic evidence of communications between you; text messages, chats, phone calls, and my client to my left; Collin Hayden?
A. Not that I'm aware of.
MR. VAN CLEEF: Can we pull up Exhibit 47?
Q. (Mr. Van Cleef continued.) Where did you obtain this picture you've testified about, Exhibit 47?
A. My lawyer showed it to me first, back in August or maybe --
Q. Okay.
A. Yeah, August or June.
Q. All right. Forgive me, Mr. McLemore, I'm about the dates. So August of?
A. 2016.
Q. Sixteen?
A. I'm sorry. 2019.
Q. 2019.
A. Too many dates.
Q. Okay. So the first time you identified my client in this picture as a guy that you were selling drugs to in Dallas was in August of -- August 29th of 2019; correct?
A. Well, my lawyer asked me -- had asked me, first of all, if I wanted to cooperate. And I told him that I didn't know who the guy was. And he brought the picture,

and I said that was the first time I saw the picture. And then subsequently I saw it whenever they came to visit me in August.
Q. Okay. But, again, timeframes. Was this in August of 2019 when you saw this picture the first time?
A. It would have been right around there, yeah.
Q. Okay. And to clarify, this might help. You were originally represented by a lawyer name Craig Henry; correct?
A. Yes.
Q. He's a judge now; right?
A. Yeah.
Q. Well, he is a judge now. Your lawyer right now is Jason Castle; correct?
A. Yes.
Q. And Jason Castle was the person who brought you this picture is what you're saying; right?
A. Yes.
Q. So that would have been more recent, meaning in August of 2019 or so. Is that right?
A. Yes.
MR. VAN CLEEF: You can take it down now. Thank you.
JUDGE SCHROEDER: Mr. Van Cleef.
MR. VAN CLEEF: Yes.

JUDGE SCHROEDER: When you get to a good stopping place, we've been going about two hours.

MR. VAN CLEEF: It seems like two minutes, Your Honor, but I can -- I can pick up right there.

JUDGE SCHROEDER: All right. That's fine. Ladies and gentlemen of the jury, we're going to take our afternoon recess a little early today because we came back early from lunch.

Don't discuss the case among yourselves until all of the evidence has been submitted and presented to you and I've instructed you on the law.

We'll be in recess about 15 minutes.

(Wherein a break was taken from 2:42 to 3:05 p.m.)

JUDGE SCHROEDER: Mr. Van Cleef.

MR. VAN CLEEF: Thank you, Your Honor. May I proceed?

JUDGE SCHROEDER: Yes, you may.

Q. (Mr. Van Cleef continued.) Mr. McLemore, during this time that you were living the life of a drug dealer in Dallas, talking about the six or seven months that we mentioned before the break. Are you on the same timeframe with me?

A. Yes.

Q. Okay. Did you have any other source of income for that period of time other than selling drugs?

A. No.
Q. And you mentioned that you were high and didn't recall whether you executed a consent when your new apartment was searched; right?
A. Yes.
Q. And what I'm curious about, what kind of drugs were you using at the time?
A. Meth.
Q. Did you use the GHB?
A. No.
Q. Cocaine?
A. No.
Q. Xanax?
A. No.
Q. Ecstasy?
A. No.
Q. Those were all things that you sold though; correct?
A. Yes.
Q. All right. When you first sat down, I think you said something about being nervous; right?
A. Yes.
Q. Okay. Part of being nervous is you've probably never sat in a witness stand like this before. Would that be fair?
A. That's true.

Q. Everybody's got their eyes on you. I'm not trying to make you more nervous by the way.
A. Yeah.
Q. But that's part of being nervous in court as well, isn't it?
A. Sure. Yeah.
Q. Okay. But the answer that you gave about why you were nervous, why you were nervous when Mr. Hornok asked you was that you were nervous because things can be bad in prison for people who testify against others. Is that generally what you said?
A. That's -- yes.
Q. Okay.
A. That's the majority of what the reasons why I'm nervous.
Q. What are the other reasons?
A. Well, just being here in general makes my nervous.
Q. Okay. So what I just mentioned before?
A. Yeah.
Q. Okay. And how long have you been in federal custody?
A. Since April -- I think since April 1st. I think it was April 1st, yeah, 2017.
Q. Okay. So going on two years now, then; right?
A. Going on three.

