**In The Matter Of:**

*UNITED STATES OF AMERICA v.*
*COLLIN GARRETT HAYDEN*

---

*COLLIN GARRETT HAYDEN*
*March 06, 2020*

---

*Donald Court Reporting & Transcription, LLC*
*P.O. Box 1640*
*Springdale, AR 72765*
*(888) 438-7836*
*donaldcrt@gmail.com*

Original File HaydenCollin03062020.txt
**Min-U-Script®**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) |
| vs. | ) CAUSE NO. 5:17cr9(6) |
| COLLIN GARRETT HAYDEN<br>Defendant. | ) |

TESTIMONY OF COLLIN GARRETT HAYDEN

BEFORE THE HONORABLE ROBERT W. SCHROEDER, III

March 6, 2020

2:28 p.m.

APPEARANCES

MR. JONATHAN HORNOK FOR THE PLAINTIFF
MR. DONALD CARTER
U. S. Attorney's Office E/TX-Texarkana
500 State Line Avenue N, No. 402
Texarkana, Texas 75501
(903) 794-9481
jonathan.hornok@usdoj.gov
donnie.carter@usdoj.gov

MR. L. CHARLES VAN CLEEF FOR THE DEFENDANT
Van Cleef Law Office
P. O. Box 2432
Longview, Texas 75606-2432
(903) 248-8244
charles@vancleef.pro

I N D E X


| TESTIMONY BY COLLIN GARRETT HAYDEN | Page |
|---|---|
| Examination by Mr. Van Cleef ------------------ | 4 |
| Statement by Mr. Hayden ----------------------- | 5 |
| Cross-Examination by Mr. Hornok --------------- | 25 |
| Statement by Mr. Hayden ----------------------- | 73 |
| Recross-Examination by Mr. Hornok) ----------- | 81 |
| Statement by Mr. Hayden ----------------------- | 87 |
| Recross-Examination by Mr. Hornok ------------- | 96 |


E X H I B I T S


| Plaintiff's Exhibit | | Referenced |
|---|---|---|
| 53 | (Letter from Hayden ) -------------------------- | 56 |
| 55 | (Collin Hayden's Certified Conviction Document) ------------------------------------ | 37 |

JUDGE SCHROEDER: Let's have the jury brought down, please.

Please be seated. All right, ladies and gentlemen of the jury, welcome back. I hope you enjoyed your lunch. I apologize that it took us a little longer to get you down back into the courtroom. We had a number of legal and evidentiary matters that we needed to resolve outside your presence.

Before we broke for lunch, you heard the Government rest on its case, and at this time the defendant may call his first witness.

MR. VAN CLEEF: Thank you, Your Honor. The defense calls Collin Hayden.

JUDGE SCHROEDER: Mr. Hayden, if you would please stand and be sworn.

MS. SCHROEDER: Do you solemnly swear that the testimony you're about to give in the case before the court is the truth, the whole truth, and nothing but the truth, so help you God.

MR. HAYDEN:: Yes, ma'am.

COLLIN GARRETT HAYDEN, having been called upon to testify in the form of a hearing and having been duly sworn, testified as follows, to wit:

EXAMINATION

BY MR. VAN CLEEF:

Q. Mr. Hayden, will you state your full name for the record.
A. Collin Garrett Hayden.
Q. How old are you?
A. I am 28 years old.
Q. How far did you go in school?
A. I made it to 10th grade.
Q. Now is your opportunity to speak with the jury.
A. All right.
Q. Go right ahead.

STATEMENT BY MR. HAYDEN

MR. HAYDEN: Ladies and gentlemen of the jury, I have decided to testify on my behalf today against my lawyer's personal opinion, because I want you to hear the story straight from my own mouth, my own words, not some secondhand corrupted, convoluted story that's been made up.

So before I start, I want to apologize for if I get a bit emotional, because for three years I've been incarcerated. For three years I've had to deal with corruption, I've had to deal with lies, I've had to deal with hiding evidence, coverups, things that every one of y'all have witnessed. And it's such a relief to be able to talk to people that are on the outside looking in. So before I start my testimony, I want to go ahead and clear

the air, because this has basically become a public smear campaign, and I just want to clear a few things up.

So I wasn't raised in some house on the hill in some fancy suburb. I'm from the hood. I come from the ghettos. I was raised -- I was raised around nothing but black people, so, of course, I speak differently than others. Of course, when I'm angry, I get upset. Of course, I use slang terminology, but that's how I was raised. That's not the person that I have become. That's not the person that I carry myself in the world. But, unfortunately, when somebody gets mad, of course, you result back to your roots.

So first, I want to -- I want to talk about these tattoos. They say I'm some -- they're going to make me out to be the biggest, baddest man to walk the face of this earth, let's be honest. And I want to explain my tattoos. And they say I'm gang related and all this. I got these tattoos when I was 17 years old. I had no Nazi training. I had no specific information on any of this stuff. And as I later found out -- at 17 years old I've never stepped foot into a prison, so there's no way in hell that I could ever join a prison gang. So I later realized that those tattoos, they don't hold my values, they don't hold my personal morals. They don't describe me as a person.

So I just want to -- as I got older, and I found what they really meant, I no longer have those tattoos. This is -- I replaced it with Gucci. I'm pretty sure everybody's aware of that. I'm in the public eye 24/7 of my life, so I'm constantly being judged, you know, what kind of guy this is. So I removed the tattoos because it's not who I am. Now, now that it's all -- that's all out of the way, let's begin where everything started.

October 1st of 2016, I was released from jail on a probation violation. I violated my probation. You know, I don't claim to be perfect, and everybody in this world, no matter who you are, at some point in time in your life, you've fallen weak to temptation, no matter what it is. At one point in your life somebody, anybody, it doesn't matter, nobody in this world is perfect, so you have fallen weak to temptation at some point in your life. And I'm no exception. No exception whatsoever.

So I got out of jail October 1st of 2016. I started living with my dad with weekly probation visits from the probation office here in Texarkana. My dad lives in Atlanta, Texas, and I had to be at my dad's house in order to complete these weekly visits with my probation. But, of course, you know, I needed money. You know, you're not going to just live anywhere for free. So as

the time went on, my probation started to slack up because they -- they did a risk assessment on me and decided that I wasn't a risk. I -- I presented no risk -- risky features. So they lightened up on me. And that was around the beginning of December they finally lightened up on me. And I began to go to Dallas to strip.

I was approached online by one of the managers of the club. His name is Ray Demps. And he said, "Hey, man, you've got it. Man, you've got the look, you've got the body, you've got the charisma. I think" -- "I think you can make it, and I think you can make it big." So I said, "Hey, you know, I'm willing to give it a try." And this is where my career started.

So upon working this career, I come in contacts with numerous and numerous of people, and I also come -- come in contact with the workers, but I don't know these workers. These are just people that I work with. You're not sitting in the room standing in your underwear, sitting here talking to another man standing -- well, not me. You're not going to sit here and conversate with another man sitting in his underwear because this another man sitting in his underwear is not paying your bills. This guy -- this guy is just a -- he's trying -- he's there for money, just like you are. He's not going to put money in your pocket, so that is not where my goal is.

The goal is the people in the audience. They are -- they pay your bills. They're the ones that furnish your life. So I'm not sitting around hanging out with people in the back. I'm hanging out without the crowd, the audience. I'm getting tips, I'm getting money.

So a few weeks go by. Now, I don't know anybody in this conspiracy whatsoever. Nobody. During December I seen a guy at the gym that worked -- you know, we had the same job, basically, and, you know, you recognize each other from at work. Now, if you work a job, and you got your co-workers and everything, and you see them out in public in a grocery store, you're going to basically, "Hey, man, what's up?" You know. That's a common reaction. So that is basically what I did at the gym during this -- probably the beginning, maybe middle of December. I think it was mid-December. And I said, "Hey, man, what's up, man? You know, we work together, you know?" "Oh, yeah, you know." Okay. Well, I made a video. "Hey, man, guess who I just seen." So -- well, a few weeks after that, we became friends on Facebook for the first time ever. You know, we exchanged information after the gym. We said, "Hey," you know, "we can make a lot of money together, man." People -- they like people with tattoos, they like people with muscles, they -- that's what everybody wants. So we -- "Yeah, man, we can

make money together." So one of our mutual friends, Big Mama Dena, or Reva Dena. I don't know the person's real name, but they reached out to us and said, "Hey, y'all should come down her to Waco. Do a show. We'll put you on some promotional pictures," this and that. I say, "Yeah, we'll come down there."

And so we travel down there, we did the show and everything, and we go our separate ways. Because once again, this is a guy who is just a work partner. That's all he is to me. I don't go to the clubs with this guy, I don't -- I don't hang out with this guy. I don't know nothing about this guy. I just met him a few weeks ago. So afterwards, you know, we're -- we're conversating. We became friends on Facebook and everything.

It rolls around in January, probably mid-January, me and Timothy Harper both have a mutual friend in the real estate business. His name is Jonathan Beck. Now, Jason McLemore I do not know. I've never met the guy. I have no idea what he looks like until the other day he got on the stand. I don't know that guy. So I was -- this guy says that I came and smoked meth with him numerous of times at this apartment. But once again, I don't know this guy, "so how would I smoke meth with you at this apartment?" Why would I have to come see this apartment that I'm renting if I already know what it looks

like? If I already know what this apartment looks like, why do I have to come check this apartment out?

So, well, Timothy Harper moved in through Jonathan Beck, which is why he got the master bedroom, the bigger bedroom, because, well, basically he moved in first. And Jonathan Beck said, "Hey, man, there's this" -- "a guy that you work with. Y'all work together. Makes sense for y'all to be roommates. He needs help with the bills. He can't pay the bills." I was, like, all right, well, I'll give it a shot. And that is when me and my brother moved into the apartment, roughly late January. We both moved into the apartment, and we had to take the smaller bedroom, unfortunately.

But February 1st rolled around is when I received the electronic payment information from Jonathan Beck to pay the apartment, so I paid the apartment. That was the first payment I made, and then a few weeks later it gets busted. But -- now, I don't recall January 23rd. I don't -- Paul Brown is obviously a very rememberable person. If y'all see him later on down the road, you -- you know who he is. Well, I don't recall that guy, but on February 9th, I do recall him. That was me in the video February 9th.

I don't hang around smoking meth or dealing methamphetamine. There's not one single shred of evidence

that I ever touched a piece of methamphetamine. But Paul Brown, he came and knocked on the door, and I answered the door. I said, "What are you here for? Who are you?" He said "I'm here for Tim." I said, "Hold on. Let me go get him." So I opened up the door, and I was careful not to walk in because he had a tranny in there, and I'm not real fond on seeing things like that, but -- so I creeped in there. I tried to wake him up. He didn't wake up.

The guy -- I asked the guy, "What do you want, man? What are you here for? What do you need?" He said, "Timothy has a kilo for me," or to something of that matter. I don't know, because I don't sit in the back room and practice with videos, and I don't need to be prepared. I don't need to be prepped. I don't have to have people prepping me and coaching me on what I have to say. So the guy asked me, "I'm here to get a kilo" -- he says, "I'm here to get a kilo from Timothy Harper." Okay. Well, to my knowledge a kilo is a lot of drugs, and it's got to cost a lot of money. You know, that's not some small bag.

And the way his body movements, the way he was talking, the way -- it seemed like his head was in the clouds. And in my career I am trained to be able to read people, to be able to know what these people are about, whether they're telling the truth, whether they come in

there and they say -- they say they're all millionaires and this and that. They're going to sell you a bunch of dreams. I'm able to see through that. And when I see -- when I saw Paul Brown, that's exactly what I seen, a guy with his head in the clouds, didn't know his -- just wandering through life. And you've got all this money?

He looked to me like a target. That's basically -- I just moved into this apartment. I just paid the bills at the first of the month. It's now February 9th. It's only a week and a half later, so I'm a little short on cash. I'm sorry, you guys, this -- this is where it gets a bit emotional for me.

