**In The Matter Of:**

*UNITED STATES OF AMERICA v.*
*COLLIN GARRETT HAYDEN*

---

*TIMOTHY HARPER*
*March 05, 2020*

---

*Donald Court Reporting & Transcription, LLC*
*P.O. Box 1640*
*Springdale, AR 72765*
*(888) 438-7836*
*donaldcrt@gmail.com*

Original File HarperTimothy03052020.txt

Min-U-Script®

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) |
| vs. | ) CAUSE NO. 5:17cr9(6) |
| COLLIN GARRETT HAYDEN Defendant. | ) |

TESTIMONY OF TIMOTHY HARPER

BEFORE THE HONORABLE ROBERT W. SCHROEDER, III

March 5, 2020

1:32 p.m.

APPEARANCES

MR. JONATHAN HORNOK FOR THE PLAINTIFF
MR. DONALD CARTER
U. S. Attorney's Office E/TX-Texarkana
500 State Line Avenue N, No. 402
Texarkana, Texas 75501
(903) 794-9481
jonathan.hornok@usdoj.gov
donnie.carter@usdoj.gov

MR. L. CHARLES VAN CLEEF FOR THE DEFENDANT
Van Cleef Law Office
P. O. Box 2432
Longview, Texas 75606-2432
(903) 248-8244
charles@vancleef.pro

# I N D E X


| TESTIMONY BY TIMOTHY HARPER | Page |
|---|---|
| Direct Examination by Mr. Hornok -------------- | 4 |
| Cross-Examination by Mr. Van Cleef ------------ | 77 |
| Redirect Examination by Mr. Hornok ------------ | 126 |
| Recross-Examination by Mr. Van Cleef ---------- | 127 |
| Redirect Examination by Mr. Hornok ------------ | 127 |


# E X H I B I T S


| Plaintiff's Exhibit | | Referenced |
|---|---|---|
| 27 | (Timothy Harper's Federal Conviction Documents) ---------------------------------- | 6 |
| 28 | (Timothy Harper's SEALED plea addendum) -------- | 8 |
| 29 | (Timothy Harper's Proffer Letter) -------------- | 9 |

MS. SCHROEDER: Do you solemnly swear that the testimony you're about to give in the case before the court is the truth, the whole truth, and nothing but the truth, so help you God.

MR. HARPER: I do.

MR. HORNOK: May I proceed, Your Honor?

JUDGE SCHROEDER: You may.

TIMOTHY HARPER, having been called upon to testify in the form of a hearing and having been duly sworn, testified as follows, to wit:

DIRECT EXAMINATION

BY MR. HORNOK:

Q. Could you please state your name for the jury?

A. Timothy Harper.

Q. Mr. Harper, are you a drug dealer?

A. Yes.

Q. And are you or -- now or ever been a member of a white supremacist prison gang?

A. Yes.

Q. And is that the Peckerwood gang?

A. Yes.

Q. Have you been a prostitute.

A. Yes, sir.

Q. A stripper?

A. Yes, sir.

Q. A porn star?
A. Yes, sir.
Q. A felon?
A. Yes, sir.
Q. A drug addict?
A. Yes, sir.
Q. And, in fact, when was the last time you used methamphetamine?
A. Just November of last year.
Q. And that was while you were in a federal prison?
A. Yes, sir.
Q. You were a defendant in this case; correct?
A. Yes, sir.
Q. Tell us, what was the result of you being a defendant in this case?
A. I took a plea agreement for 188 months.
Q. And approximately how long in years is 188 months?
A. Fifteen and a half.
Q. Now, in order to get that sentence, what did you have to plead guilty to doing?
A. Conspiracy to possess and distribute 500 grams or more of methamphetamine.
Q. And did you plead guilty because you are, in fact, guilty of that conspiracy?
A. Yes, sir.

Q. Let me turn your attention to what's in front of you. It's Exhibit No. 27. Do you recognize those documents?
A. Yes, sir.
Q. And have you seen the documents that are there in Exhibit 27 before?
A. Yes, sir.
Q. How do you recognize those documents?
A. It's the plea agreement that I signed.
Q. And is a -- is your judgment -- your -- your criminal judgment in that stack of documents there as well?
A. Yes, sir.
MR. HORNOK: Your Honor, at this time I move to admit Exhibit No. 27.
JUDGE SCHROEDER: Any objection?
MR. VAN CLEEF: Your Honor, I'm sorry, I'm scrolling as fast as I can.
No, sir, no objection.
JUDGE SCHROEDER: Very well. It will be received.
(Wherein Exhibit 27 was received.)
Q. (Mr. Hornok continued.) If you can, turn over --
MR. HORNOK: Well, let's -- I'm sorry, let's go ahead and if we could, display Exhibit 27, page 1 to

the jury.

Sorry, Your Honor, there's --

(Wherein there was a problem with the monitors.)

JUDGE SCHROEDER: No, I see it.

MR. HORNOK: Mrs. Schroeder, are you -- do you know? Would it be from the witness stand? Is that possible?

MS. SCHROEDER: Shouldn't be.

MR. HORNOK: Your Honor, could I approach the witness?

JUDGE SCHROEDER: Yes.

MR. HORNOK: Thank you.

JUDGE SCHROEDER: Ah. No, I fixed it. Yes. You can thank me.

MR. HORNOK: Thank you, Your Honor.

Q. (Mr. Hornok continued.) Mr. Harper, is this the first page of your plea agreement?

A. Yes.

Q. And in this plea agreement did you plead guilty to a violation of 21 U.S.C. Section 846?

A. Yes, sir.

Q. All right. Let me direct your attention now -- in the book in front of you there's a tab. Should be just the next tab, 28.

Are you able to flip the page there?

A. Okay.
Q. What do you recognize Exhibit 28 to be?
A. My plea agreement addendum.
Q. And this is an addendum to that plea agreement?
A. Yes.
MR. HORNOK: Your Honor, at this time I'd move to admit Exhibit No. 28.
JUDGE SCHROEDER: Any objection?
MR. VAN CLEEF: No, sir.
JUDGE SCHROEDER: Very well.
(Wherein Exhibit 28 was received.)
MR. HORNOK: Your Honor, if we could display Exhibit 28.
Q. (Mr. Hornok continued.) Is this -- if you could, there's some underlying parts of it, then it starts "The defendant."
If you could, just read there for the jury?
A. It says, "The defendant, Timothy Franklin Harper, the defendant's attorney, Greg Waldron, and the United States Attorney for the Eastern District of Texas, state that there are no provisions included in this addendum."
Q. All right. Let me direct your attention to the next tab in the book in front of you. It's Exhibit 29.
A. Okay.
Q. Do you recognize this document?

A. Yes, sir.
Q. And what do you recognize this document to be?
A. My proffer.
Q. When was this proffer letter executed?
A. On August the 30th of 2019.

MR. HORNOK: Your Honor, at this time I move to admit Exhibit No. 29.

JUDGE SCHROEDER: Any objection?

MR. VAN CLEEF: No, sir.

JUDGE SCHROEDER: It will be received.

(Wherein Exhibit 29 was received.)

MR. HORNOK: If we could display page 1 and focus in on paragraph 1.

Q. (Mr. Hornok continued.) All right. There where it has the 1, could you read that paragraph for us, please?
A. It says, "You have expressed an interest in having an off-the-record meeting. This meeting is entirely voluntarily. You are under no obligation to meet with me. In order to assure that there are no misunderstandings about the meeting of off the record, I am writing to clarify the ground rules. One, you will completely and truthfully answer all questions will provide complete and truthful information, and will not conceal any information or make any false statements; you will not attempt to protect any person or entity, nor will you falsify,

implicate any person or entity."
Q. Now, on that day when you agreed to tell the truth, did you tell the truth?
A. Yes, sir.
Q. And on that day were you made any promises about any kind of sentencing reduction that you might receive?
A. No, sir.
Q. Now, are you here because you hope to receive a sentencing reduction?
A. Yes, sir.
Q. Why?
A. It's the right thing to do.
Q. Who is it that makes the decision about whether you would receive a sentence reduction?
A. It's up to the judge.
Q. Do I decide whether you get a sentencing reduction?
A. No, sir.
Q. And what basis will the judge use to make a decision about whether you should receive some kind of sentence reduction for your testimony today?
A. Whether or not the statements that I made were the truth.
Q. So are you here to help the case against Collin Hayden?
A. No, sir.

Q. Does it matter what the jury decides in this case in terms of whether you would receive some kind of sentence reduction?
A. No, sir.
Q. So are you going to tell the truth today?
A. Yes, sir.
Q. Now, are you nervous to be here?
A. Yes, sir.
Q. Why are you nervous to be here?
A. For my safety.
Q. Why would you be nervous about your safety?
A. Because of the way that the prisons are ran. Snitches, I guess you can call them, are frowned upon inside of the BOP.
Q. Would you consider yourself to be a snitch, sitting here on a witness stand in a criminal case where you're not the defendant?
A. Yes, sir.
Q. And when you say they're not looked on well, what do you mean by that?
A. In most cases you can be assaulted violently or even in worse cases, stabbed to death.
Q. I want to direct your attention now to Dallas in 2010. Did you start distributing drugs in the Dallas area at that time?

A. Yes, sir.
Q. Now, at some point in November 2010 were you arrested?
A. Yes, sir.
Q. And were you convicted of a felony?
A. Yes, sir.
Q. What were you sentenced to?
A. Four years in TDC.
Q. And what was the nature of that crime that you committed?
A. Possession of a controlled substance.
Q. So it was a drug crime.
A. Yes, sir.
Q. Now, at the same time were you convicted of another felony?
A. Yes, sir.
Q. What was that felony?
A. Family violence.
Q. And what kind of family violence did that involve?
A. An assault charge on my ex-girlfriend.
Q. And was there any kind of choking involved in that offense?
A. Yes, sir.
Q. And what did you -- what sentence did you receive for that offense?

A. I believe it was -- ran concurrent with my four-year sentence.
Q. At the same time were you convicted of another felony offense?
A. Yes, sir.
Q. What was that offense?
A. Two state jail felonies for credit card and debit card abuse.
Q. And what was the result of those convictions?
A. Two years state jail ran concurrent with the four-year TDC sentence.
Q. Now the four-year TDC sentence, what was your understanding about whether you may be able to parole out early -- earlier than four years?
A. Since it was a nonviolent crime, if you behave yourself, I guess you could say then you had an opportunity to parole out after, I think 18 months.
Q. Did you behave yourself in prison?
A. No, sir.
Q. And how long did you end up staying in TDCJ?
A. I did the entire four years.
Q. And that was on the basis of your conduct in prison.
A. Yes, sir.
Q. What kind of conduct in prison led to you staying in prison for an extra three years?

A. Violent acts committed for the gang that I joined.
Q. What gang did you join?
A. Peckerwoods.
Q. And what are Peck -- the Peck -- what is the Peckerwood gang?
A. It's a gang that offers protection for white people inside of prison.
Q. Do they let black people in?
A. No, sir.
Q. How is the Peckerwood gang similar or dissimilar from the Arian Brotherhood or the Arian Circle gangs?
A. Dissimilar in a way that there is no one person that calls the shot. Everybody has their own voice and opinion versus being in a family they have one person that pretty much calls all the shots.
Q. And that's -- so where the family is, that's the Arian Brotherhood or the Arian Circle?
A. Correct.
Q. And how is the Peckerwood gang different?
A. There's no leader. Everybody pretty much speaks for themselves.
Q. Now, is there a common ideology that connects these three gangs?
A. Yes, sir.
Q. What is that ideology.

A. To the -- to advance and further the preservation of your own race.
Q. And that is the Caucasian race.
A. Correct.
Q. And where primarily do these gangs operate?
A. Inside a prison.
Q. Now, are there any kind of tattoos that signify membership in a gang?
A. Yes, sir.
Q. What kind of tattoos are associated with being a member of the Peckerwood gang?
A. A set of lightening bolts.
Q. And when you say a set of lightening bolts, is it two? Three? Four?
A. Two. A pair.
Q. And are they parallel to one another? Perpendicular? How are they typically fashioned relevant to one another?
A. Independent bolts are usually squared at the top and pointed at the bottom.
Q. And are they side by side?
A. Yes, sir.
Q. Kind of pointed in the same direction?
A. Yes, sir.
Q. So if you could, explain for the jury what this

looks like. And I know this is -- this is kind of hard, but maybe if you can just help them have a better understanding, a mental picture of what it looks like.
A. Okay. If you've ever seen a Gatorade commercial, the bolt that is on the Gatorade is the bolt that's represented for the independent Peckerwoods.
Q. And I believe on a Gatorade bottle, is there one lightening bolt?
A. There's just one, yes.
Q. So in a Peckerwood --
A. There would be side by side.
Q. Okay. And would that have any similarity to the SS lightening bolts that maybe were worn by Nazi soldiers?
A. Yes, sir.
Q. Are there other forms of lightening bolts which are associated with different gangs?
A. Yes, sir.
Q. What -- how are they different?
A. If you belong to Arian Brotherhood or Arian Brotherhood of Texas, if you would picture the Gatorade bolt where it's squared off at the top, it will be also squared off at the bottom.
Q. And so this would be kind of like that shape (indicating)?
A. Yes, sir.

Q. But square on the top and square on the bottom.
A. Yes, sir.
Q. And it would be two of them side by side?
A. Yes, sir.
Q. And that would be Arian Brotherhood?
A. Yes, sir.
Q. And it were pointed on top and pointed on the bottom, what would that indicate?
A. That would be Arian Circle.
Q. Now, if you have one of these tattoos, and you're not a member of one of these gangs, what happens?
A. You become beat up or marked or sometimes even killed.
Q. Is -- and killed by whom?
A. The people that represent the gang.
Q. And so is there some kind of -- do these gangs consider these kinds of like trademarks for membership in the gang?
A. Sure. Initiation, of course.
Q. And how would one be initiated into a gang in order to obtain the right to wear one of these tattoos?
A. They run what they call a heart shape which is when two individuals that have already been inducted into the gang put you in a cell, and they beat you up for 30 seconds.