Q. My apologies. Going on three years now.
A. Yes.
Q. Okay. So you feel like you know the ropes in federal prison and sort of how things work at this point?
A. Sure. Yes.
Q. What -- what facility have you -- was Seagoville your main facility?
A. It's the only place I've been is Seagoville.
Q. Okay. So you said that one of the things that caused you to be nervous were the people who testify against others have a hard time in prison. What kind of hard time is prison did they have?
A. Getting beat up, getting stabbed. I mean I've heard things before and seen things, of course, on TV and in the news.
Q. Have you seen anything in person like that?
A. No.
Q. But let me ask you about some other categories. And I'll just list off four, and you tell me if any of those four would also cause somebody -- based on your experience -- to have a hard time in prison.
Number one, gay; two, stripper; three, porn star; four, with Nazi tattoos.
MR. HORNOK: Objection, Your Honor. Is this relevant?

MR. VAN CLEEF: It was asked about in voir dire, Your Honor.

MR. HORNOK: Then it's beyond the scope of direct examination.

JUDGE SCHROEDER: Well, what's -- what's the -- can you lay some sort of foundation?

MR. VAN CLEEF: Your Honor, there a tampering charge. Tampering with a witness charge that I'm addressing now.

JUDGE SCHROEDER: Okay. Can you --

MR. VAN CLEEF: Can I approach the bench?

JUDGE SCHROEDER: Yes.

(Bench Conference Begins)

JUDGE SCHROEDER: I'm sorry, I just wasn't understanding you.

MR. VAN CLEEF: Your Honor, there was a newspaper article that Mr. Harper was a gay -- gay porn star with Nazi tattoos.

JUDGE SCHROEDER: Okay. Got it.

MR. VAN CLEEF: In Texarkana. And there's a charge that my client caused him to have a very hard time in prison, including getting beaten up, that sort of thing. So I'm asking this guy if any of those other categories would cause somebody to get beat up in prison because it's attention to my client. And my client is

accused now, indicted for, causing bad things to happen to Mr. Harper, and I'm suggesting to this witness that they could have happened for other reasons.

MR. HORNOK: He's not charged for causing bad things to happen to Mr. Harper. He's caused -- he's charged with threatening Mr. Harper. What has happened to Mr. Harper since then, on the basis of whatever, is not relevant to any count in the indictment.

MR. VAN CLEEF: If that's true, if that's the Government's position, I'm fine with that. If they're not going to accuse -- if they're not going to have Harper testify that bad things have happened to him because of my client, I'm fine. I'll move on.

JUDGE SCHROEDER: Is Harper going to say that?

MR. CARTER: I don't think Harper -- he will not attribute any bad thing that's happened to him -- to him in custody to the defendant.

JUDGE SCHROEDER: Then that's all that you're --

MR. VAN CLEEF: Yes.

JUDGE SCHROEDER: Okay.

(Bench Conference Ends)

Q. (Mr. Van Cleef continued.) I've lost my place. And I've lost your name. What is your last name? I'm sorry?

A. McLemore.
Q. McLemore. Mr. McLemore. Mr. McLemore, my apologies. Mr. McLemore, when these -- these transactions that you've described that you made with Collin Hayden -- let me just ask generally.
Did you keep track of your transactions? Either purchases or sales?
A. Not -- no. Did I, like, write them down? No.
Q. So you didn't have any sort of ledger?
A. No.
Q. You didn't -- did you keep track of who you owed money or who owed you money?
A. I mean, I kept general track but not specific, like names, or anything like that. Basically just notes to myself about who I owed money or people who owed me significant amounts of money, not -- people who paid and left, I didn't write that down. People who owed me money, I wrote that down.
Q. Where did you write that down?
A. In a journal. In a book, a little journal book.
Q. What happened with that journal? Do you know?
A. It was in the desk in my drawer. I don't know. It's -- like I said, I don't know what they -- I don't know what they took from the apartment when I -- when they left.