My brother, you've heard Timothy Harper say my brother is mentally challenged. He has autistim -- autism and bipolar issues, and most of my family has abandoned him because he's hard to deal with. So every day of my life I try to pick him -- something he wants to do. And it's basically dealing with a kid, you know. He's like, you know, "I want to go play laser tag." You know, he's 26 something years old, and he still wants to go play laser tag and -- and things of this nature.

So I seen Paul Brown as a target to be able to fund what my brother needed, because we came from a real poverty stricken area, and that's basically what it was. So I -- I pretended to be a drug dealer for a day.

I said, "Yeah, I've got six ounces. Of course. Whatever you need, man." I just threw a random number at the wall. You know, maybe -- maybe he'd buy it.

So he's like, "Ah, yeah, man, I got 9500, but I need a kilo." I say, "Damn, this guy has 9500. The guy with his head in the clouds." So this guy with the head in the clouds has $9500, and I just paid rent. And as you seen from the video, there was no furniture in this house. There was nothing. I was struggling to put a roof over me and my brother's head. So I walked downstairs with the guy. He says, "I'll show you the money." I walk downstairs with this guy, and he points out his vehicle. I walked up to the vehicle, and I try to open the door before he got there. I tried to pop this door, as they say. I tried to pop the door before they got to it so I could see what was inside. I couldn't see inside because the tint was so dark. It was an undercover vehicle. The tint was so dark, I couldn't see inside. Didn't know there was somebody else in there waiting.

So I popped the door, and it was locked. The guy locked it on me. And then he rolled down the window. Well, he shows me all this money he has, and I'm, like, dang. Well, the guy has a big baggy jacket on, and there's two of them. I don't know if this guy's got a gun. I'm not willing to risk it, so I was like, "All

right. Hold on. Let me go make this call." I was trying to crawfish. I was trying to get out of there without being harmed in any way.

So the guy was, like, "Hold on. Hold on. Do you want my number? You should hurry up and get it down." I said I really didn't care about his number, but for the purpose of saving face, that's exactly what I did. "Yeah, sure I'll take your number, man." I typed it in, and I hit send. I immediately hung up, and I went back upstairs.

I went back upstairs and woke my roommate up. I said, "Man, I don't know what you've going downstairs, but there's some dudes out there waiting on you, man, and I got to go." And that's when me and my brother -- I got my brother out of there. I had no intentions to sell this guy anything. I never weighed out anything. I never touched any scales. There's not a single fingerprint on any scale ever. I've never showed anybody any drugs. I never produced any drugs. I never was downstairs with any drugs. What took place in that apartment after I left, I have no idea, because I was not there. I don't know what happened. But I know there was not six ounces in my room. What I know is I had cocaine. I've fallen weak to cocaine. You know, I'm not perfect. I -- I did fall into addiction, but the cocaine that I was

buying was not coming from them. It -- I never bought, sold, agreed, or anything with none of these guys. I was going all the way to Austin, Texas, to buy cocaine through a guy that Timothy Harper introduced me to. He's like, "Hey, man, I know this guy right here." "Okay. Cool." And I would buy an ounce, ounce and a half, at a time so I wouldn't have to ride around dirty, as they say. I -- there's no point in me going to a dealer, buying a couple of grams, going home and having to travel back and forth constantly and putting myself at risk as getting pulled -- pulled over and getting stopped and going to jail.

So, yeah, I bought an ounce. I mean, a typical cocaine high lasts approximately 30 minutes maximum. Maybe a little more. Well, yeah, add that up throughout the day, a typical user, you're using two or three -- two or three grams, maybe four grams a day, and nobody wants to have to keep going back and forth, back and forth constantly traveling, constantly riding with drugs. Nobody wants to do that.

So, yeah, I bought an ounce, you know, maybe a little more. Maybe 30 grams. So three grams a day times ten, that's 30. That's 30 grams. That will last me ten days. That's not some substantial huge amounts of kilos and kilos of drugs that I'm not responsible for.

Yeah, I had 16 grams of cocaine. Yeah,

that's my cocaine. That's not distribution amount. Those -- that cocaine was not prepackaged. That cocaine was not weighed out to sell. That cocaine was in one single bag. I just get a little bit at a time. I had no packaging, no syringes, no nothing in my room that is even corroborating the story of distribution. I don't have any meth pipes laying around my room. That was not found in my room. That was in -- throughout the house. And everybody in this courtroom heard this guy say, "We live two separate lifestyles." I stay up seven, eight, nine times a day, and then I pass out. My roommate, on the other hand, he does not live like that. It's because I don't live like that. I shoot steroids, I work out. I do a little bit of coke here and there, and I go to bed and start all over.

After February 9th, after the bust took place in Dallas, Texas, that the drugs have never left the Eastern District of Texas, never left the -- to go through the Eastern District of Texas. I've never touched any kind of methamphetamine. Yeah, there was cups in there with my fingerprints, but there's cups around anybody's house in America. Anybody's house in America, you're going to go to, and you're going to find fingerprints on people's cups. Now, what those cups were used for after I left, that's not on me.

My roommate sits there and weighs out drugs

using these cups. He normally takes care of business behind closed doors as to not get robbed, or whatever he's got going on. So every time he has a drug deal going on, "Hey, man, I need you to leave for a few minutes. I want to go ahead and take care of this." "All right, man. That's good." I don't care. Because normally he has four or five, six people in the house at a time, and they're usually all in his bedroom. So what he did with those cups afterwards, I have no idea. But everybody in this room heard that lady say there was other -- there was three other fingerprints on that cup that she could not identify. So you have my fingerprints, and you have three unidentifiable fingerprints, which I'm pretty sure they were smudged, or whatever happened in the process. I don't know.

But after I left February 9th, I cut all ties with these people. I don't want anything to do with you. I don't even want anything. I don't want to be roommates with you anymore. I don't care about any of that. Yeah, I tried to bond the guy out. I tried to do the friendly thing to do and help the guy out of jail. I couldn't come up with the money. His bond was 110,000. I couldn't come up with that amount of money. So I was staying at his girlfriend's house for the time being, and all of the sudden the guy pops up out of nowhere. And I

answered the door with no shirt on, at his girl's house. He didn't -- he didn't seem too -- too happy with that, but he seemed a very, very scared, very, very nervous. I don't know what gotten in this guy. I was like, "How did you get out of jail?" He said, "Well, the police let me out." I was like, "What do you mean? The police don't let you out of jail. That's not how it works. They take you to jail." He said, "Well, this dude named Agent Daniel Kelly agreed with me that I could be a cooperating individual. I agreed to work for the government to bust all these people."

I said, "All right, man. I guess you got to do what you got to do. I mean, I don't know. I guess that's your life." He's, like, "Yeah, man. They're looking for Jason McLemore, the guy we got the apartment from." Huh. Jason McLemore. I didn't know Jason McLemore, but I knew Jonathan Beck who I went through. So the guy made me nervous. You know, I'm not too fond of sitting on a stand against somebody and ruining somebody else's life because I got in trouble. I just -- I can't put myself in that position. I have values, I have morals, I have self-respect. I can't sit up here and point at this guy over here, "Oh, he did this." That's not the type person I am. And if you want to do that, that's all right. That's on you. But I do not condone in

that.

So you know what I did? I turned around, and I called Jonathan Beck. I said, "Hey, man, can I get the number of that guy that -- that you set us up with the apartment with?" He's like, "Yeah, what happened?" I was, like "Man, old Timothy Harper done" -- "he done turned confidential informant, and he's looking for that guy. He's looking for that guy to bring to the police," or whatever. I don't know what he's got going on. So I made the call to this guy, Jonathan McLemore. I said, "Hey, man, whatever you're doing, whatever you have going on in your life, man, you better" -- "you better change it real fast, man, because Timothy Harper's looking for you, and Timothy Harper's going to bust you."

Well, so he hangs up the phone, or whatever. He's real scared. He deletes all his Facebook and everything. Now you got Timothy Harper who cannot produce results for Agent Daniel Kelly. He cannot produce results. He cannot produce results like Paul Brown produced results. So Agent Daniel Kelly threatened him to put him in jail. He used the excuse of, you know, "You haven't been approved to be a CI." If he hasn't been approved, why was he let out in the first place? So he's like "Man, I can't deliver this guy. I got to get out of here." So he fled to New York, which he end -- ended up

being arrested somewhere in Tennessee after a domestic dispute with his girlfriend.

I moved to Miami with my girl and my brother. My brother goes wherever I go. No matter what, I will always, always take care of my brother. And my brother, he said, "Man, I want to be a witness. I want to tell these people what really went on." But I told him "No, because if they get you on the stand, and" -- I can't -- I can't put my brother on the stand in front of these -- these monsters so they can sit here, and they can point at him, and they can nitpick. He's not smart enough to be in a position like that. And they will sit here, and they will take advantage of his mental disabilities, and they will take advantage of everything. So I decided no, man, I -- just -- just relax, man.

So Agent Daniel Kelly comes looking for me, which I had no idea he was going to come looking for me. Because essentially, I didn't do nothing wrong. I never touched a piece of methamphetamine, and I told him that. He cannot con -- he goes to my dad's house, and he cannot contact me. So what's he do? He goes on Facebook, and he sees that I'm in a relationship with a Cuban girl that can't speak no English or anything. So he gets her phone number off of her Facebook, because he cannot contact me, he cannot get my information. And he calls her, and she

does not understand what he says. So she passes the phone to me, and this is when he's, like, "Hey, man, I need you to tell me where McLemore is," this and that. And I was, like, "Man, I don't know what to tell you, buddy. I don't have nothing to do with that. That's on somebody else. I've got nothing to do with any of those guys. This is" -- "you've got who you wanted. You've got the guy who delivered the drugs. You've got the guy who sold the drugs, and you've got the cooperating who -- who received the drugs." I was never around. I never seen any methamphetamine, I've never seen any guns, I've never seen any of this. That whole box over there, I don't know what it is because I've never seen it. It doesn't pertain anything to do with me at all. Nothing in that box.

So I told him -- and excuse my language, but I told him to fuck off. You know, "I don't want nothing to do with you, buddy. I don't want nothing to do with your operations, I don't want anything to do with you. I'm not cooperating for nothing, because I don't know anything. You've busted everybody that has something to do with it. What do you need me for?" And then I hung up the phone on him. And that's basically all that happen.

Later on, I get arrested in Miami. I get arrested for possession of Xanax, you know. I was using Xanax. I was using cocaine. I would take cocaine, and I

would come down with Xanax because Xanax brings you down. Well, I've never sold a drug in my life. I've never -- now, my girlfriend, she said, "Hey, if you're going to continue using these drugs, you've got to" -- "you've got to pick. It's either me or the drugs." And so, yeah, I got on Facebook. I mean, I had 26 grams of cocaine in my room. I got on Facebook, and I said, "Hey, can I" -- I messaged somebody, "Hey, can you get rid of this? I need it gone as fast as possible." Because I didn't want to jeopardize my relationship because of some drugs, so I decided to get rid of it, and I was unsuccessful. And I didn't want to throw away possibly a thousand something dollars. Who wants to throw away a thousand something dollars? But in the end, I chose to anyways, because I was not prepared to give up my relationship. I was not prepared for any of that. So I'd rather suffer without drugs, suffer without the need of drugs, than to jeopardize my relationship, so I ended up flushing it down the toilet.

Never one time did I sell drugs for anybody. Never did I conspire with anybody. I've never been fronted any drugs. I've never told anybody about anything. I was a drug user. A user. None of this was packaged up for presale. None of this -- it was -- so I ended up going to jail, and I ended up over here in the

Eastern District of Texas, a district I know nothing about. I don't know anybody in the Eastern District of Texas.