Q. Have you ever been engaged in that kind of activity?
A. Yes, sir.
Q. In what capacity?
A. When I first got my heart shaken, and I've conducted several heart shakes as well.
Q. So you've been one of the two beating up on the new member.
A. Correct.
Q. You, at one point, mentioned an independent. Is there some kind of an association between independent and Peckerwood.
A. It's the same thing. Just independent Peckerwoods is what they're called, which means they have no affiliation to a family.
Q. And are there any other kinds of tattoos which you may earn the right to wear on behalf of the gang?
A. Sure. There's what there's called a Maltese cross or iron cross.
Q. And how might somebody earn the right to wear an iron cross on behalf of the gang?
A. For committing an act of bravery.
Q. And --
A. For the gang.
Q. And another word for act of bravery on behalf of the gang might be an act of violence in prison.

A. Correct.
Q. Have you -- do you have any iron crosses tattooed on your body?
A. Yes, I have two.
Q. And did you commit any acts of violence associated with those tattoos?
A. Yes, sir.
Q. Can you tell us about those briefly?
A. Both of them were for heart checks given to new members coming into the system.
Q. Now, at some point did you eventually get out of prison?
A. Yes, sir.
Q. Approximately when was that?
A. September 11th of 2015.
Q. And after you got out of prison, did you eventually move to Dallas?
A. Yes, sir.
Q. And what kind of criminal activity did you engage in when you moved to Dallas?
A. I started distributing methamphetamine.
Q. Okay. Did you engage in any kind of other sex work?
A. Yes, sir.
Q. What was that?
A. I start stripping and doing pornography.

Q. And did you engage in any kind of prostitution at that time?
A. Yes, sir.
Q. And what kind of clients -- who -- who were your clients in term of prostitution?
A. Mostly male.
Q. Did you distinguish between clients, either male or female?
A. No, sir.
Q. At some point did you meet somebody named Collin Hayden?
A. Yes, sir.
Q. And did you -- when did you meet Mr. Hayden, relative to getting out of prison and moving to Dallas in 2015?
A. The fall of 2015. Late fall. November-ish.
Q. I want you to look around the room, and I want you to tell me whether you see Mr. Hayden in the courtroom here today.
A. Yes, sir.
Q. And could you point out generally where he's sitting or describe where he's sitting and identify a distinct article of clothing that he is wearing?
A. To the right in the suit with the blue tie.
MR. HORNOK: Your Honor, may the record

reflect that the witness has properly identified the defendant?

JUDGE SCHROEDER: Yes, it will.

Q. (Mr. Hornok continued.) Was there an individual through whom you met Mr. Hayden?

A. Yes, sir.

Q. Who was that individual?

A. His name is Jason Terrell.

Q. And how did you meet Jason Terrell?

A. Through the escorting website in which I advertised on.

Q. What was that website?

A. Backpage.com.

Q. So Mr. Terrell was a prostitution client. Is that right?

A. Yes, sir.

Q. And tell us about the -- well, did Mr. Terrell call -- or make a call to you that initiated your meeting with Mr. Hayden?

A. Yes, sir.

Q. And when he called you, what -- what was the nature of that call?

A. He wanted me to deliver two ounces of methamphetamine to him.

Q. And did you take those -- take that methamphetamine

to the location he described?
A. Yes, sir.
Q. What was that location?
A. It was a hotel.
Q. And once you got to the hotel room, who, if anyone, did you meet in the hotel?
A. Mr. Hayden.
Q. And did you speak with Mr. Hayden at that time?
A. Yes, sir.
Q. What, if any, tattoos did you notice on Mr. Hayden when you met him?
A. A set of square lightening bolts.
Q. And they were square on top and square on bottom?
A. Yes, sir.
Q. And what, if anything, did that indicate to you about his possible association -- or what, if anything, did that mean to you?
A. That he was affiliated with ABT or Peckerwoods.
Q. And did he -- did you have any conversations about that with him?
A. Briefly.
Q. And what -- tell us what that conversation was.
A. I just asked him if he was a Wood. He told me yes, and we kind of just clicked from there.
Q. Based on that conversation, what did you conclude

about whether Mr. Hayden was a member of one of these gangs you've described?
A. I concluded that he was trustworthy, and that he was.
Q. And so because of that membership, you trusted him.
A. Yes, sir.
Q. Now, in the fall of 2015, did you have more interactions with Mr. Hayden?
A. Yes, sir.
Q. Did you guys have -- develop some kind of a friendship?
A. Yes, sir.
Q. Did Mr. Hayden express any interest in your work?
A. Yes, sir.
Q. What interest did he express?
A. He wanted to know more about how he could become a stripper.
Q. And did you assist him in that endeavor?
A. Yes, sir.
Q. So did you operate kind of like a mentor for Mr. Hayden in terms of stripping?
A. Sure.
Q. At some point in 2015, did you lose contact with Mr. Hayden?
A. Yes, sir.

Q. While you lost contact with him, did you have any contact with any of his family members?
A. Yes, sir.
Q. And who was it that you had contact with?
A. A younger brother.
Q. Where was that brother -- where did that brother live?
A. Louisiana.
Q. What, if any, criminal activity did you engage in with that younger brother?
A. I began selling him methamphetamine.
Q. Where was -- so you were selling methamphetamine to him. What was he doing with the methamphetamine?
A. Taking it to Louisiana to distribute.
MR. VAN CLEEF: Objection. That calls for speculation.
JUDGE SCHROEDER: Can you lay a foundation?
MR. HORNOK: Sure.
Q. (Mr. Hornok continued.) Did you have any conversations with this individual about what he was doing with the methamphetamine?
A. Yes, sir.
Q. And what did he tell you about -- or what -- based on those conversations, where -- where did you understand the methamphetamine you were selling was going?

MR. VAN CLEEF: Objection, Your Honor. That's pure hearsay.

JUDGE SCHROEDER: Can you -- is there -- Mr. Hornok, what's the exception?

MR. HORNOK: Your Honor, it's not hearsay. I haven't asked him what the brother said; I've asked him did he have a conversation.

JUDGE SCHROEDER: Well --

MR. HORNOK: And then I've asked him --

JUDGE SCHROEDER: Is there an exception that applies?

MR. HORNOK: It is also -- it is a statement of a co-conspirator, during and in furtherance of a conspiracy.

MR. VAN CLEEF: Your Honor, can I approach?

JUDGE SCHROEDER: You may.

(Bench Conference Begins)

MR. VAN CLEEF: The testimony -- the only testimony about the relationship between the defendant and his brother is that they are brothers. That is not a conspiratorial relationship at all.

MR. HORNOK: Your Honor, the conspiracy is as between the defendant, Mr. Harper, and the defendant -- sorry, the witness, Harper, and the defendant's brother, this other individual, who were selling methamphetamine,

one to another. That is a drug conspiracy, it is part of Mr. -- Mr. Harper's criminal activity, and so, therefore, it is --

JUDGE SCHROEDER: Do we have any further testimony?

MR. HORNOK: And in addition to that, Your Honor --

MR. CARTER: I apologize -- it's my understanding, and Mr. Hornok has prepared this witness, so he can correct me if I make any misstatements.

My understanding, I've been in the preparatory meetings, is that the witness is also going to testify that once he and Mr. Hayden reconnected, that he was -- they were getting methamphetamine from Mr. McLemore. The defendant was giving it to his brother and -- to sell through East Texas into Louisiana area.

MR. VAN CLEEF: Okay. But --

JUDGE SCHROEDER: If that's -- if that's right, that's -- if that's right, that does it. I mean, is that --

MR. HORNOK: I believe that's correct.

MR. VAN CLEEF: And if that's correct, then the testimony would be admissible, but right now they're just brothers.

JUDGE SCHROEDER: Yeah, once it comes -- I

mean, I -- I think that's right, you-all have to get there. He hasn't gotten there yet.

MR. HORNOK: I -- that will be my next question.

JUDGE SCHROEDER: All right.

(Bench Conference Ends)

Q. (Mr. Hornok continued.) You mentioned that you sold methamphetamine to Mr. Hayden's brother.

A. Yes, sir.

Q. At some point did Mr. Hayden also get involved in purchasing methamphetamine and selling it with you and his brother?

A. No, sir.

Q. At some point did you get involved with Mr. Hayden in selling methamphetamine?

A. Yes, sir.

Q. Okay. And were you aware of any instance when Mr. Hayden sold methamphetamine to his brother?

MR. VAN CLEEF: Your Honor, asked and answered as to the questions --

JUDGE SCHROEDER: I'll -- I'll permit it.

Q. (Mr. Hornok continued.) Were you aware of any instance in which Mr. Hayden sold methamphetamine to his brother?

A. Yes, sir.

Q. And where did you understand Mr. Hayden's brother to live?
A. In Louisiana.
Q. And do you know specifically where in Louisiana?
A. Bossier City.
Q. And is that near Shreveport?
A. Yes, sir.
Q. And so the methamphetamine that we're describing that you were selling, where was that methamphetamine going?
A. To my understanding, to Shreveport.
Q. And Mr. Hayden and Mr. Hayden's brother were involved in that activity.
A. Yes, sir. Not together. Separately, but, yes, sir.
MR. VAN CLEEF: Your Honor, then that's my objection --
JUDGE SCHROEDER: Well --
MR. VAN CLEEF: The answer that the witness just gave, under 801.
JUDGE SCHROEDER: Mr. Hornok.
MR. HORNOK: Your Honor, I think it is asked and answered at this point, although I think -- there may be some confusion here, but I think we asked a question -- I think there's some muddiness here, but at this point I think it's asked and answered.

JUDGE SCHROEDER: Mr. Van Cleef could move to strike it, and I could, you know, instruct the jury to disregard it, so can you fix it?

MR. HORNOK: Let me -- let see me if I -- if I might.

Q. (Mr. Hornok continued.) You sold methamphetamine to Mr. Hayden.

A. Yes, sir.

Q. Is that what you testified?

MR. VAN CLEEF: Your Honor, we're leading now.

JUDGE SCHROEDER: No leading.

Q. (Mr. Hornok continued.) Did you ever sell methamphetamine to Mr. Hayden?

A. Yes.

Q. And were you aware if Mr. Hayden ever sold methamphetamine to his brother?

A. Yes.

Q. And were you aware, based on your communications with Mr. Hayden, where that methamphetamine went?

A. Yes.

Q. Where, based on your conversations, did it go?

A. Bossier City, Shreveport.

JUDGE SCHROEDER: Mr. Van Cleef.

MR. VAN CLEEF: I'm sorry, Your Honor, it's

not clear the two -- are we --
JUDGE SCHROEDER: I'm going to let you --
MR. VAN CLEEF: Mr. Hayden, there's him and his brother.
JUDGE SCHROEDER: All right. So you mean -- I think Mr. Hornok is referring to Mr. Hayden, the defendant, in the last question.
MR. HORNOK: Yes, Your Honor. I'm happy to ask -- reask the question with respect to the defendant.
JUDGE SCHROEDER: Let's -- let's move on. Mr. Van Cleef, I'm going to give you an opportunity to --
MR. VAN CLEEF: Yes, sir.
JUDGE SCHROEDER: -- fully explore this in cross.
Q. (Mr. Hornok continued.) In the fall of 2016, did you become involved in drug activity with an individual named Jason McLemore?
A. Yes.
Q. Can you tell us about what drug activity you were involved in with him?
A. Distribution of methamphetamine.
Q. Were you buying methamphetamine from him or selling methamphetamine to him?
A. Selling.
Q. And at some point did that relationship turn sour?

A. Yes.
Q. What happened?
A. He cut me out and went straight to my supplier.
Q. Now, why is that bad for you?
A. Because I lose money.
Q. Tell us -- tell us the jury a little bit about the process of a drug transaction.
So if Mr. McLemore comes to you and wants to purchase methamphetamine --
A. Correct.
Q. How does -- how does that work? What -- what does that look like?
A. Okay. He would call me, and me being the supplier, I would then contact my supplier and get it at a cheaper price coming through me, and then turn around and sell it to him for a higher price to where I make a profit being the middle man of the deal.
Q. And what -- what value added do you add to the transaction in order to merit getting some money out of the transaction?
A. Could you reask the question?
Q. So in that -- in that transaction, you're buying the methamphetamine, you're selling the methamphetamine.
A. Correct.
Q. So you're taking some money out of the deal.

A. Yes.
Q. What value do you add to that transaction that allows you to get to take some money out of it?
A. Being the middle man.
Q. And is -- the middle man, is that just another name for somebody who has a relationship?
A. Yes, sir.
Q. And so you're making the -- making the connection between the buyer and the seller?
A. Correct.
Q. And when you get cut out, what does that mean?
A. That means you no longer make the connection, and you lose the potential profit on the deal.
Q. Now, in order to kind of engage in multiple transactions, is there any kind of trust or understanding that is necessary with all the parties?
A. Sure.
Q. What -- tell us about that.
A. You really want to trust who you're dealing with, whether or not they're trustworthy, I guess you could say, and things of that nature.
Q. And if you don't have a relationship or don't trust them, what happens?
A. You usually don't do business with them.
Q. And so in order to form a business relationship to

buy and sell drugs, is this the same kind of business relationship you might have with Walmart if you go in and purchase something off the shelf?

A. Yes.

Q. Is -- is it -- and if you are a repeat customer, do you have to build a better relationship than you might otherwise have at a Walmart, or with Walmart?