Q. So to clarify, that was in a desk -- it was in a drawer of your desk in your apartment where you last lived before being locked up.
A. Yeah. That was the last place I remember, yeah.
Q. And that's the -- that's the same place that you don't recall whether you signed a consent to search; right?
A. Yes.
Q. Okay. So you don't know what happened with that ledger.
A. Or if even -- yeah, I don't know. I have no idea.
Q. Is it your testimony that Mr. Hayden's name would be in that ledger?
A. No, because he was paid. He never left any -- whenever he bought something, he paid for it all. He never owed me money for it.
Q. And do you have any record at all, electronic, chats, or paper, any -- I don't know what the right word to -- social media, anything like that to record any sort of transaction whatsoever with Mr. Hayden?
A. I mean, other than text messages on the phone, but I don't have the numbers, so I don't have anything, no.
Q. Well, you said text messages on the phone. Do you know how to get to the phone or no?
A. Whatever the -- no, I don't.

Q. Okay. And the -- the transactions that you allege that you had with Mr. Hayden, then, they would have been in that book if it was one that resulted in him owing you money; right?
A. Yes.
Q. Or one that resulted in you owing him money.
A. Sure. Yes.
Q. There wouldn't have been any transaction -- you don't allege any sort of transaction where you have owed him money; correct?
A. No.
Q. Or anything; correct?
A. No.
Q. So with regard to those transactions that you allege between you and Mr. Hayden, he was a buyer, and you were a seller; right?
A. Yes.
Q. And that was the limit of your interaction with one another in that particular topic; right? Buyer and seller.
A. Yes.
Q. Did you make plans in these alleged transactions for a future transaction, or was it just, "Hey, I need something," and you've either got it or not?
A. What do you mean?

Q. Did you make plans together for buying and selling drugs?
A. Between him and I?
Q. Yes.
A. No, just the texting and "I need to see you," or whatever. That was it. That was all we ever did.
Q. Was it your impression that Mr. Hayden did, in fact, use drugs when you were around him?
A. I mean, I assume that he did. I mean, I can't say for sure that he did or not. I mean, we -- we'd smoke some meth together every now and then, like whenever he'd come pick up, but I don't know if he was a user like outside of that.
Q. Okay. Well, that would be a yes as to being a user, wouldn't it, if you were smoking methamphetamine?
A. Sure. Yes.
Q. Okay.
A. I guess.
Q. What other things cause you to assume that he's a user?
A. Just that he came to pick it up, I guess. I mean, I don't know what you're -- I don't know what you're asking.
Q. Well, I'm sorry --
A. I mean --
Q. You said you assumed. I'm asking why --

A. Okay.
Q. I'm asking why you assumed.
A. Well, because he used with me whenever we sat down. That would be a user, yes.
Q. Okay. Were there any others things that caused -- you were a user; right?
A. Yes.
Q. Can users spot users? I'm really asking. I don't know.
A. Sometimes, sometimes no.
Q. Okay. What are tells of a user?
A. Someone who's nervous or gets angry really easily a lot or -- I mean, there's lots of things. Someone who's kind of aloof to everything around them. I -- there's lots of ways to describe a user.
Q. Is there any person in the entire world that you can name right now that saw you and Mr. Hayden together ever, other than in this courtroom?
A. Tim Harper, Jason Terrell. These are people that -- how I connected with Mr. Hayden.
Q. I'm not talking about connections. I'm talking about being in the same room with him.
A. Yes. They were there.
Q. When?
A. The first time I met Collin Hayden, Tim and Jason