So essentially, I -- I decided to do what Timothy Harper did. And Timothy Harper, he decided to work for the police, and they let him out of jail. So I was going through my discovery, and I was taking facts out, and I was getting on the kiosk. We have a little kiosk with Internet capabilities there. And I was trying to put together some kind of good factual basis that would allow them to let me out of jail. I've been in here for three years for a crime I did not commit. So, of course I'm going to write these people, and I'm going to try my damndest to get out of here. But they -- they offered me -- I sat down with this guy over here, Jonathan Hornok. I sat down with Agent Kelly. I sat down with Jonathan Vera -- Joshua Vera. I sat down with these three guys to have this agreement to cooperate with the government.

And they bring out my letters. "Hey, man, this is what you wrote us. Can you explain in further detail?" Well, some of my details were off, so they decided not to use me. I was a confidential informant. And I said, okay. I go back to jail, and I tried again. But I guess after that first meeting, they didn't -- they really didn't have faith in me, so I -- I gave up, and

here I am today.

And that is it, Your Honor.

JUDGE SCHROEDER: Is that all?

MR. HAYDEN:: Yes, sir.

JUDGE SCHROEDER: Mr. Van Cleef, any follow-up?

MR. VAN CLEEF: I don't have any questions for the witness, but for the Court, did we formally admit Defendant's Exhibit 3? I just wanted to make sure we did that. I'm getting the nod from --

JUDGE SCHROEDER: Mrs. Schroeder, did we?

MR. VAN CLEEF: Yes.

JUDGE SCHROEDER: She tells me we did.

MR. VAN CLEEF: So nothing else, Your Honor.

JUDGE SCHROEDER: All right. Thank you, Mr. Van Cleef. Mr. Hornok.

MR. HORNOK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HORNOK:

Q. Mr. Hayden, when were you born?

A. I was born 9/29/1991.

Q. Where'd you grow up?

A. I grew up in Shreveport, Louisiana.

Q. Where did you go to high school?

A. I went to high school at Airline High School in

Bossier City, Louisiana.
Q. Now, you lived in Dallas at some point; right?
A. I did. I lived in Dallas.
Q. And did you ever travel from Dallas to Shreveport?
A. No, sir.
Q. You have never travelled from Dallas to Shreveport?
A. Never one time in my life.
Q. How did you get from Shreveport when you were in high school to Dallas when you lived there in February of 2017?
A. I didn't.
Q. You didn't what?
A. I believe I just answered the question. I never traveled from Shreveport to Dallas.
Q. Well, didn't you just testify that you went to high school in Shreveport?
A. I did.
Q. And didn't you just testify that you lived in Dallas in February of 2017?
A. Yes, sir, I did.
Q. How was it that you got to -- you came to be in Shreveport in high school, and Dallas in 2017?
A. Well, because when I was released from jail, I was released on probation. I had my probation transferred to Texarkana, Texas, which my dad lived down the street from

here in Atlanta. So essentially, I've never been from Shreveport to Dallas. I went from Shreveport to Atlanta where I lived with my dad with -- dealing with probation.
Q. And your dad lives in the Eastern District of Texas?
A. Yes, he does.
Q. So when you testified a minute ago that you didn't know anybody in the Eastern District of Texas, that was not correct, was it?
A. Well, I guess you could say so, but...
Q. My question is would you say so.
A. I know --
Q. Which was correct? Do you know somebody in the Eastern District of Texas, or not?
A. I know my dad. That -- that's it. Nobody else.
Q. And he -- and he is in the Eastern District of Texas?
A. He is.
Q. All right. Let me direct your attention to page 47, page 1 -- or Exhibit 47, page 1. This is you, is it not?
A. That appears to be me.
Q. All right. Very well. And you lived in Dallas from fall 2016 through April of 2017?
A. No, sir.
Q. When did you live in Dallas?
A. In '16 and '17. I, essentially, was able to

physically move to Dallas in around the middle of December of 2016. Essentially, due to my probation.
Q. And you were in Dallas until April of 2017.
A. No, sir.
Q. When did you leave Dallas?
A. I left the Dallas area to move to Miami, Florida.
Q. When?
A. A few weeks after the bust. Probably beginning of March.
Q. You mentioned that you work out. Did you ever work out at Gold's Gym in Dallas?
A. I have.
Q. And have you ever worked out at the Youfit Health Clubs in Dallas?
A. I have.
Q. And, in fact, you have registered your -- checked into those locations on Facebook in Dallas.
A. From time to time, yes.
Q. And you worked at an entertain -- as an entertainer for BJ's NXS?
A. I did for a short period of time.
Q. And you worked as a stripper at Hung Mansion Male Strip Club?
A. It was called Hunk's Mansion Male Strip Club. It was in Miami, Florida.

Q. And you worked as an entertainer at LaBare, Dallas?
A. I have worked at LaBare, Dallas.
Q. Let me direct your attention to Exhibit 2, page 4270. This is you in the bottom center of this picture, isn't it?
A. Yes, sir, that is me.
Q. And you posted this to your Facebook account?
A. I did.
Q. And that was to the Justin Givenchy Facebook account that you used.
A. Yes.
Q. And how do you say -- what's the proper way that you say that stage name?
A. Justin Givenchy.
Q. And where did you come up with the name Justin Givenchy?
A. It was given to me. I didn't -- I didn't create it.
Q. Who -- who gave it to you?
A. My manager.
Q. Do you know how he came up with it?
A. I have no idea. He just said, "Man, you look like a Justin."
Q. And how did -- where did the Givenchy come from?
A. That came from him as well.
Q. Now, who is Cameron Diggs?

A. Cameron Diggs is a fellow worker that worked at the club with me, a gay Nazi porn star with white supremacist tattoos.
Q. Is he the one who's pictured on the right side of this?
A. He is.
Q. Is his real name Timothy Harper?
A. His real name is Timothy Harper.
Q. And does Timothy Harper have a Facebook account under the name Cameron Diggs?
A. Yes, he does.
Q. And you had a Facebook account under your stage name Justin Givenchy; correct?
A. Yes, I did.
Q. And you had a Facebook under the name of Collin Hayden as well; correct?
A. Yes, I did.
Q. And you -- you were friends with Cameron Diggs on Facebook; correct?
A. Yes, I was, I do believe. I recall the time when I added him.
MR. HORNOK: If we could play Exhibit 6.
(Video plays.)
Q. (Mr. Hornok continued.) That's you and Timothy Harper in that video; correct?

A. Yes, it is.
Q. And you took that video and posted it to your Facebook account; correct?
A. I did.
Q. Let me direct your attention to Exhibit 2, page 4188. This is a picture of you; correct?
A. That seems to be a picture of me.
Q. I'm asking you. Is it or is it not a picture of you?
A. Yes.
Q. And you have chain link fence -- a chain link fence tattoo on both of your shoulders?
A. Yes.
Q. And you have the phrase, "No pity for a coward" tattooed on your chest; correct?
A. I do.
Q. When did you get these tattoos.
A. Which ones? All of them or --
Q. When did you get the chain link fence tattoos? Let's start there.
A. I think I was about 18 years old.
Q. Where were you at that time?
A. I was in Shreveport.
Q. And when did you get the "no pity for a coward" tattoo?

A. Shortly after the same timeframe.
Q. What does the phrase "No pity for a coward" mean to you?
A. The phrase "no pity for a coward," if you were to go to YouTube and look up "No pity for a coward," it's a heavy metal song that I work out to. It's one of my favorite songs. It's by the band Bring Me the Horizon.
Q. And why did you choose to have that phrase particularly tattooed across your chest?
A. Because I just stated, it's one of my favorite workout songs. It gives me energy. It pumps me up. I like it.
Q. Now, you've said that you removed the lightening bolt tattoos, but at one point you did, in fact, have lightening bolt tattoos on your right forearm; correct?
A. Yes, sir, I did.
Q. And they were square on the top and square on the bottom?
A. Yes, sir.
Q. When did you get those tattoos?
A. When I was approximately 17 years old.
Q. Where did you get them?
A. I got them at some motel room in Shreveport.
Q. Why did you get them?
A. I mean, I was 17 years old. I didn't have any

tattoos, and a guy had some cool looking patterns, some skulls, some bricks, some other stuff. I said, "Yeah, man, that looks cool, man. Why not?"
Q. Let me direct your attention to Exhibit 13, page 1. You moved into this apartment in January of 2017; correct?
A. Yes, sir.
Q. And underneath the sign Magnolia at Wycliff there is kind of an entryway and a gate. Is that the security door that would be visible from the -- the parking lot?
A. No, that's the gate that's visible from the street. There is no parking lot.
Q. Let me direct your attention now to page 3. This is the front door to the apartment in which you lived; correct?
A. That is correct.
Q. Let me direct your attention to page 4. This was your roommate at the time, Timothy Harper; correct?
A. That -- that is my roommate, yes.
Q. Let me direct your attention to page 28. Whose fire helmet was this?
A. That was my roommate's, but I acquired it after he lost everything in the apartment, and I returned his stuff.
Q. You had a cell phone at the time; correct?
A. I did.

Q. Do you remember what the phone number was?
A. I cannot remember what a phone number was three years ago. That was activated and deactivated. I have no idea.
Q. You used that cell phone to call Timothy Harper; correct?
A. Yeah. We were roommates. Of course.
Q. And you texted him as roommates would?
A. I texted him as roommates would, as he testified earlier, Daniel Kelly.
Q. Let me direct your attention to Exhibit 13, page 9. This is your kitchen counter; correct?
A. That is the kitchen counter that was in the apartment that I lived in.
Q. So it's your kitchen counter on February 9th, 2017.
A. It's Timothy Harper's kitchen counter because I was not there at that time.
Q. When you left -- or when you were at the apartment on the morning of February 9, 2017, this was your kitchen counter; correct?
A. As I just said, I left the apartment, so, essentially, it belonged to -- that kitchen counter belongs to Timothy Harper, because I was not around. I'm not there to supervise that kitchen counter.
Q. Let me direct your attention to page 12. This is

your laundry basket; correct?
A. No, sir, that looks like some clothes that are on the floor, and the laundry basket looks like it's to the right.
Q. This is your -- your laundry, then; is that correct?
A. It has multiple people's clothes in that laundry basket.
Q. Are your clothes in that pile of laundry?
A. Yes, sir, but you see there's some female socks at the bottom of the screen. There's one of my brother's shirts, there's one of Timothy Harper's shirts. There's multiple items in this laundry basket.
Q. Let me direct your attention now to Page 18. This was a safe in your apartment; correct?
A. That was in the safe of my roommate's bedroom.
Q. So this was not your safe?
A. No, it was not my safe.
Q. Did you keep anything in your -- in that safe?
A. I never kept anything in anybody's safe.
Q. Let me direct your attention to Exhibit 58, page 11. If we could focus in on the top right-hand corner, that's a picture of you; correct?
A. That is a picture of me, yes.
Q. If we could zoom out. These are your fingerprints; correct?

A. I do remember taking these fingerprints.
Q. And do you remember putting superglue on your fingers before you took these fingerprints?
A. No, I do not remember putting superglue on my fingers, no, but I do recall fixing a radio in jail where I was trying to glue it back together.
Q. And how is it that you came to possess a radio while in jail?
A. Um, you buy it off the commissary.
Q. And at the time that you provided these fingerprints, you had been informed a few days earlier that you would be -- someone would be coming to take your fingerprints; correct?
A. I believe that's probably a week before.
Q. Isn't it correct that on Thursday, the week before you were informed that the fingerprints would be taken, and then the fingerprints were taken on that following Monday?
A. No, I was not informed of that. It came at a random time. I was not expecting. They woke me up out of my sleep.
Q. You've been to prison before; correct?
A. No, sir, I have not.
Q. You've never been to prison before?
A. I've never been to a actual prison.

Q. Have you ever been incarcerated before?
A. I have been incarcerated, but only county jails.
Q. You've been convicted of multiple felonies; correct?
A. I have been convicted of multiple felonies.
Q. Let me direct your --

MR. HORNOK: Or, Your Honor, at this time I would move to admit Exhibit No. 55. These are certified conviction documents for the defendant.