A. Yes.

Q. Did you eventually meet an individual named Daniel Montes-Munoz?

A. Yes.

Q. How did you meet Mr. Montes-Munoz?

A. Through a transgender woman.

Q. And what was the context of -- how did you know that transgender woman?

A. She was a client off of one of my escorting websites.

Q. And by "escorting," you mean prostitution. Is that right?

A. Correct.

Q. And at the time, what were you looking to buy?

A. A car.

Q. And why did your interest in buying a car lead to you meeting Mr. Montes-Munoz?

A. Montes-Munoz ran a body shop in Dallas, and he

bought cars at an auction, fixed them up and resold them.
Q. So did you end up buying a car from Mr. Montes-Munoz?
A. Yes, sir.
Q. What kind of a car did you buy?
A. I bought a 2005 535i BMW.
Q. Is that an expensive vehicle?
A. It can be, yes.
Q. Was that one an expensive vehicle?
A. 3500.
Q. Did you eventually engage in any kind of drug activity with Mr. Montes-Munoz?
A. Yes, sir.
Q. What activity did you engage with him?
A. Distribution of methamphetamine.
Q. Were you purchasing methamphetamine from him or buying meth -- or selling methamphetamine to him?
A. Purchasing.
Q. And so was he -- did he become your supplier?
A. Yes, sir.
Q. And did you engage in multiple -- multiple drug transactions with him?
A. Yes, sir.
Q. And did you guys have a relationship over -- build a relationship over time?

A. Yes, sir.
Q. At some point did Mr. Hayden get back in contact with you?
A. Yes, sir.
Q. And approximately when was that?
A. Fall of 2016.
Q. And at that time where did he move?
A. To Dallas.
Q. Did you help Mr. Hayden get any kind of job at that time?
A. I helped him get on at the strip club I worked at.
Q. And what strip club was that?
A. It was called BJ's NXS.
Q. And is that located in Dallas?
A. Yes, sir.
Q. So you were working there together?
A. Yes, sir.
Q. So, again, this is another instance where you were kind of mentoring Mr. Hayden?
A. Yes, sir.
Q. Eventually, did you two become roommates?
A. Yes, sir.
Q. Where first did you live?
A. The Budget Inn & Suites in Dallas.
Q. Approximately when in 2016 was that?

A. Late November.
Q. Now, at some point at that time did you again give Mr. Hayden some methamphetamine?
A. Yes.
Q. And approximately how much methamphetamine did you give him?
A. One to two ounces.
Q. And did you front the methamphetamine to him, or did you sell it to him outright?
A. I would pretty much put it up, and then when the buyer got there, he would sell it to him, and we would split the profit.
Q. So was he acting as the kind of middleman like you had described earlier?
A. Yes, sir.
Q. As you guys were discussing, did you -- did Mr. Hayden ever introduce you to somebody from Shreveport?
A. Yes, sir.
Q. Or from the Bossier City area.
A. Yes, sir.
Q. And was this individual a drug purchaser?
A. Yes, sir.
Q. And based on your conversations with Mr. Hayden and with the drug purchaser, where was the methamphetamine purchased going?

A. To Shreveport.

MR. VAN CLEEF: Hearsay, Your Honor.

MR. HORNOK: Your Honor --

MR. VAN CLEEF: And I would ask that the answer be stricken.

JUDGE SCHROEDER: Can you rephrase the question?

Q. (Mr. Hornok continued.) So you were selling, again, methamphetamine to Mr. Hayden. Is that correct?

A. Yes, sir. Correct.

Q. Okay. And did he operate as a middleman with any purchasers?

A. Yes, sir.

Q. And did any of those purchasers live in Shreveport?

A. From my understanding, yes.

Q. And did you have conversations with those purchasers?

A. Briefly.

Q. And did you have conversations with Mr. Hayden?

A. Yes, sir.

Q. And so based on those conversations with Mr. Hayden and with the actual purchasers of the methamphetamine, where was that methamphetamine traveling?

MR. VAN CLEEF: Objection, Your Honor. That's the same question. It's hearsay.

JUDGE SCHROEDER: I think it is.

MR. HORNOK: It is -- these are statements that are -- so this is -- we're into the conspiracy here, these are statements about drug purchases that he's having with the defendant and with the defendant's drug purchaser. They're clearly during and within and furtherance of their drug conspiracy.

JUDGE SCHROEDER: I'm going to overrule the objection. I -- the rephrasing of the question didn't fix it, but your explanation did.

Q. (Mr. Hornok continued.) So based on this, where did you understand that Mr. Hayden was sending methamphetamine?

A. To Shreveport.

Q. And how often did you guys engage in these transactions with the buyer from Shreveport?

A. Once or twice a week.

Q. For approximately how long?

A. Three months.

Q. Why did the two of you have to work together to supply the purchaser from Shreveport?

A. I had the connection to get it at a cheaper price, and he had the buyer that could -- that he could charge a higher price for.

Q. So did you guys come to some understanding of

working together to supply methamphetamine to Shreveport?
A. Yes, sir.
Q. Was this a kind of partnership?
A. Yes, sir.
Q. And what -- what did you bring to the partnership?
A. Drug product at a cheap price.
Q. And what did he bring to the partnership?
A. A buyer with money.
Q. Approximately how many ounces of methamphetamine did the two of you sell to the purchaser in Shreveport?
A. Weekly? Monthly?
Q. Just in total.
A. In total?
Q. If you were to estimate how many ounces.
A. Between 25 to 30.
Q. Did you meet an individual named Cam Stringer --
A. Yes.
Q. -- in the context of these interactions?
A. Yes, sir.
Q. Who is Cam Stringer?
A. She was a girl that was a friend of the guy that was coming to buy the drugs.
Q. And where did Cam Stringer live?
A. In Shreveport.
Q. Did you ever go visit Cam Stringer?

A. I attempted to one time, yes.
Q. Now, where -- are you familiar with -- with traveling from Dallas to Shreveport?
A. Vaguely.
Q. Okay. And if you were to travel from Dallas to Shreveport, perhaps in this instance that you've described, how -- how did you intend to travel that day?
A. Interstate 20.
Q. And do you know whether Interstate 20 goes through the Eastern District of Texas?
A. Yes, sir. Tyler, Longview.
Q. And so is that in the Eastern District of Texas?
A. Yes, sir.
Q. Did you have some kind of alias that you used when you were dancing?
A. Yes, sir.
Q. What was that alias?
A. Cameron Diggs.
Q. And would that properly be referred to as a stage name?
A. Yes, sir.
Q. Did you have a Facebook account associated with that alias?
A. Yes, sir.
Q. Now, at some point did you take steps to delete that

account?
A. Yes, sir.
Q. When was that?
A. After I was arrested for discharge.
Q. Did Mr. Hayden have a stage name?
A. Yes, sir.
Q. What was his stage name?
A. Justin Givenchy.
Q. Did you ever interact with a Facebook account under that name?
A. Yes, sir.
Q. Who -- whose Facebook account was that?
A. Mr. Hayden's.
Q. And that's the defendant, Mr. Hayden.
A. Yes, sir. Correct.
Q. Did he have any other Facebook accounts?
A. I believe he had a personal Facebook account as well.
Q. And what was the name associated with that Facebook account?
A. Collin Hayden.
Q. Would he use both Facebook accounts?
A. Yes, sir.
Q. How did he interact with Facebook? Was he on a computer? On a cell phone?

A. Cell phone.
Q. And would he use the cell phone to access both accounts?
A. I mean, it's his phone. I wouldn't know personally, but I would assume so, yes.
Q. Okay. At some point did Mr. Hayden get involved in buying or selling cocaine?
A. Yes, sir.
Q. What was -- what was he doing with the cocaine?
A. He would buy a large amount, break it down and sell it into smaller quantities for a higher price.
Q. Who was he purchasing the meth -- or the cocaine from?
A. Jacon -- Jason McLemore.
Q. Where was he selling the cocaine?
A. In the Dallas area.
Q. Anywhere in particular in the Dallas area?
A. Oaklawn, Garland.
Q. Do you ever sell it at a strip club?
A. Yes, sir.
Q. At some point did you make a connection between Mr. Hayden and Mr. Montes-Munoz?
A. Yes, sir.
Q. What was that connection?
A. For a purchase of cocaine.

Q. Did Mr. Hayden eventually make any purchases of cocaine from Mr. Montes-Munoz?
A. Yes, sir.
Q. And you observed those?
A. One, yes.
Q. Based on your conversations with him or -- with Mr. Hayden, do you know whether he engaged in other -- or purchased other cocaine from Mr. Montes-Munoz?
A. Yes.
Q. Was Mr. Montes-Munoz your supplier at this time?
A. For methamphetamine, yes.
Q. Each time Mr. Hayden would purchase cocaine, approximately how much would he purchase?
A. One to two ounces.
Q. Where -- where would Mr. Hayden break down the ounces of cocaine?
A. In the apartment that we were living in at the time. We had moved from the Budget Suites to an apartment off of Oaklawn and Wycliff.
Q. What kind of units would he break it down into?
A. Just depended. Could be anywhere from a gram to seven grams to a half ounce.
Q. And he would break it down into these -- these smaller units, and what would he do with them?
A. Redistribute them.

Q. From November 2016 through February 2017, approximately how many ounces of cocaine was Mr. Hayden moving each week?
A. I'd say at the most, three.
Q. And what would you say would be the low end of that?
A. One.
Q. So one to three ounces of cocaine each week?
A. Yes, sir.
Q. Did Mr. Hayden make any money based -- from his drug trafficking?
A. I would assume so, yes, sir.
Q. Did he make any purchases that you were aware of?
A. Yes.
Q. What kind of things did he buy?
A. Jewelry, clothes. I believe the money helped him buy a car also, or put a down payment on a vehicle.
Q. What kind of vehicle did he buy?
A. It was a red Camaro.
Q. How else did he spend his money?
A. Girls.
Q. Did he ever buy any drugs?
A. Yes, sir.
Q. Was Mr. Hayden ever present when you were selling drugs to other people?
A. Yes, sir.

Q. What kind of drugs were you selling?
A. Methamphetamine.
Q. Was that -- was methamphetamine your primary drug to sell?
A. Yes, sir.
Q. And was cocaine Mr. Hayden's primary drug to sell?
A. Yes, sir.
Q. So did you guys kind of have a different subset of customers?
A. Yes, sir.
Q. Was there ever any overlap between your customers?
A. No, sir.
Q. What happened -- or what would happen -- did you ever have any customers reach out to you expressing an interest to buy cocaine?
A. Yes.
Q. And if you received such a request, what did you do?
A. I would talk to Collin and give them his phone number, or give him their phone number.
Q. And so you guys worked together to supply each other's customers?
A. Yes, sir.
Q. Did Mr. Hayden have a filter in terms of the things he said and the words he used in talking about drug trafficking?

A. No, sir.
Q. When you say, "no," what -- what kind of things would he say that lead you to believe that?
A. If he was looking to buy cocaine, that's exactly what he would say, "I need to buy some cocaine."
Q. Did that surprise you?
A. Sometimes.
Q. Why did it surprise you?
A. People in the drug trade typically aren't so flamboyant about the vocabulary that they use.
Q. Would -- did you ever observe any flamboyance in Mr. Hayden in other aspects of his life?
A. I don't understand the question.
Q. So you've characterized Mr. Hayden's words as flamboyant.
A. Yes.
Q. Would you characterize any other aspects of Mr. Hayden's life or activities as flamboyant?
A. Sure. I mean, being dancers we, I mean, had a cocky airiness about us, I guess you could say, so, yeah.
Q. At some point in January 2017, did you move into an apartment?
A. Yes, sir.
Q. Who had lived in that apartment before you lived there?

A. Jason McLemore.

Q. How is it that Mr. McLemore, based on your understanding, decided to leave?

A. He had the notion that he was being investigated by the federal government.

Q. Did it turn out he was correct?

A. Yes, sir.

Q. And why -- why were you able to move into the apartment?

A. Me and Collin Hayden were looking for a place at the time, and because of our felony convictions and background, and I guess you could say lack of employment income on paper, it was hard for us to find a place, so we were able to move in through a rel -- a mutual friend of ours.

Q. And so you assumed the lease from Mr. McLemore?

A. Yes, sir.

Q. At that time were you on friendly terms with Mr. McLemore?

A. No, sir.

Q. So if you weren't on friendly terms with Mr. McLemore -- well, let me move on.

Before you moved into the apartment together, were you and Mr. Hayden living together?

A. Yes, sir.

Q. Where were you living?
A. At the Budget Suites.
Q. And when you moved out of the Budget Suites, did you move into the apartment at relatively the same time?
A. Within the same week, yes, sir.
Q. Did Mr. Hayden's brother ever live in the apartment with you?
A. Which one? He has two different brothers.
Q. Did either brother live in the apartment with you?
A. Yes, sir.
Q. Which brother lived in the apartment with you?
A. It was another brother of his. Not the one that we were referring to with the trafficking back and forth, but another brother of his.
Q. The other brother of his, was -- was he involved in drug trafficking ever?
A. No, sir.
Q. In January and February of 2017, were you using methamphetamine or marijuana?
A. Yes, sir.
Q. How frequently?
A. Every day.
Q. Were you ever using anything called GHB?
A. Yes, sir.
Q. What is GHB?

A. Basically, liquid ecstasy.
Q. And were you using all of these drugs at the same time, or one -- at different times?
A. Pretty much at the same time.
Q. And how -- with what kind of frequency were you using methamphetamine, marijuana, and GHB?
A. On a daily basis.
Q. How often were you sleeping at the time?
A. Maybe once every eight or nine, ten days for a few hours at a time.
Q. So you would stay awake for eight to ten days at a time?
A. Yes, sir.
Q. And what would lead to you actually sleeping?
A. Just my body crashing on itself.
Q. And would that ever happen unexpectedly?
A. All the time.
Q. Did Mr. Hayden ever have similar experiences?
A. No.
Q. He did not stay up for days on end?
A. No, sir.
Q. If I were to recite a phrase -- the phrase to you "a parachute of tea," what does that mean?
A. It's when you would take methamphetamine in a physical form and wrap it in a piece of toilet paper and

then ingest it orally.
Q. Why would somebody do that?
A. The high that it provides is more intense than smoking it.
Q. So you've mentioned smoking it. What are some other ways that you might ingest methamphetamine?
A. You could snort it, you could smoke it, you could shoot it. You can throw it in a glass of water and drink if you want to.
Q. So since you were staying awake for so many days, did you sleep at the apartment much?
A. No.
Q. So what did you use the apartment for if you weren't sleeping there?
A. Pretty much just as a base to shower and change clothes or conduct business or party with girls, things of that nature.
Q. When you say, "conduct business," what kind of business were you conducting?
A. Drug transactions.
Q. Did Mr. Hayden ever engage in drug transactions at the apartment?
A. Yes, sir.
Q. How many bedrooms were in the apartment?
A. Two.