were both there. And then Jason was there at least once or twice whenever Collin and I first met.
Q. When did you first meet him?
A. I first met him where that -- when we had the original deal when I went to meet Junior.
Q. And approximately what date was that?
A. It was in the fall. Like in the late summer, early fall. I don't know.
Q. Of 2016?
A. Yes.
Q. Where was that meeting?
A. It was at a Airbnb apartment that I was renting.
Q. Do you know what city that was in?
A. Dallas, Texas.
Q. Do you know generally where that Airbnb apartment was?
A. It was in Oaklawn. Like, Regan and something.
Q. I'm sorry. I don't know what Oaklawn is. Is that --
A. That's a part of Dallas on Cedar Springs and -- I think it's called Cedar Springs. It's just in a part of town, like uptown area.
Q. What did the place look like?
A. It was an apartment complex. We had 20 apartments in it. Small with a fence around it.

Q. Who made the reservation at that Airbnb?
A. Me.
Q. Under what name?
A. My name.
Q. How'd you pay for it?
A. With a debit card.
Q. Have you mentioned that to anyone before today?
A. I mentioned that that's where we met, yes.
Q. To whom?
A. To Mr. -- to the AUSA.
Q. Have you said that -- have you mentioned that to anyone prior to two weeks ago, ever?
A. There wasn't really nothing to talk about it, no.
Q. So is that a no, that you're not mentioned this Airbnb meeting to anyone prior to two weeks ago?
A. Yeah.
Q. Ever.
A. (Witness nods head.) Yeah.

MR. VAN CLEEF: Pass the witness.

THE WITNESS: Sorry.

MR. VAN CLEEF: No, I'm sorry. I didn't mean to interrupt you.

REDIRECT EXAMINATION

BY MR. HORNOK:

Q. Mr. McLemore, you mentioned that you purchased

cocaine from Junior.
A. Yes.
Q. Did Mr. Hayden ever purchase any of that methamphetamine from -- or sorry.
You mentioned that you purchased cocaine from Junior.
A. Yes.
Q. At some point.
A. Yes.
Q. Did any of that cocaine ever get sold to Mr. Hayden?
A. That was the reason I started getting it was for his purposes.
Q. So the only reason you started buying cocaine was because the defendant asked you to.
A. Yes.
Q. At the very beginning of our discussion, we talked about telling the truth.
A. Yes.
Q. And in your proffer letter you promised to tell the truth on that day.
A. Yes.
Q. And at the beginning of your testimony you swore an oath to tell the truth.
A. Yes.
Q. Have you told the truth today?

A. Yes, sir.

MR. HORNOK: No further questions.

RECROSS-EXAMINATION

BY MR. VAN CLEEF:

Q. Mr. McLemore, in -- did you say this meeting at the Airbnb took place in the summer or fall of 2016, or did I --

A. Uh-huh.

Q. -- just misunderstand?

A. Like it was probably late summer or early fall. I mean, I couldn't tell you. It was still warm outside, but it's Texas.

Q. Well, that could be all the way to March.

A. That's right.

Q. Do you have any recollection of Mr. Hayden having -- since you had this relationship with him, ever having gone to jail in that time period?

A. No.

MR. VAN CLEEF: I'll pass the witness, Your Honor.

MR. HORNOK: No further questions, Your Honor.

JUDGE SCHROEDER: Very well. The witness may step down.

MR. HORNOK: May this witness be excused,

Your Honor?

JUDGE SCHROEDER: May the witness be excused?

MR. VAN CLEEF: For the defendant, yes, Your Honor.

JUDGE SCHROEDER: Very well.

(End of testimony by Jason McLemore.)

C E R T I F I C A T E

STATE OF ARKANSAS )
) ss
COUNTY OF BENTON )

I, CYNTHIA A. DONALD, Certified Court Reporter, in and for the aforesaid county and state, do hereby certify that the within transcript was reduced to typewritten form by me or under my direction and supervision; that the foregoing transcript is a true and accurate record to the best of my understanding and ability.

I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set, or have authorized said setting, of my hand and affixed my seal of office this 10th day of July, 2020.

CYNTHIA A. DONALD, CCR
Certified Court Reporter
Arkansas Supreme Court
License No. 183