JUDGE SCHROEDER: Any objection?

MR. VAN CLEEF: I wasn't prepared for that, Your Honor.

JUDGE SCHROEDER: Certainly.

MR. VAN CLEEF: May I look real quick?

JUDGE SCHROEDER: Yes. Of course.

MR. VAN CLEEF: No objection.

JUDGE SCHROEDER: Very well. Those will be received.

(Wherein Exhibit 55 was received.)

MR. HORNOK: Your Honor, may I have just a brief second?

Q. (Mr. Hornok continued.) Let me direct your attention to page 1 of Exhibit 55.

Now, in the middle there, there is a name. That's your name; correct?
A. That is definitely my name.

Q. And this is a document charging you with illegal possession of stolen things; correct?
A. Yes.
Q. And it was filed on June 27th of 2013; correct? It's in the bottom right-hand corner.
A. Yes.
Q. And that was a felony conviction; correct?
A. Yes, sir.
Q. And up in the top right-hand -- or top left-hand corner there's a date of birth provided on this document. What is that date of birth?
A. That date of birth is 9/29/91.
Q. And that's your date of birth; correct?
A. That is definitely my date of birth.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) And these are your fingerprints related to that conviction; correct?
A. Yes, sir.
MR. HORNOK: Next page, please. And if we could focus in on the paragraph at the bottom.
Q. (Mr. Hornok continued.) If you could, please, just read this paragraph for us.
A. "Collin Garrett Hayden, incarcerated and present in open court with Christopher Brawten withdrew a former plea of not guilty, entered a plea of guilty to felony grade

illegal possession of stolen things. The court explained the rights to trial by jury, to confront accusers, to compulsoy" -- "compulsory process, to appeal to court appointed or private counsel, and a privilege against self-incrimination. The defendant indicated he understood and waived these rights. The DA summarized the facts, and the court questioned the defendant and his attorney and determined that the plea was free and voluntary with full understanding of rights. The court then accepted the plea of guilty. Defendant waived all delays and is duly and legally sentenced pursuant to the agreement of five years."

Q. If we could direct your attention to the next page. If you could read the remainder of that paragraph.

A. "At hard labor in the Louisiana Department of Corrections. Credit for time served on this count" -- "time served on this charge and to run concurrent with Docket No. 203955, count one, but consecutive with any other sentence. Defendant is advised based on disagreement and agreed upon sentence, there are no rights to appeal. Defendant is advised of two years to apply for a postconviction relief. Court recommended the defendant for any program available through the Department of Corrections. Doug Stenson is present on behalf of the State."

Q. Thank you. Let me direct your attention to the next page. Now, in this case you were also charged -- this is a different count of illegal -- being charged with illegal possession of stolen things; correct?
A. It's a different count, but it's for the same object.
Q. This was filed in -- on February 18th of 2014; correct?
A. Yeah, I guess.
Q. Yes or no?
A. Yes.
Q. Thank you. Let me direct your attention to the -- well, let's -- let's focus in on count 1 right there in the middle.
Please read the paragraph beginning with "Count 1."
A. "Count 1. Intentionally possessed, procured, received, or concealed 2001 F250 truck with a value of 20,000 which have been the subject of a robbery or theft under circumstances which indicate the defendant knew or had good reason to believe the property was the subject of one of these offenses."
Q. Thank you. If we could focus your attention on the next page, please. And as result of this conviction, you were sentenced also to five -- is it five years of hard labor?

A. Yes, sir. They were all ran concurrent.
Q. Actually, if we could focus in right in the middle of that paragraph, I believe -- this one is two years of hard labor; correct?
A. Yes.
Q. And after that, you were placed on supervised probation?
A. Yes.
Q. If we could focus on the bottom paragraph. And your probation was revoked; correct?
A. I revoked my probation while I was incarcerated so I could get the concurrent sentence ran from -- because I was essentially charged with the crime in two different counties. So I revoked my probation so it would be ran concurrent with the other charge of the same charge that I got charged with in a different county. Yes, sir.
Q. Can you read that paragraph for us, please?
A. I'm not see what you're getting at, sir. I'm not a --
Q. I just need you to read the paragraph, starting with "The defendant."
A. I'm not a narrator. I mean --
MR. HORNOK: Your Honor.
MR. VAN CLEEF: I think he objects to this. It's not really asking him a question, he's asking him a

form for the jury, and I think the jury can read.

JUDGE SCHROEDER: You want to give him an opportunity to read himself, perhaps, and then ask a follow-up question?

MR. HORNOK: Sure.

Q. (Mr. Hornok continued.) Please look at the paragraph. Refresh yourself, and I'll ask you a question.

A. All right.

Q. Are you ready?

A. Yeah.

Q. Isn't it true that you admitted the allegations in the petition to revoke your probation in this case?

A. Yes, sir.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) Isn't it true that this is a separate charge for theft of a motor vehicle?

A. It's a separate charge, but it was for the same exact vehicle.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) And as a result of that conviction, you were also sentenced to five years of hard labor in the Louisiana Department of Corrections; correct?

A. Let me -- let me -- let me clear this up because you --

MR. HORNOK: Your Honor, it's a yes or no

question.

JUDGE SCHROEDER: Just -- you can answer the question, and then Mr. Van Cleef will have an opportunity to come back up, and you can say anything you want to. Unfortunately --

MR. HAYDEN: Okay, because he's just -- he's just trying to muddle everything up.

JUDGE SCHROEDER: That -- he -- he's entitled to ask questions on cross-exam --

MR. HAYDEN:: Okay.

JUDGE SCHROEDER: -- and you answer those questions, and then Mr. Van Cleef can follow up if he wishes to.

MR. HAYDEN:: All right.

MR. VAN CLEEF: May I have a sidebar?

JUDGE SCHROEDER: Yes.

(Bench Conference Begins)

JUDGE SCHROEDER: Okay.

MR. VAN CLEEF: Your Honor, as I understand, I'm not able to assist him in presenting his testimony at all, so I just want to make clear that we will be following up.

JUDGE SCHROEDER: That's fine. You know, I --

MR. VAN CLEEF: This is uncharted waters for

me.

JUDGE SCHROEDER: I understand.

MR. VAN CLEEF: But I'm following advice -- the advice --

JUDGE SCHROEDER: No, that's fine.

MR. VAN CLEEF: -- that you gave me.

JUDGE SCHROEDER: I certainly understand that. I -- I had understood, perhaps, there was a way for you to answer -- to ask certain follow-up questions, but if that's the -- if that's your view of it, that's what we'll follow.

MR. VAN CLEEF: Actually, I would be happy to follow your view of it, Your Honor. I know that I'm in safe territory of following your view.

JUDGE SCHROEDER: Well, I don't know. I guess all I'm saying is to the extent you feel comfortable asking follow-up questions, do that.

MR. VAN CLEEF: Yes, sir. Thank you.

(Bench Conference Ends)

Q. (Mr. Hornok continued.) As a result of this felony conviction, you were sentenced to five years of hard labor in the Louisiana Department of Corrections; correct?

A. Yes, sir.

MR. HORNOK: Next page, please. Next page, please.

Q. (Mr. Hornok continued.) Now, in October -- on October 20th of 2014, you were also charged with simple burglary. Isn't that correct?
A. Yes, sir.
MR. HORNOK: Next page, please. And if we could focus in on that bottom paragraph.
Q. (Mr. Hornok continued.) And as a result of that conviction, you were also sentenced to hard labor for a period of two years; correct?
A. I'm sorry, you're just repeating the same two years that I've already said I was convicted of.
Q. This is a separate charge; correct?
A. No, sir. This is not a separate charge.
Q. As a result of simple burglary, you, in fact, were sentenced to a period of two years and committed to the Louisiana Department of Corrections; correct?
A. Yes, sir.
Q. And some of those may have run concurrently; correct?
A. Yes, sir. They were all essentially caught at this same time period. I was just charged over here in this county, and then I moved to another county. I got put on probation, moved to another county. I pled guilty to the same charges of that same crime instance, that same truck and the stolen property. I pled guilty to that. And then

I came back on -- I revoked my probation while I was still in custody, so this was all essentially one thing, you're just going over and over and over and over.

Q. In 2016 you were confined in the Bossier City maximum facility; correct?

A. Yes, sir. County jail.

MR. HORNOK: Next page, please.

Q. In 2017 you were charged with possession of Alprazolam in Florida; correct?

A. Yes, sir.

Q. And that was a felony conviction?

A. Yes, sir. I -- I pled no contest.

Q. And Alprazolam is the -- kind of the formal name for Xanax; correct?

A. Yes.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) And these are your fingerprints; correct?

A. Yes, they are.

MR. HORNOK: Next page, please. Thank you. You can take that exhibit down.

Q. (Mr. Hornok continued.) Now, it's your testimony that you were there at the apartment on February 9th, 2017; correct?

A. Yes, I was.

Q. And it's your testimony that you knew that Paul Brown was looking for drugs; correct?
A. I was aware, yes.
Q. And it's your testimony that you offered to sell Paul Brown six ounces of methamphetamine; correct?
A. I offered to trick him into believing I had six ounces of methamphetamine, when, in fact, I did not.
Q. And it is your testimony that after you offered to sell Paul Brown six ounces of methamphetamine, that you went down to look at the money that was located in the car; correct?
A. I did.
Q. And it is your testimony that after viewing the money in the vehicle, that you went and woke up Timothy Harper; correct?
A. I -- I did do that.
Q. Now, you have described that you had cocaine in your room; correct?
A. Yes, sir.
Q. And that was approximately 16 ounces of cocaine?
A. Nowhere near 16 ounces. It was 16 grams.
Q. Sixteen grams of cocaine. My apologies.
MR. HORNOK: Your Honor, may I approach?
JUDGE SCHROEDER: Yes.
MR. HORNOK: The witness.

JUDGE SCHROEDER: Yes.
Q. (Mr. Hornok continued.) I've placed in front of you Exhibit No. 16. It's the first exhibit there. That is your cocaine; correct?
A. This right here is my cocaine, yes.
Q. Okay. Let me direct your attention to Exhibit No. 13, page 12. Do you see your cocaine in this picture?
A. I am not clear if I see it or not. I don't know if that's...
Q. You would agree with me -- well --
A. Kind of foggy of what it -- what is in that plastic bag.
Q. If you could, hold up Exhibit No. 16.
A. Yes.
Q. And there's a Ziploc bag contained in that; correct?
A. Yes, there is.
Q. And the trim -- the detail trim on that Ziploc bag is green; correct?
A. Yes.
Q. And that's consistent with the Ziploc bag that's on the left side of this picture; correct?
A. Yes.
Q. Now, let me direct your attention now to exhibit -- the next exhibit, which is the one without the cups. I believe that's Exhibit 15.

A. Yes.
Q. That's your methamphetamine; correct?
A. No, sir, this is not my methamphetamine.
Q. Tell me, how many grams are in six ounces?
A. I have no idea.
Q. How many grams are in an ounce?
A. Twenty-eight.
Q. And so if you were to multiply 28 by six, approximately how many grams would you get?
A. 168, I believe. I'm not a mathematician, but I think that's a rough ballpark.
Q. Now, you would agree with me that the exhibit that you're holding in your hand with the methamphetamine is contained in a Ziploc bag with green detail; correct?
A. Yes, sir.
Q. And you would agree with me that the exhibit with the methamphetamine that you're holding in your hand is consistent with what is depicted on the right side of this image; correct?
A. I -- I don't know. It's upside down. I can't see the trim, but I do see it's green. A little slice of green right there, yes.
Q. So it is -- what you're holding in your hand is consistent with what is depicted on the right side in this picture; correct?