Q. And where -- did you have your own bedroom?
A. Yes, sir.
Q. Did Mr. Hayden have a bedroom?
A. Yes, sir.
Q. And you Mr. -- you mentioned Mr. Hayden's brother. Where did Mr. Hayden's brother stay?
A. In the room with Collin at times unless he had a girl over. Then he would sleep in the living room on the floor.
Q. If who had a girl over?
A. Mr. Hayden.
Q. Where did you keep your drugs in the apartment?
A. I had a safe in my closet in my bedroom, and I kept them in there.
Q. Did you keep drugs -- significant quantity of drugs anywhere else?
A. No, sir.
Q. At the time what was an ounce -- what were you selling an ounce of methamphetamine for?
A. Anywhere between four to five hundred dollars.
Q. And approximately what were you selling a pound of methamphetamine for?
A. Three to four thousand dollars.
Q. If in the past you had -- would $5,000 ever be a reasonable price to pay for a pound of methamphetamine?

A. Sure, if it was coming from an out-of-town buyer, yes.
Q. And what were the size of transactions of methamphetamine in which you would engage?
A. It varied. It could be anywhere from an ounce at the very least to a kilo at the very most.
Q. In reference to Mr. Hayden's brother, not the one with whom you engaged in drug trafficking, but this other brother you've described, what, if anything, stuck out to you about that brother?
A. I believe he had some kind of mental disability.
Q. And what, if any, care did -- special care did Mr. -- did the defendant provide to that brother?
A. Collin was very protective of his younger brother. Took care of him, fed him, clothed him, gave him rides wherever he needed to go, made sure he always had somewhere to sleep.
Q. Did the defendant ever allow his brother to engage in criminal activity or be a part of criminal activity?
A. Absolutely not.
Q. And why was that?
A. I don't know. I mean, I assume because he loves his brother. He didn't want him to end up like he did.
Q. Before January of 2017, did you know an individual named Paul Brown?

A. No, sir.
Q. How -- what were the circumstances of you meeting Paul Brown?
A. Early February he knocked on my door at the apartment that me and Mr. Hayden resided in and asked for Jason McLemore.
Q. And when he asked -- knocked on your door and asked for Jason McLemore, what -- why did you think he has looking for Jason McLemore?
A. From my understanding, he owed Jason some money, and so he was looking to pay him back that money.
Q. Now, based on your knowledge of Mr. McLemore and the situation, what -- what conclusion did you come to about the nature of Mr. Brown's interest in relationship with Mr. McLemore?
A. Strictly in the buying and distribution of drugs.
Q. So Mr. Brown was not a friend of Mr. McLemore, he was a drug purchaser.
A. Yes, sir.
Q. Now, at the time when you came to the realization that Mr. Brown was looking to buy drugs, what, if anything, did you -- what, if any, interest did you have in Mr. Brown's drug business?
A. I looked at it as an opportunity to steal a client from Mr. McLemore.

Q. Was anyone -- when Mr. Brown knocked on the door, and you spoke with him, who else was present at that time?
A. Mr. Hayden.
Q. Do you remember anything of note that Mr. Hayden said to Mr. Brown?
A. He asked him how much money he had and what he was looking to buy.
Q. Based on your conversation with Mr. Hayden and your observations, did you conclude whether Mr. Hayden was aware Mr. Brown was looking for drugs?
A. Yes, sir.
Q. So when Mr. Hayden was asking Mr. Brown how much money he had and what -- what he wanted, what did you understand Mr. Hayden to mean?
A. "How much money do you have, and what kind of drugs are you looking for to purchase?"
Q. Now, in the course of that conversation, did you provide Mr. Brown with your phone number?
A. Yes, sir.
Q. Do you -- does the phone number (469) 805-1066 mean anything to you?
A. Yes, sir.
Q. What -- what does that -- what is that phone number?
A. That was my personal cell phone number.
MR. HORNOK: Your Honor, at this time I'd

like to play what's been previously admitted as Exhibit 57C.

(Audio recording plays.)

Q. (Mr. Hornok continued.) Is this a recording of the conversation you just described?
A. Yes, sir.
Q. And did you hear Mr. Hayden's voice in that recording?
A. Yes, sir.
Q. Did you hear your own voice in that recording?
A. Yes, sir.
Q. Somebody identified themselves as Cameron in that recording. Who was that?
A. That was me.
Q. And when you introduced yourself as Cameron in that recording, were you referring to your stage name?
A. Yes.
Q. Now, at some point a few days later did Mr. Brown come back to buy methamphetamine?
A. Yes, sir.
Q. Approximately how much methamphetamine did he purchase on that day?
A. Ten -- ten ounces.
Q. Where were you going to purchase the meth -- or where was the methamphetamine going to come from for that

purpose?
A. Mr. Munoz-Montes.
Q. And when the appointed time came for Mr. Brown to arrive and purchase the methamphetamine, had Mr. Montes-Munoz provided the methamphetamine to you?
A. No, sir.
Q. Was this a trait common for Mr. Montes-Munoz?
A. Yes, sir.
Q. Eventually, was the methamphetamine delivered?
A. Yes, sir.
Q. And once the methamphetamine was delivered, to whom did you deliver it?
A. To Paul Brown.
Q. In the interim time did Mr. Brown spend any time at the apartment?
A. Yes, sir.
Q. With respect to purity, how would you compare the methamphetamine purchased on that day with the purity of other methamphetamine that you received from Mr. Montes-Munoz?
A. Average, below average.
Q. And you mentioned some of these escort sites. You mentioned specifically backpage.com. For those members of the jury who aren't familiar with backpage.com, can you please -- what, if any other website might they be

familiar with that is similar to Backpage? Is it like Craig's List?
A. Oh. Yes, sir.
Q. And what kind of activity predominates on backpage.com?
A. Prostitution.
Q. Is there any other criminal activity that might be engaged in on backpage.com?
A. Sure. Drug sales, I'm sure.
Q. Did you ever discuss backpage.com with the defendant?
A. Yes, sir.
Q. Now, approximately how much did you charge per hour for your prostitution services?
A. $300.
Q. On early February of 2017 did you obtain a vehicle as a result of your activity as a prostitute.
A. Yes, sir.
Q. Can you tell us about that?
A. I had a client that I met through a friend, and part of the agreement for my services was he would buy a vehicle for me and pay the car note, and in return, I would just keep up on the insurance.
Q. And did you have to -- was -- were you going to engage in any prostitution services on -- in exchange for

him paying for the car?
A. Yes, sir, twice a month.
Q. What kind of vehicle did he buy you?
A. I got a 2008 Mercedes SL550 convertible.
Q. What color was it?
A. Silver.
Q. What color was the trim?
A. Red.
Q. After he bought you the car, what happened?
A. It got totaled the very next day.
Q. How did it get totaled?
A. Fell asleep behind the wheel on the way to Shreveport.
Q. Why were you going to Shreveport?
A. To meet with Miss Stringer.
Q. And on what road were you whenever you totaled the car?
A. Interstate 20.
JUDGE SCHROEDER: Mr. Hornok, when you get to a good stopping place, I think the jury probably would be ready for a break.
MR. HORNOK: I just got --
JUDGE SCHROEDER: Is now a good time?
MR. HORNOK: I just got to one right now.
JUDGE SCHROEDER: All right. Excellent.

Ladies and gentlemen of the jury, we've been going a couple of hours. We'll take our afternoon recess at this time.

We'll be in recess about 15 minutes.

(Wherein a break was taken from 2:31 to 2:50 p.m.)

JUDGE SCHROEDER: All right. If we could have the jury brought down.

(Jury returns to the courtroom.)

JUDGE SCHROEDER: Please be seated. Mr. Hornok, you may continue.

MR. HORNOK: Thank you, Your Honor.

Q. (Mr. Hornok continued.) So before the break you had described two times when Mr. Paul Brown had come to the apartment. The first he knocked, the second he purchased some drugs.

At some point was there a third time when he came to the apartment?

A. Yes, sir.

Q. Okay. And before he came to the apartment, did he reach out to you with respect to his intention -- or his interest in buying drugs?

A. Yes, sir.

Q. How much -- what quantity of drugs did he want to buy?

A. A kilo.

Q. A kilogram of what?
A. Methamphetamine.
Q. Now, what are some -- if somebody's not going to say a kilo, "I want a kilo of methamphetamine," in a text message or a phone call, what kind of words or phrases might somebody use to reference the amount of a kilo?
A. They would call it like a bird or something like that.
Q. Okay. How many ounces are in a kilogram, approximately?
A. Thirty-six.
Q. So would -- if somebody were to say, "I want to buy 36," what would you understand that to be?
A. A kilo.
Q. Now, on the morning that Mr. Brown was supposed to arrive, were you awake or asleep?
A. I was asleep.
Q. Why were you asleep?
A. I'd been up too long.
Q. And when you say, "too long," do you mean multiple days?
A. At least, yeah.
Q. So was it your intention to fall asleep that morning?
A. No, sir.

Q. Now, that morning when you first -- first woke up, who was in -- who was in -- who were you aware that was in the apartment that morning?
A. It was me, a girlfriend of mine, another friend of mine, Mr. Hayden, and Mr. Hayden's brother.
Q. The -- the two -- the two people that you described, the girlfriend and then the other friend --
A. Yes.
Q. -- do you know what their names are?
A. One is Jeremy Struve and the other is Jeremy Mendoza.
Q. And does Jeremy Mendoza go by another name?
A. Mya.
Q. Now, when you woke up that morning, what -- what did you see?
A. Collin was standing at the foot of my bed.
Q. What, if anything, did he say to you?
A. He asked me if I was going to wake up and get this money, or did he need to take care of it.
Q. And when he said, "Do I need to take care of it?" or -- what did -- what did you understand him to mean?
A. To complete the transaction.
Q. And the transaction, what was -- what was to be purchased?
A. A kilo of methamphetamine.

Q. Did Mr. Hayden say anything else about what had happened that morning?
A. He said that he went downstairs to check out the money to make sure the guy wasn't wasting our time. And he made a comment that when he looked at the money, he noticed that it was all old currency, that the hundred dollar bills were older one hundred dollar bills; they weren't like new blue faces that they have in circulation now.
Q. And did he comment -- in referencing this, did he -- why did this stick out to him?
MR. VAN CLEEF: I couldn't understand the question. I think it calls for speculation.
JUDGE SCHROEDER: Restate it.
Q. (Mr. Hornok continued.) What, if anything, significant did you understand Mr. Hayden to attach to this old money?
A. Just that it was out of place. Most drug dealers -- I mean, most currency that is dealt is newer -- newer dollar bills and things of that nature. So it was just weird that it was an abundance of all old one hundred dollar bills. It just seemed out of place.
Q. Now, you had mentioned that Mr. Hayden's brother was in the apartment that morning.
A. Yes, sir.

Q. And you've described two different brothers of Mr. Hayden.
A. Yes, sir.
Q. Which of Mr. Hayden's brothers was in the apartment that morning?
A. The younger brother, which I believe to have a mental problem.
Q. After you had this interaction with Mr. Hayden, what did you -- what did you do?
A. I got up immediately and began to get dressed, brush my teeth, get on the phone, check out and see where Daniel was, and also to text message Paul and let him know that I was running behind.
Q. What did Mr. Hayden do?
A. He told me that he was going to take off and go to the gym.
Q. And did anyone go with him?
A. His brother.
Q. Did he, in fact -- did he and his brother, in fact, leave and go to the gym?
A. I would assume so.
Q. They left the apartment in any event.
A. Yes, sir.
Q. You mentioned communicating with Mr. Brown. Did you, in fact, have some communication with Mr. Brown?

A. Yes, sir. I told him that the deal was still going to happen, I was just running a little behind, and I had to make the call and wait for it to get there before I'd be ready to do the transaction.
Q. Did you make the call?
A. Yes, sir.
Q. Who did you call?
A. Daniel --
Q. And when you say --
A. -- Munoz.
Q. I'm sorry?
A. Munoz.
Q. After you called Daniel Montes-Munoz, who -- or what -- what did he do?
A. He told me it would be about an hour, he would be there somewhere around 10:00. And so I waited, and then he showed up. Came into the apartment, opened the box. I checked out the product. At that time I sent a message to Paul and let him know that I was ready on my end. About five minutes later --
Q. When you --
A. -- the bust happened.
Q. Let me -- let me stop you there. When you said you checked out the product --
A. Yes, sir.