A. I can't testify to that. I have no idea because it's upside down.
Q. Let me direct your attention now to Exhibit 17 which is the exhibit with the cups in it. And these are the cups with your fingerprints on them; correct?
A. I don't know if these are exact cups, but they look similar to the cups that are in the photos, yes.
Q. You've been in the courtroom during the entirety of the testimony, and you heard the forensic fingerprint examiner testify that your fingerprints were found on these cups; correct?
A. I heard her testify that this thumb and this finger were found on these cups. Also along with three unidentified fingerprints, yes.
Q. And you also heard the testimony establishing that those cups contained methamphetamine; correct?
A. Yes, I did.
Q. Let me direct your attention now --
MR. HORNOK: Let me -- you can take that off.
Q. (Mr. Hornok continued.) You knew McLemore and Harper were selling drugs to each other; correct?
A. I -- I don't know if they were or not, but I have heard Timothy Harper bragging about ripping the guy off.
Q. And you knew that McLemore and Harper had a falling

out over a drug deal; correct?
A. Yes. I heard --
Q. And you purchased cocaine from Mr. McLemore. Isn't that correct?
A. No, sir, that is not correct.
Q. Let me direct your attention now to Exhibit No. 52, page 2, with the paragraph titled Jason McLemore. "This is a letter that you wrote to me. Isn't that correct?
A. That is definitely a letter I wrote to you, yes.
Q. And in this letter you said, "All you know is Jason and Timothy were selling back and forth to each other, and they had a falling out because Tim gave him a bad kilo"; correct?
A. That is what I understood from Timothy Harper's bragging about he ripped a guy off so --
MR. HORNOK: Your Honor.
A. -- that's what I understood, yes.
MR. HORNOK: This is a yes or no question.
JUDGE SCHROEDER: Yes or no?
MR. HAYDEN: Yes.
Q. (Mr. Hornok continued.) And you also wrote at that time that Jason and Tim were both -- were selling to the same real estate agent. That's how he came across the apartment on Dickinson, because Jason moved off of Harry Hines Boulevard, an uptown area, because I used him from

time to time to supply my cocaine addiction"; correct?
A. That is what I wrote, yes.
Q. And so when you testified just a minute ago that you never purchased cocaine from Mr. McLemore, you, in fact, were not correct.
A. I presented this story to y'all in the -- the -- the proffer, the plea agreement proffer that I was agreed to cooperate with the government, and y'all deemed my story not accurate.
Q. So it is your testimony that you -- in writing this letter to the federal prosecutor, you were lying?
A. I was just trying to cooperate with the government. That's all.
Q. It is your testimony that in writing this letter to the Federal Prosecutor on your case, you were lying; correct?
A. Yeah, I was -- I was -- I was making up stories trying to get released, yes.
Q. Let me direct your attention now to Exhibit No. 52, page 2, which is the same page if we can just focus on the paragraph "My Dad's house."
And in that same letter, you said the following: "Agent Kelly showed up to my dad's house saying he had a warrant. I immediately called. I had nothing. I was clean. I was stopped several times from speeding. The

tickets match all the dates after the bust. I never had any warrants, tickets in Miami Beach, Lacy Lakeview, Texas; Plano, Texas; Carrollton, Texas. I got scared and called an ex-police chief here in Texas. He was selling arms and ammo and was operating an underground, all nudes men" -- "men's club in Farmers Branch. So I felt he was all right. He said he knew someone close to the investigation and would put ears on the case. Months went by with no mention of my name. Then I found out he was a sex offender, and the club he was running underground was underage nude guys. I hate sex offenders, so I told him to go F himself, and I stopped communicating." That's what you wrote; correct?

A. That is what I wrote, yes.

Q. Let me direct your attention now to page two -- or the Agent Kelly paragraph of that same page.

And in that same letter you wrote, "Agent Kelly. He called me saying I had a warrant, but nothing was coming up. My latest ticket was May 20th, 2017, Miami Beach. No warrants. I told him I had nothing of importance. He" -- isn't that what you wrote; correct?

A. Yes.

Q. Let me direct your attention now to the top of page 3. And you later wrote, "Already knew everything. I had no solid information on meth. I told him I had nothing to

do with it. I only knew about the cocaine. I didn't have a warrant until Timothy told Agent Kelly I was in Fort Lauderdale jail"; correct?
A. Yes.
Q. And so in that you admitted that you, in fact, had possessed cocaine.
A. Yes. I have had --
Q. And in it you also lied about the fact that you had no information about methamphetamine; correct?
A. No, I did not lie. I did not have any information --
Q. Let me direct your attention now to --
MR. VAN CLEEF: Objection, Your Honor.
JUDGE SCHROEDER: Hold on, Mr. Hornok. You have to let him finish his answer.
MR. HORNOK: It was -- yes, Your Honor.
JUDGE SCHROEDER: Were you finished with your answer?
MR. HAYDEN: No, sir, I was not.
JUDGE SCHROEDER: Go ahead.
A. I had nothing on meth. I don't know anybody that deals meth. I don't know any -- anything about the methamphetamine, so I had no information to tell him that he didn't already know.
Q. (Mr. Hornok continued.) Isn't it true that you just

testified that you knew that Jason McLemore and Timothy Harper were selling methamphetamine to one another; correct?

A. Yes.

Q. Let me address your attention now to the cocaine paragraph of the same letter that you wrote.

Isn't it true in this paragraph that you described meeting somebody who showed you how to work the black market; correct?

A. Yeah.

Q. And isn't it true that in this you also described -- described buying a couple thousand dollars in coke; correct?

A. Yes, I did.

Q. Let me focus your attention on the bottom portion of this paragraph.

And isn't it true that you -- you met Gulf Cartel members who were in the process -- in the business of moving cocaine?

A. I'm sorry, but that -- that is not true. As you can see from Cartel de Golfo, it's not even spelled correctly.

Q. So it's your testimony that in writing this letter that you were lying to the federal prosecutor.

A. I've already said I was -- I've already said yes.

MR. HORNOK: Your Honor.

A. I've already said that I was trying to get out of jail. I've already said it.

JUDGE SCHROEDER: I'll let him explain that way.

Q. (Mr. Hornok continued.) So is it your testimony that in stating that you knew members of the Gulf Cartel and the Zetas Cartel -- well, you knew members of the Gulf Cartel, that you were, in fact, lying?

A. Yes.

Q. And were you also lying when you described going to a house where members of the Cartel were pressing cocaine into blocks?

A. Yes.

Q. But you were not lying when you described buying thousands of dollars worth of cocaine.

A. This is thousands of dollars worth of cocaine, sir.

Q. Were you lying when you described buying thousands of dollars of cocaine?

A. No, sir.

Q. Let me direct your attention now to --

MR. HORNOK: Your Honor, at this time I move to admit Exhibit No. 53.

JUDGE SCHROEDER: Any objection?

MR. VAN CLEEF: No objection.

JUDGE SCHROEDER: It will be received.

(Exhibit 53 was received.)
Q. (Mr. Hornok continued.) Let me direct your attention to page 1.
Do you recognize this as another letter that you wrote to the Federal Prosecutor in this case?
A. Yes.
Q. Let me direct your attention to the bottom paragraph. Were you lying in this case when you described "The guy walks in and tells me he was there to see Tim"?
A. I'm -- I'm sorry, when I was writing this letter, I was under the influence of medication prescribed to me by a doctor at the jailhouse.
Q. So are the contents of this letter true or not true?
A. The contents of this letter don't make any sense. They don't even go with the videos.
Q. So is it your testimony that this -- the contents of this letter, as displayed right here, are true or not true?
A. They are not true, no.
Q. Let me direct your attention now to page 2. Let me direct your attention now to the middle -- the middle paragraph.
MR. HORNOK: I'm sorry, if we could back out. Down to the line starting "agreeable deal." It's in the bottom paragraph halfway through.

Q. (Mr. Hornok continued.) And isn't it true that you said "I'm also willing to cooperate with the government in bringing down this sex ring because I hate sex offenders, and bring down the cocaine suppliers that I will talk about at a later point in time"? Did you write that?
A. Where's that say that? "I'm also" -- yeah, I wrote that.
Q. And what information did you have to offer about a sex ring and sex offenders and cocaine suppliers?
A. I didn't have any information to offer. That's why y'all refused my proffer. That's why y'all refused to incorporate me into a cooperating individual deal.
Q. So it is your testimony that in writing this letter, that you were lying to the Federal Prosecutor?
A. It has some truth in there.
Q. These statements specifically about your willingness and ability to take down a sex ring, sex offenders, and cocaine suppliers, did you, in fact, have that ability, or did you not?
A. No, sir, I did not have that ability. I'm a stripper.
Q. Let me direct your attention now to Exhibit 54, page 1. And if we could focus on the line starting with, "Both knew" -- or both know and" down to "next." It's towards the top.

Isn't it true in this letter that you said, "I have multiple witnesses who will testify" that you knew nothing and had nothing to do with what was going on?
A. Yes, I have multiple witnesses that are ready to testify.
Q. Are we going to hear from those witnesses today?
A. Possibly. I'd have to talk to my attorney.
Q. What kind of preparation have you engaged in, in order to call these witnesses?
A. I haven't prepared any witnesses. I don't need to call and prepare statements, and I don't have to -- I don't have to set my witnesses up, because they know what happened.
Q. What are the names of these witnesses who are prepared to come testify today?
A. My dad Robert Hayden; and my brother which I've chose -- which who was there present who is in the video sitting on the floor. He's prepared to testify, but the same thing you're trying to do with me, you're trying to attack me and all this, you're going to do the same thing to him, and I will never let you do that.
Q. Isn't it true that in this letter you said, "Now I speak three languages, and I have some pretty good information, information that got me a bullet wound in the foot. Now, if me and you can have a little sit-down, I

can bring forth a lot of information. With your power and my knowledge, we can shut down a lot of Cartel movement." Did you write that?

A. I did write that.

Q. Was that a truth or a lie?

A. It's -- it's all bullshit.

Q. Let me direct your attention now to Exhibit 1, page 2151. If we could focus on the bottom two lines of text. These are records from your Facebook; correct?

A. I don't know. It just appears --

Q. Well, isn't it true that on your Facebook you wrote the message, "Backpage.com, where all your dreams come true for a certain price"?

A. Yes I -- yes, I did. That's a joke.

Q. Let me direct your -- do you know what backpage.com is known for?

A. Backpage.com is the same thing as when I was out. It was the same thing as Craig's List: Automobiles, relationships, houses.

Q. Isn't it true that backpage.com is known for the facilitation of prostitution?

A. I don't necessarily know that, but I know my roommate was involved in some weird stuff like that. But that's got nothing to do with me.

Q. Did you know that your roommate was using

backpage.com to -- in order to find prostitution clients?
A. I was aware. He regularly bragged.
Q. Let me direct your attention now to page 2155. If we could focus on the third line of text.
Isn't it true that another user in reference to your comment said, "LOL. And who taught me how to rob people off backpage? Thanks, Collin. LMAO."
A. That was a girl who's known for prostitution.
Q. And what did you teach her about robbing people off backpage?
A. Nothing. She was just trying to save face.
Q. So she was lying? Is that your testimony?
A. Yes, she was just trying to save face because she was getting put on the public display in front of thousands of people.
Q. Let me direct your attention now to page 6092, the penultimate summary. It's the last -- second to the last one.
Isn't it true that on November 14th of 2016, you used your Facebook to say this: "You got any money saved? I'm fixing to go to Colorado trying to buy a pound, but I need people because you can only legally buy an ounce a day"?
A. Yes, sir, I did say that. Would you like me to explain, or is it just one sided?