Q. -- what -- what was -- what was it that Mr. Montes-Munoz brought over?
A. There was a gallon Ziploc freezer bag full of methamphetamine.
MR. HORNOK: Your Honor, if I could take a minute to approach the witness.
JUDGE SCHROEDER: Yes.
Q. (Mr. Hornok continued.) Mr. Harper, I've put in front of you what has been previously admitted as Government's Exhibit 18.
Does this exhibit that you see in front of you bear any resemblance to the methamphetamine that was brought to the apartment that day by Mr. Montes-Munoz?
A. Yes, sir.
Q. And what, if anything, sticks out to you as resembling that methamphetamine?
A. The amount.
Q. Is there anything else?
A. The coloration of the -- the drugs itself.
Q. And looking at that, what -- what -- what does that look like to you?
A. Amount wise?
Q. Content. I mean, is it rock salt? Is it flour?
A. It looks to be methamphetamine.
Q. And is this the typical way that methamphetamine

might look?
A. Yes, sir.
Q. And looking at it, how would you compare it in terms of the quality of methamphetamine that you typically received from Mr. Montes-Munoz?
A. About the same.
MR. HORNOK: Your Honor, if I could approach again.
JUDGE SCHROEDER: Yes.
Q. (Mr. Hornok continued.) I put in front of you Government's 31, 35 and 37.
Looking at those and comparing them, what, if anything, can you tell is in those exhibits?
A. The same thing, methamphetamine.
Q. And what, if any, resemblance in those exhibits -- or what, if any, resemblance do those exhibits have and the methamphetamine -- what appears to be methamphetamine there, have to the methamphetamine that you received from Mr. Montes-Munoz?
A. The coloration seems to be the same, as well as the size of the shards, as we would call them. The resemblance of it.
Q. And you've identified shards, and the size of the shards, and you've identified the color. Is that the kind of thing that might change, depending on who the supplier

is?
A. Yes, sir.
Q. And what, if anything, is consistent in terms of the packaging of those drugs?
A. They're all in Ziploc freezer bags.
Q. And what kind of -- what sticks out about those Ziploc Freezer Bags that seems to be the same?
A. They all have the pink top, the zip seal.
Q. And looking at the other three exhibits that I've provided to you, do those appear to be -- how would you compare the purity or quality of the product in those bags as against the other methamphetamine you received from Mr. Montes-Munoz?
A. Just looking at these, the size of the shards are typically a little smaller, so this looks like it could have been the bottom of a batch. Normally better quality has larger pieces.
Q. Okay. Did Mr. Montes-Munoz come with anyone else to the apartment?
A. Yes, sir.
Q. Who?
A. I believe his name is Hugo.
Q. Once Mr. Montes-Munoz and Mr. Hugo showed up with the kilogram of methamphetamine, what did you do next?
A. I sent a message, I believe, to Mr. Brown and told

him that I was ready to conduct the transaction whenever he was.
Q. When you sent that message, what device did you use?
A. My Samsung cell phone.
Q. And when you sent that message, were you sending a text message or a Facebook message, or something else?
A. A text message.
Q. After you let Mr. Brown know that the kilogram of methamphetamine had arrived, what happened next?
A. The apartment was raided.
Q. And raided by whom?
A. DEA, U.S. Marshals, Dallas SWAT team.
Q. Guys with guns?
A. Yeah. A lot of them.
Q. Police? After DP -- after the SWAT team raided the apartment, what happened to you?
A. I was then transported to the DPS office in Garland.
Q. What happened at the DPS office in Garland?
A. I was interviewed and debriefed.
Q. Who interviewed you at the DPS office?
A. Agent Kelly and his partner.
Q. Do you recall who his partner was?
A. The gentleman sitting right behind him. I can't recall his name.
Q. But it's these two guys.

A. Yes, sir.
Q. After they spoke with you at the DPS office, where did you go?
A. I was transported to Dallas County Jail. Lew Sterrett.
Q. While you were at the Dallas County Jail, did you have any contact with Mr. Hayden?
A. Yes, sir.
Q. What contact did you have with Mr. Hayden?
A. One or two telephone calls.
Q. And what -- what did you guys discuss?
A. He was trying to get me some -- get some money together to bond me out. He let me know that my ex-girlfriend at the time was calling wanting to know what was going on with me, and he let me know that he got all of our stuff out of the apartment.
Q. Did you eventually get out of the Dallas County Jail?
A. Yes, sir.
Q. How did you get out of the jail?
A. I had agreed to do confidential informant work for Agent Kelly and his partner.
Q. Did you -- so this is -- this is something that -- this is an opportunity they had offered you?
A. Yes, sir.

Q. Now, did you actually end up conducting cooperating individual work for them?
A. No, sir.
Q. Why?
A. Because of my previous arrest record with the assault on the ex-girlfriend.
Q. And did that -- what did you understand as to why that prevented you from being able to cooperate?
A. They didn't say.
Q. They just -- you just knew that --
A. They just said that it wasn't going to work out, and my next step would be for me to contact an attorney.
Q. You mentioned a minute ago that Mr. Hayden had gotten your personal stuff out of the apartment. At some point did you meet him to obtain that stuff?
A. Yes, sir.
Q. Where did you meet him?
A. Downtown Dallas in a parking garage.
Q. And was that -- when was that relative to when you got out of jail?
A. Three days, four days, after I got out.
Q. After you got out of jail, did you at some point eventually leave the Dallas area?
A. Yes, sir.
Q. Where did you go?

A. Waco, Texas.
Q. Did you go with anyone?
A. Yes, sir.
Q. Who?
A. My ex-girlfriend Christine Caldwell.
Q. When you went to Waco, did you stay with anyone?
A. Yes, sir.
Q. Who did you stay with?
A. A friend of mine named Clifford Williams.
Q. Does Clifford Williams have any stage names?
A. Yes, sir.
Q. What is Clifford Williams' stage name?
A. Reva Dena.
Q. Does -- was Reva Dena ever known as Big Mama Dena?
A. Yes, sir.
Q. Was that kind of an alter stage name for --
A. Yes, sir.
Q. -- Mr. Williams?
A. More of a personal friend name.
Q. At some point did Mr. Williams kick you out of his house?
A. Yes, sir.
Q. When was that?
A. Mid April.
Q. Why did Mr. Williams kick you out?

A. Because of the arguments that continued between me and Christine Caldwell.
Q. After you guys got kicked out of the -- Mr. Williams' house in Waco, where did you go?
A. To Geneva, New York.
Q. And after you went to New York, where did you go?
A. To Cleveland, Ohio.
Q. And at some point were you arrested?
A. Yes, sir.
Q. In testifying today, did you have any nervousness about Mr. Hayden and how he might respond?
A. Yes, sir.
Q. What -- why were you nervous about that?
A. During my time on the run, I guess you could say, there were brief exchanges between me and Mr. Hayden in regards to me snitching him out, and he threatened to put a price on my head to kill me.
Q. When he communicated with you, did he communicate over Facebook?
A. Yes, sir.
Q. And you said, "snitching." What did he accuse you of snitching? Or to whom did he accuse you of snitching?
A. Basically throwing him under the bus saying that the whole drug thing was all his and not mine.
Q. Now, did he use any specific phrase in the message

he sent you that was a threat?
A. I believe he said "Bitch ass, Nigger. You threw me under the bus. I'll kill you if I find you. I've got $2,000 for your location."
Q. And based on that communication, what did you -- what did you interpret he -- that he might do, if he found you?
A. Cause serious harm or possibly kill me.
Q. And did that give you any hesitation about whether you should continue to cooperate with the police?
A. Yes, sir.
Q. Did it give you any hesitation when you were asked whether you would testify?
A. Yes, sir.
Q. Based on your history with Mr. Hayden, did you believe that he would follow through with his threat?
A. Yes, sir.
Q. And based on your history with Mr. Hayden, did you believe that he was capable of actually following through with his threat?
A. Yes, sir.
Q. At the time was Mr. Hayden engaged in any kind of body building?
A. Yes, sir.
Q. And so looking at Mr. Hayden today, is he a smaller

-- smaller man or a larger man than he was at the time that you knew him in 2017?
A. Smaller.
Q. Why was he bigger at that time?
A. From the use of steroids.
Q. And when you say, "bigger," are we talking about overweight, or are we talking about bigger muscles?
A. Bigger muscles.
Q. So looking at -- or at the time did you believe he was -- well, the bigger muscles, would that have associated with his ability -- been associated with his ability to follow through on the threat?
A. Yes, sir.
Q. Now, at some point in 2018 did you have a chance encounter with Mr. Hayden?
A. Yes, sir.
Q. Can you tell us about that?
A. It was December. I had just got sentenced and left Bowie County and was in Oklahoma City transfer center. And me and Mr. Hayden were roommates.
Q. And where did Mr. Hayden say he was headed at that time?
A. For a mental evaluation.
Q. And what, if anything, did he say he was going to do during that mental evaluation?

A. Try to play crazy.
Q. During your conversations with him in Oklahoma City, did he -- did you discuss the morning of the bust?
A. Yes, sir.
Q. And what conversations did you have with Mr. Hayden about it?
A. Just the things that happened basically while I was asleep and just filled in the gaps.
Q. And what did he say had happened?
A. That he went downstairs to check on the money, make sure that, you know, it was all there. It looked to be all there. And then he made the comment about it being funny money.
Q. Looking back on that morning, what if -- what, if anything, do you -- what, if anything, do you believe that happened with Mr. Hayden and his interest in conducting a drug deal that morning?
A. A part of me feels like he was kind of spooked about the whole situation. Like maybe --
MR. VAN CLEEF: Your Honor, speculation.
JUDGE SCHROEDER: If you can lay some kind of foundation for this, I'll admit it, but I -- I'm going to sustain the objection at this point.
Q. (Mr. Hornok continued.) So did you have conversations with Mr. Hayden about that morning?

A. While we were in Oklahoma City?
Q. While you were in Oklahoma City.
A. Yes, sir.
Q. And you had conversations with Mr. Hayden the morning of the bust.
A. Yes, sir.
Q. And have you thought about those conversations?
A. Yes, sir.
Q. And have you -- in the context of those conversations, did you form an opinion based on those conversations about whether he got spooked?
MR. VAN CLEEF: Your Honor, this is the same speculation.
JUDGE SCHROEDER: If he can connect it -- if you can connect it to a statement, I'll allow it, but at this point it's sort of general.
Q. (Mr. Hornok continued.) Did Mr. Hayden say anything to you suggesting his lack of -- his change of -- change of heart with respect to whether he wanted to engage in a drug trafficking deal that morning?
A. No.
MR. HORNOK: Your Honor, at this time I'd like to direct your -- the witness's attention to Exhibit 51C.
(Audio tape plays.)

Q. (Mr. Hornok continued.) Mr. Harper, did you rec anybody's voice -- recognize anybody's voice in that recording?
A. Mr. Hayden's.
Q. Have you ever heard this recording before?
A. No, sir.
Q. What, if any, reaction would you like to share with the jury to this recording?
A. Doesn't surprise me. It's nothing I already didn't know. Makes me a little nervous. That's about it.
MR. HORNOK: No further questions, Your Honor.
JUDGE SCHROEDER: Cross-examination.

CROSS-EXAMINATION

BY MR. VAN CLEEF:
Q. Mr. Harper, my name is Charles Van Cleef. I represent Collin Hayden.
A. Yes, sir.
Q. And I do have a few questions for you, but I like to keep thing in sort of chronological order so that everyone can understand when they happened. So that's the first part of my questioning to you.
So if you will, do you know exactly when you first met Collin Hayden and under what circumstances you met him?

A. I met him in November of 2015.
Q. Okay. And at that time were you two living together?
A. No, sir.
Q. Were you working together?
A. No, sir.
Q. Were you socializing together?
A. No, sir.
Q. So this was a -- were you living in Dallas at the time?
A. Yes, sir.
Q. And who did you live with at the time?
A. Christine Caldwell.
Q. All right. And as you described, I believe, there was a time when you did not see Mr. Hayden, a series -- a series of months. When was that?
A. Early spring of 2016 all the way through the summer until the fall of 2016.
Q. All right. When you came back into Mr. Hayden's company, were you still in Dallas?
A. Yes, sir.
Q. And where were you living at the time?
A. We had just -- me and Christine had just moved to another apartment in Oak Cliff in Dallas.
Q. This is not the apartment that you -- that was

raided on February 9th; correct?
A. No, sir.
Q. All right. At that time were you -- were you being supplied drugs by Mr. Montes-Munoz --
A. Yes.
Q. -- in 2016?
A. By when?
Q. In spring of 2016. Were you being supplied drugs by Mr. Montes-Munoz?
A. Not at that time. No, sir.
Q. Who was supplying you at that time?
A. It was a guy that went by the name of Pablo.
Q. And where were those -- what geographical area, I guess? Was that in the Dallas area or somewhere else?
A. Yes, sir, east Dallas area.
Q. Okay. Mr. Montes-Munoz also in the Dallas area?
A. Yes, sir.
Q. All right. So spring of 2016 is when you met up with -- or you reacquainted yourself with Mr. Hayden in Dallas; right?
A. No, sir.
Q. Okay. What happened then? I've lost place of what happened in April of 2016. Could you tell me one more time?
A. April of 2016 is when --

Q. I meant spring of 2016. I said that --
A. Spring of 2016?
Q. Uh-huh.
A. Nothing happened. That's when he fell off the radar.
Q. Okay. Then late fall of 2016 you reacquainted yourself. Is that the -- is that the right timeframe?
A. Yes, sir.
Q. Okay. And at that time what were you doing for a living?
A. I was prostituting, I was selling drugs, and I was stripping.
Q. Were you also using drugs?
A. Yes, sir.
Q. And was this also one of the timeframes when you were using drugs to the extent that you would stay up for seven or eight days at a time?
A. Yes, sir.
Q. How long did you manage to do that?
A. The entire time that I was selling drugs, using drugs.
Q. And that time up to and including when you were arrested on February 9th, 2017?
A. Yes, sir.
Q. Did you continue to buy, sell, or use drugs after

February 9th of 2017?
A. No, sir.
Q. Now, on February 9th, 2017, that's -- that's when your apartment was -- was raided; right?
A. Yes, sir.
Q. You were placed into custody sometime after that. I'm not asking about the specific timeframe right now, but you're obviously in custody now.
A. Yes, sir.
Q. I thought I heard you earlier say that you've used drugs while in federal custody. Have you?
A. Yes, sir.
Q. Okay. Well, then when I asked you if you've used -- if you've continued to use -- buy, use, or sell drugs after that time period, I'm including the time that you're in federal custody.
A. Okay. Then, yes. The answer would be yes.
Q. So how often do you use drugs while you're in federal custody?
A. Just the one time.
Q. And who sold you those drugs?
A. The guy that lived three or four cells down from me in the same cell block.
Q. When did he do that?
A. November of last year.