Q. In that case you were attempting to purchase a pound of marijuana; correct?
A. I was toying with the idea, but I never went through with it.
Q. Marijuana is what you were speaking about in this specific text; correct?
A. Yes. I was toying with the idea.
Q. Let me direct your attention now to page 7263. You sent a photo via Facebook on -- in April of 2017; correct?
A. I have -- I have no idea. It's just a bunch of numbers and letters and...
Q. This Facebook record indicates that you, Collin Hayden, sent on February -- or on April 4th of 2017, a photo; correct?
A. I don't know. That's what it says, but I don't know what it is.
Q. Let me direct your attention now to page 7264. What is depicted in the syringe in this photo?
A. That would be steroids.
Q. Let me direct your attention now to page 7266. Is this you depicted in this image?
A. Yes, that was right after a shot, yes.
Q. And in the comment below, there is a reference to trend. What is "trend"?
A. Trend is Trenbolone Acetate, which is pretty much

the high -- the maximum bulking steroid out there. It's the most powerful on the market.
Q. Is it legal to use this kind of steroid without a prescription?
A. It is illegal.
Q. Let me direct your attention now to page 7267. Let me direct your attention to the top.
Isn't it true that you were taking four milliliters shots of steroids every other day at that time?
A. Yes, it was true.
Q. Let me direct your attention now to Exhibit 1, page 7263. Let's go to the next page.
Let me direct your attention now to Exhibit 8, page 57. Isn't it true that on April 9th, 2017, you sent -- you took this picture, and you sent that message described there in red?
A. I did do that, but, I mean, who can blame me? I'm angry. I'm aggravated.
Q. So it is your testimony that the chain link fence that's depicted in that image is the chain link fence tattoo on your shoulder.
A. Yes.
Q. And is it your testimony that at that time you were, in fact, holding the device that sent that image?
A. Yes.

Q. Let me direct your attention now to Exhibit 1, page 7270. Isn't it true that on this date you sent a video which you described as your porn shoot?
A. Yes, but I would not like that video to be played because of the safety of the female.
Q. Let me direct your attention now to the last full comment. Isn't it true that in April -- on April 18th, 2017, you said, "Moving to Miami"?
A. Yeah, I guess.
Q. So isn't it true that, in fact, you didn't move to Miami until April 2017, it was not February of 2017?
A. No, I never said I moved to Miami in February 2017. I said I moved shortly after the bust, which was in -- somewhere in March.
Q. Isn't it true that based on this comment, you moved to Miami in April of 2017, not March of 2017?
A. You know, that -- that is not true because you're sitting here trying to show it one sidedly when it's a conversation saying, yeah, I'm moving to Miami.
Q. Let me direct your attention --
A. You're taking it out of context.
Q. Sorry. Do you have anything more you want to say?
A. No.
Q. Let me direct your attention now to page 1460 -- or 79. The fifth summary.

Isn't it true that you wrote the quoted text displayed here on your Facebook on April 3rd, 2017?

A. Yes, but I don't know what it pertains to.

Q. Let me direct your attention now to page 1579. Again, the fifth summary.

MR. HORNOK: Can you back out? It's -- there we go.

Q. (Mr. Hornok continued.) Do you see the comment made on January 6th, 2017?

A. I do, but, once again, you're only showing one side of things. You're not showing what the other party sent. I was being sent pictures of guns and threatening me. Of course I'm going to threaten somebody back. You're taking everything out of context.

Q. So it's your testimony that you were threatening to kill somebody in this -- in this comment?

A. I was responding to their comment of threatening to kill me. They sent me pictures of guns. And you're -- you're only showing one-sided stories.

Q. And it's your testimony that in response to the threat that you testified that you received, that you returned with a threat to kill them.

A. Of course.

Q. And isn't it true that in this you describe yourself as a gangster with a rap sheet?

A. I don't know if I was referring to myself as a gangster with a rap shit.

Q. And isn't it true that in responding to this, the reason you sent this threat is because the other person was saying something you didn't like?

A. No, I just -- I just told you what he said. They were sending me pictures of guns. This was a person that stole from me. This was a person that was sending -- and then threatening me with bodily harm and threatened me that they were going to jump me with their brothers and all that. And I just responded, "Hey, man." I don't have a rap sheet with violent charges. I have felony possession of stolen things.

Q. Do you have any other convictions besides that one instance that you're describing?

A. I do. I don't have any other felony convictions, no.

Q. Let me direct your attention now to page 1586. And if we could focus on the top four groups of information.

Please read these comments. As to the first comment, isn't it true that this is what you wrote on Facebook on January 4th, 2017?

A. Yes, but once again, you're showing all one-sided issues. You're just showing my responses. You're not showing the court. You're not showing the people what

really took place.
Q. Did you have access to these Facebook records?
A. No, I do not. I'm in jail.
Q. Was your attorney provided a copy of these records months ago?
A. I have no idea.
Q. Please read the second -- the second phrase starting with "I'll beat."
Isn't it true that you wrote that statement on Facebook on January 4th, 2017?
A. Yes, after he threatened me to jump me with his brothers.
Q. And I want you to read the last comment, please.
MR. VAN CLEEF: Your Honor, I'm going -- I'm going to object. Just having him read out -- read things out loud is not an appropriate question.
JUDGE SCHROEDER: Yeah. I'm --
MR. HAYDEN: I'm not a puppet.
JUDGE SCHROEDER: Can we move it along a little, Mr. Hornok?
Q. (Mr. Hornok continued.) Let me direct your attention now to Exhibit 8. If we could go to page 3. This is your Facebook information; correct?
A. Yes.
Q. Page -- next page. This is a picture that you

uploaded to your Facebook; correct?
A. Yes.
Q. Next page. This is a picture of you on your Facebook account; correct?
A. Yes.
Q. Page 7, please. And this is a phrase that you wrote on your Facebook; correct?
A. Yes, I did.
Q. In addition to uploading that picture; correct?
A. Yes.
Q. And, in fact, in that picture you're wearing your watch on your right hand?
A. I don't know if it's my watch. It could have been somebody else's.
Q. In fact --
A. It is --
Q. -- weren't you wearing a watch on your right hand in that picture?
A. Yeah, I was wearing a watch on my right hand.
Q. Let me direct your attention now to page 11. This is the information for your Justin Givenchy page; correct?
A. Yes.
Q. Next page, please. And this is you --- a picture of you in that -- or that you uploaded to that account; correct?

A. Yes.
Q. Page 26, please. This is a picture that you uploaded of yourself and Timothy Harper; correct?
A. Yes. It's unclear. It's some club that we were at. I don't -- no idea. Some women in the background. I don't know.
Q. Page 41, please. This is your phone number calling Paul Brown on February 9th, 2017; correct?
A. Yes.
Q. Page 46, please. We've seen this videos played. That's Timothy Harper's hand in that video; correct?
A. I don't know what Timothy Harper's hand, but everybody has testified that it was his hand. I guess, yeah.
Q. Page --
A. It's his -- it's his video. It came from him.
Q. And you uploaded it to your Facebook; correct?
A. Yes.
Q. Page 49, please. On this date you said that crystal meth keeps you shredded; correct?
A. Once again, yes, but you've tooken it out of context. This was a meme with the words on a funny picture that my friend sent me.
Q. Would you like for me to provide the entire context of your conversation with Jamie Knighten to this jury?

A. I don't know. Probably not. I don't know.
Q. I'm going to move on. Let me direct your attention now to page 52. You wrote this message to Reva Dena on April 5th, 2017; correct?
A. Yes, I did.
Q. And in this message when you said, "Tim," you were referencing Timothy Harper; correct?
A. Yes, I was.
Q. And you offered to pay $2,000 to find Timothy Harper; correct?
A. Yes, sir, to find Timothy Harper.
Q. And in this message you also said that you had to, quote, Get rid of him; correct?
A. Yes, I did.
Q. Let me direct your attention to page 54. And on April 6th, 2017, you offered $2,000 to Christine Caldwell for the location of Timothy Harper; correct?
A. Yes, on multiple occasions I've did this.
Q. Page 55, please. On April -- or on April 8th, 2017, you posted a message saying you were offering $2,000 cash for the location of Christine Caldwell and Timothy Harper; correct?
A. Once again, yes, for the location.
Q. And you also posted this meme that is pictured here; correct?

A. Yes. Ice Cube saying, "I can't stand a fucking snitch."
Q. Next page, please. Now, on April 9th, 2017, you wrote this message to Timothy Harper; correct?
A. I did. And every day of my life the hate grows in my heart for a crime I did not commit. The hate grows in my heart every single day I have to sit in here and -- because of somebody else. So, of course, I was mad. Of course I might have wanted to fight the guy, but I never said, "Oh, yeah, I'm going to kill you." I never went into any kind of details, "I'm going to go send somebody after you." I never did none of that. I just wanted him to know that, "Hey, man, you betrayed me. You weren't man enough to take your charge, and now I have to pay for your consequences."
Q. What did you expect to do if you found Timothy Harper?
A. Really, nothing at the time. I just wanted him to know what I thought about him, what I thought about the whole situation, what I thought about him ruining my life.
Q. In fact, haven't we heard in the jail call we've heard numerous times during this trial that you intended to get Timothy Harper's, quote, wig split?
A. Yeah.
Q. And isn't it true that you have described your

intention to spread information about Timothy Harper to other gang members so that retribution could be paid?

A. I did say that, but who can blame me? I've been in here three years for a crime I did not commit. A crime that's corrupted and influenced by law enforcement officials, influenced. People have -- have lied on this stand time and time again. And it's all at y'all's direction. All y'all's statements y'all prepared for these people, the jury sees that. It's not fair, man. There's a camera right there in the corner of this courtroom, and it's facing right there in the center section. And you know who was sitting in the center section today? Law enforcement officials that were shaking their head yes and no, trying to influence Agent Daniel Kelly's testimony. And it's right there on camera. This is insane. This is insane at the lengths that y'all will go to, to ruin somebody's life because they wouldn't cooperate for y'all.

MR. HORNOK: No further questions, Your Honor.

JUDGE SCHROEDER: Anything, Mr. Van Cleef?

MR. VAN CLEEF: Your Honor, can we have a moment for the witness to gather himself?

JUDGE SCHROEDER: Of course. Yes.

MR. VAN CLEEF: And see if he needs any

advice at this point.

JUDGE SCHROEDER: Sure. That's fine.

MR. VAN CLEEF: And we probably ought to do that outside the presence of the jury.

JUDGE SCHROEDER: That's fine. Ladies and gentlemen of the jury, let's take a short recess.

(Jury leaves the room at 4:14 p.m.)

JUDGE SCHROEDER: Okay. Be seated.

MR. VAN CLEEF: May I approach the witness?

JUDGE SCHROEDER: Yes. Of course. Yes.

(Jury returns to the room at 4:22 p.m.)

JUDGE SCHROEDER: Please be seated. Mr. Van Cleef.

MR. VAN CLEEF: Mr. Hayden, do you have anymore statements to make to the jury? If so, you can do so now.

MR. HAYDEN:: I do.

STATEMENT BY MR. HAYDEN

MR. HAYDEN: So there was cocaine and methamphetamine found in my room. I've admitted to this. This is mine. And what he's trying to hit at, the prosecutor, what he's trying to hit at is the type of bag that's used. He wants y'all to see that it's a green top right here. This is what he's trying to point out, this green top. He's trying to make the connection to this

bag, to this bag. But they're two separate bags. A bag that my fingerprints were not found on. A bag that looks nothing like this. I don't have to prepare no witnesses. I don't have to have secret multiple meetings with witnesses. I don't have to do none of that. I don't have to have law enforcement officers sitting in the background nodding their head yes or no whenever they want you to say a certain thing. And it's all on camera. And I do want those -- I do want that camera feed. I do want that.

All these messages he's showing y'all, everything that he's trying to do, he's trying to manipulate every single one of you because he's showing everything that's one sided. I threatened this person, I did this, I did that. But he's not going to show you what the other person said. He's -- like I said in the beginning, they are going to make me look like the biggest and baddest person in the world. The worst charge I have is illegal possession of stolen things.

I mean, this -- this is insane, man, at the lengths that these people will go to. Do you -- do you know -- let me -- let me -- let me explain something. Jason McLemore got on this stand, and he said he was delivering two to four kilos a day of methamphetamine, a day. You know how much drugs that is? That is -- that is -- that is numerous. That -- I can't even begin to fathom

how -- how -- how much that is. And you know how many years in prison he got? The dude got 13 and a half years in prison. My roommate sat up here, and he said on stand that he distributed kilos and kilos. He even signed the deal that he distributed kilos and kilos of methamphetamine. You know how much time he got? Fifteen and a half years. You know how much time they want me to do?