Q. What was his name?
A. I can't recall.
Q. On February 9th, 2017, you described being arrested and then being brought into the presence of the two officers sitting to my right; correct?
A. Yes, sir.
Q. And that would be Mr. Kelly and Mr. Vera.
A. Yes, sir.
Q. And the circumstances of your being brought to -- being in their presence was for you to be interviewed, wasn't it?
A. Yes, sir.
Q. And do you recall being interviewed by them?
A. Yes, sir.
Q. Have you recently viewed the video of yourself being interviewed by them?
A. No, sir. I've never seen the video.
Q. Okay. Do you have an independent recollection of your interview with them that day?
A. Not point for point, tit for tat, but vaguely, yes.
Q. Well, do you remember it well enough to agree me that you never mentioned Collin Hayden during that interview?
A. He was mentioned, but it was in context to who he was.

Q. He wasn't mentioned in context to any drug dealing or drug use or drug possession. Would you agree with that?
A. Yes, sir. At that time.
Q. Correct.
A. Yes, sir.
Q. And that time was February 9th or -- 9th, 2017; correct?
A. Correct.
Q. All right.
MR. VAN CLEEF: And could we pull up Exhibit 27, please?
Q. (Mr. Van Cleef continued.) You've got a notebook in front of you if you want to flip to Exhibit 27. Or you can just wait for it to come up on the screen.
A. Okay.
MR. VAN CLEEF: And can we go to 270 -- well, page 10.
May I approach the exhibit, Your Honor?
JUDGE SCHROEDER: Yes, you may.
Q. (Mr. Van Cleef continued.) Okay. That page.
A. Okay.
Q. All right. Do you know what this document is that's -- that's on the screen there?
A. Looks to be a Factual Basis document.

Q. And if we can just leave the video version where it is, but can you flip with your hand and see if that's your signature on the next page?
A. Yes, sir.
Q. Okay. So that's the document that you signed in pleading guilty in this very case; correct?
A. Yes, sir.
Q. All right. And I want to refer your attention to paragraph 1 of that document -- or numbered paragraph 1.
Do you see that on the first page?
A. Yes, sir.
Q. And do you see where you agreed that you were transporting -- or that you involved in the distribution of at least five kilograms of methamphetamine? And I'll just paraphrase here, to portions of the Eastern District of Texas, including Mount Pleasant.
A. Yes, sir, I see that.
MR. VAN CLEEF: Okay. And can you flip to the next page, please, Jamie? Thank you.
Q. (Mr. Van Cleef continued.) And, again, in paragraph 2, do you also see where you admitted to facilitating the purchase and distribution of methamphetamine in and around Mount Pleasant, Texas?
A. Yes, sir.
Q. And who was your understanding that you were

facilitating the distribution of methamphetamine to in Mount Pleasant, Texas?
A. At that time I didn't know. The only involvement that I was aware of was strictly with Jason McLemore and myself and Daniel Munoz-Montes.
Q. And who -- now you just told me that at that time you didn't -- wait a minute.
Are you saying that when you signed this document you didn't know who it was that you had been distributing to in Mount Pleasant, Texas?
A. I knew of the informant named Paul Brown, but I didn't know that he was distributing it in Mount Pleasant. I had no idea at the time where he lived or even where he was from.
Q. So now you know that what you pled guilty to was distributing to Paul Brown who's testified in this case already.
A. Yes, sir.
Q. And it's your understanding that that distribution was to Mount Pleasant, Texas; correct?
A. Yes, sir.
Q. And there's no mention of Shreveport, Louisiana, anywhere in that document, is there? You can flip through it if you like.
A. No, sir, there's not.

Q. And, in fact, you said that you were debriefed by officers. You used the word "debriefed." Where did you get that word?
A. It's a term that they use.
Q. Officers use?
A. Officers, federal inmates, yes, sir.
Q. And on February 9th, 2017, was it your understanding that you were being debriefed?
A. Yes, sir.
Q. And it was -- was it your understanding that it was required of you that you be honest and admit your own culpability in an offense on that date?
A. Yes, sir.
Q. And, yet, you did not mention Collin Hayden as any sort of drug dealer, did you?
A. No, sir.
Q. In fact, you didn't mention Collin Hayden as any sort of drug dealer until this year, did you?
A. Incorrect.
Q. Okay. When did you first do that?
A. We -- me and the federal agents, a few days after I was booked into Lew Sterrett had another meeting, and that's when I was asked about Mr. Hayden and his association with me.
Q. And was that -- do you know if that meeting -- it

was in Lew Sterrett in the same location the first meting was?
A. No, sir. The very first meeting was at the DPS office in Garland.
Q. Okay. So Lew Sterrett is a different location than the first interview on February 9th.
A. Yes, sir.
Q. What date was the second interview on?
A. I couldn't say exactly. I would have to say somewhere around Valentine's Day, if I could remember correctly.
Q. Same year, 2017?
A. Yes, sir.
Q. Do you know if that meeting was recorded?
A. I do not know.
Q. Were you in the room that appeared to you to have recording equipment in it?
A. No, sir.
Q. Did you sign any documents that day?
A. I can't recall. I don't believe so, no.
Q. Was that the day that you agreed to be a confidential informant for the -- for the officers?
A. Yes, sir, it was.
Q. All right. And when you were released from custody, how much -- how many days after that meeting were you

released from custody?
A. One, two at the most, I believe.
Q. All right. And just so we keep things sort of clear, that was -- that would have still been in February of 2017?
A. Correct.
Q. And you never -- I think you've already testified, but you never really did any confidential informant work for them, did you?
A. No, sir.
Q. In fact, you weren't approved as a confidential informant, were you?
A. No, sir.
Q. And instead of serving as a confidential informant, you fled, didn't you?
A. Yes, sir.
Q. You fled first to Waco, then to New York, and then to Ohio.
A. Yes, sir.
Q. Correct? How long were you gone?
A. Five months.
Q. And during that time did you understand that you had felony criminal charges -- well, federal charges pending ultimately?
A. No, sir. At the time it was strictly a state

charge. I spoke with an attorney. He said that technically I'm not out on bond, and so if I -- if it was my wish to leave the state, then it was my wish to do so. I wasn't aware of a federal indictment until late April of 2017.

Q. So are you telling this jury that you thought it was okay after what happened on February 9th and then a meeting with the officers on Valentine's Day, a few days later, to be gone for several months to several states?

A. Yes, sir.

Q. You thought you were within your legal right to do so?

A. Yes, sir.

Q. And how were you -- how were you ultimately arrested, then?

A. I was picked up in a bar right outside of Knoxville, Tennessee, I believe. And they ran my name, and I had a federal warrant for my arrest. And from there they transported me to a federal facility in Tennessee.

Q. How were you supporting yourself during those five months that you were gone?

A. I was a stripper.

Q. So does that mean that you worked at different places in different cities and moved to those cities, or did you have a specific location?

A. Hotel to hotel.
Q. And hotel to hotel, meaning that you would stay in a hotel or --
A. Yes, sir.
Q. -- you would be a stripper in a hotel?
A. No, stay at the hotel.
Q. Okay. So can you name the cities where you were a stripper, please, during that five months.
A. Mansfield, Ohio; Cleveland, Ohio. I did a show in Alabama, in Birmingham. I also did a gig in Akron, Ohio, and I believe that's it.
Q. You know a little bit about the business of being a male stripper; correct?
A. Yes, sir.
Q. All right. So while we're on that subject, I think I heard you earlier sort of agree with something that I've said before, so I'm going to ask -- that's what I'm asking you about, which is that it -- it includes an element of self-promotion in order to be a successful stripper. You have to be a good promoter of yourself. Is that fair to say?
A. Yes, sir.
Q. You have to take care of your appearance and that sort of thing; correct?
A. Yes, sir.

Q. And you have to give off the appearance of being a very successful person; correct?
A. Yes, sir.
Q. You're not trying to fly below the radar as a stripper; correct?
A. No, sir.
Q. All right. And in -- in part of that self-promotion is having events and having posters made and that sort of thing. Would you agree?
A. I agree.
Q. And whether or not you're doing well, haven't you said that it's important that you look like you're doing well.
A. Yes, sir.
Q. And that was behind you having a Mercedes that you really weren't even buying yourself; correct?
A. Yes, sir.
Q. And some of the other more flamboyant. I think that was the word, flamboyant things that you and any other male stripper would need to do in order to keep your name in the public eye. Is that fair?
A. Yes, sir.
Q. All right. Now, you at some point, then, came to live with Collin Hayden, or the two of you were living together. This is where I'm kind of focusing on my

timeframe now.

How did it come about the two of you started living together?

A. When Collin first got out, he and a girlfriend of his were living at the Budget Suites off 35 in Dallas. Me and Christine Caldwell had an apartment together. Our relationship was kind of on the rocks, and so Collin said at that point that I could move in with him.

Q. At the Budget Suites.

A. Yes, sir.

Q. Okay. And at that time were you in the same line of business? In other words, male strippers?

A. Yes, sir.

Q. Okay. And was -- was -- do you know what Mr. Hayden's girlfriend's name was at the time?

A. Hannah? I don't know her last name, but Hannah, I think, was her first name.

Q. Okay. Did she move in with you and Mr. Hayden to the former McLemore apartment?

A. No, sir.

Q. And do you recall what date you moved into the McLemore apartment with Mr. Hayden?

A. Not an exact date. No, sir.

Q. Okay. The time that -- in -- at the Budget Inn & Suites -- is that what you called it, the Budget Inn &

Suites?

A. Yes, sir.

Q. How long did -- to your knowledge, did Mr. Hayden live at the Budget -- Budget Inn & Suites?

A. We lived at one location off of 35 for a month or so, and then he got 86'd from the property, and at that point we moved into a second Budget Inn & Suites location off of Northwest Highway.

Q. Okay. Do you know where his -- his -- the rest of his family actually lives? And I mean like a specific location.

A. I believe his father lives in East Texas somewhere. And besides that, I don't know anything else.

Q. So he has -- you've mentioned two brothers; right?

A. Yes, sir.

Q. And are you aware that he also has a sister?

A. Now that you mention it, yes, sir, I do.

Q. Okay. And what are his two brothers' names? Full name.

A. I honestly couldn't tell you, it's been so long. I wasn't really on a day-to-day relationship basis with them. I mean, I -- like I said, when we were at the apartment, I had my room, he had his. They would do their thing, I would do my thing. It would be very rare occasions when we all interacted together just hanging out

kind of, so to speak. It was more just business.
Q. All right. You started living together on what date at the apartment that you took over for McLemore?
A. Again, I couldn't recall. It was either the last week in January or the -- yeah, it had to have been the last week in January.
Q. Do you have a recollection whether that was before or after January 23rd of 2017?
A. I do not.
Q. Do you recall what day of the week you moved in.
A. No, sir.
Q. Do you recall whether you moved in together? In other words, at the same time.
A. No, sir, it wasn't at the same time.
Q. Who got there first?
A. He did.
Q. And how long had he been there when you got there?
A. Three, four days at the most.
Q. All right. So late January, 2017 is when the two of you came to this apartment?
A. Yes, sir.
Q. But, in fact, you were the person who had the connection with Mr. McLemore through a friend in order to obtain the apartment; correct?
A. At that time both of us had a connection with

McLemore.
Q. Okay. So did you inform Mr. Hayden, or did Mr. Hayden inform you that the apartment was available?
A. Mr. Hayden informed me.
Q. All right. And which bedroom did you take?
A. If you enter the door, you make a right. Immediately there's the kitchen right there in the front. His bedroom was to the left, my bedroom was to the right of the apartment.
Q. Was there a bathroom that connected the two bedrooms?
A. No, sir.
Q. Was there --
A. I had my own separate bathroom. He had his own separate bathroom.
Q. Was there one bedroom that was larger than the other?
A. Yes, sir.
Q. And so I'll call that the mas -- if there's two bedrooms --
A. The master.
Q. -- I'll call that the master bedroom. So which bedroom did you have? The master bedroom or the other bedroom?
A. I had the master bedroom.

Q. How did you two make arrangements to pay for the apartment?
A. I believe Mr. Hayden informed me that the payments could be made online, and so I believe the money was just paid online through -- through a debit card.
Q. So is it your testimony that during this time in -- let me -- this time is like January 23rd, 2017, to February 9th, 2017. That's the time I'm talking about at the moment.
A. Okay.
Q. Very small period of time of a couple of weeks basically.
A. Yes, sir.
Q. Do you agree with that? Or two and a half weeks roughly. Agree with that?
A. Agree.
Q. Was Mr. -- is it your testimony that Mr. Hayden during that time was buying methamphetamine from you?
A. On one occasion, yes, I do recall.
Q. What date was that?
A. I could not recall the date. I just remember the specific transaction.
Q. What day of the week was it?
A. I can't recall.
Q. What were the circumstances of it?

A. He had a friend coming from out of town to purchase methamphetamine. And, again, I sold it to him at a cheaper price. He then sold it for a higher price, and we split the profit.
Q. Who was the friend? Who bought it from you?
A. I can't recall hid name. I don't want to speculate a name, but it was the same person that was traveling back and forth when we lived at the Budget Suites.
Q. The person who was traveling back and forth, is that the person you testified earlier about that you contend was going to Shreveport?
A. Yes, sir.
Q. Is that the brother, or is that someone else?
A. It's someone else.
Q. Okay.
A. An associate of Mr. Hayden's.
Q. And -- and who is that person?
A. I think they did time together in Louisiana. They were just friends.
Q. I know that -- that the description like that might fit in certain circumstances. I'm asking you for a name when I say "who."
A. I don't have a name.
Q. Do you know who that person was?
A. No, sir.