MR. HORNOK: Objection, Your Honor. Punishment is not relevant to the case before the jury.

JUDGE SCHROEDER: Yeah.

MR. VAN CLEEF: That's correct, Your Honor. He's aware of that.

JUDGE SCHROEDER: Mr. Van Cleef will give you advice --

MR. HAYDEN: I'm sorry.

JUDGE SCHROEDER: -- but I will instruct you that's not an issue the jury will need to consider.

THE WITNESS: Yeah, I didn't know. I'm not a lawyer.

JUDGE SCHROEDER: That's fine.

MR. HAYDEN: Well, can I rephrase that?

JUDGE SCHROEDER: You can rephrase it as long as you don't talk about what the -- the sentences are that the Government potentially could seek or what penalty

to do.

MR. HAYDEN: So I can't tell them what they offered me?

JUDGE SCHROEDER: I think -- yes, you can testify about that.

MR. HAYDEN: Okay. These guys, Jason McLemore, 13 and a half years; Timothy Harper, 15 and a half. You know how much time they offered me? These guys offered me 30 years. Thirty years for some drugs I never even seen. That whole stack over there. Jorge Martinez, don't even know, never seen a gun in my life. I have never touched any of nothing -- anything of that. And they offered me 30 years, and nobody else got these charges. Nobody else got any -- pled guilty to any of those drugs. Nobody but me. I'm the one that has to -- apparently that's all mine. Everything here is all mine. The guns, everything.

These people go through great lengths to bury you in the system, because you won't cooperate for them? Because I refused to cooperate. Because I refused to be less than a human being and cooperate and ruin somebody else's life by sitting up here and trying to pretend like I know something about that person and trying to pretend like I can lie about that person? I -- I can't. I can't do it. I can't do it, man, and I refuse

to cooperate for them. And this is what I get for refusing.

You've see -- you've seen the plea agreements that -- that my -- nobody's charged with cocaine. Nobody's charged with any guns. Nobody's charged with any of that over there. But because I refuse to cooperate, they retaliate against me. This is -- this is -- this is what I get for not cooperating.

That's -- that's all I wanted everybody to know.

MR. HORNOK: Your Honor, may we approach?

JUDGE SCHROEDER: Yes.

(Bench Conference Begins)

MR. HORNOK: Your Honor, he's mischaracterized his criminal history, saying that the worst thing he has is a felony possession of stolen things.

JUDGE SCHROEDER: Okay.

MR. HORNOK: In fact, I have certified criminal conviction documents of things that include misdemeanor carnal knowledge of a juvenile, tattooing a minor, and other things of that nature. I believe that the jury's entitled to know these things.

MR. VAN CLEEF: Your Honor, the worst thing, I think, is the highest level felony, and he's just

mentioned some misdemeanors.

JUDGE SCHROEDER: Those are misdemeanors, aren't they?

MR. HORNOK: They are mis --

JUDGE SCHROEDER: I mean, they're awfully -- I mean, they have -- you know, highly egregious sort of titles, but I'm not sure that as a -- as a level of punishment they're necessary -- necessarily as serious.

MR. HORNOK: If that were the statement he had made, sure.

JUDGE SCHROEDER: Tell me what statement he's made.

MR. HORNOK: What he said is the worst thing I have -- the worst conviction I have is felony possession of stolen things. He didn't say the most serious, the most --

JUDGE SCHROEDER: I'm going -- I'm going to let you see if that door gets opened a little bit. If he -- if you can ask him what he meant by that, if he gives you an answer that you think opens the door, we'll go there.

How's that sound, Mr. Van Cleef? I mean, I don't --

MR. VAN CLEEF: That sounds terrible to me, Judge. I think he said the -- I don't recall the precise

question, but "what is the worst thing" -- "the worst thing I've been convicted of."

JUDGE SCHROEDER: Right.

MR. VAN CLEEF: The normal understanding of that would be the highest level felony.

JUDGE SCHROEDER: Mr. Van Cleef, he's testifying to all kinds of things here this afternoon. There was not a single objection to any of the discussion of his criminal history. I think if this had come up on direct, you know, perhaps you would have objected then, but I -- I mean, there were very serious things that were -- that were discussed, and there were no objections to it.

So, no, I'm not -- if you think -- I mean, just tell me why you -- where's the prejudice here because --

MR. VAN CLEEF: Well, these would not otherwise be admissible, and we are not on the border with Louisiana, but already the offenses that he's convicted of have names that are odd to me, but these are extremely odd. And the way that they're worded are as outside to the misdemeanor characterization of a misdemeanor level of what they are.

JUDGE SCHROEDER: So, Mr. Hornok, I'm going to give you just a very, very little bit of latitude, and

if you can ask him to clarify or explain what he means by the worst convictions. And if that door gets opened, I'll let you use some of that. But it will need to be very, very brief.

MR. VAN CLEEF: Your Honor, will I -- will I be able to advise him -- or speak with him prior to that questioning?

JUDGE SCHROEDER: Sure, but I'm not going to -- I mean, I -- I hesitate to take the jury out again to do that.

MR. VAN CLEEF: No, no, no, I won't ask for that, but Jonathan needs to be aware I'm going to go tell him that if he -- I mean, it's really this line of questioning. I don't want to make you look bad.

MR. HORNOK: Donnie's made a point, and I think he's right, the door's either open or it's not.

MR. CARTER: I don't plan on a door -- I think that's --

MR. VAN CLEEF: I do not go opening doors.

JUDGE SCHROEDER: Let me think about that just a minute.

MR. HORNOK: Yes, sir.

JUDGE SCHROEDER: Well, I guess what I was saying, I think that probably is right, it's either open or it's not. What I'm saying is I can't tell -- based on

what you gentlemen are telling me at the bench here whether it was, in fact, opened or not. So I've heard slightly different things, and I was thinking that that opportunity to sort of inquire into it would give us an opportunity to see whether it was or not, but I think that's probably right.

MR. CARTER: Yes, and if Your Honor isn't confident the door has been opened, then I think it's just an avenue best not traveled.

JUDGE SCHROEDER: Yeah, I'm not convinced it has, so let's -- let's don't do that. I think you've got other things you can raise.

MR. HORNOK: Thank you, Your Honor.

(Bench Conference Ends)

MR. HAYDEN: Your Honor, can I please refer to my attorney before he starts?

JUDGE SCHROEDER: Yes, of course.

(Mr. Van Cleef speaks with the witness.)

MR. VAN CLEEF: Thank you, Your Honor.

JUDGE SCHROEDER: Yes. Mr. Hornok.

MR. HORNOK: Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. HORNOK:

Q. (Mr. Hornok continued.) Isn't it true, Mr. Hayden, in October, specifically October 29th of 2018, you were

offered a plea agreement by the Government that would have allowed you to plea on terms more favorable than Mr. McLemore in this case?
A. On what date?
Q. In October of 2018, isn't it true that the Government offered you a plea agreement that was more favorable than the agreement with -- under which Mr. McLemore pled guilty?
A. I do not recall.
Q. You recall receiving a plea agreement in October of 2018, don't you?
A. No, I do not. I'm sorry, that was -- that was two something years ago. I don't know.
Q. You, in fact, recall receiving plea offers in this case; correct?
A. I've received like four or five.
Q. And you remember that those early plea offers were, in fact, more beneficial than later plea offers; correct?
A. I remember -- I don't remember the specifics of the first deal that you offered, but --
Q. Well, let me -- let me refresh your recollection. Isn't it true that on that date a plea agreement was offered to you in which you would have to stipulate that you were personally responsible for the distribution of at least 500 grams but less than 1.5 kilograms of actual

methamphetamine; therefore, that your base offense level would be 34, which is the exact same base offense level as what Mr. McLemore pled guilty to; correct?

A. In my defense --

MR. HORNOK: Your Honor, it's a yes or no question.

MR. VAN CLEEF: No -- objection, Your Honor. The question was "let me refresh your recollection," and then he read part of the --

MR. HAYDEN: And --

JUDGE SCHROEDER: Okay. Hold on just a second.

MR. HAYDEN: Okay.

JUDGE SCHROEDER: How about you rephrase your question, and we'll see where we are. And let me instruct the witness. If it's a yes or no question, if you can answer it yes or no, please do so.

MR. HAYDEN: Okay.

JUDGE SCHROEDER: If you can't, just say "I can't."

MR. HAYDEN: Okay.

JUDGE SCHROEDER: And I'll give you an opportunity to explain it at a later time. But while in cross --

MR. HAYDEN: Okay.

JUDGE SCHROEDER: -- if you can answer it yes or no, do that. And if you say -- if you can't, just say, "I can't answer with a yes or no."

MR. HAYDEN: Okay.

Q. (Mr. Hornok continued.) Isn't it true that on that date you were offered a plea agreement in which the base offense level would have been 34, which is the exact same base offense level as which Mr. McLemore pled guilty?

A. I -- I cannot answer in a yes or no.

Q. Would you disagree with me if I told you that you were offered a plea agreement on that date which provided the same base offense level as Mr. McLemore?

A. I was --

MR. VAN CLEEF: Objection.

JUDGE SCHROEDER: I'm going to -- on the basis of his answer, I'm going to give him some latitude.

MR. VAN CLEEF: All right, Your Honor.

MR. HAYDEN: I was offered a plea agreement for me to plea to --

MR. HORNOK: Your Honor, it is --

MR. HAYDEN: -- some drugs that I was not prepared to plead guilty to because it wasn't my drugs.

MR. HORNOK: Your Honor, it was a yes or no question.

JUDGE SCHROEDER: Well --

MR. HORNOK: Is --

JUDGE SCHROEDER: Show it to him if you want to.

MR. HORNOK: All right.

MR. HAYDEN: Yeah, please show me because I -- I have no recollection.

MR. HORNOK: Let's move on.

Q. (Mr. Hornok continued.) Isn't it true that in that -- in that agreement that were offered, that the United States would have agreed to recommend that the defendant's sentence not exceed the low end of the applicable sentencing guideline range?

A. No, sir. I don't recall.

Q. You wouldn't disagree with me if I told you that that was, in fact, the case in October of 2018.

A. I do remember receiving a deal from my attorney, but he said "You have to have it in by the next day, or he's going to take it off the table. If you do not -- if you do not plea out today, he's going to take it off the table, and you do not have any time to review the facts."

Q. So it's your testimony that you did, in fact, receive a plea offer that was more beneficial than the one that you've described?

A. It was -- it was more beneficial than the one that I described, the 30 years that you offered me, yes.

Q. It was less than 30 years; correct?
A. It was less than 30 years.
Q. In fact, it was much less than 30 years; correct?
A. Yes, it was.
Q. And so in offering to the -- offering to cooperate with the Government, you've -- it's your testimony that you were not found credible; correct?
A. That's what you deemed.
Q. And it is your testimony that, in fact, you were lying to the Federal Prosecutor in numerous occasions over the course of your -- the pendency of this case; correct?
A. No. I didn't lie numerous occasions. I lied a few times, yeah, but only -- only in the letters that I sent to you, lied.
Q. So isn't it your testimony that you lied on multiple instances in the letters that you wrote throughout the course of this pending proceeding; correct?
A. Yes.
Q. And your lie -- you lied in those letters just like you're lying on the stand today; correct?
A. No. You and I both know that's not correct.

MR. HORNOK: No further questions, Your Honor.

MR. VAN CLEEF: Is that all you have to say, Mr. Hayden?

MR. HAYDEN: You know, I -- no. No. No. I want to keep going.

MR. VAN CLEEF: All right. Your Honor, with the Court's permission --

JUDGE SCHROEDER: Okay. You can give him --

MR. VAN CLEEF: -- he'd like to address you some more.

JUDGE SCHROEDER: -- a brief -- brief response if you want.