Q. Did you meet that person?
A. Yes, sir.
Q. Did you see what they were driving?
A. Yes, sir.
Q. Were -- okay. Were they tall? Short?
A. Average height. Maybe Mr. Collins' height.
Q. Okay. So what were they driving?
A. It was like an old police car. I don't know what kind of car those are, but like the old round body cars.
Q. And how do you know that that person took anything that was purchased from you to -- through Mr. Hayden back to Shreveport, Louisiana?
A. Well, I mean after he left our apartment, I can't testify that he, indeed, drove straight there to take it back, but under the conversations that we had, it was the assumption that that is, in fact, where he was going with it.
Q. And that's all I'm asking you, Mr. Harper, because earlier it sounded like you seemed very sure about where that person, whoever that person was, was taking the drugs.
I'm asking you now if you actually know that or --
A. No, sir.
Q. -- if it's an assumption on your --
A. It's based off the statements that individual made

to me.
Q. Okay. But you don't know either how he traveled to Shreveport, Louisiana, or if he went to Shreveport, Louisiana, do you?
A. I know it was by car, but whether he went there or not, I do not know, no.
Q. And with regard to Mr. Hayden's brother, you claim that Mr. Hayden's brother was buying drugs from Mr. Hayden?
A. Yes, sir.
Q. That -- that started with you?
A. When I first met Mr. Hayden in late 2015, he was buying the drugs from me, taking them back to Shreveport and then selling them to his brother, and his brother was redistributing them.
Q. When is the first time you told law enforcement officers about his brother taking drugs to Louisiana? When is the very first time you told these officers about that? It should be easy to remember.
A. August of 2018.
Q. And what was the circumstances of that meeting?
A. It was in circumstances to me agreeing to testify here today.
Q. So you're -- in 2018?
A. Yes, sir. August of last year.

Q. August -- last year was 2019.
A. Oh, I'm sorry. Then it was, yes, sir, 2019.
Q. Okay. Who came to visit you in August of 2019?
A. It was Mr. Hornok and Mr. Kelly.
Q. So the two individuals to my immediate right.
A. Yes, sir.
Q. And do you recall the date that they came to visit with you?
A. Not the exact date, no, sir.
Q. Maybe I can --
A. I believe it's in the waiver that I signed.
Q. You want to look at Exhibit 28 right there in front of you just to refresh your recollection?
A. 28 just shows the plea agreement addendum.
MR. VAN CLEEF: May I approach, Your Honor?
JUDGE SCHROEDER: You may.
Q. (Mr. Van Cleef continued.) I'm sorry, 29.
A. 29.
Q. Yeah. Should be the proffer letter that you referred to earlier.
A. Okay. There's a date at the top that says Proffer of Timothy Harper on August 30th, 2019.
Q. Okay. So August 30 -- now, does that refresh your recollection as to the year when you first told someone that my client's brother was carrying drugs to Shreveport

that you had sold to my client?
A. Yes, sir.
Q. And did you have that entire conversation with Mr. Hornok and Mr. Kelly, that's -- those are the two people to my right here.
A. Yes, sir.
Q. Did you have that entire conversation about Tyler, his brother, Mr. Hayden's brother, taking drugs to Shreveport on that day? In other words, did you tell them that that day?
A. Yes, sir.
Q. All right. And then when was the next time you met with the people who are here to my right?
A. About two weeks ago.
Q. How many times did you meet with them about two weeks ago?
A. I've met them -- since today I've met them twice, on two different occasions.
Q. Okay. So how far apart were those meetings?
A. A week apart.
Q. And what --
A. Leading up until today.
Q. I'm sorry. I didn't mean to interrupt you. Were you finished?
A. Yes, sir.

Q. And where did those meetings take place?
A. The first meeting was at the DPS office in Mount Pleasant. The second meeting was in the district attorney's office a few doors down.
Q. Okay. And during those meetings did you go through your -- your testimony today?
A. Yes, sir.
Q. The testimony that you would give today.
A. Yes, sir.
Q. In other words, did Mr. Hornok practice asking questions and receiving your answers similar to the questions and answers that he's asked you today?
A. Yes, sir.
Q. And that happened two weeks ago?
A. Yes, sir.
Q. And then was it -- was the second time a week ago or were they three weeks ago and two weeks ago?
A. The second time was last week.
Q. Do you know what Mr. Hayden's brothers' last names are?
A. No, sir.
Q. Other than the one that I just stated, Tyler, do you even know his other brother's name?
A. No, sir.
Q. The disabled brother.

A. No, sir.
Q. And, yet, those people lived with you at the apartment in Dallas that we're talking about here in this case.
A. Yes, sir.
Q. Correct?
A. Yes, sir.
Q. But you never bothered to get their first or last names?
A. I mean, I'm sure that I knew it at the time, but, again, I'd be up for days at a time with no sleep and heavy drug use, so, I mean, it's been almost three years now, so it's a name that could be easily forgotten considering the relationship that I had with that person.
Q. All right. Did -- did Tyler have a car or any means of transportation of his own?
A. No, sir.
Q. Did his other brother have a car or any means of transportation of his own?
A. I'm sorry. The last question, Tyler -- which brother was that? Was that the one that was coming back and forth from Shreveport?
Q. I don't know. I don't know who you're talking about.
A. Okay.

Q. Did either brother have a car of their own?
A. Yes, sir. One brother, the one that I was selling to after Hayden disappeared, eventually bought a red Corvette, and that was his means of transportation.
Q. So in 2017, in Jan -- late January to early February 2017, how many people had cars in the apartment? Let's start there and we'll work backwards.
A. Just me and Mr. Hayden.
Q. Okay. Did either of Mr. Hayden's brothers live there at that time?
A. Yes, sir.
Q. Which one?
A. The one that had the mental disability.
Q. Okay. And he did not have a vehicle then.
A. No, sir.
Q. All right. So let's go back. When is the last time a different brother lived with you?
A. A different brother never lived with me.
Q. Tyler --
A. His brother lived in Shreveport, Louisiana, and I lived in Dallas.
Q. Okay.
A. He could commute back and forth.
Q. All right. So during what time period did the brother who lived in Shreveport have a red Corvette?

A. This was March of 2016.
Q. Until when, to your knowledge?
A. Until he got busted. A few months later, I would assume. I believe I remember hearing that he got busted somewhere in May or June of 2016.
Q. Busted where?
A. I don't know where he got busted at.
Q. And when -- do you know what he was busted for?
A. No, sir.
Q. On January 23rd, 2017, which was what you were listening to or looking at on the screen there, is it your contention that my client's voice is the voice that's not yours and not Paul Brown's in the video?
A. Yes, sir, I would.
Q. The brothers whose names you can't remember because it was so long ago, can you remember what they looked like?
A. No, sir, not honestly.
Q. Can you remember what they even sound like?
A. No, sir.
Q. Did my client ever own a Range Rover while you knew him?
A. No, sir.
Q. Have these gentlemen shown you a picture of my client sitting in a Range Rover with a little stack of

money in his hand?
A. It was discussed, but I was never seen a picture, no. Shown a picture.
Q. Was that a test drive of a used car?
A. Yes, sir.
Q. In which he took a picture in order to promote himself?
A. Yes, sir.
Q. Now, do you understand that in order to receive a reduction of your sentence, which I heard you say was your hope here; right?
A. Yes, sir.
Q. That in order to do that, do you already understand that in order to do that, Mr. Hornok, or the Government, must file a motion requesting that the Court reduce your sentence?
A. Yes, sir, I understand.
Q. And that it's in his sole discretion whether or not he will file that motion.
A. Yes, sir.
Q. And I asked you that because earlier you stated that your only reason for testifying was to -- to be truthful and that it didn't matter whether it helped or hurt the prosecution.
Am I accurately summarizing what you said?

A. Yes, sir.
Q. And, yet, were you given the opportunity to speak with me prior to the trial of this case?
A. Yes, sir.
Q. And what was your answer to that?
A. No.
Q. You've testified a little bit about these tattoos, and I assume -- I believe what you said was that the tattoos if you -- if you're not supposed to have the tattoos but you have them -- in other words, if you're not a member and you have them, then you are going to be marked -- or I think you said marked, beaten, or killed; right?
A. Yes, sir.
Q. Well, what happens if you were to remove your tattoos?
A. Then there would be no more affiliation with the gang.
Q. Is that your -- would that be -- do you still have those tattoos?
A. Yes, sir.
Q. If you were to somehow have those tattoos -- are they on your neck? I can't see.
A. No, sir.
Q. All right. Where are they?

A. I have two set of lightening bolts on either side of my hip, and then I have two iron crosses on each shoulder.
Q. Okay. Are you wearing short sleeves?
A. No, sir.
Q. All right. All right. If those -- if you were to remove those, then, would there be any punishment to you?
A. In regards to what?
Q. In regards to your affil -- your former affiliation, or is that just a way of quitting if you have a tattoo removed?
A. I guess it could be a way of quitting, yes.
Q. Okay. Okay. Now, you testified also that Mr. Hayden wanted a quantity of methamphetamine at a hotel. Is that the Budget -- Budget Inn & Suites that we were talking about, or is there another one?
A. No, sir. This was -- I assume you're talking about the first time I met him.
Q. It was way back, yes.
A. Yes, sir. This was at the Marriott hotel off of 35.
Q. And when did that happen?
A. Late November or early December of 2015.
Q. What was the name of the hotel?
A. The Marriott.
Q. And who else was there?
A. Jason Terrell.

Q. And where did you get the drugs that you sold?
A. From my supplier, Pablo.
Q. And were you and Mr. Hayden -- you didn't really know each other at that time, did you?
A. No, sir. That was the first time I had ever met him.
Q. Okay. So at that time he was just a -- a customer, I guess, is what your testimony is. Is that fair?
A. Yes, sir.
Q. There was no common work habits, no common living arrangement, no common drug arrangement, nothing between the two of you at that time; correct?
A. No, sir.
Q. You said, "no," but am I correct in saying that?
A. Yes, sir, you're correct.
Q. All right. Thank you. Now, I got -- I got a little confused. You used the word "separate," and let me tell you what I heard the context of. And I'll tell you, I -- you already know I can't see you very well. Well, I'll tell you, I couldn't hear you very well at the moment.
You said something about you were selling drugs to Collin Hayden and to his brother, but it was occurring separately. Can you explain to me what that means?
A. I didn't start selling drugs to Collin's brother until Collin fell off the radar.

Q. Okay.
A. Collin's brother came and delivered some money that Mr. Hayden had owed me, and informed me that Mr. Hayden was no longer around. At that time his brother approached me and selling the drugs directly to him.
Q. Okay. So, again, at that time, which would have been when you and Mr. Collin Hayden were not in touch for sometime, was that still also just a buyer/seller-type relationship, or was it something more?
A. No, sir, it was just strictly buyer/seller relationship.
Q. All right. When you -- moving forward in time to early 2017, when -- on January 23rd, 2017, which was the video that you heard -- or that you looked at when you first sat down, did -- did Mr. Collin Hayden deliver any controlled substance to anyone?
A. No, sir.
Q. And where did that conversation take place?
A. At our front door.
Q. Which is in Dallas, Texas?
A. Yes, sir.
Q. How do you know what the contours and boundaries of the Eastern District of Texas are? Who told you that?
A. I was told that by the Government.
Q. So Mr. Hornok told you what the boundaries of the

Eastern District of Texas are?
A. Yes, sir.
Q. Did he tell you what the boundaries of the Northern District of Texas are?
A. No, sir.
Q. And did you have that conversation with him, and he tell you "This is Northern District. This is Eastern District," within the past couple of weeks?
A. We had a conversation in regards to the Eastern District, but we've never discussed anything on the Northern District of Texas.
Q. Okay. All right. Well, then it's my turn. I'll inform you that Dallas is in the Northern District of Texas.
So what was the context of your conversation with Mr. Hornok about that Eastern District of Texas?
A. When I would travel -- or the day that I was traveling to go meet Miss Stringer, that I took I-20 which is the Eastern District of Texas.
Q. Oh, so he was asking how you got to Shreveport; correct?
A. Yes, sir.
Q. All right. And then he told you that's in the Eastern District of Texas; correct?
A. Yes, sir.

Q. And that was in the context of him telling you the sorts of questions and the sorts of answers that he expected here at this trial; correct?
A. Yes, sir.
MR. HORNOK: Objection, Your Honor. I believe it misstates the testimony that he's already provided.
JUDGE SCHROEDER: I'll give you a chance to discuss it on redirect.
Q. (Mr. Van Cleef continued.) Now, when you -- so -- so my client had nothing to do with any delivery of a controlled substance on January 23rd, 2017. We agree on that; correct?
A. Agreed. There was no transaction of any drugs taken place on that date.
Q. Nobody did; right?
A. No, sir.
Q. Okay.
A. It was just a conversation.
Q. And on January -- it was just a conversation. On -- is that correct?
A. Yes, sir.
Q. And on January 26th, 2017, my client had nothing to do with the delivery of controlled substances; agreed?
A. Agreed.

Q. And on February 9th, 2017, my client had nothing to do with the delivery of controlled substances either. Would you agree with that?
A. Disagree.
Q. Why do you disagree with that?
A. He involved himself in the transaction when he went downstairs to look at the money before the transaction.
Q. Is that what you think is a legal definition of involvement in the transaction?
MR. HORNOK: Objection, Your Honor.
JUDGE SCHROEDER: I'll sustain that.
Q. (Mr. Van Cleef continued.) Why do think that causes -- why does that cause you to conclude that he was involved in the transaction?
A. I mean, if I'm doing a drug deal, and I tell someone, "Hey, go look and see if the money's right," I mean that makes you a part of the deal. That's common sense.
Q. Well, let me suggest some other common sense to you, Mr. Harper. There's already been testimony in the case that when money is flashed -- we know that the money was flashed by an uncover agent now, don't we?
A. Yes, sir.
Q. The man who was sitting next to Paul Brown.
A. Yes, sir.