MR. HAYDEN: I'm going to give a brief response about these deals that I was offered.

STATEMENT BY MR. HAYDEN

MR. HAYDEN: So I was offered a deal. The first deal I was offered, I do not recall what it was. The first deal that I was offered, you offered me one day to accept that deal, so I didn't have time to review the facts of the case. And then I denied that deal, and you got mad. And you got mad. You know what the next deal was? Are you aware of the next deal? The next deal was 140 something months, 150 something months. I refused that deal, too, because you went up. And you want to know what happened after that? You got mad again, and you went up again. Then it was 200 something months. That's 20 years. I refused that offer, and you went up again. You went up again from 210 months to 360 months because I

refused your deal. Because I -- I stuck to my innocence.
That's all. That's all, Your Honor.
JUDGE SCHROEDER: All right. Mr. Hornok, anything more?
MR. HAYDEN: Your Honor, I want to be completely honest. I can't go on with this anymore.
JUDGE SCHROEDER: Hold -- hold tight just a minute.
MR. HAYDEN: This is --
JUDGE SCHROEDER: Mr. Hornok, anything more you have?
MR. HORNOK: Your Honor, may I approach?
JUDGE SCHROEDER: Yes.
(Bench Conference Begins)
MR. HORNOK: Your Honor, he's described how his plea agreements got worse and worse over the course of the proceedings.
JUDGE SCHROEDER: Yes.
MR. HORNOK: One of the reasons that the plea agreements got worse is because he had a prohibited weapon in prison.
JUDGE SCHROEDER: Right.
MR. HORNOK: And I think --
JUDGE SCHROEDER: The jury's heard it.
MR. HORNOK: -- I think it opens the door

for why -- why the plea agreements got worse.

JUDGE SCHROEDER: Well, I mean, I hate to go down this road, but I do think the door has gotten opened a little bit on this, and the jury's already heard him plead guilty to it.

MR. VAN CLEEF: Your Honor, the pleas -- the plea offers to him did not include -- I mean, did not include a plea to -- none of them -- I've only been here for one, but the last one was the day of the superseding indictment which included that new charge, and he would not have been pleading to the prohibitive weapon.

JUDGE SCHROEDER: Right.

MR. VAN CLEEF: That was not really part of the plea. That was -- he was still pleading to the conspiracy. He's correct. The offer was to plead every time to the conspiracy, and the offer went up each time. It didn't go up because of the additional charges, that I know of, it just went up because he hadn't changed.

MR. HORNOK: The last offer was the -- what we tried to enter with him was a 911(c)1(c) range. The reason we had to do a range as opposed to what we typically do in a guideline sentence is specifically because he had engaged in that conduct, but we did not believe on the basis of that conduct he would receive acceptance and responsibility, even if we had stipulated

to it, and that is specifically -- that was the specific reason we engaged in that specific kind of plea offer and negotiation, and that's a plea agreement that he rejected.

MR. VAN CLEEF: Well, I don't know that he would know that. I mean, I don't -- I'm going to make this real quick, Your Honor.

JUDGE SCHROEDER: Go ahead.

MR. VAN CLEEF: I take your word for it, but I don't even know that, Your Honor. These are --

JUDGE SCHROEDER: Yes.

MR. VAN CLEEF: -- internal machinations --

JUDGE SCHROEDER: Right.

MR. VAN CLEEF: -- of the -- the U.S. Attorney's office.

JUDGE SCHROEDER: Yeah. So how -- I mean, how's he going to have knowledge of that, Jonathan?

MR. CARTER: Your Honor, if I may, the evidence he has proffered for the jury that the United States has somehow acted in a vindictive manner, I think the jury would be entitled to hear about his behavior and what -- he's attacked --

JUDGE SCHROEDER: I understand that, but he's --

MR. VAN CLEEF: So I think he can --

JUDGE SCHROEDER: But -- I understand that,

but he doesn't have any -- I mean, if his lawyer doesn't know it, how's he going to know it? And so what's the -- what's his knowledge here? What's -- I mean, permitting Mr. Hornok to ask him questions that we know the witness doesn't know the answer to.

MR. CARTER: Well, I think -- I think we should be able to get to the underlying facts of the prohibited weapon.

MR. HORNOK: Which occurred -- which he knew occurred, his lawyer knew occurred, and I knew occurred was long before that plea -- plea agreement.

MR. CARTER: It was negotiated.

MR. VAN CLEEF: He still wouldn't know the reason was that they are going up.

MR. CARTER: But the jury's entitled to know the real reasons.

MR. HORNOK: And he has -- he has alleged the reason was that I am a vindictive prosecutor.

JUDGE SCHROEDER: He quite clearly did that.

MR. VAN CLEEF: He did. And that's what anyone would say if the offer goes up, regardless of whether -- the charges.

JUDGE SCHROEDER: But they did have other charges. That's the thing.

MR. VAN CLEEF: But they did -- he wasn't

being asked to plead to them.

JUDGE SCHROEDER: Yeah, but, I mean, it's like -- I mean, I understand the argument, but a lot of times, you know -- I mean, all of these cases I see where, you know, there's seven counts in the beginning, and he pleads guilty to one count. So -- and it's all part of the same --

MR. VAN CLEEF: Sure.

JUDGE SCHROEDER: -- negotiation. So --

MR. VAN CLEEF: The -- the additional count was -- became count 1 was added the day that we were supposed -- we had the plea deal.

JUDGE SCHROEDER: Right. And so help me understand why that matters.

MR. VAN CLEEF: Because he -- it was the day that he was coming to plea. The plea agreement was the day he was arraigned on the superseding indictment. He would have no idea why the offer went up because the superseding indictment would have done in the initial appearances that day.

JUDGE SCHROEDER: But the offer went up after that, did it not?

MR. VAN CLEEF: No. That was the last offer.

MR. HORNOK: After the act it went it up.

MR. CARTER: After the act it went up.

MR. VAN CLEEF: After the act, but not after the new indictment.

JUDGE SCHROEDER: Yeah.

MR. VAN CLEEF: The new charge.

JUDGE SCHROEDER: Right.

MR. HORNOK: And it went up. It went up after the act on the basis of the act, and we totally retooled the way that plea agreement was structured because of the act.

JUDGE SCHROEDER: Okay. And you weren't involved in that?

MR. HORNOK: Be was.

MR. VAN CLEEF: Which part?

MR. HORNOK: The last plea agreement when we did the 11(c)1(c).

JUDGE SCHROEDER: I mean, you don't recall any discussions about that?

MR. VAN CLEEF: I mean, I remember that they superseded the indictment and added that charge, and I know why they did it.

MR. HORNOK: But you -- we -- the last plea agreement, the one that he didn't plead guilty to --

JUDGE SCHROEDER: Yeah.

MR. HORNOK: -- it was an 11(c)1(c) to a

range. And you remember having discussions with me that the reason we engaged in that range is because we did not believe that if we had stipulations with respect to acceptance of responsibility, that he would actually get the benefit of that acceptance of responsibility because he'd had the weapon in jail.

MR. VAN CLEEF: I did -- there's two conversations there. First, yes, I was concerned about him not getting acceptance of responsibility. That's three points. But the range that was offered, and he's got it wrong, it wasn't 360 months, it was 210 to 327 months, which is about 120 months difference. That's not explained by 327 to responsibility.

JUDGE SCHROEDER: I agree with that.

MR. VAN CLEEF: Additional time.

JUDGE SCHROEDER: I agree with that.

MR. HORNOK: But what is explained by the -- the additional time in the more flex favorable plea agreement is the fact that the guy had a weapon in prison, in jail.

JUDGE SCHROEDER: All right. Here's the deal.

MR. VAN CLEEF: Yes, sir.

JUDGE SCHROEDER: None of this came up until your client got up on the stand and brought it out, and I

am somewhat unsure about the decision I made to let him go into it. As I understand that plea agreements, offers that are made are certainly inadmissible, certainly by the government, but not necessarily inadmissible by the defendant. He -- he opened the door on this. All right?

Jonathan, I'm going to give you a little bit of latitude on this. Let's try to do it in two or three questions and get this jury upstairs.

MR. HORNOK: Fair enough.

MR. VAN CLEEF: That's why I had my book out.

(Bench Conference Ends)

MR. HAYDEN: Your Honor?

JUDGE SCHROEDER: Yes, sir.

MR. HAYDEN: Do they have any more questions? Because --

JUDGE SCHROEDER: Yes, they've got just a couple of other questions to follow up on some information that you brought up.

MR. HAYDEN: Okay. Because I -- I honestly -- I don't -- I don't feel like sitting here quibbling with these guys --

JUDGE SCHROEDER: I appreciate that.

MR. HAYDEN: -- for too much longer, you know.

JUDGE SCHROEDER: I think it will be relatively -- it will be relatively short.

MR. HAYDEN: All right. Thank you.

RECROSS-EXAMINATION

BY MR. HORNOK:

Q. Isn't it true that on December 26th, 2019, you were an inmate at the Titus County Jail?

MR. HAYDEN: Your Honor, I don't want to go through with these guys anymore. I can't -- I can't -- I've been through -- I've been through enough.

JUDGE SCHROEDER: Well, you know, one of the -- the -- we had this discussion.

MR. HAYDEN: Yeah.

JUDGE SCHROEDER: -- Mr. Hayden, earlier, that if you were going to testify, you would be subjecting yourself to cross-examination by the Government.

MR. HAYDEN: Yeah. Yeah, yeah, I understand, but --

JUDGE SCHROEDER: Right. And so that's where we are. And we've had a discussion at the bench over here. I've had an opportunity to visit with Mr. Hornok and Mr. Van Cleef on your behalf about a series of just a few questions to follow up on some information that you brought up. So I think it's fair that they are able to --

MR. HAYDEN: Yeah, I understand, but they're just trying to smear me even further.

MR. HORNOK: Objection, Your Honor.

JUDGE SCHROEDER: Just -- just do your best to answer the questions.

Q. (Mr. Hornok continued.) Isn't it true that on December 26th, 2019, you were an inmate at the Titus County Jail?

A. Yes.

Q. And isn't true that on that date while you were in the separation cell, you armored yourself up, and you got ready for a fight?

A. Yes.

Q. And isn't it true that while -- when you armored yourself up, you were wielding a bolt that looked like this?

A. Yes. I've already pled guilty to that, sir.

Q. Yes. And isn't it true that on that date you threatened to kill any officer who came into the cell to get you?

A. Yes.

Q. And that's why you pleaded guilty, isn't it?

A. That's -- they's why I pleaded guilty because it was a charge that I was, in fact, guilty of.

Q. And I --

A. The contraband. I was, in fact, guilty of contraband. I wasn't guilty of all this other stuff. That's why I have not pled guilty to none of this.

Q. And after that date, your plea agreement got substantially less beneficial to you. Isn't that correct?

A. No, sir, that is not correct.

MR. HORNOK: No further questions, Your Honor.

JUDGE SCHROEDER: Anything you want to add?

MR. HAYDEN: No, I --

JUDGE SCHROEDER: Mr. Van Cleef, anything going on?

MR. HAYDEN: I'm tired, man. I'm tired.

JUDGE SCHROEDER: You may step down. Oh, I'm sorry. Ladies and gentlemen of the jury, we'll take a short recess. Okay.

(End of Testimony by Mr. Hayden.)

C E R T I F I C A T E

STATE OF ARKANSAS )
) ss
COUNTY OF BENTON )

I, CYNTHIA A. DONALD, Certified Court Reporter, in and for the aforesaid county and state, do hereby certify that the within transcript was reduced to typewritten form by me or under my direction and supervision; that the foregoing transcript is a true and accurate record to the best of my understanding and ability.

I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set, or have authorized said setting, of my hand and affixed my seal of office this 10th day of July, 2020.

Cynthia A Donald

CYNTHIA A. DONALD, CCR
Certified Court Reporter
Arkansas Supreme Court
License No. 183