Q. Okay.
A. Well, I don't know. I didn't -- I never saw that happen. I was asleep.
Q. Okay. Yeah, fair enough. Fair enough. But you heard about that; right?
A. Yes, sir, I did.
Q. And who did you hear about that from?
A. Mr. Hayden.
Q. Okay. And that was when he came upstairs; right?
A. Yes, sir.
Q. And he made clear when he came upstairs that he was having nothing to do with the transaction; right?
A. No, sir. He informed me that if I didn't want to take care of the deal, that he would take care of the deal.
Q. And said he was going to the gym; right?
A. Afterwards. After I got up and said that I was going to handle it, yes, he left to go to the gym.
Q. Okay. So he went to go to the gym. But when these -- earlier testimony in the case indicated there could be other reasons why you had to be careful with money at a drug transaction, so let me ask you. You were a drug dealer for a very long time?
What are the reason you have to be careful about money in a drug transaction?

A. It could be counterfeit. I mean, I'm not sure where you're going.
Q. Okay. Well, let me help you. Why would you not want to show someone that you had a lot of money available to you for a drug transaction?
A. I guess it would present an opportunity for the person to get robbed.
Q. There's been testimony to that effect. Does that surprise you?
A. No, sir.
Q. And is that a concern of yours if you're involved in a drug transaction with someone you don't know, that once you've shown them money, if the transaction doesn't occur, that you should probably leave?
A. Sure. That's a fair assumption.
Q. And the reason you would is because you would be fearful of being robbed. Is that correct?
A. Who would be fearful of being robbed?
Q. Well, the person who holds the money, sir.
A. Sure. That could be a concern, yes.
Q. All right.
A. But Mr. Hayden wasn't the one holding the money.
Q. No, he wasn't, was he?
A. No, sir.
Q. The person who was holding the money was the -- was

an undercover officer. And the testimony in this case has been that undercover officers are directed to leave quickly with the money. Does that surprise you?

A. I couldn't say. I don't -- I'm not aware of how they conduct raids.

Q. Well, I think we're getting off in the weeds here, but I'm trying to put two thoughts together for you, and those are, number one, that money is flashed and no transaction occurs; and number two, is it surprising to you that the person who flashes the money would be concerned about being robbed.

MR. HORNOK: Objection, Your Honor. This calls for a legal conclusion.

MR. VAN CLEEF: Concern is not a legal conclusion.

JUDGE SCHROEDER: No, no, no. I'm going to overrule the objection. I'm not -- I'm sort of having trouble following it myself. Could you rephrase it?

MR. VAN CLEEF: I think I've made the point, Your Honor. I'll just move on.

Q. (Mr. Van Cleef continued.) The bed -- the bathrooms in the apartment, did they have locks on the doors?

A. Yes, sir.

Q. Which side of door locked? The door side if you're standing in the bathroom can you lock the door?

A. Yes, sir.
Q. If you're outside the bathroom and in the bedroom, can you lock the door?
A. No, sir.
Q. So the doors would lock from one side or the other, and it was always from the bathroom side in both bedrooms?
A. Correct.
Q. Okay. When you conducted drug transactions, did you ever conduct drug transactions in the apartment?
A. Yes, sir.
Q. And on February 9th, just before the SWAT team came in, were you conducting a drug transaction in the apartment?
A. I was attempting to, yes, sir.
Q. Okay. Fair enough. Did you have the drugs?
A. Yes, sir.
Q. And had you yet received the money?
A. No, sir.
Q. And who exactly was in the apartment at that moment when the SWAT team came through?
A. Myself, both Jeremys that I mentioned earlier, Mr. Daniel Montes and Hugo.
Q. Were there any other people present when that took place?
A. No, sir.

Q. No other people -- who was in your bedroom when that took place?
A. It was myself, it was Jeremy Struve, the other Jeremy, and that was it.
Q. Okay. So there were three people in your bedroom --
A. Yes.
Q. -- when the SWAT team came through the door?
A. Yes.
Q. Had you been in any other part of the apartment immediately prior to that?
A. Yes, sir. I was in the kitchen.
Q. And what were you doing in the kitchen?
A. I was there with Mr. Montes and Hugo looking at the product of methamphetamine.
Q. Okay. So describe -- if you will, give me an idea. When they bring methamphetamine over, and -- and you --
You've ordered it already; correct?
A. Yes, sir.
Q. So in essence, in words that we can all understand, it's like ordering a pizza. You tell them what you want, and they bring it to your place; right?
A. Correct.
Q. And when they bring it to your place, is that when you -- when you give them money for the methamphetamine?
A. Yes, sir.

Q. And prior to giving them money, you want to have a look at it and make sure that it is what you've ordered; correct?
A. Yes, sir.
Q. And part of figuring out whether it's what you've ordered is probably to weigh it; correct?
A. Yes, sir.
Q. And how do you -- like, physically how do you go about that when you're standing in the kitchen? They bring a bag -- it doesn't matter, but let's point to any of those bags. If that was your order, how would you then, and how did you, on February 9th determine whether or not that was what you wanted to pay for?
A. The weight was never -- it was never weighed.
Q. Okay. Then how did you determine that it was something you wanted to pay for, period?
A. Just from the look of the quality and just, I guess an eyeball measurement, as you would call it. It looked to be a kilo, so...
Q. Oh. So I didn't quite understand how simple the process was. You just have a look at it, and then you hand over the money; right?
A. In most cases, no. I mean, it just depends on who you're dealing with, how they want to deal with it. I mean, at times it can be weighed. Other times it could

just be a quick transaction, "Here you go." You know, wham, bam, let's get in and out.

Q. So the -- the individuals who brought you the methamphetamine on February 9th were people that you already knew and trusted enough that you didn't need to weigh it?

A. Yes, sir.

Q. And were they people that you knew and trusted enough that you didn't need to test it or try it?

A. Yes, sir.

Q. And when you handled methamphetamine, whether it was for weighing purposes or putting it in your safe or carrying it around your apartment, did you take any extra precautions for your -- for your own self? In other words, did you wear a hazmat suit or eye protection or gloves, or anything along those lines, when you were handling methamphetamine?

A. No, sir.

Q. Ever?

A. I didn't personally, no.

Q. And when you used methamphetamine, tell me how you used methamphetamine.

A. I would smoke it.

Q. Okay. So if -- again, I don't want to walk all the way over there, but if you look at one of those bags and

you were to pull something out of one of those bags, describe me the process that results in you receiving some smoke by inhalation.
A. You take a piece of shard out of the bag, put it in the pipe, and melt it down with a lighter and then inhale it.
Q. Did you have the equipment to accomplish that at the apartment that we're talking about, on February 9th?
A. Yes, sir.
Q. And where did you keep that?
A. In my drawer underneath my bathroom cabinet -- or my bathroom sink. The cabinet underneath the bathroom sink.
Q. So on February 9th, 2017, when the SWAT team came in and then there were some other investigators that came in that you probably wouldn't remember, but did they take you out of the apartment pretty quickly, or did they try to talk to you right then?
A. Immediately they removed me from the apartment.
Q. And so you don't know what happened after that?
A. No, sir.
Q. Okay. Just prior to that, you said you were in the bedroom with two other individuals, but you'd been out in the kitchen area.
What other areas of the apartment are there to be occupied?

A. Just Collin's bedroom and bathroom.
Q. Okay. So --
A. And I mean, I guess you could say the balcony outside of the apartment.
Q. Okay. So -- so you and your friends and the people you were buying from were occupying every part of the apartment except Collin Hayden's bedroom?
A. Correct.
Q. And to be clear, you did place the order for the methamphetamine that was found at the apartment on February 9th when the SWAT team came in.
A. Yes.
Q. The prior witness testified that Mr. Hayden had done -- made that order. That wouldn't be true in your recollection, would it?
MR. HORNOK: Objection, Your Honor. It's restating the testimony. He doesn't know. He wasn't there.
JUDGE SCHROEDER: Overruled.
Q. (Mr. Van Cleef continued.) That wouldn't be true, would it?
A. No, sir.
Q. When you managed -- we've also seen some text messages and stuff, so everybody knows everybody uses a cell phones these days.

Are there other ways that you would manage your drug transactions?
A. Besides the cell phone?
Q. Uh-huh.
A. I mean, maybe in person if the person was standing right next to you. But besides that, I couldn't see any other way.
Q. Are there any other electronic means that you use to manage your drug transactions?
A. Any other electronic means that I did personally or just in general?
Q. Facebook, Facebook Messenger.
A. Sure. Yeah. You could use those.
Q. And -- no, I asked did you use them?
A. Oh, did I? No, sir.
Q. Okay. So your drug activity should all be reflected in your phone -- phone calls or in person-to-person interactions that I wouldn't have access to. Is that fair?
A. That's fair.
Q. Phone calls, text messages, and nothing else.
A. To my recollection, yes.
Q. Okay. Did Mr. Hayden have a cell phone when he lived with you for this timeframe January 23rd to February 9th?

A. Yes, sir.
Q. Did his brother have a cell phone during that time period, the disabled brother who was -- who was there?
A. I believe so, yes.
Q. Okay. Did you text with his -- did you text with his disabled brother whose name you can't recall?
A. No, sir. We -- I never had his phone number, he never had mine.
Q. Did you text with Mr. Hayden?
A. During what time period?
Q. I'm sorry. This is all January 23rd to February 9th.
A. No. We were within the same apartment, so there was no reason to send each other texts.
Q. So conversations between you and Mr. Hayden would have occurred personally?
A. Yes, sir, face to face.
Q. And would there have been other people normally at the apartment for purposes of hearing those conversations?
A. No other people.
Q. During that timeframe.
A. During that timeframe, just the people that were in the room, my bedroom with me. Mr. Struve and Mr. Mendoza.
Q. Mr. Struve and Mr. Mendoza.
A. Yes, sir.

Q. Both of whom were also interviewed the same day you were, way back in February of 2017; correct?
A. Correct.
Q. Have you read their statements that they gave?
A. No, sir.
Q. Have you watched their statements that they gave?
A. No, sir.
Q. Do you believe they said anything about Collin Hayden in February of 2017?
MR. HORNOK: Objection, Your Honor.
JUDGE SCHROEDER: Sustained.
Q. (Mr. Van Cleef continued.) Are you claiming that my client was a prostitute when he was living with you?
A. No, sir.
Q. And in sum, you don't have any personal knowledge that you can -- that you can tell me about, about your sales of drugs, your alleged sales of drugs to Collin Hayden, his brother, his other brother, his sister, or anyone he knows. You don't have any personal knowledge of any drugs passing through or ending up in the Eastern District of Texas, do you, sir?
A. No, sir.
MR. VAN CLEEF: I'll pass the witness.
JUDGE SCHROEDER: Redirect?

REDIRECT EXAMINATION

BY MR. HORNOK:
Q. Based on what you were told by Mr. Hayden and Mr. Hayden's drug buyers, where did you believe that the drugs were going after they were purchased from you?
MR. VAN CLEEF: Your Honor, that's the same hearsay question that's been asked and over -- and not allowed twice.
MR. HORNOK: Your Honor, it is not hearsay. It is -- it is excluded because it is co-conspirator statements during and in furtherance of the conspiracy. In addition to that, it is a statement of a party opponent.
JUDGE SCHROEDER: Overruled.
A. To my understanding, the drugs were going to Louisiana.
Q. (Mr. Hornok continued.) And how, in your experience, do you travel from Dallas to Louisiana?
A. Yes, sir.
Q. How do you do that?
A. Interstate 20 is a direct connect.
Q. Now, when we spoke about your testimony, what did I tell you was the most important thing for you to do then and to do now?
A. To tell the truth.
Q. Have you done that?

A. Yes, sir.
MR. HORNOK: No further questions, Your Honor.

RECROSS-EXAMINATION

BY MR. VAN CLEEF:

Q. Mr. Harper, have you done all the things that he told you to do here at trial today?
A. To tell the truth. Yes, sir.
Q. He told you about the Eastern District of Texas, to be sure and mention that, didn't he?
A. He didn't say to be sure to mention it.
Q. Oh. But he practiced the questions that he's asked you today on two different occasions within the last two weeks, hasn't he?
A. Correct.
Q. And Mr. Kelly was there as well, wasn't he?
A. Yes, sir.
Q. And when you didn't answer right, they helped you get to the right answer, didn't they?
A. Yes, sir.
MR. VAN CLEEF: Pass the witness.

REDIRECT EXAMINATION

BY MR. HORNOK:

Q. In terms of addressing the questions that we practiced, were there things that we instructed you not to

talk about?
A. Yes, sir.
Q. Are just some of the -- some of the directing you to the things we -- directing you to the answers we wanted you to receive? That were -- that you were referencing?
Is this one -- is this a way that we directed you to the answer that we wanted?
A. Is what a way?
Q. In telling you not to address -- not to --
A. Oh, yes, sir.
Q. -- talk about certain things?
A. Yes.
Q. And those things, were they -- did we ask -- ever ask you to lie about anything?
A. No, sir.
Q. Did we ever tell you anything other than to tell the truth?
A. No, sir.
Q. And when we asked you not to talk about certain things, were those things that were beneficial to Mr. Hayden? If those things had been discussed, would they have been beneficial to Mr. Hayden or not beneficial to Mr. Hayden?
A. Not beneficial.
MR. VAN CLEEF: Objection, Your Honor.

Calls for speculation.

JUDGE SCHROEDER: I'm going to permit that.

A. Not beneficial.

Q. (Mr. Hornok continued.) And so have you told the truth today?

A. Yes, sir.

Q. And did you tell the truth when we talked previously?

A. Yes, sir.

MR. HORNOK: No further questions.

MR. VAN CLEEF: I don't have any further questions, Your Honor.

JUDGE SCHROEDER: All right. You may step down.

(End of testimony by Timothy Harper.)

C E R T I F I C A T E

STATE OF ARKANSAS )<br>
) ss<br>
COUNTY OF BENTON )

I, CYNTHIA A. DONALD, Certified Court Reporter, in and for the aforesaid county and state, do hereby certify that the within transcript was reduced to typewritten form by me or under my direction and supervision; that the foregoing transcript is a true and accurate record to the best of my understanding and ability.

I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set, or have authorized said setting, of my hand and affixed my seal of office this 10th day of July, 2020.



CYNTHIA A. DONALD, CCR<br>
Certified Court Reporter<br>
Arkansas Supreme Court<br>
License No. 183