**In The Matter Of:**

*UNITED STATES OF AMERICA v.*
*COLLIN GARRETT HAYDEN*

---

*Day 5 of 5*
*March 06, 2020*

---

*Donald Court Reporting & Transcription, LLC*
*P.O. Box 1640*
*Springdale, AR 72765*
*(888) 438-7836*
*donaldcrt@gmail.com*

Original File HAYDEN DAY 5_1.txt
Min-U-Script®

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| vs. | ) | CAUSE NO. 5:17cr9(6) |
| COLLIN GARRETT HAYDEN Defendant. | ) | |

TRIAL

BEFORE THE HONORABLE ROBERT W. SCHROEDER, III

March 2 - March 6, 2020

VOLUME FIVE OF FIVE

APPEARANCES

MR. JONATHAN HORNOK — FOR THE PLAINTIFF
MR. DONALD CARTER
U. S. Attorney's Office E/TX-Texarkana
500 State Line Avenue, N, No. 402
Texarkana, Texas 75501
(903) 794-9481
jonathan.hornok@usdoj.gov
donnie.carter@usdoj.gov

MR. L. CHARLES VAN CLEEF — FOR THE DEFENDANT
Van Cleef Law Office
P. O. Box 2432
Longview, Texas 75606-2432
(903) 248-8244
Charles@vancleef.pro

# I N D E X

TESTIMONY OF DANIEL KELLY BEING RECALLED

Direct Examination by Mr. Hornok -------------- 1121
Cross-Examination by Mr. Van Cleef ------------ 1188
Redirect Examination by Mr. Hornok ------------ 1245
Recross Examination by Mr. Van Cleef ---------- 1253

GOVERNMENT RESTS ------------------------------------ 1255

TESTIMONY BY COLLIN GARRETT HAYDEN

Examination by Mr. Van Cleef ------------------- 1274
Examination by Judge Schroeder ----------------- 1276

EX PARTE MOTION BY MR. VAN CLEEF (SEALED) ------------ 1279

## D E F E N D A N T' S E V I D E N C E

TESTIMONY BY COLLIN GARRETT HAYDEN

Examination by Mr. Van Cleef ------------------- 1297
Statement by Mr. Hayden ------------------------ 1298
Cross-Examination by Mr. Hornok ---------------- 1318
Statement by Mr. Hayden ------------------------ 1361
Recross-Examination by Mr. Hornok -------------- 1368
Statement by Mr. Hayden ------------------------ 1373
Recross-Examination by Mr. Hornok -------------- 1382

DEFENDANT RESTS -------------------------------------- 1391
GOVERNMENT RESTS ------------------------------------- 1391
DEFENDANT RESTS -------------------------------------- 1391
JURY INSTRUCTIONS ------------------------------------ 1392
CLOSING ARGUMENTS BY MR. HORNOK --------------------- 1417
CLOSING ARGUMENTS BY MR. VAN CLEEF ------------------ 1440
REBUTTAL CLOSING ARGUMENT BY MR. HORNOK ------------- 1466
VERDICT OF THE JURY --------------------------------- 1478

E X H I B I T S


| Government's Exhibit | Admitted |
|---|---|
| 12E (Clip 3 of Video) | 1121 |
| 12F (Clip 4 of Video of Hayden During Drug Order) | 1121 |
| 12H (Transcript of Video Clip) | 1121 |
| 20 (Summary of Drug Quantities and Values - (Demonstrative) | 1178 |
| 52 (Letter from Hayden Jul 2019) | 1129 |
| 53 (Letter from Hayden Nov 2019) | 1346 |
| 54 (Letter from Mr. Hayden Dec 2019 | 1133 |
| 55 (Collin Hayden's Certified Conviction Documents) | 1328 |

| Defendant's Exhibits | |
|---|---|
| 2 (Indictment) | 1220 |
| 3 (Second Superseding Indictment) | 1240 |

JUDGE SCHROEDER: Did both of you-all have an opportunity to look at the proposed final jury instructions last night?

MR. HORNOK: Yes, Your Honor.

MR. VAN CLEEF: Yes, Your Honor.

JUDGE SCHROEDER: Okay. We don't have to discuss them in depth at this point, but when we get to the appropriate time, I'm going to want to discuss it and make sure everybody's satisfied with where we are.

Mr. Hornok, you have something you need to raise?

MR. HORNOK: Yes, Your Honor. I just wanted to address an evidence issue that is going to come up right with this first witness. I intend to move to admit 12A. This is the longer video that kind of encompasses all of the clips that have been played and admitted already. It was -- Mr. Van Cleef moved to admit it on Wednesday at 1:13, and there's a transcript that goes with it, 12H, which has been provided to Mr. Van Cleef.

And what I intend to play, it's a much longer video, but what I intend to play about 20 minutes that kind of connects and provides the context between the three clips. So we've heard -- we've had three different clips that kind of each pulled, and the jury hasn't had an opportunity to see how these clips link up or kind of create -- fit into the overall chronology. And so that -- that's what I

intend to do with that.

JUDGE SCHROEDER: And so how long is the -- the clip you intend to play?

MR. HORNOK: The clip itself is about -- it's less than 20 -- it's less than 20 minutes. About 18 minutes.

JUDGE SCHROEDER: Okay.

MR. HORNOK: There's a lot of dead space in there, and so there's maybe like five minutes worth of actual discussion, but I -- we kind of struggled with whether we could kind of clip it shorter to try and save some time. The problem is, is I think the dead space helps establish the chronology of these things. And so it's -- kind of the problem we were feeling is, we're getting -- the jury's getting a bunch of these clips, but they don't have a sense as to the timeframe that these things are actually occurring in. And so by giving them that timeframe, even though it involves some dead space, it helps them see how these things fit into the overall chronology so they can understand what they have heard already.

JUDGE SCHROEDER: Mr. Van Cleef.

MR. VAN CLEEF: Your Honor, I have -- I have a slight quibble with that. I did not move to admit 12A. I said I thought Exhibit 12A had already been admitted.

What I was trying to admit was two or three or four clips that we had pulled out of 12A. And we did ultimately

admit two clips, which I believe were 12G and 12B, maybe. And my understanding was the Court instructed us to pull out the portions that we were actually going to use, and that those would be the portions that went back to the jury.

So I was unable to use those clips because 12A had not been admitted. And now I understand Mr. Hornok wants to admit the entirety of 12A --

JUDGE SCHROEDER: Wait a minute. Why were you not able to use them because they had not been admitted? What were you -- what --

MR. VAN CLEEF: 12A -- without 12A being previously admitted by -- by some -- by means of some witness, I was unable to use the clips that I had pulled out of 12A and had been designated and put together on DVDs beforehand. And so I was -- I was pulling out portions that I thought were relevant --

JUDGE SCHROEDER: Are we talking about cross-examination at this point? But you haven't put your case on. So how could --

MR. VAN CLEEF: No, sir. No, sir. That was -- that was on cross-examination of a witness.

JUDGE SCHROEDER: Okay.

MR. VAN CLEEF: If you'll recall, Your Honor, I was trying to get Mr. Brown and Officer Canete to interpret

their speech for me, and there were four clips, 12 -- or several clips, 12B through now G. G is the one that was admitted ultimately during that testimony.

So my -- my -- just -- the quibble is, no, I did not move to admit Exhibit 12A. I thought it had been admitted, and I was correctly corrected it had not been admitted.

The second thing is that I just want to -- I don't know what clip because we're just hearing about this this morning, that they're pulling out, unless he's saying he wants to play the entire 12A, which is two hours long, and I'm sure that's not his intention, then I think I would like to have an opportunity to have some better understanding of what the clip is, before I agree to its admission at this late date.

MR. HORNOK: So I can kind of describe for the Court kind of where -- where we are. So we've had 12 -- so 12A is this two-and-a-half-hour-long video; right? We've -- obviously we wanted to cut that down.

JUDGE SCHROEDER: And we agree that's not admitted. Do you --

MR. HORNOK: I agree that 12A is not admitted, but looking at -- I went back and looked at the minutes, and what I saw was that there was a motion by defense to admit 12A. So that's -- nevertheless, what we have so far is we have about a -- 12C is about a 15-minute clip that happens

toward the beginning of 12A. Then 12G is 10 seconds that occurs after that clip with some time -- a little bit of time in between. Then there is some time, and then we have 12, I think it's D, that is -- has also been admitted. And those are -- those are the two clips that defense counsel has -- has moved to admit. There hasn't -- there's been others that have been marked, but none of those others have been used so far. And so this clip kind of -- it captures the tail end of the initial interaction. So we don't need to see that again, but it's just enough of it to kind of see, okay, this picks up at that point, covers the context of -- kind of fills in the gaps of the three clips that we have already heard.

And, Your Honor, at this point, so I'm moving to admit 12A. If Mr. Van Cleef feels that he wants to --

JUDGE SCHROEDER: Hold on. Let me ask. Mr. Van Cleef, does that help you understand what it is he's -- he's seeking to play?

MR. VAN CLEEF: Your Honor, the -- no. The words that -- the words may have come out of my mouth, "I move to admit 12A," I'm not saying that I didn't say that. I know it wasn't admitted, and the objection that the Court heard to the exhibits that I was trying to admit, whatever ones they were, was that they were hearsay. Both attorneys stood up and said that they were hearsay or that they

contained hearsay.

And so I would like to know -- I need to really understand exactly what they're trying to admit to determine whether I want to make that objection myself.

MR. HORNOK: Those objections by the government were overruled by the Court, and those clips were admitted pursuant --

JUDGE SCHROEDER: Well, here's where we are right now. I'm going to step out. I'm going to let you-all visit about this. Let's -- Mr. Hornok, give Mr. Van Cleef a very candid explanation --

MR. HORNOK: Sure.

JUDGE SCHROEDER: -- of what it is you intend to cover. I'll be back out in about five minutes, and we'll -- I'll -- we'll see if you guys can get this resolved.

MR. HORNOK: Thank you, Your Honor.

(Recess from 8:58 to 9:05 a.m.)

JUDGE SCHROEDER: Please be seated.

All right. Did the parties have an opportunity to visit about this issue?

MR. HORNOK: Yes, Your Honor, and I believe we've come to an agreement. I am going to move to admit 12A, 12E, 12F, and 12H. And, essentially, the idea here is I've got -- I've explained to him the clip that I intend to play. E and F are some additional clips that he identified

beforehand that he had an interest in playing, and so we're just kind of giving the opportunity for the jury to hear what both of us want to hear.

JUDGE SCHROEDER: We're playing it all at the same time? E and F, in other words?

MR. VAN CLEEF: They're included -- well, I don't know how much of -- I don't -- are they included in -- may I -- may I address?

JUDGE SCHROEDER: Of course.

MR. VAN CLEEF: Are they included in the clip?

We're not sure if they're included in the clip that he intends to play, but we will -- if -- I'll pay attention to the times, and if something else needs to be played then, we'll just get it over with.

JUDGE SCHROEDER: All right. And is this an agreed -- y'all have discussed this; you're happy with this, Mr. Van Cleef?

MR. VAN CLEEF: I am. It's just all -- all the -- basically all the Exhibit 12 exhibits and its subparts we've agreed that they would be admitted.

JUDGE SCHROEDER: That will be fine.

MR. HORNOK: Thank you, Your Honor.

JUDGE SCHROEDER: What else do we need to raise and discuss before we have the jury brought down?

MR. HORNOK: I believe that's it, Your Honor.

MR. VAN CLEEF: I do too.

JUDGE SCHROEDER: Okay. Let's have the jury brought down, please.

MR. HORNOK: Your Honor, maybe one more thing while we've got a little dead space.

When closing comes, I have a PowerPoint. I wonder if it would be possible to bring the -- the big screen -- somehow or another orient it so that I can kind of use it in terms of interacting with the jury.

JUDGE SCHROEDER: I've got no objection to that. Do you have any concern with that, Mr. Van Cleef?

MR. VAN CLEEF: No, Your Honor.

JUDGE SCHROEDER: That's fine with me.

MR. HORNOK: Thank you, Your Honor.

JUDGE SCHROEDER: Now, I'm not sure how far it goes, Mr. Hornok, but if it will -- if you can -- if you can get it around there, I'm happy for you to do it.

MR. HORNOK: I'll investigate.

(Jury seated.)

JUDGE SCHROEDER: Please be seated.

Good morning, ladies and gentlemen of the jury. Welcome back. I hope you had a pleasant evening. I apologize for just a wee bit of a late start this morning. We had several matters we had to discuss.

At this time the government may call its next

witness.

MR. HORNOK: Your Honor, the government recalls Daniel Kelly.

And at this time, Your Honor, I move to admit 12A, 12E, 12F, and 12H.

JUDGE SCHROEDER: Any objection?

MR. VAN CLEEF: No, Your Honor.

JUDGE SCHROEDER: Very well. They will be received.

(Government's Exhibits 12A, 12E, 12F, and 12H were admitted.)

MR. HORNOK: Thank you, Your Honor.

DANIEL KELLY, having been recalled as a witness, and having been previously sworn, testified as follows, to wit:

DIRECT EXAMINATION

BY MR. HORNOK:

Q. Agent Kelly, yesterday we heard mention of an individual named Sharon Walker listed on one of the lab reports.

Can you tell us who Sharon Walker is?

A. Sharon Walker was our administrative assistant that receives drug reports back from the lab and files them accordingly.

Q. So this is just somebody who works in your office?

A. Yes, sir.

Q. We also heard discussion earlier this week about Paul Brown's operation as a CI.

What was the date of the first time that Paul Brown acted as a CI for DPS?

A. He -- he placed text messages and calls at our direction prior to January 23rd, so a few days prior, but the actual first day that he acted at our direction was January 23rd, the very first time that they traveled to the apartment on Dickason.
Q. And that was in 2017?
A. Yes, sir.
Q. So did he operate as a CI before 2017?
A. No, sir.
Q. And when was the last operation as a CI that Paul Brown was engaged in, in this case?
A. February 9th, the date of the search warrant.
Q. Why was Paul Brown -- or what characteristics did Paul Brown have that made him an effective CI in this case?
A. As -- as with most of our informants, he had characteristics that permitted him to engage with the suspects in this case and not be suspected to be a police officer.
Q. At some point after February of 2017, did Mr. Brown work on another occasion as a CI?
A. He attempted to act as an informant for us in another investigation. Yes, sir.
Q. Was he successful in that?
A. He was not.
Q. And how many other investigations, or how many other times after February 2017 did he act as a CI?
A. Just on that one occasion.

Q. And since that -- he was unsuccessful on that occasion, has he ever -- or was he deactivated as a CI?
A. I believe he's deactivated. Yes, sir.
Q. Now, we heard some discussion about traveling to and from Shreveport from the Dallas area.
Are you familiar with how to travel from Dallas to Shreveport?
A. Yes, sir.
Q. And somebody traveling from Dallas to Shreveport, if they were to take the shortest route, how would they likely go?
A. I-20.
Q. And if they were to travel on I-20 from Dallas to Shreveport or from Shreveport to Dallas, would they travel through the Eastern District of Texas?
A. They would.
Q. Now, if somebody wanted to avoid traveling through the Eastern District of Texas and go from Dallas to Shreveport or from Shreveport to Dallas, what route would they have to take in order to make that trip?
A. They would have to go into Oklahoma and Arkansas, and then down to Louisiana.
Q. Would that -- would that extend the trip?
A. Extremely.
Q. And if they wanted to take a southern route, how would they have to go?
A. I believe they would have to go to the Gulf and take a boat.

MR. HORNOK: Your Honor, at this time I ask that we can play 12 -- portions of 12A beginning at 2815 -- and just one second.

Q. (Mr. Hornok continued.) So Agent Kelly, this clip that we're about to play for the jury, if you can kind of provide the context of where -- what do we hear -- what have we heard in this case already that this clip starts with?

A. So this would be the date of February 9th. This would be after the defendant has been upstairs with the informant and come downstairs, observed the flash roll of currency. This would be the following events after the defendant decides to go upstairs and wake up Mr. Harper.

Q. And so this -- this -- is this clip recorded from the same recording device that the jury has heard already?

A. Correct.

Q. And we've heard a couple of clips from that recording device.

Does this kind of tie together the three clips that we've heard?

A. That's correct. Gives a full context of the circumstances.

Q. Okay. And there's some dead space in here. Does that help kind of establish the time -- timeline between these various clips and statements?

A. Yes, sir.

MR. HORNOK: All right. Let's go ahead and play.

(Audio plays.)

Q. (Mr. Hornok continued.) Agent Kelly, towards the beginning of that clip there was -- there was a brief comment, and Mr. Van Cleef was asking some of the other witnesses about that portion of it, asking some questions about "prop the door open."

Did you -- in listening to that and kind of listening to his questions, did you hear anything like that in the transcript -- or in the recording there?

A. Yes, sir.

Q. What did you hear?

A. I heard, I believe it was Paul, say "He propped the door open."

Q. Now, obviously the transcript at some point stops. Was -- did it stop because there was only a certain portion of this transcribed, and the rest of the video just -- we just didn't prepare a transcript for?

A. Yes, sir.

Q. And in the interim, so between the propped the door open clip and then this last piece that we heard, were there -- did you hear some phone calls?

A. I did.

Q. And who -- based on the conversation, who did it appear those phones calls were from?

A. The defendant.

Q. And did -- were there any phone calls from Tim Harper?

A. Yes.

Q. And were -- were you able to, based on listening to it,

distinguish which phones calls were from the defendant and which phone calls were from Tim Harper?
A. Yes, sir.
Q. And how did you distinguish those things?
A. The first call as they were leaving the apartment complex, based upon Paul Brown's conversation, he basically stated that Tim was asleep and the defendant had let him know that Tim was up and going to take care of it.
Q. And then later phone call -- later phone calls, was there mention of the other party being Tim?
A. Yes. I could hear his -- I could hear Tim Harper's voice and distinguish that was him.
Q. At some point in 2019 did the defendant write any letters?
A. Yes, he did.
Q. How many letters did he write?
A. Three.
Q. And did he write those letters in July, November, and December?
A. That's correct.
Q. In those letters did he offer to help law enforcement?
A. He did.
Q. What are some of the kinds of criminal activity or criminal organizations that he offered to help bring down?
A. A sex trafficking ring, a cartel-related cocaine distribution location in the Austin area, I believe, and then cartel smuggling operation on the border.

Q. Okay. Anything with respect to fraud?
A. A fraud ring based out of Miami that was stealing people's identities.
Q. Now, based on your experience with working with potential cooperating individuals, is this -- is this the kind of information that you would have without being proximate to or engaged in this kind of criminal activity?
A. No, sir. To have actionable knowledge, you would have to be involved in it.
Q. Did Mr. Hayden in those letters admit to knowing any of the participants of this conspiracy?
A. Yes, sir.
Q. Who did he admit to knowing?
A. Jason McLemore and Daniel Montes-Munoz, Timothy Harper.
Q. Did the defendant admit to being involved in any cocaine or methamphetamine activities?
A. Yes, sir.
Q. What did he admit to?
A. Trafficking cocaine and metham -- I remember cocaine specifically. I'm not recalling methamphetamine, but it's possible.
Q. Did he describe any knowledge or being present at any methamphetamine transactions?
A. Yes.
Q. And you mentioned cartels. Did he admit to knowing any members of any cartels?

A. Yes. He stated he was being recruited because of his stature.
Q. And by whom was he being recruited?
A. The cartel.
Q. Do you remember which cartel?
A. I believe it was the Gulf cartel.
Q. Are you familiar with the Gulf cartel?
A. Yes, sir.
Q. And what kind of activity is the Gulf cartel involved in?
A. Human trafficking, human smuggling, narcotics trafficking, narcotics smuggling.
Q. What, if anything, in those letters did he describe about any locations with -- containing cocaine or cocaine operations?
A. He identified a location where bulk cocaine was being pressed into -- compressed into bricks.
Q. Did Mr. Hayden admit to anything about being at the apartment that day?
A. Yes, sir.
Q. What?
A. Stated he was there and a dude flashed him some money, I believe.
Q. Let me direct your attention in the book in front of you to Exhibit No. 52. Do you recognize Exhibit 52?
A. Yes, sir.
Q. What is it?
A. This is a letter to the prosecution.

Q. And is this one of the letters that the defendant wrote?
A. That's correct.
MR. HORNOK: Your Honor, at this time I move to admit Exhibit No. 52.
MR. VAN CLEEF: No objection.
JUDGE SCHROEDER: Very well. It will be received.
(Government's Exhibit 52 was admitted.)
Q. (Mr. Hornok continued.) So if we could, let me direct your attention to page 1 of the letter. And let's focus in on the initial connection paragraph.
If you could, just read this paragraph to the jury.
A. "The initial connection. Timothy Harper was looking for a car to buy. Daniel Munoz had a BMW for sale. Tim was smoking weed, and Danny offered that he had an abundance of weed. One day Tim drove over to get his car worked on, and I went with him. A guy named Hugo was with Danny. Tim got out of the car, and they knew he was on meth because he was moving too fast. I speak Spanish so I could hear them talking. Well, Hugo was asking Danny to see if he needed anything, so Tim immediately grabbed" -- "grabbed up the deal at $250 an ounce. Well, Tim would always need big amounts, but he never had any money to pay for it. That's the reason Hugo drove his Jeep to meet with Tim, and he wouldn't let Danny out of his sight with that kilo that day because it was coming from Hugo."
Q. Now, there's a reference there to $250 an ounce.
What, if anything, sticks out to you about $250 an ounce?

A. That's a good price.
Q. Good price for what?
A. Methamphetamine.
Q. All right. If we now could zoom back out and focus in on the bust paragraph.
A. "The bust. When I left with my brother and Savannah Christy, there was no meth in the apartment. I only had knowledge of the cocaine that was mine."
Q. All right. Let's look at the next page. Go ahead.
A. "The CI had already been communicating with Tim via text. I made no connection with the two. I never presented anybody with drugs or give anybody anything nor weigh anything."
Q. All right. Let's zoom out, and let's focus on the Jason McLemore paragraph.
A. "Jason McLemore. All I know is Jason and Timothy were selling back and forth to each other. And they had a falling out because Tim gave him a bad kilo. Jason and Tim both were selling to the same real estate agent. That's how he came across the apartment on Dickason because Jason moved off of Harry Hines Boulevard and up in the" -- "in Upton" -- "in uptown area because I used him from time to time to supply my cocaine addiction."
Q. All right. Let me direct your attention now to the "my dad's house" paragraph.
A. "My dad's house. Agent Kelly showed up to my dad's house saying he had a warrant. I immediately called. I had nothing. I

was clean. I stopped several times for speeding" -- "I was stopped several times for speeding. The tickets match all the dates after the bust. I never had any warrants. Tickets in Miami Beach; Lacy; Lakeview, Texas; Plano, Texas; Carrollton, Texas, I got scared and called an ex-police chief here in Texas. He was selling arms and ammo and was operating an underground all nude men's club in Farmers Branch, so I felt he was all right.

"He said he knew someone close to the investigation, would put ears on the case. Months went by with no mention of my name. Then I found out he was a sex offender, and the club he was running underground was underaged nude guys. I hate sex offenders, so I told him to go fuck himself, and I stopped communicating."

Q. Let me direct your attention now to page 3, lines 2 and 3. And into the second line there's an "I." Can you start reading there?

A. "I told him I had nothing to do with it. I only knew about the cocaine. I didn't have a warrant until Timothy told Agent Kelly I was in Fort Lauderdale jail."

Q. And if we could zoom back out, and let's focus in on the cartel paragraph, and I'd like you to read that in chunks.

A. Under Cocaine?

Q. Yes, sir.

A. "Cocaine. Me and Timothy Harper was doing a show at Rain on 4th in Austin, Texas. That's why I have a speeding ticket in Lacy, Lakeview traveling back and forth. He introduced me to the DJ and promotor, Matt, who puts Molly pills and coke through the club. He

got me hooked up with the coke. I had to download the app Signal to talk with him. It destroys all messages. I would buy" -- "I would buy a couple of thousand in coke to hold me for awhile. He showed me how to work the black-market, Alpha bay market. He got me pressed Xanax from Washington. He was ordering MDMA pure crystal form from China and getting it through customs."

Q. Hold on one second. There you go.

A. "Then putting it in capsules. Well, he didn't want to sell me any more coke, so he introduced me to his cousin who I met a few times. He said he was Cartel de Gulfo and the coke was pure. He brought me to some house in Austin where they were pressing it into blocks. This one guy was impressed on how big I was and asked if I wanted to work because the Cartel de Gulfo is beefed out say the Zetas, and they are trying to look for better ways to get money and control the border."

Q. All right. Let me direct your attention to the next page.

A. "Like Matamoros Reynosa, Guanajuato, border cities. More money, more control, more people. Because of my size, they wanted to place stakes from the Rio leading up the Pecos River with a pulley chain. They can run it up the river with oxygen tanks. They need someone strong to swim with Matamoros and Brownsville, Texas. Swim with a tank and something they call a third lung. I turned them down, but the way I carry myself kept me in good standings. That's I all know on the cocaine. I know nothing on the meth."

Q. All right. Let me turn your attention now to Exhibit 53 in the

book in front of you.
Is this another -- or what do you recognize Exhibit 53 to be?
A. This is another letter from Mr. Hayden.
Q. And is -- does this letter contain some of -- similar admissions that you've described earlier?
A. Yes, sir.
Q. All right. Let me direct your attention now to Exhibit 54. Do you recognize Exhibit 54?
A. Yes, sir. This is a letter to me.
Q. And who wrote the letter.
A. Mr. Hayden.
MR. HORNOK: Your Honor, at this time I would move to admit Exhibit 54.
JUDGE SCHROEDER: Any objection.
MR. VAN CLEEF: I -- sorry, Your Honor. No. No objection.
JUDGE SCHROEDER: All right. Very well. It will be admitted.
(Government's Exhibit 54 was admitted.)
Q. (Mr. Hornok continued.) Let me direct your attention to page 1. There's a line that's lengthy there. If we could focus in on the lines beginning with "Career choice to from Mullahs." And if you could, read "I have some pretty," the sentence starting -- or "Now I" -- "Now I speak three languages." Just start there.
A. "Now, I speak three languages, and I have some pretty damn good

information, information that got me a bullet wound in the foot. Now, if me and you can have a little sit-down, I can bring forth a lot of information. With your power and my knowledge, we can shut down a lot of cartel movement. I can call some people and prove I have the ability. I can contact some Mullahs directly in Reynosa and Nuevo Laredo. I can shut down two big operations in Dallas and Austin. I can get info on immigrant safe houses, direct routes from Mullahs. I know I've been in jail awhile, but my name is respected. All thanks to some phony Google results. If it wasn't for that, I'd probably be dead. I also know a fraud ring in Miami. They take over people's bank accounts, do an online deposit with a remade payroll check. Take their card and replicate it with a Magtek IntelliStripe 380 or the NCR 200 EMVIC. If my memory serves me correct, they pay the people to use their accounts, empty it, and then pay them 400 to 500 dollars."

Q. All right. Let me direct your attention to the top of the next page. And if you could just read the remainder of that.

A. "The guy was trying to bring me in on it, but I was more interested in a normal life. And if my memory is correct, they also used LuxeCC.su and GoSwipe, and I can produce results, but I want a new identity because these people know who I am. If you want to talk, you know where to find me."

Q. Now, the information contained in these letters and the -- the knowledge that Mr. Hayden says that he has, how would somebody obtain that information or meet those kinds of individuals?

A. He would have to be introduced or become a trusting member to be involved in any discussions with a criminal group of this nature.

Q. Is this the kind of information that you would expect just an average Joe to be able to divulge to the police?

A. No, sir.

Q. Let me direct your attention now to Exhibit 8, page 1.

MR. HORNOK: If we can go ahead and put that up on the screen as well.

Your Honor, Exhibit 8 has been partially admitted as a summary, wholly admitted as a demonstrative. At this time I'd like to walk through that with this witness before the jury.

JUDGE SCHROEDER: And display it to the jury?

MR. HORNOK: Yes, Your Honor.

JUDGE SCHROEDER: Any objection?

MR. VAN CLEEF: As a demonstrative, no, Your Honor.

JUDGE SCHROEDER: Very well.

Q. (Mr. Hornok continued.) Is this a summary that you -- you participated in creating of the various digital evidence in this case?

A. That's correct.

Q. So let's -- let me direct your attention to the next page. So I'd like to start as we walk through this summary with some of the information that you have obtained from Mr. Hayden. The Facebook account bearing the name Collin Hayden.

Now, where does this information come from in the exhibits?
A. It was obtained via search warrant.
Q. And is there an exhibit that is the -- forms the basis of the information here in this section?
A. Exhibit 1.
Q. All right. Let's step forward. Now, for Mr. -- for the Facebook page associated with the name Collin Hayden, what was the account ID?
A. Collin.Hayden.773.
Q. What was the name?
A. Collin Hayden.
Q. And what was the date of birth provided?
A. September 29th, 1991.
Q. Do you know whose birth date that is?
A. The defendant's.
Q. And what was the PayPal account associated with the account?
A. Justingivenchybooking@gmail.com.
Q. What, if anything, sticks out to you about the first part of that e-mail address?
A. I know Justin Givenchy to be the defendant's stripper name.
Q. And where did -- where did this account user say that he worked?
A. LaBare Dallas as an entertainer.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, is this a -- who is displayed in

this picture?
A. The defendant.
Q. And was this picture uploaded to the Collin Hayden Facebook page?
A. Correct.
Q. Now, at the beginning of this week did we see another version of this picture in the source documents in Exhibit 1?
A. That's correct.
Q. And it was a bigger picture showing more -- more of the defendant's body?
A. Yes, sir.
Q. And this is now just zoomed into the defendant's head?
A. Correct.
Q. And who's tagged in this picture?
A. Collin Hayden.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What's displayed in this picture?
A. This is a picture of the defendant's back specifically identifying his tattoos.
Q. Okay. Which -- which, of any of the tattoos visible here, is particularly important in terms of this investigation?
A. The chain link fence on the -- on the shoulders.
Q. Okay. And on the right shoulder, look -- looking at the right shoulder and the left shoulder, it looks like there's chain link tattoo there on both shoulders.

How would you kind of distinguish the two sides, the two tattoos?
A. On the left side, the fence comes to three points, and then on the right shoulder, the fence comes to five points.
Q. And what was -- what was the comment associated, or what was a comment associated with this picture?
A. Jeff Rogers commented, OMG, Collin. Boy, you swole. Looking good, son.
Q. And when was this photo uploaded to the Collin Hayden Facebook page?
A. January 2nd, 2017.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, the two pictures that we have seen previously, are they representative of pictures throughout Exhibit 1?
A. That's correct.
Q. And based on the pictures that you've seen in Exhibit 1, the various kinds of pictures, the numbers of pictures, what, if anything, did you conclude about who the user associated with that Facebook page was?
A. The -- it would be the defendant.
Q. Tell us what we're seeing here on this page.
A. On Collin Hayden's Facebook, November 7th, 2016, identified as his stage name to be Justin Givenchy.
MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) Please tell us what we're seeing here?
A. This is a comment from December 28th, 2016, in reference to the lightening bolt white supremacist tattoos. "These get my ass" -- excuse me. "These get my pulled out the car and searched every time. That's why I don't ride dirty."
Q. What, if anything, sticks out to you about the phrase "why I don't ride dirty"?
A. Ride dirty is a term specifically used by narcotics users or traffickers to refer to when they are riding around with narcotics in their vehicle.
Q. And the lightening bolts displayed here, are they squared off at the top and the bottom?
A. They are.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What, if anything, is displayed here?
A. The defendant's flashing a large stack of cash.
Q. And what is he seated in?
A. I believe this is the Range Rover picture.
Q. Okay. What kind of comment did he provide with that picture?
A. "All I do is work, work, work, like Rihanna."
Q. Now, do you know whether the defendant actually purchased this vehicle?
A. I don't believe he did.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What kind of check-in information

is -- did you find in the Collin Hayden Facebook page?
A. Check-ins at LaBare Dallas, Gold's Gym, and Youfit Health Clubs.
Q. Are these all locations in the Dallas area?
A. They are.
Q. And relevant to the other events that we have heard about in this case, how did these dates compare to those, to those dates?
A. They're consistent with the investigation.
Q. And what kind of comments did Mr. Hayden make when checking into these locations?
A. At LaBare, had a statement of "Ladies, where your wallets." Gold's Gym, "Big like a silverback." Youfit Health Clubs, "Getting big ASF. Step up and give me more weight."
Q. And are these representative check-ins that you saw in the Facebook information for the Collin Hayden account?
A. They are.
Q. And are -- Mr. -- are the defendant's association with these locations consistent with other aspects of your investigation?
A. They are.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, I'd like to walk through some of the information that you found in Exhibit 2.
What is contained in Exhibit 2?
A. The down -- the download of Justin Givenchy's Facebook.
Q. And Exhibit 2 is also in evidence? Is that correct?

A. That's correct.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) Tell me about the account information that you identified from Exhibit 2.

A. The name is Justin Givenchy. Date of birth, September 29th, 1991, with a registered e-mail of flexhayden@yahoo.com. Education, Airline High School, Bossier City, Louisiana, with work description at BJ's NXS as an entertainer and Hung Mansion, male strip club.

Q. And what, if anything, sticks out to you about the date of birth?

A. That's the date of birth of the defendant.

Q. And, what, if anything, sticks out to you about the registered e-mail?

A. That it refers to Hayden.

Q. And what -- is that the defendant's last name?

A. Yes, sir.

Q. And what, if anything, sticks out to you about the education?

A. It's in Bossier City, Louisiana, which is a location I know the defendant to be commonly involved.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) What's displayed here?

A. This is an upload from December 31st, 2016, to a Christmas Eve album tagging Justin Givenchy, but it's a photograph of the defendant.

Q. And what, if any, distinguishing marks in this picture help you

identify the defendant in this picture?
A. The chain link fence on his shoulders.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What's displayed in this picture?
A. This is also a photograph of the defendant with a distinguished chain link fence tattoo, and this photograph is uploaded on December 31st, 2016, to the Christmas Eve album tagged Justin Givenchy.
Q. Now, when a photo -- a user is tagged in a photo like this, is that a way of identifying somebody in the photo?
A. Correct.
Q. Now, did -- have we previously seen a larger portion of this picture?
A. Yes, sir.
Q. And that picture's located in Exhibit 2?
A. Yes, sir.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What are we seeing here?
A. This is a slide that shows an identical photograph belonging to the -- from the defendant uploaded to both the Collin Hayden and Justin Givenchy Facebook page, within a very close timeframe.
Q. So the photo on the left was uploaded to the Collin Hayden account. Is that right?
A. Correct. Correct.
Q. And the photo on the right was uploaded to which account?
A. The Justin Givenchy Facebook page.

Q. Now, in this photograph there appears to be what's a cell phone in -- on the left side of the photo, which would be the defendant's right hand.
What, if anything, do you understand, based on the orientation of this photograph, as to who took the picture?
A. The defendant.
Q. And would he have taken this picture as kind of a selfie in a mirror?
A. Correct.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What are we seeing here?
A. Justin Givenchy's Facebook account has searched for the term Collin Hayden on two separate occasions.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, thinking back to -- now, we've walked through the Collin Hayden Facebook account, we've walked through the Justin Givenchy account. Based on your review of Exhibits 1 and Exhibits 2, what, if any, conclusion did you come to about who the user was associated with those accounts?
A. Both accounts are consistent with the defendant being in care, custody, and control.
Q. All right. Let me now turn your attention to the at&t records. They're in Exhibit 3. Now, these records, have they been admitted already? Or they have been admitted already, so let's take a look.
MR. HORNOK: So next page, please.

Q. (Mr. Hornok continued.) What was the phone number associated with these phone records?
A. (918) 297-5867.
Q. Now, you mentioned earlier that you obtained the Facebook records pursuant to a search warrant.
How did you obtain these at&t records?
A. Through a court ordered request.
Q. Now, the use -- what was the user name associated with this -- these at&t records?
A. Paul J. Brown.
Q. And from what date to what date was this phone number active for Paul Brown?
A. July 1st, 2013, through May 9th, 2018.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued. ) Let's now talk about Timothy Harper's cell phone data which is in previously admitted Exhibit 5.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What was the phone number associated with the phone -- phone dump of Timothy Harper's phone.
A. (469) 805-1066.
Q. And what was the make and model of that phone?
A. A Samsung Galaxy.
Q. And what was the date of the extraction?
A. February 10th, 2017.
Q. And I believe you previously testified that you were the one

who performed that extraction. Is that right?
A. That's correct.
MR. HORNOK: All right. Next page, please.
Q. (Mr. Hornok continued.) And what is displayed here?
A. Appears to be a selfie taken by Timothy Harper.
Q. When was that uploaded?
A. February 8th, 2017.
Q. And when is that date relevant to the day of the bust?
A. That is the day prior to the bust.
Q. And what, if anything, do you understand, based on the orientation and content of this picture?
A. That Timothy Harper was actually holding the device that took the picture.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, I'd like to walk through in chronological order events from these four different data sources.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What are we seeing here?
A. These are uploaded flyers to both the Collin Hayden and Justin Givenchy Facebook page, both uploaded within a day of each other.
Q. And which account uploaded this flyer first?
A. The Justin Givenchy page.
Q. And to which albums were these photos -- or these flyers uploaded?
A. The mobile uploads album.

Q. Do you recognize any individuals in this flyer?
A. I recognize Big Mama Dena as Clifford Williams, Timothy Harper, and the defendant.
Q. And Timothy Harper, to be clear, is the one with the tattoos -- well, the one on the right side?
A. Timothy Harper?
Q. Yes.
A. Yes. That's semi blacked out.
Q. And the individual on the bottom is who?
A. Collin Hayden, the defendant.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What is displayed here?
A. This is a photograph. Appears to be a selfie taken by Timothy Harper and the defendant.
Q. And this is actually a screen shot from a video. Is that right?
A. Oh. Yes, sir.
Q. And who uploaded the video, this video?
A. Collin Hayden and Justin Givenchy.
Q. Sorry, who --
A. I'm sorry. Collin Hayden.
Q. Okay. And when did he upload it?
A. December 20th, 2016.
Q. And relevant to that date, were the Justin Givenchy and Cameron Diggs accounts ever connected via Facebook?

A. Two days later they were connected as friends.
Q. And two days after that, what happened?
A. Justin Givenchy searched for Cameron Diggs.
MR. HORNOK: Your Honor, at this time I move to -- if we could, I'd like to play what has previously admitted Exhibit 6.
(Video played.)
Q. (Mr. Hornok continued.) And who did you recognize in that video?
A. The defendant.
Q. Anybody else?
A. Timothy Harper.
Q. All right. Let me direct your attention now to -- back to page 23 of Exhibit 8.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What are we seeing displayed on this page?
A. A conversation involving Justin Givenchy's Facebook page with Gary Earl.
Q. And do you know who Gary Earl is?
A. I do not.
Q. All right. And in terms of helping the jury understand how to read what's going on here, the text in red, which user is associated with that text?
A. The defendant.

Q. And the text in black, who is associated with that text?
A. Gary Earl.
Q. And as we move down the page, is this formatted kind of like somebody might see on a phone with text messages?
A. That's correct.
Q. And the date that is there at the top in the middle, is that relevant to when these text messages occurred?
A. That's correct.
Q. All right. If you could, just -- I'm going to -- I'll read in -- what's in black, if you could respond with what's in red. "I have the $6 I owe you."
A. "You owe me $26."
Q. "Okay."
A. "I gave you the 40 that was for six for 20."
Q. "K. I'm at Marty's. Come up here."
A. "All right. When?"
Q. "I'm getting ready to go to Zippers now. You have white? I'm at Zippers. You have green also?"
Do you understand -- or what, if anything, sticks out to you, the phrase "you have white"?
A. That indicates to me he's asking about cocaine.
Q. And is this the kind of language -- or coded language that you would see -- you've seen on a regular basis in drug trafficking conversations?
A. Yes, sir.

Q. And what, if anything, sticks out to you about the phrase "you have green also"?
A. That would be in reference to marijuana.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Is this the continuation of the conversation between these two users --
A. Yes.
Q. -- on the dates listed here? Is that a yes?
A. Yes. I'm sorry.
Q. All right. If you could, just read -- read that for the jury.
A. "I need green. Green I need. What happened today? I messaged you about getting green."
Q. And how did the defendant respond?
A. "You."
Q. And is the green described here also related to marijuana?
A. Yes, sir.
MR. HORNOK: Next page, please.
Q. What, if anything -- or what is described -- or what is displayed here on this page?
A. A photograph including Collin Hayden and Timothy Harper.
Q. And to be clear, which individual is the defendant in this picture?
A. The defendant is on the right with a gold chain, and you can see his chain link tattoos.
Q. And where was this photo uploaded?

A. To the Mobile Uploads album.
Q. Of which Facebook account?
A. Justin Givenchy's.
Q. And to be clear, as we're kind of working through this now, this is kind of a mix of information from the various data sources in chronological order.
A. Yes, sir.
Q. When did -- when was this photo uploaded?
A. January 22nd, 2017.
Q. And when is -- what is that date relevant to the -- the first day that Paul Brown knocked on the door of the apartment?
A. This would be the day prior to Paul Brown arriving at the apartment.
Q. And who is tagged in this photo?
A. Justin Givenchy and Cameron Diggs.
Q. And what, if any, comments did Justin Givenchy make attached to this photo?
A. "I'm fly."
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What are we seeing here?
A. A identical picture uploaded to both Collin Hayden and Justin Givenchy's Facebook pages, both within a day of each other.
Q. And who's depicted in this picture?
A. The defendant.
MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) What is displayed here?
A. This is a -- a call record from Paul Brown's at&t records on January 26th, 2017.
Q. And what, if anything, is significant about that date in this investigation?
A. This is the date of the controlled purchase of the approximately eight-ounces of methamphetamine from Timothy Harper.
Q. Okay. And who, if anyone, in this investigation is associated with the phone number there, +1-469-805-1066?
A. That would be Timothy Harper.
Q. And who initiated -- based on this information, did Timothy Harper call Paul Brown, or did it go the other way?
A. This call was from Timothy Harper.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) All right. Let's start walking through the events of February 2017.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What is depicted in this slide?
A. This -- this is the cell phone activity from Timothy Harper's cell phone involving calls from Collin Hayden -- or from a number identified as Collin in Harper's phone.
Q. And what are the dates of this activity?
A. February 7th, 2017, and February 8th, 2017.
Q. How many calls did this individual named Collin -- or this phone number associated with Collin -- and Timothy Harper exchange

on February 7th of 2017?
A. Seven calls.
Q. And how many on February 8th?
A. Nine calls.
Q. Now, have you reviewed the content of those -- well, were there text messages also between these two numbers?
A. There were text messages.
Q. And what, if anything -- how would you characterize those text messages between Timothy Harper's phone and the phone number in his phone associated with Collin?
A. They were consistent with conversation between roommates.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What is displayed here?
A. This is a text conversation between Timothy Harper and Paul Brown. Oh, excuse me. Not Paul Brown. This is going to be an unidentified number.
Q. And so if you could -- when did this conversation occur?
A. February 7th, 2017.
Q. And if you could, read the conversation for the jury.
A. "Hey, bro, if I came back to Dallas tomorrow, could you hook me up" -- "could you hook me and my boy up with a couple of zips, like 350 each, I think I heard."
Timothy Harper replied "Right now everything is going for 400 an ounce. Sup."
Q. What is a zip?

A. That is an ounce quantity of narcotics.
Q. And what, if anything, sticks out to you about the amounts of $350 each and $400 an ounce?
A. That would indicate to me that it's methamphetamine.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Is this a continuation of that same conversation?
A. Correct.
Q. And when did this -- when did this continuation occur?
A. February 8th, 2017.
Q. If you could, please read the conversation for the jury.
A. "My buddy says it's better to wait." Harper replies, "How much you trying to spend?" "How much is a pound?" Harper replies, "5,000. Who wants a pound?" "A friend of New York City." "Or do they want OT?" "They are trying to raise the funds. If they're able to and when they can, then we'd come down. I'd give you a couple day's notice."
Q. Is any of this conversation consistent with drug trafficking?
A. Yes, sir.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Is this a continuation of that same conversation?
A. It is.
Q. And if you could please, read it for us.
A. "How do I know this is Cameron? Who's our mutual friend that

we met through?" Question. "Dean."
Q. And who do you know to be associated with the name Cameron?
A. Timothy Harper.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What are we seeing here?
A. Another cell phone -- another text conversation with Timothy Harper's cell phone.
Q. And is this with a different -- different phone number on the other side?
A. That's correct.
Q. And when was this phone conversation?
A. February 8th, 2017.
Q. All right. If you could, read this conversation for the jury.
A. "Hey. How are you? Taking Mary to get mattress." Harper replies, "Sad. I need to make some money." "What can I do to help other than the obvious?" "I need to think, but I'm not a jealous guy so I'll try and think of friends of quality that can be" -- "that could be referred. I'm going pick that hydro for you tonight. I'm pretty sure price is $90, so less than the hundred dollar ceiling you mentioned, but I'm going to pay for it anyway."
Q. And what is hydro?
A. Hydroponic marijuana.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Is this a continuation of that same conversation?

A. It is.
Q. And if you could, read that for us.
A. "I do want to get a gram of coke from your roommate. I like starting off with a small line before a parachute of T."
Tim replies, "Okay. Where are you?"
Q. And who do you understand Mr. Harper's roommate to be?
A. The defendant.
Q. And when somebody says, "I like starting off with a small line," what does that phrase mean?
A. I understand that to be a line of cocaine that's processed to be consumed by an individual.
Q. And what is a parachute of T?
A. Methamphetamine wrapped in toilet paper for consumption.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Is this a conversation between Mr. Harper and Mr. Brown?
A. That's correct.
Q. Now, is this the conversation that led to the -- the buy bust on February 9th --
A. Yes, sir.
Q. -- 2017?
A. Yes, sir.
Q. All right. If you could, the text in blue is associated with whom?
A. Paul Brown.

Q. And the text in green is associated with whom?
A. Timothy Harper.
Q. All right. If you could, read the conversation for the jury.
A. Paul Brown, "This is your advance notice. I'll be in the city in a couple of days. You get a new phone?"
From Timothy Harper, "Hey, yes. I'm ready for you. How many you need?"
Paul Brown states, "I'm shooting for Thursday."
Q. And at the end of there, there's a date 9 February 2017. Was that the next Thursday following this February 7th conversation?
A. That's correct.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Is this the continuation of that conversation?
A. Correct.
Q. And is this the next day?
A. Correct.
Q. If you could please, read that conversation to the jury.
A. Timothy Harper replies, "Got ya." Paul Brown, "I'll be there in the morning. You going to be ready, right?" Harper, "Yes. How many?" Paul Brown, "Bird. 36." Timothy Harper, "Okay. You bring 9500. It will be here in the morning."
Q. And when the phrase bird and 36 are used in response to the question of how many -- "Tes. How many," what do you understand that to mean?

A. Bird to be slang for a kilo, and 36 to be the number of ounces in a kilo.
Q. And when Timothy Harper said "Okay. You bring 9500," what was he referring to?
A. The price of the kilo.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Is this a continuation of that same conversation?
A. It is. From February 9th, 2017.
Q. And at what time did this exchange occur?
A. Four o'clock in the morning.
Q. And please read the conversations to the jury.
A. From Paul Brown, "Yes. And I'm goin" -- "I'm goin be there by ten." Timothy Harper, "Okay. Good deal."
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) And is this a continuation of that conversation?
A. It is.
Q. What time did this -- did these exchanges occur?
A. Approximately ten o'clock in the morning on February 9th, 2017.
Q. All right. And what happened here?
A. "Everything good, bro?" This is from Paul Brown.
"Everything good, bro? I'm stuck in traffic, but headed your way. I can't wait around this morning, so let me know when you're ready cause my guy's with me. He gets nervous easy, so we're going

to make this go as smooth as possible. You ain't still asleep are you?"
Q. And at 10:25 that morning, what message did Paul Brown send to Timothy Harper?
A. "I'll be there in ten."
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, what is displayed here?
A. This is cell phone activity on Timothy Harper's seized cell phone from the date of the bust.
Q. And at 10:35, did Mr. Harper receive a missed call?
A. He did from Paul Brown.
Q. And the phone number that's there in the blue, the +1-918-297-5867, is that the phone number associated with the at&t records that we have discussed?
A. That's correct.
Q. And at 10:36, what occurred?
A. Paul Brown attempted to call Timothy Harper and was unsuccessful.
Q. What happened at 10:51?
A. At 10:51 Timothy Harper had a missed call from the defendant.
Q. And what happened at 10:55?
A. At 10:55 Paul Brown attempted to call Timothy Harper's cell phone again.
Q. What happened at 10:57?
A. The same. Missed call.

MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Where does this information come from?
A. This is from the CI's at&t records on the same phone.
Q. So this is different from the source of information on the previous slide which came from Timothy Harper's actual cell phone device.
A. Correct. This is from the actual CI who was communicating with Harper.
Q. Now, there is -- well, there's one phone number listed there a couple of times in red. And who is -- who do you understand to be associated to that phone number, based on your investigation?
A. The defendant.
Q. And at 10:51, what occurred?
A. There was a unconnected call at 10:51 from the defendant to Paul Brown.
Q. At 10:54 what occurred?
A. At 10:54 there was a 22 second conversation involving Paul Brown and the defendant.
Q. And who made that call?
A. The defendant.
Q. At 10:54 was there also a text message?
A. There was an -- there was an outgoing call from the -- the CI to the defendant.
Q. This is an outgoing SMS message?
A. Correct.

Q. And is SMS, is that a text message?
A. It's a common text message.
Q. Okay. And what occurred at 10:59?
A. The same. Paul Brown text messaged the defendant.
Q. And what occurred at 11:05?
A. There was an incoming text message from the defendant.
Q. Now, in looking at this data here, and having listened to the audio clip we listened to earlier, what, if anything, corresponds between the data you're seeing here and what we heard on the audio clip?
A. The 10:54 incoming call is consistent with the incoming call that Paul Brown received as they were leaving the apartment complex, and Paul Brown then replying to the undercover officer that he -- that -- with the confirmation that the defendant had woken up Timothy Harper. Then the text messages are consistent with the conversation that the CI had with Rick Lopez in reference to the defendant.
Q. And there's the last -- the last bit of that clip that we heard, which was a clip we actually heard yesterday or the day before, relevant to a text message between Paul Brown and the defendant, is -- is that associated with any of the records on this page?
A. Yes, sir.
Q. Which of those records?
A. That would be the text message records.

Q. And would that be the 11:05 text message?
A. Oh. Yes, sir.
Q. All right. And the times converted here -- times here, were they converted from a different time zone?
A. Yes, sir. From the Universal time zone.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, where does this information come from?
A. Timothy Harper's cell phone download.
Q. What occurred at 10:59?
A. At 10:59 Timothy Harper called Paul.
Q. What happened --
A. Paul Brown.
Q. What happened at 11:02?
A. Timothy Harper called Paul Brown.
Q. And based on the clip that we heard earlier today, what, if anything, is consistent between those two call records and the clip that we heard?
A. It would be consistent with Timothy Harper calling the CI to confirm that the narcotics were there.
Q. What happened at 11:25?
A. Timothy Harper had a missed call from the defendant.
Q. And at 12:32?
A. A incoming call to Timothy Harper from Paul Brown.
Q. And at 10:36?

A. An outgoing call from Timothy Harper's cell phone to Paul Brown.
Q. And there's a 13:45 there. Could you explain to the jury what time that is in terms of a.m. and p.m.?
A. That would be 1:45 p.m.
Q. So at 1:45 p.m., what occurred?
A. Timothy Harper had a missed call from the defendant.
Q. Okay. And there's -- the next record is 16:40. What are you -- what happened there?
A. That is a missed call from Timothy -- on Timothy Harper cell phone from the informant, Paul Brown.
Q. And at that time where was Timothy Harper?
A. In custody.
Q. And so what, if anything, sticks out to you about that call record, based on his -- him being in custody?
A. What I would understand this to be is a tactic used by law enforcement when debriefing Paul Brown -- or excuse me -- when debriefing Timothy Harper. Timothy Harper was unaware of who the informant was at this point. He just knows that he was arrested in a -- in a drug sting. And so Paul Brown could potentially be used in follow-up investigations after this bust, so we would ask Paul Brown who -- or I'm sorry. We would ask Timothy Harper, you know, "Who are you visiting with today?" And ask him to discuss Paul Brown, who was a CI with us, to give him misinformation about who the actual informant was for -- for Paul Brown's sake we wouldn't

want Timothy Harper to know who exactly the informant was, so we'll ask him to describe Paul Brown to us, like we don't know him.
Q. And would you -- after kind of having this conversation with Mr. Harper about Paul Brown, what, if anything, would you do using Mr. Harper's cell phone to kind of seal -- or confirm that conversation?
A. So we'd ask him who -- who Paul was. "So this guy was here to buy a kilo of methamphetamine? Well, call him. Let's" -- "let's have a recorded conversation with him and see if we can get Paul's voice on the phone."
Q. And the basis of this is to mislead Mr. Harper?
A. Correct. And protect the informant.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What is displayed here?
A. This is a cell phone conversation between Timothy Harper and Paul Brown.
Q. And when you say a cell phone conversation, do you mean text messages?
A. I'm sorry. Yes, sir.
Q. And at 12:23, what occurred?
A. A text message between Timothy Harper and Paul Brown, "What's up with it?"
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, on February 11th, 2017, what kind of messages did you see on the Justin Givenchy page with a user

named Bradley Harris?
A. Justin Givenchy's Facebook page contained a message asking about -- asking if he was okay because this person had read about Cameron and wondered if the defendant was okay.
Q. Okay. Who do you know Cameron to be?
A. Timothy Harper.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) On February 12th what occurred?
A. On February 12th Justin Givenchy's page searched for Collin Hayden.
Q. And based on this continued pattern of connection between these two, what, if anything, do you understand, based on your investigation, about the user of these accounts?
A. That they are maintained and controlled by the defendant.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What's displayed here?
A. This is the beginning of an uploaded video to the Collin Hayden -- to Collin Hayden's Facebook involving a large quantity of U.S. currency.
Q. And when was this uploaded to the Collin Hayden Facebook account?
A. February 23rd, 2017.
MR. HORNOK: At this time f we could play what's been previously admitted as Exhibit 7.
(Audio played.)

Q. (Mr. Hornok continued.) There's a phrase at the end "four or five racks." What do you understand that phrase to mean?
A. A rack is slang for a thousand dollars.
Q. Now, what, if anything, stands out to you about the pattern of the countertop displayed in this picture?
A. It's consistent with the apartment belonging to the defendant.
Q. Now, there are two individuals, one individual is the one who's flipping out the money and has the gold watch. There's another hand that is seen that has some kind of tattoo on it.
Do you recognize that too -- that tattoo from anyone involved in this investigation?
A. I believe that to be Timothy Harper's hand.
MR. HORNOK: All right. If we could go back to Exhibit 8, page 47.
Q. (Mr. Hornok continued.) Let me direct your attention now to the activities of March 2017.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What occurred on March 17th, 2017?
A. On this date there was a comment from Justin Givenchy's Facebook, "See Instagram photos and videos from Collin Hayden."
Q. And what is the Instagram account associated with those photos and videos of Collin Hayden?
A. @justin_givenchy.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) And what, if anything, occurred on

March 27th?
A. Collin Hayden's Facebook displayed a comment in a conversation -- in a messaging conversation with Jamie Knighten, "Crystal meth keeps me shredded."
Q. What do you understand that phrase to mean?
A. Crystal meth keeps him lean and muscular.
Q. And have you reviewed the full context of this conversation between Collin Hayden and Jamie Knighten?
A. I have.
Q. And would you be -- would you consider it to contain any obscene material?
A. Absolutely.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) All right. Let's now turn to the events in April of 2017.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What occurred on -- or well, what do we see here on this slide?
A. This is a slide showing that both Collin Hayden and Justin Givenchy are using IP addresses that are the same source.
Q. And the first line there, Justin Givenchy's search for Tim Harper, what do you understand that to -- that to mean?
A. This --- this is -- this timeframe is going to be April 4th, 2017, to April 5th, 2017, so this would be after the arrest and within the timeframe that Timothy Harper has stated he was receiving

threats from the defendant.
Q. And those very long series of characters with colons, what are those things?
A. That is the new form of IP address.
Q. Okay. And what's your understanding as to the likelihood that two devices would be using -- or two different accounts would be using the same IP address at two different times during a two-day window, as seen here?
A. What's the likelihood that it would be different devices?
Q. Yes.
A. Very unlikely.
Q. So based on this information, what do you understand occurred?
A. Both Collin Hayden and Justin Givenchy are accessing their accounts from the same device.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) All right. What's displayed here?
A. These are messages with Facebook conversation involving Reva Dena. Reva Dena is the -- is Clifford Williams, the person at the top of the flyer that we saw earlier.
Q. When did that -- when did this conversation occur?
A. April 5th, 2017.
Q. And if you could, please read that conversation for the jury.
A. "Where is Tim at? I got to get rid of him. I will pay 2,000 to find him." From Reva Dan, "He ain't at my house no more. I don't know." Justin -- the defendant, "Bitch ass nigga put the

people in my life. Now the feds hunting me. I want him." From Reva Dena, "I kicked him out Monday."

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) Is this a continuation of that conversation?

A. That's correct.

Q. Now, there's -- there's some text here. Is -- is this text coming from a photo that the Justin Givenchy account sent to the Reva Dena account?

A. That's correct.

Q. And if you would, please read that for us.

A. "What's going on? There was two state police and one sheriff here saying that had a federal indictment to place you in custody for methamphetamine and searched all out here for you. They said it would be easier on you to come" -- "to come in. What the is going on, bud? Said they had seized a kilo of meth from your apartment in Dallas. This have anything to do with that other dude they arrested, and maybe he said it was yours when you was not there?"

Q. And how did Reva Dena respond?

A. "I'm sorry."

Q. Is this -- is this -- is anything in this message consistent with an event that you are aware of in the investigation?

A. Yes, sir.

Q. Which event?

A. This would be within the timeframe of when I went out to the

defendant's parents' residence in East Texas and asked about locating the defendant.
Q. And at that time did you have a conversation with the defendant?
A. I did.
Q. And based on your investigation and this message, what knowledge did you -- did you believe that the defendant had on April 5th of the federal investigation?
A. That we were actively looking for him.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, on April 6th, 2017, what messages did the defendant send?
A. On this date, Justin Givenchy in a conversation with Christine Caldwell stated, "I will pay $2,000 for the location of Tim."
Q. And who is Tim?
A. Timothy Harper.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, what we've been looking at before then is information from the Justin Givenchy account. Is that right?
A. Correct.
Q. Where does this information come from?
A. This is from the Collin Hayden account.
Q. Okay. And on April 8th of 2017, is this a photo that the Collin Hayden account posted?

A. That's correct.
Q. And what is -- what is the message of this photo?
A. "I can't stand a snitch."
Q. And what do you understand that phrase to mean?
A. People who talk to the police.
Q. And based on this photo, do you -- what do you conclude as to the defendant's attitude with respect to those who talk to the police?
A. Don't mess with snitches.
Q. What message did -- did the defendant post on April 8th, 2017?
A. "Paying $2,000 cash for the location of Christine Caldwell and Timothy Harper. If anybody knows anything, I will pay cash upon delivery."
Q. Who is Christine Caldwell?
A. Timothy Harper's girlfriend.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, at this point are we jumping back to the Justin Givenchy Facebook page?
A. That's correct.
Q. And what, if any, messages did the Justin Givenchy Facebook page send to the Cameron Diggs Facebook page?
A. On April 9th the Justin Givenchy page in a conversation with Cameron Diggs stated, "Bitch ass nigga. I'm goin to find you. I got two" -- "200 P for your location. Want to throw me under the bus? We goin to see the last one standing. Yeah, your little bitch

ass detective guy texted me, told me everything you said, how you putting it all off on me. Two thousand bones."

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) Now, on April 9th of 2017, what, if any, commonalities did you observe relevant to IP addresses used by the Collin Hayden and Justin Givenchy accounts?

A. That both of these accounts were using the same IP address.

Q. And on that day using that IP address, did the Collin Hayden account upload a photo?

A. It did.

Q. And is this the photo displayed here?

A. That's correct.

Q. What, if anything, in this photo sticks out to you as identifying anybody?

A. The defendant's chain link tattoo.

Q. And which shoulder of that tattoo is depicted here?

A. The left.

Q. The left or the right?

A. Right.

Q. And is this the five points that you described earlier as being distinguishing on that shoulder?

A. Yes, sir.

Q. So based on the orientation of this picture, what appears -- what part of the defendant's body appears to be kind of out of frame on the right side, kind of as the skin kind of darkens and there's a

crease there?
A. A shoulder.
Q. And is that the defendant's legs off to the left?
A. Yes, sir.
Q. And what is -- what is displayed underneath this blackout portion?
A. The defendant's buttocks.
Q. And what message did the defendant send associated with this picture?
A. "Bitch ass nigga, kiss my ass."
Q. And based on the content of the image and the content of that message, do you believe that they're connected to one another?
A. Yes, sir.
Q. And based on the orientation and content of the photo, who, if anyone, do you believe -- or do you conclude took that picture?
A. The defendant.
Q. And after he took that picture, what did he do with it?
A. He posted it.
Q. To what?
A. The -- both the Collin Hayden -- yeah, Collin Hayden's account.
Q. Okay. And so based on this information, what, if anything, do you conclude about whether the defendant had possession of -- possession and control of the Justin Givenchy account on April 9th of 2017?
A. I believe the defendant had control of the account on this

date.

MR. HORNOK: All right. Next page, please.

Q. (Mr. Hornok continued.) What is depicted here?
A. This is going to be a -- four messages on Collin Hayden's Facebook account showing consistent use of a frequent term.
Q. Now, is this a term that appeared in the threat that the defendant sent on April 9th of 2017?
A. That's correct.
Q. All right. Let me direct your attention now to Exhibit 1, page 1,579. And if we could just focus on the top half of that page.
And this bottom summary that's listed here, if you could, read that for the jury.
A. The bottom summary?
Q. Yes. The last one there.
A. Collin Hayden commented on a post from the 6th of January 2017, "Because you running your fucking mouth about shit you know nothing bout running your mouth about a fucking gangster with a rap shit bitch ass nigga, I'll get you killed."
Q. Let me direct your attention now to Exhibit 1, page 1,586. And, again, let's focus on the first four summaries.
A. Collin Hayden replied to a comment from a post January 4th, 2017, "Anybody want to get this bitch ass nigga here? I got bread. I'll be in Louisiana soon. Anybody want to set him up? I got two racks on him right now."
Q. Next comment.

A. On January 4th, "I'll beat the fuck out of both of y'all same time. I stay with them hitters."
Q. Next page -- or next summary.
A. "LMAO that dude seriously, ha-ha, that bitch ass nigga called security on me."
Q. And the last one?
A. "Oh, yeah. What's happening pussy? You ain't wanna say shit to me or my little bro in this hotel. Now you wanna internet talk, little ass boy. I'm triple your size. Imma break your fucking jaw and guess what, I already know you ain't gonna meet up, so I'll pay someone to" -- "to get you. I got cash, bitch."
Q. All right. Let me direct your attention now to Exhibit 8, page 59.
On April 9th, 2017, what check-in did the defendant make on his Facebook account?
A. Havana, Cuba.
Q. And what, if anything, is -- does that correspond to something else in this investigation?
A. This is a location the defendant told me he was going to flee to when I told him that we were attempting to locate him.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, on April 19th, 2017, what was the location used to access the Collin Hayden Facebook account?
A. Miami, Florida.
Q. And is that -- where is that relevant to Cuba as compared to

East Texas or Dallas?
A. Much closer.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Let's look at the events that occurred in May of 2017.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What is depicted here?
A. A May 8th conversation. May 8th, 2017, with Scott Beckett.
Q. And who -- which of these data sources did we find this conversation?
A. Collin Hayden's Facebook account.
Q. All right. And if you could, please read the conversation for the jury.
A. "I need to get rid" -- this is from the defendant. "I need to get rid of coke and Xanax. I have 300 Xanax and 26 grams of coke. I need it gone. I'm selling cheap." From Beckett, "How cheap? I know people." From the defendant, "Probably 800 for all. I need the cash." From Beckett, "Individual? My friend said what will you do for 250?" From the defendant, "Ha. They's crazy. An ounce of coke and 300 Xanax for 250."
Q. Now, what do you understand to be the nature of the transaction that the defendant is discussing here?
A. Selling cocaine and Xanax.
Q. And what is Xanax?
A. A control -- a prescription anxiety medicine.

Q. And is it ever -- is it -- is it a controlled substance that is abused like cocaine?
A. It is abused. I would differentiate it from cocaine.
MR. HORNOK: Okay. Next page, please.
Q. (Mr. Hornok continued.) What is depicted here?
A. Similar photo uploaded to both Collin Hayden and Justin Givenchy's Facebook account.
Q. Now, is it the same photo, or is it a similar photo?
A. Similar but different.
Q. And how is it different?
A. The photograph on the left is a little fuzzy and at a little bit different angle, and the one on the right is -- has more clarity and is more direct with the -- with the face of the defendant.
Q. Is the defendant wearing the same shirt in the two pictures?
A. That's correct.
Q. And although the background is mostly dark, there are lights there. Is there any similarity in the lights in the background?
A. Similar but different.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Let's look at July of 2017.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) July -- in -- on July 6th of 2017, what -- what did you observe in the Justin Givenchy Facebook account?
A. On this date Justin Givenchy's Facebook account in a

conversation with Chris Taylor, Chris Taylor replied -- or states to Justin Givenchy, "Hey, are you still looking for Tim? I saw the message you posted on Christine's page under one of her pics."
Q. Now, to be fair, did the defendant ever respond to this message?
A. No, sir.
Q. So in terms of categorizing this as a conversation, what is -- what is indicated by that title conversation?
A. That it is a text string -- a mess -- a message in a digital download.
Q. So would this maybe be a -- is this associated with a maybe direct message conversation between users as opposed to a message that might be posted on a public post?
A. Correct.
Q. Let me direct your attention --
MR. HORNOK: Your Honor, may I have a moment?
JUDGE SCHROEDER: Yes. And, Mr. Hornok, I'm not sure how much more you have, but if you have much more, we need to take a break.
MR. HORNOK: Let me ask that question.
Your Honor, I think we can get through the next piece in about five to 10 minutes. Is that -- and then I'll be done.
JUDGE SCHROEDER: I think we probably ought to go ahead and take a break. We've been going --

MR. HORNOK: Okay.

JUDGE SCHROEDER: -- quite a while now.

So, ladies and gentlemen, let's take our morning recess at this time for about 10, 15 minutes.

(Jury recessed.)

JUDGE SCHROEDER: Please have the jury brought down.

(Jury seated.)

JUDGE SCHROEDER: Please be seated. Mr. Hornok, you may continue.

MR. HORNOK: Thank you, Your Honor.

Q. (Mr. Hornok continued.) Agent Kelly, in preparation for your testimony today, have you prepared a summary regarding drug quantities involved in this case?

A. Yes, sir.

Q. And is that Exhibit 20?

A. Yes, sir.

MR. HORNOK: Your Honor, at this time I move to admit Exhibit 20 as a demonstrative, not as a summary.

JUDGE SCHROEDER: Any objection?

MR. VAN CLEEF: Your Honor, conditional on the witness substantiating what is in Exhibit 20. I would reserve the right to object if he does not. I do not object now as demonstrative.

JUDGE SCHROEDER: Very well.

(Government's Exhibit 20 was admitted as demonstrative.)

MR. HORNOK: All right.
Q. (Mr. Hornok continued.) Let me turn your attention now to page 1. Is this the summary that you prepared?
A. Yes, sir.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) In 2016 and 2017 what were the approximate prices for methamphetamine and cocaine?
A. For methamphetamine, an ounce, approximately $400; a pound, approximately $5,000, and a kilo, $9,500. For cocaine, $1200 an ounce; a pound, $16,000; a kilogram, $30,000.
Q. Now, these amounts, like the $5,000 for a pound of methamphetamine, is there anything in this case -- any evidence in this case that you've reviewed that kind of supplies the basis of that number?
A. Yes, sir. We've recovered text messages that indicate this was the going rate.
Q. And what -- what's significant about the $9500 price for a kilogram of methamphetamine?
A. That is the price that the -- that Paul Brown was going to pay for the kilo that was recovered on the date of the search warrant.
Q. And the $400 an ounce for methamphetamine, where does -- is there evidence in this case as to that approximate price?
A. Yes, sir. That was also documented in text messages.
Q. And have we seen some evidence of lower prices and some evidence of higher prices?

A. This -- this price would be kind of in the middle. Harper and the defendant were involved with a supplier who is directly connected to kilo quantities, and so this price would be after breaking up a larger quantity what you would see.

Q. And with respect to the cocaine, the $1200 an ounce amount, where did this amount -- or where did this price amount come from?

A. This is approximate for the timeframe.

Q. And based on Mr. McLemore's testimony, was there anything there that led you to believe that this was an appropriate price to place here?

A. Yes, sir. Based upon the price that he was selling it for.

Q. And the $16,000 a pound and the $30,000 a kilogram, is that kind of an extrapolation based on that testimony and based on your underlying knowledge about the price of cocaine at that time?

A. That's correct.

Q. And is it your -- part of your job to figure out what the price of methamphetamine and cocaine are at any given time in a given area?

A. Yes, sir.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) Now, is this -- what is displayed here?

A. This is a breakdown of the purity from all of the exhibits seized from the apartment in this investigation.

Q. Now, in this case some of the methamphetamine was tested for

purity, and some of it was not. Is that correct?
A. That's correct.
Q. So of the methamphetamine that was tested for purity, how much -- how many results are displayed here?
A. Seven results.
Q. And is this all of the -- the purity results in this case?
A. Yes, sir.
Q. The first result, when is -- when is that from?
A. The first result is the approximate eight-ounce buy from Timothy Harper on the 26th.
Q. And what was the purity associated with that purchase?
A. 99 percent.
Q. And do you recall yesterday in Mr. Harper's testimony how he -- how he graded the purity of that methamphetamine on that day?
A. I believe that he said it was okay.
Q. And what was the -- what was the actual purity once tested?
A. Almost pure.
Q. All right. Now, the purity of the various methamphetamine seized on February 9th, what kind of numbers did we see there?
A. Numbers ranging from 75 percent up to 81 percent.
Q. Now, what was -- what is the average purity of the methamphetamine that's been tested in this case?
A. 82 percent.
Q. And what is the lowest observed methamphetamine purity in this case?

A. 78 percent -- 75 percent. Excuse me.
Q. And within a drug trafficking organization, would you expect to see consistent drug -- methamphetamine purity within the same relative time period?
A. Yes, sir.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Now, is this a summary of the various drugs that were seized and tested in this case?
A. That's correct.
Q. And the numbers that are here in terms of grams of meth and grams of cocaine, where do these numbers come from?
A. These are the -- the quantities -- quantities of the seized exhibits in this case.
Q. And were these numbers obtained from the -- the drug purity testing reports in this case?
A. Lab results, yes, sir.
Q. Which are in evidence in this case.
A. That's correct.
Q. Now, the approximate value, how -- how was that obtained?
A. Using the values that we have previously discussed.
Q. And so what is the total amount of methamphetamine that has been seized and presented in evidence in this case?
A. 8,619 grams of methamphetamine.
Q. And how many kilos is that?
A. That's a little over eight and a half kilos.

Q. How many grams of cocaine has been seized in this case?
A. Sixteen grams.
Q. And what is the approximate -- total approximate value of the drugs that have been seized in this case?
A. $83,800.
Q. So that's -- the drugs sitting here on the table, that's approximate -- over $83,000 in drugs?
A. Yes, sir.
Q. And that value, as you identify it, it really could be greater or lesser, depending on the particular circumstances of the transaction.
A. If someone was to buy all of that at one time, I would expect the price to go down somewhat. If that was put into distribution quantities, the price would escalate exponentially.
Q. So the -- the -- is this price a -- kind of an average price as to where the central activity was in this case?
A. Yes, sir.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) What's displayed here?
A. This is a breakdown of the quantities described by the defendants in this case.
Q. The witnesses in this case? Did you say witnesses or defendants in this case?
A. I'm sorry. Witnesses.
Q. Okay. So let's look at the first -- the first line. Where --

what is depicted here?
A. These are the quantities provided by Jason McLemore in reference to what the defendant purchased from him.
Q. And 226 grams of methamphetamine, approximately how many pounds is that?
A. It's about a half a pound.
Q. And 1,275 grams of cocaine, approximately how many ounces is that?
A. Over 36.
Q. Okay. Is it approximately 45 ounces?
A. Yes. Yes.
Q. All right. And what is the approximate value of the drugs as described by -- as described to be -- have been purchased by the defendant from Mr. McLemore?
A. 59,000.
Q. What is -- what is depicted in the second line of this chart?
A. These are the quantities described as sold by the defendant to the Louisiana connection.
Q. And who gave us this testimony?
A. Timothy Harper.
Q. And approximately -- is 700 grams approximately 25 ounces?
A. Yes, sir.
Q. And what is the approximate value of 25 ounces of methamphetamine at the time?
A. $10,000.

Q. So totaling those two things up, what's the total amount of methamphetamine and cocaine that was -- that we have testimony about here?
A. $69,000.
Q. And how many grams of cocaine total?
A. 1,275.
Q. And how many total grams of methamphetamine?
A. 926.
Q. Now, we also heard some testimony from Mr. Harper about Mr. Hayden selling cocaine in clubs. Do you recall that?
A. Yes, sir.
Q. And is that what's represented on the last line here?
A. Yes, sir.
Q. Now, why does this line fall -- well, let me step back.
Is 833 grams of cocaine, does that approximate to two plus ounce -- or two ounces per week from November through February?
A. Yes, sir.
Q. Now, why is this -- why does this line fall below the total?
A. This line is not included in the total because an attempt to give a accurate depiction of the cocaine -- basically I didn't -- we don't want to double count cocaine that -- that the defendant purchased for resale, and the cocaine that he would have sold.
So in order to not double count, just included the cocaine that was purchased for resale.
Q. Now, do we know for a fact whether it would be double counting

if we were to include this into that total?
A. We don't know whether it would be double counting or not.
Q. Okay. So which side have we erred on?
A. Caution.
Q. And what was the approximate value of the cocaine -- the 833 grams of cocaine sold by the defendant in clubs?
A. $35,280.
Q. And these values, again, are based on the approximate street values that we discussed earlier?
A. Yes, sir.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) Is this a summary of the two last pages that we have seen?
A. That's correct.
Q. So these are just the -- the top two lines are just the total amounts brought -- brought down into this new total?
A. Yes, sir.
Q. Now, what is the total amount -- total number of grams of methamphetamine that we have either seized or drug testimony to in this case?
A. 9,545 grams.
Q. And how many grams of cocaine?
A. 1,291.
Q. And what is the approximate value of the drugs that we have evidence of or actual drugs in court here?

A. $152,800.
Q. Now, if we took that total amount of methamphetamine seized, and we were to apply the average purity in this case to it, how many grams of pure methamphetamine would we have?
A. 7,636.
Q. And if we were to apply the lowest purity observe -- methamphetamine purity observed in this case to all of the methamphetamine seized or testified about in this case, how many grams of pure methamphetamine would we have?
A. 7,158.
Q. And if we were to apply an arbitrarily low percentage of 48 percent purity, how many grams of pure methamphetamine would we have?
A. 4,581.
Q. And approximately how many kilograms is that?
A. Four and a half.
Q. Based on your training and experience and observations in drug trafficking organizations, which of these purity numbers is likely the best fit of the purity applicable in this case to the drugs that were not tested?
A. The average purity.
Q. And how many kilograms of pure methamphetamine would that be?
A. Over seven and a half.
MR. HORNOK: No further questions, Your Honor.
JUDGE SCHROEDER: Cross-examination.

MR. VAN CLEEF: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. VAN CLEEF:

Q. Mr. Kelly, how are you today?

A. Doing good.

Q. You have given some testimony about things that you've heard in court on direct examination from Mr. Hornok. Would that be fair?

A. Yes, sir.

Q. And the Exhibit 20 that -- I think that's probably still there in front of you, or you were looking at it a few moments ago and going through it with Mr. Hornok, is that something that you modified since yesterday's testimony?

A. I believe so.

Q. Did you assist in that?

A. Yes, sir.

Q. And how did you assist in that?

A. In discussing quantities and prices and values.

Q. So did you also assist in your recollection by listening to the witnesses testify? In other words, did you change the drug quantities based on what you heard the witnesses say on the stand?

A. Yes, sir.

Q. And was one of those witnesses Tim McLemore?

A. Yes, sir.

Q. The other witness being -- I'm sorry. Jason McLemore; correct?

A. Yes, sir.

Q. And the other witness being Tim Harper.
A. Correct.
Q. Were there any other witness testimonies that you used in reformulating Exhibit 20?
A. No, sir.
Q. All right. Let's talk about Paul Brown.
First, for the record, you've been in the courtroom during the entire trial; correct?
A. Yes, sir.
Q. And the reason you're able to do that is because you're a case agent; right?
A. Yes, sir.
Q. So in addition to being a person who's been involved in this investigation from the very beginning, you are seated at counsel table somewhat in the capacity of a party or a client. Would you agree with that?
A. Yes, sir.
Q. All right. And so you've had the opportunity to listen to all the testimony that the jurors have heard in this case; correct?
A. Correct.
Q. In fact, you've even been present at other times before we had a jury. For instance, were you here for pretrial?
A. No, sir.
Q. Have you attended any other hearings for any other defendant in this case?

A. Potentially. It's been a while.
Q. Well, I guess what I'm getting at is, normally the case agent comes and sits at all the sentencings. Have you done that?
A. No, sir.
Q. Do you recall which ones you've sat for?
A. No, sir.
Q. Have you kept track of what's happened with the other defendants in the case in terms of the status of their case, the closing of their case, and their sentences?
A. Yes, sir.
Q. And can you name those defendants for me?
A. The other defendants in this case?
Q. Yes, sir.
A. Timothy Harper, Daniel Montes-Munoz, Juan Pargas, Gerald Davis. I'm sure I'm -- is there somebody specific?
Q. I'm just -- I'm looking to your recollection on the case, but I might be able to help you out just a little bit.

MR. VAN CLEEF: May I approach the witness, Your Honor?

JUDGE SCHROEDER: You may.

MR. VAN CLEEF: Your Honor, for the record, I've just handed the witness a copy in the indictment, and it's got the names listed.

Q. (Mr. Van Cleef continued.) Does that refresh your recollection, sir?

A. Yes, sir.
Q. So what are the names that you couldn't remember a moment ago that now you see on the indictment?
A. Jorge Antonio Martinez. The only other one is Richard Saucedo, Junior.
Q. All right. And does that appear to be the -- can you see some writing at the bottom of that that makes it appear as though that's an actual copy of the indictment in the case and not something that I typed up on Word Perfect?
A. Yes, sir.
Q. Okay. And what -- what is the general caption that you see there at the bottom?
A. A true copy.
Q. Yes. I'm sorry. All right. Now let's talk about some people who are not on the indictment. Let's talk about Paul Brown.
A. Okay.
Q. You were here for his testimony, were you not?
A. I was.
Q. And you heard him testify that he believed he'd been a confidential informant since 2015 or 2016; correct?
A. Correct.
Q. Now, I heard you testify at the beginning of your time on the stand today that you didn't consider him a confidential informant until January 23rd of 2017. Is that right?
A. A couple of days before that, but, yes, sir.

Q. Okay. So January 20th, thereabouts, is when you consider him to have been a confidential informant; right?
A. Yes, sir.
Q. Do you have any idea where he would get the idea that he was a confidential informant from 2015 or 2016 forward?
A. I believe he was confused.
Q. I will agree with you. Mr. Brown actually appeared quite confused on the stand, did he not?
A. Correct.
Q. And as he struggled to form his thoughts, did you take any issue in your mind with his -- any of his testimony, other than what we just discussed?
A. It was consistent with what I would expect from Paul Brown.
Q. All right. But the significance of a confidential informant designation is that a person is then insulated, as long as he follows the rules, from criminal liability for his actions; correct?
A. Acting under our direction?
Q. Yes, sir.
A. Yes, sir.
Q. And in the context of a conspiracy, a confidential informant is not considered a conspirator because they cannot form --
JUDGE SCHROEDER: Is there an objection, Mr. Hornok?
MR. HORNOK: I was just waiting for him to finish. I believe it's going to call for a legal conclusion for which this defendant -- or this witness is not --

JUDGE SCHROEDER: All right.
MR. HORNOK: It's inappropriate.
JUDGE SCHROEDER: Let's see what -- let's see what the question is.
Q. (Mr. Van Cleef continued.) If a person is working for the government, they cannot form an agreement to engage in an illegal act. Would you agree with that?
MR. HORNOK: Objection, Your Honor. Calls for a legal conclusion.
MR. VAN CLEEF: It --
JUDGE SCHROEDER: I'm -- go ahead.
MR. VAN CLEEF: I'll take your -- Your Honor's --
JUDGE SCHROEDER: No. Go --
MR. VAN CLEEF: Well, what I'm asking the witness is just in his knowledge of human beings and from Paul Brown and from the confidential -- and from the normal way that confidential informant status works is whether a confidential informant can form an agreement to enter into a conspiracy.
JUDGE SCHROEDER: I'll permit the question.
Q. (Mr. Van Cleef continued.) That is the question.
A. Can you state it again, please?
Q. Sure. Was Paul Brown a conspirator with Tim Harper by virtue of placing a drug order with him?
A. No, sir.

Q. So would it be fair to say, then, that Paul Brown, in working for the government could not in his mind form an actual agreement to enter into an illegal act, one that he intended to go forward with?

MR. HORNOK: Objection, Your Honor. It's specifically about a formation of a legal act and whether that can occur, and all of this is relevant to the law which this witness -- this witness is not a lawyer or a legal expert to be able to opine about whether that could or could not constitute the basis of a legal conspiracy for which somebody could be held responsible.

MR. VAN CLEEF: I'm not asking whether --

JUDGE SCHROEDER: Why don't you rephrase the question so that it makes clear you're not asking him for a legal conclusion.

MR. VAN CLEEF: All right.

Q. (Mr. Van Cleef continued.) Special Agent Kelly, I'm not asking you for a legal conclusion. Okay? I'm asking you, based on your knowledge of Paul Brown, the way confidential informants work, and your general knowledge of human nature as a human being, which the record will reflect that you are, can a person who is working for the government form an actual agreement? In other words, in their minds, form an actual agreement to enter into an illegal act such as a conspiracy here.

A. I'm -- I'm unable to follow what -- if he can form in his mind what -- I'm unable to follow your question.

Q. Well, he's not a conspirator, is he, if he's a confidential informant?

MR. HORNOK: Objection, Your Honor. I think the -- this legal idea that he's trying to get at, I think it's important.

MR. VAN CLEEF: Your Honor, he's testified that he is not in the conspiracy if he's an informant. I just asked if he is a conspirator if he's an informant.

JUDGE SCHROEDER: I'm going to give him a little latitude. It's cross-examination.

Q. (Mr. Van Cleef continued.) Is he a conspirator if he's an informant?

A. No, sir.

Q. Or a -- I may be using the wrong word. A CI. If he's a CI, he's not a conspirator; correct?

A. Correct.

Q. When you went through -- you went through a lot of Facebook stuff here, and I'll be honest with you, I don't use Facebook. I don't know how. But you did hear the testimony from Tim Harper to the effect that it is part of the -- and also your own cohort Mr. Vera, that it is part of the job that those two people had, Mr. Harper and Mr. Hayden, to promote themselves and appear flamboyant, I think was the word. Do you recall that testimony?

A. I do.

Q. And is a lot of what you see, and even what the jury has not

seen, because it's in not a big deal, in the Facebook records indicate that Mr. Hayden and Mr. Harper both were extremely flamboyant in their online personalities. Would you agree with that?
A. Yes, sir.
Q. And it is important in that line of work for them to appear successful, whether or not they are. You heard Mr. Harper say that, didn't you?
A. Yes, sir.
Q. And you heard Mr. Vera say that, or words to that effect, didn't you?
A. Sure.
Q. And a lot of the Facebook information is along that line, isn't it?
A. Yes, sir.
Q. Now, again, I don't know about Facebook. You seem to.
Is it possible to check into a place where you're not actually there?
A. Yes, sir.
Q. All right. So do you have any -- you flashed up a slide -- or I'm sorry, Mr. Hornok did, and you looked at it that said that my client was in Havana, Cuba.
Do you have any information that my client's ever actually been to Havana, Cuba?
A. No, sir.

Q. And Havana, Cuba, that's a place as a law enforcement agent you would be generally aware that normal citizens without some limited purposes can't even go without government permission.
Would you agree with that?
A. Normal citizens? Yes, sir.
Q. And do you know whether or not my client has a passport?
A. No, sir.
Q. You didn't bother to check?
A. No, sir.
Q. Did you do any checking to see if he'd actually been to Havana, Cuba, to corroborate the Facebook entry Check-in, Havana, Cuba?
A. No, sir.
Q. Similarly, there were other check-ins. LaBare. Other locations. Did you go and check to see if my client had been there on those particular occasions?
A. No, sir.
Q. The jury's also seen some photographs on Facebook and a video on Facebook. Do you recall those from your direct examination?
A. Yes, sir.
Q. And one that stands out in my mind, and I want to ask you about is actually two photos next to one another. There's Mr. Hayden with kind of blond hair on top, and a -- I would call a tank top-type shirt. Is that the right word to use?
A. Sure.
Q. And then next to it is the same -- same thing. And I think the

question to you was, does that -- even though the picture's a little bit different, does that seem to be taken at the same time, same location?
A. Correct.
Q. But the dates were different on the left and the right of that slide. Why would that be?
A. Due to being uploaded on a different date.
Q. Right. And can you tell when the photographs, or when the videos that you've talked about with Mr. Hornok with regard to Exhibit 8, can you tell from looking at them when they were done?
A. Only when they were uploaded.
Q. Only when they were uploaded. Can you tell where they were done?
A. Where they were taken?
Q. Yes, sir.
A. No, sir.
Q. Either by virtue of some electronic means that I'm hoping you can explain to me or by looking at the picture itself and matching it up with a particular location, can you tell where the pictures and the videos were done or when they were done?
A. That is potentially possible.
Q. Have you done that?
A. No, sir.
Q. So, in fact, those photographs and videos that were shown as being put up on Facebook -- again, I admit my ignorance of Facebook,

so correct me if I'm wrong, you have not either tried to find out or have found out where those pictures were taken, by whom they were taken, and when they were taken; correct?
A. Correct.
Q. And in particular, there was another video where someone was counting -- it looked like hundred dollar bills to me. Is that what it was?
A. Yes, sir.
Q. All right. Can you tell when that video was taken?
A. No, sir.
Q. Can you tell by whom it was taken?
A. No, sir.
Q. Can you tell where it was taken?
A. Yes, sir.
Q. Because of the granite countertop?
A. The apartment -- the -- the setting in the video is consistent with the apartment.
Q. Okay. And did you see the person who was counting out the money use both of their hands?
A. I don't believe so.
Q. Okay. So that person had a gold watch on their right arm; right?
A. Yes, sir.
Q. So that's going to be some left-handed person, I suppose; right? You're a law enforcement officer. I'm asking you. What

does that tell you?
A. Tells me that you can't see his other hand.
Q. Now, Special Agent Kelly, we have heard you make all kinds of speculation about what people thought and where they were and what they were doing and how they got from place -- one place to another.
Are you telling me you can't tell from -- with your experience in law enforcement, you have no guess as to whether the person doling out that money was right-handed or left-handed from the arm they had their watch on, can you?
MR. HORNOK: Argumentative, Your Honor.
JUDGE SCHROEDER: Overruled.
A. Can you explain what the conclusion is based upon which hand he's dishing out the money with?
Q. (Mr. Van Cleef continued.) Sure. Wouldn't left-handed people normally put their watch on their right arm?
A. I don't have any experience with that, and I never would conclude based upon somebody having a watch on their right hand whether or not they were right- or left-handed.
Q. Okay. Well, maybe that's a tip for you in the future, but did you look at the hand -- the tattoos on the hands, then?
A. I observed Timothy Harper's tattoos.
Q. Okay.
A. But I didn't observe on the other one.
Q. So those were not tattoos -- the hands that were moving the money around, or the hand that was moving the money around, you're

able to tell the jury today that that was not my client's hand; right?

A. I don't know when he has the tattoos on his hands or when they were applied.

Q. So you're explaining to the jury now that having viewed that video and testified about it, you didn't bother to look at my client's hands to see if they might be his hands in the video.

A. The exhibit was more about -- about the evidence linked to the Facebook pages, more than the personnel in the video.

Q. Okay. So it doesn't matter who had the money in the video. Is that right? It just matters that it was in my client and Timothy Harper's apartment.

A. It's the totality of the circumstances documented on the Facebook account.

Q. Well, that's what I'm getting at. Did you hear my client's voice on that video?

A. No, sir.

Q. So did you see anything on that video that indicated that my client was there when that money was being counted on -- counted on -- or I don't know if it was counted -- while it was being spread out on a granite countertop?

A. No, sir.

MR. VAN CLEEF: Could we have Exhibit 7, please?

(Video plays.)

Q. (Mr. Van Cleef continued.) Having heard that and heard the

voices on the video, would you agree with me that my client is neither of those voices?
A. Sure.
Q. Do you know who are the voices?
A. I believe one of the persons in the video to be Timothy Harper.
Q. Right. And you've had access and actually met with Timothy Harper twice in the last two weeks; right?
A. Correct.
Q. Did you ask him what the circumstances of that video were?
A. Potentially.
Q. You potentially, or you did, or you didn't?
A. I don't recall if I asked him or not. Knowing this -- that -- I don't recall.
Q. So that video was not important as to Timothy Harper, but it's important to my client who appears nowhere on the video. Would you agree with that? Or is that your statement?
A. Are you asking what this video is important for?
Q. No. I'm asking whether it -- since it wasn't important as to Timothy Harper, I'm asking why it's important as to my client. I guess I am asking that.
A. The reason it's important to your client is because it shows what Facebook account this video is uploaded from, and it's consistent with the apartment that they were located in.
Q. Oh, I see. So the money itself has nothing to do with this case, it's just the fact of it's the granite countertop is the

important part of the case; correct?
A. No, sir. The -- the money shows consistent trends over the course of this investigation linked to this apartment, the amount of money going through with narcotics trafficking. The totality of the circumstances in this investigation I believe are supported by -- by the video and where it came from.
Q. I suppose what I'm seeking your help from, Agent Kelly, or for, Agent Kelly, is nobody here thinks that Timothy Harper is not a big time drug dealer. He admitted it on the stand, did he not?
A. Yes, sir.
Q. He admitted that he -- and Jason McLemore as well. You were here. Big time drug dealers. You agree with that, don't you?
A. Yes, sir.
Q. And the question for this jury is whether or not my client who was a roommate of Timothy Harper was some kind of conspirator with Mr. Harper, Mr. McLemore, and the other names that you read. Are we on the same page there?
A. I follow you. Yes, sir.
Q. Okay. So the fact of the money being in the video has nothing to do with the case if my client was not there, does it?
A. The video came from the defendant's Facebook.
Q. Okay. So there's a video on his Facebook. It shows a granite countertop, and so you want to show the jury, then, by playing that video that Mr. Harper and some other person with another voice that you haven't identified, and you haven't asked Mr. Harper about, were

counting money there. Is that right?
A. In his apartment. Yes, sir.
Q. Okay. And do you understand that my client is not guilty by virtue of mere association? Mere association with drug dealers. Do you understand that?
A. I understand that.
Q. I think you -- I think you cleared this up, but there were questions in that demonstrative exhibit, and I just want to make sure that it was clear.
There are places where the word "conversation" appears at the top of the slide. First of all, the title on each slide, that's something that y'all over at this table prepared. Would you agree with that?
A. Yes, sir.
Q. And that's intended to be your description of what then appears below the title; correct?
A. Yes, sir.
Q. But in the normal understanding of the word "conversation," there's going to be some give and take. Would you agree with that?
A. The meaning of the word "conversation" I believe is generally used to describe a text message conversation to denote separate messages between people as opposed to a public comment posted for viewing by everybody.
Q. I heard you say that earlier. And were you here for the testimony of Miss Wassung who was the fingerprint expert?

A. Yes, sir.
Q. Do you recall when I asked her, "Did you identify my client?" She launched into this big long discussion of what an identification is? Do you remember that? It happened yesterday.
A. Yes, sir. Sure.
Q. Okay. And I had to say to her, "I'm asking you like how normal people understand the word 'identify.'"
I'm asking you the same thing.
A. I believe --
Q. I --
A. I believe normal people now -- I'm sorry.
Q. I'm not asking you for a law enforcement definition of conversation. I'm not asking you for a Facebook definition of conversation. I'm asking you if you understand the word "conversation" as it's used among normal people like those sitting here in the courtroom.
Is it not true that among normal people, a conversation means a give and take between two individuals by whatever means of communication?
A. No, sir, I would disagree.
Q. All right. So if I say a word in an empty courtroom, and that word is recorded somewhere, or that sentence is recorded somewhere, you would call that a conversation.
A. In reference to this investigation, if you sent -- if you sent me a message to my electronic device, and somebody wanted that

message, and they said "Send me that conversation," I would copy all of what was involved in that correspondence and send it.
Q. All right. So -- so then your testimony is the word conversation includes me saying something to someone and that person not responding. Is that right?
A. In reference to electronic communication, yes, sir.
Q. All right. And that's how the word "conversation" ends up at the top of some of those slides. Would you agree?
A. Yes, sir.
Q. You also testified that you -- well, you reviewed data from Mr. Harper's phone shortly after he was arrested; correct?
A. That's correct.
Q. Was it you -- I can't remember if it was you or Mr. Vera who did the phone dump. Was -- I can't remember. It was you?
A. It was me.
Q. And when you did that, were you able to view the actual text messages that had been recently sent and received?
A. That's correct.
Q. You testified to the jury that you identified text messages between my client and Mr. Harper during the relevant time period as being those between -- normal text messages between roommates. If that a fair characterization?
A. Yes, sir.
Q. Okay. But, in fact, when you conducted the phone dump back in 2017, my client was not a suspect of your investigation. Do you

agree with that? You had no idea who he was.
A. No, I believe he was -- he was on the radar at that time.
Q. How was he on the radar? By face? name? phone number? address? What?
A. Phone number and name.
Q. Are you telling me that -- that Mr. -- Mr. Hayden was a suspect of your investigation from the moment you dumped Mr. Harper's phone?
A. Before.
Q. Because you interviewed Mr. Harper, did you not?
A. I did.
Q. And Mr. Harper didn't even Mr. Hayden, did he?
A. Mr. Harper did not.
Q. Right. That's the point.
A. Mr. Harper did not --
Q. You interviewed him at length, didn't you?
A. Correct. It was from somebody else.
Q. And Mr. Harper didn't mention Mr. Hayden once, did he?
A. Mr. Harper did not.
Q. But you dumped his phone, and you found Mr. Hayden's phone number, I suppose; correct?
A. Yes, sir.
Q. And then what you saw was text messages between -- normal text messages between roommates. Can you give me examples of normal text messages between roommates?
A. I believe there was some discussion about the door code to get

into the apartments, and conversation about keeping the music down.
Q. Okay. So nothing -- nothing drug related between the two.
A. No, sir.
Q. And you recall Mr. Harper testifying that he did -- he did all of his drug transactions by cell phone, don't you?
A. Not all.
Q. Or in person.
A. He stated he -- he would have his conversations in person with his roommate.
Q. Now, when you did the phone dump of Mr. Harper's cell phone, did you also have Mr. Hayden's cell phone in your possession?
A. Yes, sir.
Q. And what did you do with that?
A. They're still in evidence.
Q. So you did nothing with it; correct?
A. They're in evidence. Yes, sir.
Q. Well, I understand they're in an envelope or a box or something somewhere, probably not in this courtroom; right?
A. Correct.
Q. Did you do any forensic analyst of that phone?
A. No, sir.
Q. Even though that phone was associated with a number that you considered interesting, you didn't do a forensic analysis of that phone?
A. No, sir.

Q. And as through today, which is now over three years later, you still haven't done a forensic analysis of that phone; correct?
A. That's correct.
Q. And now that the -- now that the evidence is developed, you would agree with me that on February 9th, Tim Harper both ordered and received the kilogram that was ordered or requested by Paul Brown; right?
A. Yes, sir.
Q. There's no evidence that my client ordered a kilogram of cocaine on February 9th. Agreed?
A. Don't agree.
Q. You -- you just told me that Mr. Harper ordered it; correct?
A. Yes, sir.
Q. And that Mr. Harper received it; correct?
A. Yes, sir.
Q. So you're saying that there were two orders?
A. More.
Q. All right. Well, we'll get to that in a minute then.
You've, evidently, got better ears than I do. You listened to that audio that we played for the jury yesterday where I was asking poor Mr. Brown, "Did you say he tried to pop the door?" And I asked Mr. -- let me finish. And I asked Mr. Lopez, "Did he say he tried to pop the door?" And nobody could understand their own voice.
Now, if you can hear it better than I can, that's just fine. The jury will have to trust their own ears on that. But I heard

your testimony that you've -- I guess you've listened to it again; right?
A. I'm familiar with it.
Q. Are you familiar with it because you listened to it again since yesterday?
A. I've listened to it many, many times.
Q. Did you listen to it last night?
A. Yes, sir.
Q. Okay. And what do you think Mr. Brown said to Officer Lopez?
A. That he propped the door open.
Q. When -- can you just help the jury -- and I understand approximately what point in the chronology of events on February 9th that comment would have been made. Was that -- in other words, was that when Mr. Hayden came downstairs?
A. That would have been after Mr. Hayden said, "I'm going to go slap him awake," and went back into the apartment.
Q. Okay. So went back into the apartment and then came downstairs again; right? You were on surveillance that day, so you would have seen that; right?
A. No, sir. We were not inside the premises.
Q. Okay. From where Officer Lopez and Paul Brown were, could you see the front door of the apartment?
A. I believe they could because they saw him prop the door open.
Q. You -- have you -- you've been to the apartment; right?
A. Yes, sir.

Q. And the front door to the apartment is in a hallway, isn't it?
A. Okay. The actual apartment, not the door that they were attempting to prop open.
Q. I'm not trying -- I'm not trying to trick you, Agent Kelly. I'm asking you if, number one, the door to the apartment was visible from the parking lot from this place in the hallway.
A. The door -- are we talking not about the door that was being propped but the apartment that was the residence?
Q. Now you know which door was being propped? Tell me, which door?
A. The door that they could see from the parking lot would be the one that would be consistent with them propping it open. It had a door code on it, so that it required people to put their numbers in to go through. So the fact that he left it open was significant.
Q. So I -- I'm lost. I'm truly lost on how many doors there are between the car that Paul Brown and Officer Lopez were in and Mr. Harper's resting place in his bedroom, I suppose.
Can you help me with how many door there are from the parking lot up to, say, the front door of the apartment?
A. So there would have to be the entry door that got him -- that allowed someone to enter into the hallway that accessed each of the apartments.
Q. So that's got a keypad or some kind of security on it; right?
A. Yes, sir.
Q. Okay. That's the first door.

A. And then there would be at least another door to enter into each separate apartment.
Q. Okay. And did you use that security door? I mean, you had to enter it to go up to the apartment; right?
A. Yes, sir.
Q. Okay. And was -- the security door, is it -- I mean, do you have to have a code to get out or --
A. No.
Q. -- is it a code to get in?
A. Code to get in.
Q. Okay. And then the apartment door, then, would definitely be un-seeable from the parking lot because it's in a hallway; right?
A. That's correct.
Q. All right. So your testimony is that if they said "Did you see that door get" -- or my client prop the door open, or words to that effect, they must have been talking about the security gate; right?
A. That would be consistent with the security door.
Q. But that's the -- or door. That's the only door that they would have been able to see from the parking lot; correct?
A. Yes, sir.
Q. Why would you prop the door open if it opens out without having to hit a code?
A. Okay. Prior -- prior to the execution of this buy, we had done preop surveillance of this facility. There was a gated entrance into the parking lot, there was a gated door into the apartment.

And so as a matter of security for our rescue team to get in to save the informant or to make entry as an entry team for the SWAT team, the significance of that was that if the door was propped open, that if entry was needed to be made in, we could get in and not be hung up trying to scan a number in -- or scan a code to get into the -- the apartment. So as matter of operational security, it was important that we tell the informant, "When you go through, prop the door open."

So the informant was actually aware that we would have an issue getting into the apartment and was paying attention as he was instructed to do so. It's also important that he prop the door open because that was stated in the conversation whenever -- I believe it was stated in the conversation from the defendant whenever he called at the end of the jail call stating "You" -- "I told you to come up." The door was propped open for him.

Q. So it's your testimony that Mr. Brown, who was then sitting in the car with Officer Lopez; correct?

A. Yes, sir.

Q. Said "Did you see him prop that door open," was talking about himself; right?

A. Mr. Brown was talking about himself?

Q. I'm asking you. That was the conversation you repeated earlier.

A. My understanding is that Paul Brown saw the defendant prop the door open and noted it to the undercover officer as he was instruct

-- as we had instructed him to pay attention to.
Q. Okay. So the -- so no uncover officer and no Paul Brown instructed my client to prop a security door open; right?
A. Not that I'm aware of.
Q. And yet, your testimony is that your understanding that Mr. Brown can't reach and that Officer Lopez can't reach hearing their own voices, is that my client obliged your plan by propping the security door open; right?
A. That was the important -- that was important to this operation. Yes, sir.
Q. And so in listening to it last night, you didn't hear the word "pop" versus "prop"?
A. Mr. Brown is very hard to understand, but my --
Q. I agree.
A. -- understanding of his conversation is that he said prop.
Q. Okay. Officer Lopez isn't as hard to understand. What's your understanding of what he said?
A. "I saw that."
Q. Okay. The --
MR. VAN CLEEF: The document -- may I approach the witness, Your Honor?
JUDGE SCHROEDER: You may.
MR. VAN CLEEF: Can I have Exhibit 44, please?
Q. (Mr. Van Cleef continued.) All right. Mr. Kelly, can you see that screen?

A. Yes, sir.
Q. Okay. Do you see the word "plea agreement" at the top? This is already in evidence. This is Exhibit 27.
MR. VAN CLEEF: What's that? Oh, excuse me. 44. Thank you Miss McCullars.
Q. (Mr. Van Cleef continued.) Exhibit 44, page 1. What kind of document is that?
A. A plea agreement.
Q. All right. And if you don't mind, do you have it in your notebook there? It might be easier for you to flip pages in your notebook?
MR. VAN CLEEF: Can I -- can I approach --
A. What's the number?
Q. 44.
MR. VAN CLEEF: May I approach, Your Honor?
JUDGE SCHROEDER: You may.
Q. (Mr. Van Cleef continued.) It's going to be the last one here. All right.
Are we on the same page, 44001, which is titled Plea Agreement?
A. Yes, sir.
Q. Okay. What -- this is already in evidence, but just -- will you just generally describe it for the record what it is? Plea agreement of whom?
A. Jason Wayne McLemore.
Q. Okay. Could you turn to page 44003, which should be the page 3

of the plea agreement?
A. Okay.
Q. All right. And there are some stipulations 5A and B.
MR. VAN CLEEF: Miss McCullars, could you make those a little bigger just so I can see them? That's good. Thank you.
Q. (Mr. Van Cleef continued.) Okay. Now, these stipulations that were -- that are reflected by Mr. McLemore again on section 5A, what drug quantity does Mr. McLemore stipulate that he was responsible for?
A. At least five grams -- or excuse me, five kilograms but less than 15 kilograms of methamphetamine.
Q. All right. And then on B, that first sentence, the words, "organizer, leader, manager or supervisor," what do those words mean to you?
A. That he was at the -- that he was a organizer, leader, or manager, or a supervisor in criminal activity.
Q. Okay. And before we leave this page, do you see the word cocaine anywhere on there?
A. No, sir.
Q. And if you'll flip to page 8 of that same Exhibit, 44008, when was that plea agreement signed?
A. October 26th of 2017.
Q. And then if you'll turn -- same exhibit, 44011, can you tell me just generally what that document is?

A. This is the factual basis from Mr. McLemore.
Q. And would it be fair to say that the factual basis are the facts that are relied upon -- just from your general knowledge of being in court -- the facts relied upon by the court in determining whether someone is guilty or not of the offense they're pleading to? Would you agree with that?
A. To the offense they're pleading to, yes, sir.
Q. Yeah. Right. And so if you'll look at that paragraph 1 --
MR. VAN CLEEF: Miss McCullars, I just can't see it. Can you bring it in a little bit? Yes, ma'am.
Q. (Mr. Van Cleef continued.) Does it appear that Mr. McLemore agreed that he was distributing to suppliers, including those he knew he -- that lived in Mount Pleasant, Texas, area, or the Mount Pleasant, Texas, area? Can you see it? Or do you need me to come point it out?
A. No, I -- I'm just taking a second to read it.
Your question is whether he was distributing -- if he claimed he was distributing it to those in Mount Pleasant?
Q. Yes, sir.
A. Yes, sir.
Q. And you can flip to the next page, 44012, paragraph 2. Again, he admitted, judicially confessed, that he was distributing methamphetamine in and around Mount Pleasant -- or to people who were in and around Mount Pleasant, Texas, which is in the Eastern District of Texas. Would you agree that's what it says?

A. Yes, sir.
Q. And the person -- you were here for his testimony. The person that he would have been distributing to referred to in both paragraphs one and two, that would be Paul Brown; right?
A. That would be Paul Brown, and that would also be Gerald Davis.
Q. Oh, Gerald Clinton Davis who came before Paul Brown; right? When I say, "came before," I mean Gerald Clinton Davis -- I'm the one who likes to keep things in order and there I didn't keep them in order.
Gerald Clinton Davis is the one who led you to Paul Brown; right?
A. That's correct.
Q. Okay. And then Paul Brown led you to Mr. McLemore; correct?
A. Correct.
Q. But the two individuals, Gerald Clinton Davis and Paul Brown, those would have been the individuals referred to here in the Mount Pleasant, Texas, area, which is where your office is. Is that all right?
A. Correct.
Q. Okay. Okay. And then if you will, flip a little bit further back.
MR. VAN CLEEF: Actually, I'm going to wear out Miss McCullars. May I have the Elmo, Your Honor?
JUDGE SCHROEDER: Yes. Of course.
Q. (Mr. Van Cleef continued.) And then I'm going to refer your

attention to page 44014, which just for ease I'll go ahead and describe as the judgment for Mr. McLemore.
Am I mischaracterizing that document?
A. No, sir.
Q. All right. And in that judgment it states that he pleads to -- if you'll look about a third of the way down, right here where my pen is, Count 1 of the indictment; correct?
A. Yes, sir.
Q. And then below that it shows what he has been found guilty of, which is a conspiracy under Count 1 of the indictment concerning methamphetamine. You agree with that?
A. Yes, sir.
Q. And so absent from anything that we've just looked at in regard to Mr. McLemore is the mention of any firearm. You agree with that?
A. Yes, sir.
Q. And absent in anything that we've just looked at regarding Mr. McLemore is mention of any cocaine. Would you agree with that?
A. Yes, sir.
Q. In fact --
MR. VAN CLEEF: May I approach the witness, Your Honor --
JUDGE SCHROEDER: Yes, you may.
MR. VAN CLEEF: -- with a sticker?
Your Honor, I'm going to offer Defendant's Exhibit 2, which I've tendered to opposing counsel, which is a copy of

the indictment that we're referring to here, and it's a certified copy.

JUDGE SCHROEDER: Any objection?

MR. HORNOK: Your Honor, the jury has been instructed the indictment in this case is not evidence. This is an indictment. It seems -- it seems like it's not relevant to the --

JUDGE SCHROEDER: I don't think he's offering it as proof of the defendant's guilt.

MR. HORNOK: Okay. Then I have no objection to that.

JUDGE SCHROEDER: Very well.

(Defendant's Exhibit 2 was admitted.)

MR. VAN CLEEF: To be clear, Your Honor, I'm not offering anything as proof of the defendant's guilt from start to finish.

JUDGE SCHROEDER: I wouldn't think so. Thank you.

MR. VAN CLEEF: Thank you. And may I give this to the witness?

JUDGE SCHROEDER: Yes.

Q. (Mr. Van Cleef continued.) All right. Mr. Kelly, I've just handed you what's marked as Defendant's Exhibit 2, which is the original indictment in the case.

Could you take a look at that?

A. Yes, sir.

Q. You've looked at it once already for the names, but does that

appear to be the same document that you were looking at earlier?
A. Yes, sir.
Q. And in that document there is a single count; correct?
A. Yes, sir.
Q. And that count is regarding a conspiracy to possess with intent to distribute methamphetamine; correct?

MR. HORNOK: Your Honor.

JUDGE SCHROEDER: Yes.

MR. HORNOK: My -- MY apologies. I feel like the last page of this document is very problematic.

JUDGE SCHROEDER: May I see the last page?

MR. VAN CLEEF: Sure. Could I just retrieve the exhibit, Your Honor?

JUDGE SCHROEDER: Of course.

MR. HORNOK: May we approach, Your Honor?

JUDGE SCHROEDER: Yes.

(Bench conference.)

MR. VAN CLEEF: I don't mind taking that off. I didn't know it was there. They made copies of it this morning. I couldn't make a copy of it.

JUDGE SCHROEDER: What's bothering you about it? I'm sorry, I don't --

MR. HORNOK: It's the penalty. The penalties associated with the --

JUDGE SCHROEDER: Oh, yeah. You're not going there,

are you?

MR. VAN CLEEF: No. No. Your staff made a copy for me. I just didn't look to the last page.

JUDGE SCHROEDER: That's fine.

MR. VAN CLEEF: Your Honor, I can't print this out because it's sealed.

MR. HORNOK: I would also note just for the record that this is a sealed document, so insofar as this goes on, I just --

JUDGE SCHROEDER: Jonathan, we've admitted addendums to plea agreements. I mean, this is open court --

MR. HORNOK: No, I --

JUDGE SCHROEDER: -- but you've made -- you've made your point.

MR. HORNOK: No, my -- my point is just when this goes on the record for the exhibits, we just need -- this needs to be one of the ones that it is sealed.

JUDGE SCHROEDER: I'm going to rely on you to do that.

MR. VAN CLEEF: And that's fine with me.

JUDGE SCHROEDER: Okay.

MR. HORNOK: I just didn't want not sealed. That's all.

JUDGE SCHROEDER: You want to take --

MR. VAN CLEEF: And that's Jonathan's copy.

MR. HORNOK: Got it.

(End of bench conference.)

MR. VAN CLEEF: May I proceed, Your Honor?

JUDGE SCHROEDER: Yes, you may.

MR. VAN CLEEF: All right.

Q. (Mr. Van Cleef continued.) All right, Mr. Kelly, that -- Defendant's Exhibit 2 that we were just looking at that you still have there in front of you. I can't recall where I left off, but I think I was asking you, does that show a single count in the indictment?

A. It does.

Q. And that is the original charging instrument in this case that we're here about; right?

A. Yes, sir.

Q. Case No. 517-CR-9. And my client is, I think No. 6 on the list of defendants in that case; right?

A. Yes, sir.

Q. And those are the names that we went over earlier in your testimony; right?

A. Yes, sir.

Q. So you're familiar with that document.

A. Yes, sir.

Q. And that original charging document, does it have a file marked date that you can see? Or do I need to help you find it?

A. April 19th.

Q. February what?
A. February?
Q. No, I just didn't hear you.
A. April 19th.
Q. April 19th of what year?
A. 2017.
Q. Okay. So as of April 19th of 2017 there was no charge that any of those defendants had anything to do with possessing a firearm in connection with a drug offense or that there was a conspiracy involving cocaine.
Would you agree with that, looking at the document?
A. Yes, sir.
Q. All right. I'm going to ask you if you'll take from your notebook there and look at tab 27.
MR. VAN CLEEF: May I approach just to make sure?
JUDGE SCHROEDER: Yes.
Q. (Mr. Van Cleef continued.) And to be clear, we were just looking at Mr. McLemore's plea documents that were in Exhibit 44. He was an organizer, leader, supervisor of the organization; correct? Is that correct, sir?
A. Yes, sir.
Q. And he pled guilty to a conspiracy involving methamphetamine; correct?
A. Yes, sir.
Q. And he was found guilty of a conspiracy involving

methamphetamine; right?
A. Yes, sir.
Q. But he was not found guilty of any offense, and he did not plead guilty to any offense concerning firearms or cocaine. Would you agree with that?
A. I would agree with that.
Q. All right. So I've directed your attention to Exhibit 27. Will you look at 27001 and tell me just generally what that document is.
A. Plea agreement for Timothy Harper.
Q. Okay. And let's see if we can see it here. All right. So I'm just going to ask the same series of questions here.
Could you refer, then, to the -- page 3, which would be Exhibit 27003. And do you -- are you there?
A. I'm there.
Q. And do you see the Stipulation A?
A. Yes, sir.
Q. Five to 15 kilograms of methamphetamine. Am I saying that right?
A. Yes, sir.
Q. No mention of cocaine; correct?
A. Correct.
Q. No mention of guns; correct?
A. Correct.
Q. And, again, this is Timothy Harper; right?

A. Right.
Q. All right. Now, if you will, flip back to the factual basis, which will be 27011, and I'll direct your attention to paragraph 1, and ask again if this is similar to Mr. McLemore's, states that he was involved in a conspiracy regarding methamphetamine.
A. Yes, sir.
Q. And that methamphetamine was going to the Mount Pleasant, Texas, area.
A. Yes, sir.
Q. And if you'll flip to the next page, 27012, paragraph 2. Once again, he pled guilty to sending to the Mount Pleasant, Texas, area; correct?
A. Yes, sir.
Q. Which would be, as we discussed before, Mr. -- is that both Mr. Davis and Mr. Brown or just Mr. Brown?
A. That what --
Q. As to Tim Harper.
A. Sir?
Q. His customers in the Eastern District of Texas.
A. Gerald Brown.
Q. Paul Brown?
A. Gerald Davis and Paul Brown.
Q. Gerald Davis and Paul Brown. Okay. So same -- same two people. All right. And if you will, look at the date on the very next page, which is 27013. When did he sign that?

A. May 29th, 2018.
Q. Well, you know what? I just highlighted his lawyer's signature. Here's what I meant. On 27012. Same date though. Is that the date that Timothy Harper signed that agreement?
A. I can't -- I can't see what you've got there.
Q. Oh. What happened?
A. There it is. Okay.
Q. All right. There we go. Does that help?
A. May 29th.
Q. All right.
A. 2018.
Q. And then same as before, if we'll just flip back to the judgment which begins at 27014.
Do you see where it states he pled guilty to Count 1 of the -- or he was found guilty, excuse me, to Count 1 of the indictment?
A. Yes, sir.
Q. And do you see where the offense mentioned is that he was involved in a conspiracy to possess with intent to distribute methamphetamine?
A. Yes, sir.
Q. No mention of cocaine, no mention of guns; correct?
A. Correct.
Q. And you can look at the date here. Let's see, here it is. The date of that judgment?
A. December 12th, 2018.

Q. Okay. Now, at some point the indictment was amended to add -- well, there's other defendants.
Can you pull the indictment again, which is Defendant's Exhibit 2. The one with the names on it? You got that in front of you?
What happened in the cases with the other defendants?
A. Jorge Antonio Martinez, as soon as the U-Haul was hit, he got together with an armed bodyguard and fled to Mexico and is remaining in Mexico, as far as I can tell; Daniel Enrique Montes-Munoz has been sentenced in this case; Hugo Pargas was deported; Timothy Franklin Harper has been sentenced; Jason Wayne McLemore has been sentenced; Collin Garret Hayden, of course we're here today; and Richard Saucedo, Junior, is deceased; Gerald Clinton Davis is in prison.
Q. All right. So leaving out -- who's deceased? Which one?
A. Richard Saucedo.
Q. Mr. Saucedo. And then who fled to Mexico?
A. That is Jorge Antonio Martinez.
Q. Okay. Leaving out those two, is this the same pile -- oh, it's been laid out for the jury.
A. Yes, sir.
Q. Is this the same pile of drugs that all those people pled guilty to?
A. Yes, sir.
Q. And this is the gun that no one pled guilty to; correct?

A. That's a gun that was seized. There --
Q. Are you contending that there's a single defendant in this case who pled guilty or was convicted for this gun?
A. No, sir.
Q. You remember the picture of the U-Haul with all the guns spread out in front of it?
A. Yes, sir.
Q. Do you recall the testimony of the officer -- I keep getting his name wrong -- Canet -- Canete -- Caneety?
A. Canete.
Q. Canete. Canete. That that gun was in that picture in front of a red cooler -- or ice -- some kind of cooler. I don't know what kind.
A. Canete was the SWAT officer.
Q. Right. He went and assisted Darren Lubbe in looking at the U-Haul the very next day, did he not?
A. No, sir.
Q. Who did?
A. That was Agent Rick Lopez.
Q. Oh, pardon me. He sure was. Yeah, Rick Lopez. Do you remember him testifying that that gun was from -- was sitting in front of the cooler in that picture in front of the U-Haul with all those rifles and things set out?
A. Yes, sir.
Q. So that's the same gun; right?

A. Yes, sir.
Q. All right. No -- no person has pled guilty to use or possession of that gun in connection with a drug offense of all those defendants that we've just discussed. Would you agree with that?
A. Not at this time. No, sir.
Q. And the other guns -- you were here when Josh Petrie, who I'm sorry I forgot I've met before, probably multiple times, who is an ATF agent testified about firearm. Do you remember his testimony?
A. Yes, sir.
Q. And do you remember him testifying that all those other rifles that have been carted off and tested for fingerprints and everything, that they've all been destroyed? Do you remember that?
A. Yes, sir.
Q. Did any defendant plead guilty to use or possession of those firearms in connection to a drug offense?
A. Not to this date.
Q. And, in fact, you were sitting here when the sole identification, like that we could look at that was found in the U-Haul, Mr. Martinez left his pay stubs there, didn't he?
A. Yes, sir.
Q. And his -- and his ID, his name tag; right?
A. Yes.
Q. That's pretty strong correlation between an object and a person when they leave their pay stubs and their ID. Would you agree?

A. Agreed.
Q. But there were no pay stubs, no ID, and no other physical correlation between my client and anything that was in the picture at the U-Haul, was there?
A. Was there any correlation between your client and what was found?
Q. I think you heard me. No items, no physical correlation between any -- anything found in the U-Haul and my client.
A. I believe there was a physical correlation.
Q. Did you find an ID there?
A. The physical correlation would have been --
Q. Did you find an ID there?
A. No, sir.
Q. Did you find a single fingerprint there that matches with my client? One?
A. No, sir.
Q. Did you find an item of clothing with his name on it?
MR. HORNOK: Objection, Your Honor. It seems like he's badgering the witness.
JUDGE SCHROEDER: Sustained.
Q. (Mr. Van Cleef continued.) Did you find -- did you find --
MR. VAN CLEEF: Is it my tone, Your Honor? Because I can certainly be more quiet.
JUDGE SCHROEDER: No -- yeah, just...
MR. VAN CLEEF: All right. I apologize, Your Honor.

Q. (Mr. Van Cleef continued.) I apologize, Agent Kelly.
A. Can I --
Q. I get excited too.
A. Can I answer your question.
Q. If you'll answer the question "Did you find an item of clothing with my client's name on it in the U-Haul?"
A. No, sir.
Q. Or any documents indicating that my client had anything to do with renting the U-Haul.
A. No, sir.
Q. Did you -- I can't recall. Did you -- you went into Mr. Harper and Mr. Hayden's apartment at the time of the SWAT team entry?
A. After the SWAT team, yes, sir.
Q. Okay. Did you go in before or after Special Agent Brock had been in to collect items for evidence?
A. It would have been around the same time.
Q. Okay. So you and Special Agent Brock would have been there about the same time?
A. Uh...
Q. In other words, before the items were taken away?
A. Yes, sir, for a brief period of time.
Q. How long, do you think?
A. Enough time to just triage what was in there, figure out who the people were in the apartment, and then go to talk with the defendants.

Q. Okay. Talk with the defendants. By that, you mean the people whose pictures, including Mr. Harper and the other people but not my client; right?
A. That's correct.
Q. Okay. And when you did that, should we rely on -- would your -- would your -- just to save some time, would it be useful to ask you where particular items were, or are you going to remember where particular items were?
A. I can -- I can remember some items.
Q. Okay. So the only item that this jury has heard about in the five days of this trial that was -- that had my client's fingerprints on them of all these things that are -- that are laid out and have been shown to them was -- was a couple of cups. You agree with that?
A. Yes, sir.
Q. Okay. And do you recall specifically seeing those cups when -- not from a picture, but when -- when you went into the apartment?
A. Yes, sir.
Q. And do you recall which bedroom those cups were in?
A. Yes, sir.
Q. And did you hear the testimony yesterday that the cups were found in -- or from Special Agent Brock that the cups were found in the master bedroom?
A. No, sir.
Q. So it's your testimony that -- as sitting here as an observer

in this court, you did not hear a witness state that the cups were found in the master bedroom?

MR. HORNOK: Objection, Your Honor. Asked and answered.

JUDGE SCHROEDER: Overruled.

A. I don't recall Agent Brock identifying a master bedroom.

Q. (Mr. Van Cleef continued.) Okay. I didn't ask you that. I said -- that was the first question.

The second question was do you not recall any witness who has testified in the five days of this trial stating that those cups were found in the master bedroom?

A. Do I not recall any witness --

Q. Uh-huh.

A. -- stating that those cups were found in the master bedroom?

Q. Yes, sir.

A. I don't recall any witness stating that they were found in the master bedroom.

Q. All right. It would be important, though, what bedroom those cups were found in; correct?

A. Absolutely.

Q. I mean, certainly important to my client; correct?

A. Yes, sir.

Q. Because there's nothing odd about having fingerprint -- you were here for the fingerprint expert, Miss Wassung, just to remind; correct?

A. Yes, sir.
Q. And it would not -- you heard what she had to say, and I'm sure you've heard other fingerprint experts testify before; correct?
A. Yes, sir.
Q. And a -- and a cup is a normal household item and not in and of itself, by itself, an instrument of illegal activity. Would you agree with that?
A. By itself, yes, sir.
Q. Well, that is my question. If you'll just answer my question and not concentrate on giving another answer, which is nonresponsive, I'd be most appreciative.

MR. HORNOK: Objection, Your Honor. Badgering the witness again.

MR. VAN CLEEF: I will object to the nonresponsive portion of that answer, Your Honor.

JUDGE SCHROEDER: All right. Let's just move -- why don't you reask the question.

MR. VAN CLEEF: Okay.

Q. (Mr. Van Cleef continued.) Is it within normal human experience that a cup is not necessarily an instrument of criminal activity?
A. Yes, sir.
Q. And is it your understanding that cups within your household are likely to have your fingerprints on them?
A. Yes, sir.

Q. And is it important in this case that we know exactly where those cups came from?
A. Yes, sir.
Q. And what they contained.
A. Yes, sir.
Q. Did you in your time in the apartment see any other signs in my client's bedroom of drug use?
A. Yes, sir.
Q. And what items did you see in my client's bedroom of -- that caused you to think that there was drug use going on in there?
A. The -- there was steroids in the bathroom, if I remember right. Something similar to that.
Q. Anything else? Such as cocaine use or methamphetamine use or any other kind of drug use?
A. No, sir.
Q. Would small quantities of a particular substance give you, as a trained narcotics officer, any clues that a person might be using a controlled substance?
A. That would be accurate.
Q. Were there any small quantity packets or --
A. Yes.
Q. -- containers?
A. Yes, sir.
Q. In my client's bedroom?
A. Yes, sir.

Q. Of what?
A. I believe it was cocaine.
Q. And how much cocaine was found in my client's bedroom in a small packet?
A. Several grams.
Q. And the several grams -- do you work much in the Dallas area, or are you mainly in East Texas?
A. Quite a bit.
Q. In Dallas?
A. Yes, sir.
Q. Okay. So the several grams that were found -- the several grams of cocaine that were found in a small packet in my client's bedroom, that is consistent with a user quantity of that particular drug, is it not?
A. Sure.
Q. Now, agreed, the items that we see here over on the table, not a user quantity.
A. Correct.
Q. Any of them, not a user quantity; agreed? Definitely not a user quantity.
A. Correct.
Q. But those items weren't found in my client's bedroom, were they?
A. No, sir.
Q. Was any firearm or destructive device found in my client's

bedroom?
A. No, sir.
Q. Have you got any photographs or any information -- well, any photographs or videos of my client in the possession of any -- any firearm? Photos or videos of my client in possession of any firearm?
A. No, sir.
Q. Even on Facebook?
A. I don't recall any.
Q. I don't either. I just want to make there wasn't something I haven't seen. So have you looked through all of his Facebook file?
A. Yes, sir. I don't believe I remember any firearms photos.
Q. And so the jury is aware, the Facebook file is thousands of pages, is it not?
A. Yes, sir.
Q. Like 14 or 15 thousand pages?
A. That's correct.
Q. Have you looked through all of that?
A. Yes, sir.
Q. And the few pages that you've pulled out, did you -- were you -- I don't know. I'm not going to ask you what Mr. Hornok did, but did you look through all the pages of the Facebook yourself?
A. Yes, sir.
Q. All right. And did you pull out all the pages from the 15,000 pages in Facebook that you thought were the most important in this

case, or are there others?
A. I tried to narrow it down. Yes, sir.
Q. Okay. And the demonstrative exhibit, Exhibit 8, does that reflect you narrowing it down?
A. Yes, sir.
MR. VAN CLEEF: Your Honor, may I approach the witness?
JUDGE SCHROEDER: Yes.
MR. VAN CLEEF: I'm sorry for the lull, Your Honor. I never said I was better with paper than I was with computers.
JUDGE SCHROEDER: You're fine.
MR. VAN CLEEF: All right.
Q. (Mr. Van Cleef continued.) I've handed you a document that -- and I've just pre -- been a little presumptuous and gone ahead and marked it with a 2 on the front, but can you tell me generally what that document is?
A. A superseding indictment.
Q. And are you familiar with it?
A. Yes, sir.
Q. Will you pull off the last two pages for me, and give them back to me.
A. Give them back to you?
Q. Yes. Thanks. Now, can you confirm for me that that is the active pleading in this case?

A. Yes, sir.
Q. And can you look down there at the bottom, does that appear to be a certified copy of the document?
A. Yes, sir.
MR. VAN CLEEF: And, Your Honor, I'm going -- I've marked this as Defendant's Exhibit 2 and intend to refer to it as such and would request that it be admitted. It is a certified copy of the second superseding indictment in this case?
JUDGE SCHROEDER: Any objection?
MR. HORNOK: Not to the admission of the exhibit, but I think it needs to be admitted as 3, not 2.
MR. VAN CLEEF: My apologies. May I approach that exhibit?
JUDGE SCHROEDER: Very well. Yes.
(Defendant's Exhibit 3 was admitted.)
Q. (Mr. Van Cleef continued.) Okay. What is the date of the second superseding indictment?
A. January 15th, 2020.
Q. Can you -- have you got both Defendant's Exhibit 2 and 3 there in front of you, which is the indictment and the --
A. Yes, sir.
Q. -- superseding indictment? Do you have them in front of you?
A. I have them both.
Q. Okay. So the indictment was filed on April 19th, 2017. You

agree?
A. Yes, sir.
Q. No -- and we've gone through this, but no mention of cocaine nor -- or -- and no mention of use or possession of a firearm by any defendant in that document; correct?
A. Yes, sir.
Q. And then if you'll look at Defendant's Exhibit 3, the second superseding indictment. Now in Count 1 -- well, first the date. What's the date on that?
A. Which one?
Q. I'm sorry. The file marked date, which is in the top right. Let me help.
A. January 15th, 2020?
Q. Yes, sir. Right there. Right there. Excuse me. January 15th, 2020.
Now if we look at Count -- Count 1, a little bit different, isn't it? Now if we look at Count 1, it's a little bit different, and I'll give you a hint where I'm headed with this.
Now all of the sudden we see the word cocaine in the indictment; correct?
A. Yes, sir.
Q. Do you know how that came about? Came to be part of a charge?
A. Yes, sir.
Q. Was that after you had -- you and other officers and the prosecutors here to my right had met with Mr. Harper and Mr.

McLemore over at the Titus County Jail?
A. No, sir. It was -- it was after I met with McLemore at the prison in Seagoville, and Harper at the prison in Oklahoma.
Q. Okay. Okay. That's really what I wanted to know.
So their testimony was that you met with them sometime in -- one of them was in August; correct? August 29th?
A. That's correct.
Q. And that would have been which one? Do you recall? It's not a big deal, but do you recall?
A. That would have been Jason McLemore.
Q. All right. And the second one that you met with would have been, then, Mr. Harper. So when and where did you meet with him?
A. That would have been the following date in Oklahoma.
Q. So August 30th of 2019.
A. Yes, sir.
Q. All right. And was I even an attorney in the case in August of 2019? Are you aware of that?
A. I'm not aware.
Q. Okay. Do you know who was the attorney in the case in August of 2019?
A. Not for sure.
Q. Okay. All right. Now, on this document, if you'll flip to the next page, which is page 2 of the second superseding indictment, we also have -- we also have a new charge here.
Did that come from the same -- the same meeting?

A. It came from the same investigation, not from the meeting. No, sir.
Q. No. Because that came from the U-Haul that was searched on February 10th, 2017, which was three years prior, wasn't it?
A. That's correct.
Q. And that charge doesn't appear in regard to the organizer leader's indictment, which was Mr. McLemore; the next guy, I guess, down, Mr. Harper; or in any of the other defendants' indictments, does it?
A. Yes, sir.
Q. Which one?
A. Jorge Martinez.
Q. Oh. Only because he's gone back to Mexico and we don't know if he's ever going return; right?
A. No, because the investigation continues.
Q. Okay. Is that why -- to your knowledge, is that why the case is still sealed, because Mr. Martinez has taken off?
A. Probably.
Q. Okay. Is there any other reason that you're aware of that you can share with me?
A. That it's sealed?
Q. Yes, sir.
A. Not -- I'm not in control of that.
Q. Okay. Okay. Fair enough. Fair enough. Fair enough.
So -- so with the exception of Mr. Martinez who no longer

resides in this country, to your knowledge, has any other defendant been charged with a violation of 18 U.S.C. 924(c)1(A), which is Use or carrying of a firearm during and in relation to and in possession of a firearm in furtherance of a drug trafficking crime?
A. No, sir.
Q. Nor has any defendant been found guilty of that; correct?
A. That's correct.
Q. And, yet, that relates back to February 10th, 2017, over three years ago, at a seizure from a U-Haul and includes that pistol that I handled just a few minute ago; right?
A. That's correct.
Q. And it also includes all those rifles in that picture that was laid out in front of the U-Haul?
A. Yes, sir.
Q. That were destroyed?
A. Yes, sir.
Q. And does it include any other firearm that you're aware of?
A. Juste the ones in the U-Haul.
MR. VAN CLEEF: Okay. May I have just a moment, Your Honor?
JUDGE SCHROEDER: Yes.
MR. VAN CLEEF: Your Honor, I will -- I'll pass the witness.
JUDGE SCHROEDER: Redirect?
MR. HORNOK: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. HORNOK:

Q. Let me direct your attention to what's been admitted as Exhibit 13, page 11. What is depicted in this picture?

A. The -- an entry into the Magnolia at Wycliff.

Q. Sorry. So if you could look -- focus on what's on the screen there.

A. I'm sorry. I looked at the wrong thing.

Q. Thank you. So on the screen, what is depicted there?

A. This is the cups that were recovered from the defendant's bedroom.

Q. All right. And are these the ones that had the defendant's fingerprints on them?

A. They are.

Q. All right. Now, there's two cups there, and they're pushed together, but it looks like there's some kind of crystalline substance in between them. What is that?

A. Appears to be methamphetamine.

Q. All right.

MR. HORNOK: Your Honor, may I approach?

JUDGE SCHROEDER: Yes, you may.

Q. (Mr. Hornok continued.) I've handed you what's been marked as Government's Exhibit 17.

Are these the cups with the methamphetamine that were found in the defendant's bedroom with his fingerprints?

A. They are.
Q. All right. Let's -- let me direct your attention now to Exhibit 13, page 12.
Is this the defendant's laundry basket?
A. It is.
Q. And what is depicted here in these bags in the middle of the laundry there?
A. A bag of methamphetamine.
MR. HORNOK: Okay. Your Honor, may I approach?
JUDGE SCHROEDER: Yes.
Q. (Mr. Hornok continued.) I've handed you what's been marked as the government's Exhibit 16 and 15.
If you could, what is Exhibit 16?
A. 16 is a bag of cocaine.
Q. And looking at Exhibit 16 there on the desk in front of you, do you see it depicted in this picture in front of you?
A. I do.
Q. Which of the two bags is it?
A. It's the bag on the left.
Q. All right. What is exhibit -- Government's Exhibit 15?
A. That is a bag of methamphetamine.
Q. And where was it found?
A. In the defendant's laundry room -- or laundry basket.
Q. And do you see Exhibit 15 depicted in this picture?
A. I do.

MR. HORNOK: Your Honor, may we publish Exhibits 17, 16, and 15? 15, 16, 17 to the jury?

JUDGE SCHROEDER: Yes.

Q. (Mr. Hornok continued.) So these exhibits that are being passed around the jury box right now, where in the defendant's apartment were they found?

A. The cups were found in his windowsill. The bag of cocaine and the bag of meth were found in his laundry basket.

Q. And the cups, are these the cups that had the defendant's fingerprints on them?

A. They are.

Q. Now, on cross-examination, you were referred to, I believe it's Exhibit 2. Do you have that in front of you? It's the indictment -- it's the first indictment with everybody listed on it.

A. Yes, sir.

Q. All right. Now, based on your -- well, in addition, on cross-examination do you remember being asked about some questions about whether people conspired with each other?

A. Yes, sir.

Q. All right. Based on your investigation, did Mr. Brown conspire with Mr. McLemore to distribute drugs?

A. Yes.

MR. VAN CLEEF: Your Honor, I object to that. That's a legal conclusion, and that's for the jury to decide.

JUDGE SCHROEDER: Mr. Hornok?

MR. HORNOK: Your Honor, I believe this is the exact line of questioning that he engaged in the --

JUDGE SCHROEDER: I'm going to permit you to discuss it without asking the witness to reach a legal conclusion or be asked a question that calls for a legal conclusion. Does that make sense? So --

MR. HORNOK: Do I need to rephrase the question?

JUDGE SCHROEDER: I think that would be helpful.

MR. HORNOK: Okay.

Q. (Mr. Hornok continued.) I'm not asking you for a legal conclusion, but in your training and experience as a drug trafficking investigator, are you able to identify members who are conspiring together to distribute drugs?

A. Yes, sir.

Q. All right. Did Mr. Brown and Mr. McLemore engage -- conspire to distribute drugs?

A. Yes, sir.

Q. And did they conspire with Mr. Harper to distribute drugs?

A. Yes, sir.

Q. And did all of them conspire with Mr. Montes-Munoz to distribute drugs?

A. Yes, sir.

Q. And did all of them conspire with Mr. Martinez to distribute drugs?

A. Yes, sir.

Q. And did all of them conspire with Mr. Pargas to distribute drugs?
A. Yes, sir.
Q. And did all of them conspire with Mr. Saucedo to distribute drugs?
A. Yes, sir.
Q. And did all of them conspire with Mr. Davis to distribute drugs?
A. Yes, sir.
Q. And did all of them conspire with the defendant to distribute drugs?

MR. VAN CLEEF: Your Honor, that's the ultimate conclusion for the jury. That can't be anything other than a legal conclusion.

JUDGE SCHROEDER: I'm going to permit that. Mr. Hornok's entitled to the same degree of latitude on this issue as I permitted you.

MR. VAN CLEEF: Yes, sir.

A. Yes, sir.
Q. (Mr. Hornok continued.) Yes, sir, what?
A. Yes, sir, the defendant conspired with all of the others.
Q. All right. Let me direct your attention to Exhibit 7.

(Video plays.)

MR. HORNOK: And if you could pause just a second.

Q. (Mr. Hornok continued.) So I want you to pay attention.

There's -- we see this hand on the left side of the screen. This is the hand that's doling out the cash. I want you to watch those hands of that individual in the video, and I want you to see which of the hands that individual is wearing a watch.

Is it a right hand or a left hand? Okay. So watch.

(Video plays.)

All right. The individual with all the cash and the gold watch, which hand is that individual wearing his watch on.

A. Right hand.

Q. All right. And the other hand that appears that is tattooed, is that a right hand or a left hand?

A. Right hand.

Q. And so there are, it appears, two individuals depicted in this video. Is that fair to say?

A. Yes, sir.

Q. One with the tattoo on the right hand, and one with the watch on the right hand.

A. Yes, sir.

Q. All right. Let me direct your attention to Exhibit 8, page 8. Looking at the defendant in this picture, on which hand is -- or which wrist is the defendant wearing that bracelet?

A. Right hand.

Q. Is that consistent with the -- the same hand as the individual in the video wearing the watch?

A. Yes, sir.

Q. All right. Let me direct your attention now, if we could, on the left side of the screen, pull up Exhibit 1, page 6859.

MR. HORNOK: And if we could zoom in on the defendant's head and the right -- all the way out to the right arm. Yeah. All of that. If we could go even further than that. All the way out to the end of his elbow. Perfect. Yeah. All right.

Q. (Mr. Hornok continued.) So is this -- looking there, is this what we're seeing here in the picture the defendant's right hand?

A. Yes, sir.

Q. What, if any, tattoos do you see on the defendant's right forearm?

A. Right forearm?

Q. Yeah. So right -- right here (indicating). There are tattoos on the right forearm? Is that --

A. Yes.

Q. Okay. And if we could, next go to -- is his right arm, is that the one with the lightening bolts on it? Is that -- is that what you recall?

A. I believe so.

Q. Let me direct -- let me direct your attention to another exhibit. Let's look on the left side at Exhibit 2, page 4188. And looking -- so the defendant is now facing us. Is his -- his right hand is on the left side. Do you see that? If we could focus out attention on his right forearm there.

Now, is this the wrist on which Mr. Hayden has the lightening bolt tattoos?
A. That's correct.
Q. And these other tattoos that are here that I'm not sure exactly what's depicted there, but is that the same that we were seeing in the last picture on the defendant's right arm?
A. Yes, sir.
Q. All right. Let me direct your attention now on the right side to Exhibit 1, page 6016.
Now, is this from Mr. Hayden's Facebook?
A. Yes, sir.
Q. All right. And looking at this hand and the tattoos that are there on the right, what, if anything, do you see identified similar between the tattoos on the hand on the right and the tattoos on the hand on the left?
A. Similar tattoos on the forearm including the bolts and the watch on it.
Q. So does it appear to be the defendant's hand on the right?
A. It does.
Q. And so which arm are we looking at on -- which of the defendant's arm on the left are we looking at?
A. His right.
Q. And which of the defendant's arms on the right are we looking at?
A. His right.

Q. And so which arm is the defendant wearing a watch on in this picture?
A. His right.
Q. Let me direct your attention now to page 6000 -- on the right side, 6018.
Is this another picture of the defendant's right forearm?
A. That's correct.
Q. And on which arm is the defendant -- or which wrist is the defendant wearing the watch in this picture?
A. His right.
Q. Let me direct your attention back to Exhibit 7.
(Video plays.)
What, if anything, about the individual doling out all the cash is consistent with the defendant in this exhibit?
A. Watch is on the right hand.
MR. HORNOK: No further questions, Your Honor.
MR. VAN CLEEF: Very briefly, Your Honor, and I think we'll be done.
JUDGE SCHROEDER: Yes.

RECROSS-EXAMINATION

BY MR. VAN CLEEF:
Q. Special Agent Kelly, do you know if my client's right-handed or left-handed?
A. No, sir.
Q. Do you -- you still agree with me that you cannot recognize his

voice of any of the voices in that video that we just looked at?
A. Yes, sir.
Q. Do you know that any -- do you know when any of the pictures of videos that we just looked at were actually done?
A. No, sir.
MR. VAN CLEEF: That's all I have, Your Honor.
MR. HORNOK: No further questions, Your Honor.
JUDGE SCHROEDER: Could I -- you may step down. Could I ask counsel to approach.
(Bench conference.)
JUDGE SCHROEDER: Okay. In the interest of saving a little bit of time -- I assume this is your last witness.
MR. HORNOK: It is.
JUDGE SCHROEDER: And I gather you're going -- is Mr. Hayden going to testify? Do you know?
MR. VAN CLEEF: I believe so. Let me check with him one last time.
JUDGE SCHROEDER: Here's my concern is if we break now for lunch and have the jury come back down to -- in order to have the government rest, and then we're going to have to send them back up in order to get him onto the witness stand.
MR. VAN CLEEF: Judge, I believe he'll have to have some sort of little hearing before he testifies as well.
JUDGE SCHROEDER: That's right.

MR. HORNOK: In a Rule 29.
JUDGE SCHROEDER: All right. So -- so here's my suggestion.
Why don't you go ahead and rest, and then -- and we'll get that done. There's not any way to really --
MR. VAN CLEEF: And, Your Honor, I will need a brief hearing off the -- not off the record. On the record ex parte with you.
JUDGE SCHROEDER: Okay. That's fine. I think what we -- I was just trying to save a little bit of time and go ahead and get him on the stand. I think if we have all that done, I think the thing that makes the most sense, it seems to me, Jonathan, is for you to go ahead and rest at this point, and then we'll send the jury upstairs to eat lunch, and we'll handle whatever we need to handle.
MR. HORNOK: Okay.
JUDGE SCHROEDER: Is that okay with everybody?
MR. HORNOK: Yes, sir.
MR. VAN CLEEF: Yes, sir.
JUDGE SCHROEDER: Thank you.
(End of bench conference.)
JUDGE SCHROEDER: All right. Is -- was Mr. Kelly the last witness on behalf of the government?
MR. HORNOK: Yes, Your Honor. At this time the government rests its case.

JUDGE SCHROEDER: All right. Ladies and gentlemen, the government has rested its case at this point, and it is 12:45, and your lunch is upstairs waiting. So we're going to ask you -- I'm going to ask you to go ahead and go up to the jury room, have your lunch. We have some additional matters that we've got to resolve down here. And once we get those done, we'll get you back downstairs in order to continue the proceedings in this case.

Done forget, I've asked you not to discuss the case until all of the evidence has been submitted to you, and I have instructed you on the law. So we'll have you back in the courtroom as quickly as we can.

(Jury excused.)

JUDGE SCHROEDER: Okay. So we've got a number of different things we need to take care of. I know you probably all need to have a bite to eat. We can either break and do that now, we can go ahead and do the things, Mr. Van Cleef, that you need to do with respect to your client. We've got to discuss jury instructions, somewhat dependent on what the defendant's decision in regards to testifying is going to be, and then have a -- I assume you are going to present a motion for judgment of acquittal.

So I'm open to addressing that in whatever order the parties think makes the most sense.

MR. VAN CLEEF: Your Honor, I -- I can eat very

quickly. I brought food with me today. I would appreciate a few moments to gather my thoughts for purposes of making a Rule 29 motion and for the other two hearings that I anticipate that we will be having.

I don't think that there will be -- I don't think that there's really any -- going to be any dispute as to the charge because we already had it in fairly complete form when we submitted it to the Court.

JUDGE SCHROEDER: Correct. But we do have to make a bunch of changes, depending on whether he testifies or not.

MR. VAN CLEEF: We do. That's true.

JUDGE SCHROEDER: And that -- that's on us, not on you-all.

MR. VAN CLEEF: And I can't report that decision to the Court finally until I've had an opportunity to consult with my client one more time.

JUDGE SCHROEDER: Sure. Okay. Mr. Hornok.

MR. HORNOK: Your Honor, the other -- the other thing is in my closing I've got a PowerPoint. It's got the doc -- like the verdict form as we have submitted it. Insofar as we make adjustments to that, I'd like to be able to get that, incorporate that into my PowerPoint so that when I'm displaying it to the jury, it actually is representative of. I don't think we're going to tweak it, but just -- if we end up tweaking the verdict form, that is going to be an

issue that I would like to be able to have like 15 minutes to kind of address and then --

JUDGE SCHROEDER: All right. Sure. Right. And once we make a final decision on the instructions, we'll be making copies for the jury as well.

So what -- what -- how much time would you-all think? Be back at 1:30? 1:45?

MR. VAN CLEEF: I can be back any -- 1:30, earlier or later. It doesn't matter. Definitely by 1:30, Your Honor.

JUDGE SCHROEDER: Okay.

MR. HORNOK: I say let's do 1:30. That way we can get as much done this afternoon as possible.

JUDGE SCHROEDER: 1:30.

(Wherein a break was taken from 12:51 to 1:32 p.m.)

JUDGE SCHROEDER: Okay. We're on the record. Please be seated. All right. In which order would you-all like to proceed?

MR. VAN CLEEF: Your Honor, I think it's incumbent upon me now to articulate a brief Rule 29 motion.

JUDGE SCHROEDER: All right.

MR. VAN CLEEF: As the state has just closed, Your Honor, for the defendant, I respectfully allege that there is insufficient evidence to sustain a conviction against the defendant in the following regards:

Number one, venue is an issue that has come up during

the trial. It's already in our jury instructions, and I believe in our verdict form, though we'll be looking at that in a minute.

You have heard testimony from numerous witnesses about where the events that form the basis for the first and second counts of the indictment, both linked by the Pinkerton Doctrine, I suppose, because there's been no evidence that my client actually personally used or possessed a firearm in regard to Count 2.

The events that have been presented to the jury all occurred in the Dallas, Texas, area. You've heard several witnesses, and I know the Court is personally aware, the Dallas -- that Dallas, Texas, is within the county of Dallas, which is within the Northern District of Texas and not the Eastern District of Texas.

What I heard as the closest testimony to something occurring here was Paul Brown who would have been a confidential -- or cooperating individual at all times relevant to the conspiracy charge, and as the Court knows, as we discussed a little bit in front of the jury, but not too much, hopefully, as a matter of law he cannot be a conspirator. And then the rest was in the surmise of Special Agent Kelly in regard to how you would travel from Dallas to Shreveport. That would cover Counts 1 and 2.

With regard to the obstruction count, similarly,

there was -- actually, there was no testimony about where the threat was made or the threat was received and no testimony linking it to the Eastern District of Texas.

Then globally with regard to all of the counts, defendant respectfully alleges that's there's insufficient evidence to sustain a conviction as to each of the enumerated charges. Thank you.

JUDGE SCHROEDER: Thank you, Mr. Van Cleef.

MR. HORNOK: With respect to Count 4, right, that was the second one you alleged the venue issue with? With respect to Count --

JUDGE SCHROEDER: Is that the threat?

MR. HORNOK: That's the witness intimidation. I'm going to read for you the statute. Subsection (i), which states: The prosecution under this section or Section 1503 may be brought in the district in which the official proceeding, whether or not pending, or about to be instituted was intended to be effected or in the district in which the conduct constituting the alleged offense occurred.

In this case, the threat, the conduct covered by 1512, which is alleged in the indictment was as against the -- the official proceeding is this case, which is, of course, pending in the Eastern District of Texas. Therefore, under 18 U.S.C. Section 1512(i), that is --

there's sufficient venue here with respect to that count.

I would note just when we get to the charge. I believe that's probably going to be something we want to add to instruct the jury, if it's not in the instructions already.

With respect to Rule 29, in United States vs. Bulok, that's 930 F3rd 383rd at page 387, the 5th Circuit in 2019 restated "The standard of this court must use in ruling on a motion under Rule 29," and it is this, "Whether a reasonable jury could conclude that the evidence presented viewed in light most favorable to the government established the defendant's guilt beyond a reasonable doubt. Thus the evidence in testimony in this case must be viewed in -- in that light most favorable to the government in making the Court's decision."

With respect to Count 1, the elements as we're about to go through our first, that two or more persons directly or indirectly reached an agreement to distribute or to possess with intent to distribute methamphetamine or cocaine. Second, that the defendant knew of the unlawful purpose of the agreement; and, third, that the defendant joined in the agreement willfully, that is with intent to further its unlawful purpose. There's a special question that is before the jury, and that is as to the type and amounts of controlled substance which is relevant to the

punishment, minimum and maximum punishment appropriate in this case.

Testimony from Jason McLemore and Timothy Harper has established viewing those testimonies in light most favorable to the government and resolving credibility disputes in the government's favor, that the defendant was engaged in drug trafficking with them. For example, we heard that the defendant used McLemore as his cocaine supplier and heard that Hayden and Harper agreed to sell methamphetamine to Hayden's buyer who was coming from and returning to Shreveport, Louisiana. And we've heard testimony sufficient on that standard to conclude that that methamphetamine was travelling through the Eastern District of Texas from Dallas to Shreveport via Interstate 20 or some similar route, because that is the natural and probable -- it would require a substantial detour in order to avoid going through the Eastern District of Texas in order to make that trip with the drugs that we have testimony about.

In addition, I would point out that Exhibits 12B, 12C, 57B, 57C, on which multiple witnesses have identified the defendant's voice, demonstrate his willingness to engage in a drug transaction on January 23rd, 2017, and his participation in the drug transaction that occurred on February 9th, 2017. Specifically his role on February 9th,

2017, was to verify the funds availability and communicate that information to Timothy Harper who then took the next steps in terms of the drug transaction.

We heard testimony from Timothy Harper that he and the defendant were in a kind of partnership, that they -- a drug partnership in which Mr. Harper primarily distributed methamphetamine and which Mr. Hayden primarily distributed cocaine, and that they would engage in this specific -- this exact kind of conduct where perhaps one of Mr. Harper's drug clients would come, Mr. Hayden would receive that message and would facilitate the communication with Mr. Harper in order to further that drug trafficking activity.

And Exhibit 8, which is sum -- both admitted summary and demonstrative in this case, demonstrates the defendant's participation in drug -- the drug transaction on February 9th, 2017. Specifically phone calls from his cell phone to the CI's phone, that showed -- in addition to that, Exhibit 8 shows drug purchasers asking to buy drugs from the defendant and showed drug purchasers communicating with Mr. Harper about drawing drugs from his roommate, the defendant. Specifically there were conversations where the defendant was advertising and attempting to conduct a purchase -- or conduct a sale of one ounce of cocaine.

The drugs seized from Mr. Hayden's apartment,

Exhibits 14 through 19, demonstrate his participation in the drug conspiracy, specifically with this last witness we heard, we saw three different exhibits that we heard testimony that were specifically found in the defendant's bedroom. That was methamphetamine, cocaine, and two cups which contained methamphetamine, and which also contained the fingerprints of the defendant located in the bedroom in which the defendant's identifying material was also found.

Then we have the drugs seized from the U-Haul that's Exhibit 31 through 37. They demonstrate the scope of the methamphetamine conspiracy in this case and the similarity in the packaging and the quality and the quantity of methamphetamine seized in the apartment and the methamphetamine seized in the U-Haul demonstrate the connection between the drugs in the U-Haul and the drugs found in the apartment.

In addition to that, the proceeding of the investigation and the way that the investigation developed, they also support that connection going back from the apartment to the U-Haul.

We have testimony from numerous forensic scientists establishing that the things seized were, in fact, controlled substances.

Finally, Exhibit 20, which is a demonstrative in this case summarizes the quantities and types of drugs involved

in this case.

With respect to venue, we've got the testimony of Harper that he and Mr. Hayden were selling drugs that were destined for Shreveport, Louisiana. We also have testimony from Mr. McLemore that he and Mr. Brown had been engaged in a drug trafficking conspiracy before Mr. Brown became a CI, and at that time Mr. McLemore, who was purchasing drugs from Mr. Montes- Munoz was selling those drugs to Mr. Brown who was selling those drugs to Mr. Gerald Davis, who was located in the Eastern District of Texas.

And so on the basis of that, there was at least one overt act during and in furtherance of the drug conspiracy that was done in the Eastern District of Texas and, therefore, venue is proper. I would also point out that the standard for venue is the preponderance of the evidence not beyond a reasonable doubt, which is a lower standard. Happy to move on to Count 2.

With respect to Count 2, it's -- the elements are first, that the defendant committed the crime alleged in Count 1, which we have just described. Second, the defendant knowingly did one or both of the following: Used or carried a firearm during and in relation to the defendant's commission of the crime charged in Count 1, or possessed a firearm in furtherance of the defendant's commission of the crime charged in Count 1.

Because a conspirator, and this is quoting --

JUDGE SCHROEDER: Mr. Hornok, slow down. Just slow down a bit.

MR. HORNOK: Sorry. This is the instruction with respect to Pinkerton. Because the co-conspirator is responsible for certain offenses committed by other conspirators, if you were first to find sufficient evidence for a jury to find that the defendant is guilty of the conspiracy charged in Count 1, and if you find -- and if you find that sufficient evidence for a jury to find beyond a reasonable doubt that during the time the defendant was a member of that conspiracy, other conspirators committed the offense in Count 2, both in furtherance of and as a foreseeable consequence of that conspiracy, then there is sufficient evidence to find the defendant guilty of Count 2, even though the defendant may not have participated in any of the acts which constitute the offense described in Count 2.

In this case we have not alleged that the defendant actually personally touched, possessed, used, or carried the firearm. What we have relied on is Pinkerton liability. That is, that he was a member of the drug conspiracy and that one of his co-conspirators, that is Jorge Martinez, in fact, did commit the violation alleged in Count 2. That is that he both possessed, used, and

carried firearms as -- as prescribed by -- or as prohibited by 18 U.S.C. Section 924(c).

The connection between the U-Haul and the defendant, of course, is that the drugs from the U-Haul -- the evidence -- the evidence indicates that the drugs in the apartment came from the drug stash in the U-Haul demonstrating that Mr. Montes-Munoz when he brought the drugs to the apartment had been conspiring with Mr. Jorge Martinez to obtain those drugs and resell them to Mr. Harper and Mr. Hayden there at the apartment, all in one. So we've got linearity in that transaction; the drugs come from Mr. Martinez, they go to Mr. Montes-Munoz, they go to Mr. Harper, who has been assisted by Mr. Hayden, all in a single drug transaction involving a single kilogram of methamphetamine.

Finally, you've heard testimony about how guns are tools of the drugs trade and are commonly possessed in kilogram quantity drug transactions such as at issue in this case. In the United States -- in the case of the United States vs. Wilson, 105 F.3rd, 219 at 221, the 5th Circuit in 1997 addressed cases such as this and found that it is reasonably foreseeable that a co-conspirator possesses a firearm in drug transactions involving as little as $5,000.

In this case you heard testimony that the defendant

was present at, participated in, or knew about multiple kilogram quantity transactions worth much more than $5,000, specifically the transaction at issue on February 9th 2017, involved a kilogram of methamphetamine, and the purchase price was $9500.

Therefore the jury could conclude that it was reasonably foreseeable to Mr. Hayden that one of his drug suppliers, Mr. Montes-Munoz, or Mr. Jorge Martinez in particular, possessed, used or carried a firearm during and in furtherance of that conspiracy, or possessed the firearm with the associated -- the related nexus -- or the required nexus.

With respect to Count 4, the elements are first, that the defendant knowingly attempted to use the threat of physical force against Timothy Harper.

Second, the defendant acted within intent to influence, delay, or prevent the testimony of Timothy Harper in this case, and official proceeding.

Third, the defendant knew or should have known that this case was pending or was likely to be instituted. However, the government does not need to prove that an official proceeding was actually pending or about to be instituted at the time of the alleged offense.

And, fourth, that this case, the official proceeding, was a federal proceeding. However, the government does not

need to prove that the defendant knew that the proceeding was, in fact, a federal proceeding.

There's a special question before the jury as to this count, and it is whether this proceeding was -- that the proceeding at issue was a trial of a criminal case. You've heard testimony from Timothy Harper that the defendant threatened him. Specifically, Mr. Harper described the defendant was threatening him because he believed that Harper was cooperating with the police.

Exhibit 8, which contains the text of the actual threat, I would note that the portion of Exhibit 8 that contains the text of that threat is fully admitted as a summary, and as substantive evidence demonstrates the defendant sent the message to Mr. Harper using Facebook. Based on the defendant's demonstrated control over the Justin Givenchy account, a reasonable jury could conclude that the defendant was the one who sent the actual threat to Harper on April 9th of 2017.

Additionally, April 8th, demonstrates the defendant's state of mind. Specifically, that he believed that he had been federally indicted, and based on the language of the actual threat, a reasonable jury could conclude that the defendant intended to prevent Harper's testimony against him in the criminal trial that would expectedly follow in this indictment.

In addition to this, you've heard testimony from Agent Danny Kelly that he spoke to the defendant, told them that he had -- he was looking for him, and that he should come in, and that this was a federal case, and that he was under investigation at that time. In addition to that, there's numerous comments, including the jail call, which is recorded -- which in that recording the defendant describes his belief that the defendant -- or Timothy Harper was cooperating, was ratting on all of his co-defendants, and that he was in, quote, witness protection program. And at that time he reiterated his intent to put a hit out on Mr. Harper, knowing at that time, in fact, that he was indicted. So it demonstrates a continued mental state relevant to the threat language.

Thank you, Your Honor.

JUDGE SCHROEDER: Thank you. Mr. Van Cleef.

MR. VAN CLEEF: Your Honor, I don't think there's much to add, except that I will note that Defendant's Exhibit 2, which is the indictment in this case, is dated April 19th, 2017, and that the call that Mr. Hornok just described in regard to Count 4 occurred on April 9th, 2017, which would be prior to the filing of this indictment. And there is, to my knowledge, no evidence of where that threat was made -- or the alleged threat was made or received.

As to the other venue argument that I've made to you,

I'll just touch on briefly just to remind the judge. It is rank speculation by the witness. It's complete speculation. I've asked each witness who's mentioned Shreveport, or anyplace in the Eastern District of Texas, if they were personally aware, if they personally knew that anyone even traveled through the Eastern District of Texas, and each one ended up saying, "I assume so."

The facts that -- and the big pile of evidence over here all from Dallas. The U-Haul is in Dallas, the apartment is in Dallas. Everything in Dallas. And since the beginning of -- or probably the middle of this trial, it dawned on me, and you heard me start asking witnesses, where did this occur, what district, you know, what city did it occur in, and the answer has been Dallas, Dallas, Dallas, Dallas, all of which is in the Northern District of Texas.

Now, that's all I have on the venue issue.

JUDGE SCHROEDER: Anything you want to say?

MR. HORNOK: With respect to Count 4, there was -- he raised an issue with respect to the date of the original indictment and the date of the threat. So, in fact, the date of the threat was April 9th, 2017. The defendant was not at that time indicted until April 19th of 2017. But Count 3 -- or element three of Count 4, this is in our jury instructions that we will soon be describing, is that the

defendant knew or should have known that this case was pending or was likely to be instituted. However, the government does not need to prove that an official proceeding was actually pending or about to be instituted at the time of the alleged threat.

What's required here is the mental state, he developed the mental state. The actual date of the pending status of the proceeding is not -- doesn't defeat that.

As to -- as to the venue, I would just remind that -- the Court that the standard here is in -- he must view the evidence in light most favorable to the government. The jury is able to use their common sense based on the testimony to conclude that when co-conspirators said they were buying drugs to take back to Shreveport from Dallas, common sense suggests that you would go through the Eastern District of Texas as opposed to either using a boat to go through the Gulf or traversing Oklahoma, Arkansas, and then Louisiana, in order to make a trip that is otherwise about two hours, much, much longer.

JUDGE SCHROEDER: Thank you, Mr. Hornok.

Mr. Van Cleef, as you know, I am required in ruling on a motion under Rule 29 not to assess the credibility of the witnesses or to weigh the evidence in any way, or to draw any inferences of fact from --- from the evidence.

The Court's role in ruling on a motion under Rule 29

is quite simple, and that is to decide whether the evidence, when it is viewed in the light most favorable to the government is sufficient for any rational trier of fact to find that there has been guilt established beyond a reasonable doubt. And I do think under the circumstances presented in this case through the testimony of the alleged co-conspirators primarily, and the case agents primarily, in addition to the forensic testimony, that I do believe that's -- all of that evidence supports a finding that the evidence when viewed in the light most favorable to the government is sufficient for a rational trier of fact to find that there was guilt beyond a reasonable doubt.

With -- and I find that with respect to the three counts, Count 1, violation of 21 U.S.C. § 846, alleging a conspiracy to distribute; Count 2, violation of 18 U.S.C. § 924 use in carrying -- use or carrying of a firearm in furtherance of a drug trafficking crime; and Count No. 4, which alleged obstruction of justice in violation of 18 U.S.C. § 1512.

So with respect to all three of the counts that the government has proceeded with in -- in trial, I do think in light of the previous rulings the Court has made and the evidence as it has come in from the witness stand, and the documents that have been admitted into evidence, there is sufficient evidence for a rational trier of fact to find in

favor of the government and to find that the defendant is guilty beyond a reasonable doubt.

So, obviously, you've made your record. You haven't waived anything, and to the extent you think it's appropriate, you may re-urge any or all of these motions following any adverse guilty verdict.

MR. VAN CLEEF: And, Your Honor, thank you for your consideration of that matter. I have another matter to -- that we need to take up outside of the hearing of the jury.

May I proceed with that now?

JUDGE SCHROEDER: Yes, please.

MR. VAN CLEEF: Your Honor, I met with my -- well, I've met with my client every day that we've been here and many days before that, but I met with him more specifically a few moments before -- moments before walking into court to confirm whether or not he intends to testify in this case.

He does intend to testify in this case, and before he does so, I think we need to make a short record.

JUDGE SCHROEDER: All right. Let's do that.

Would you like to place him on the stand?

MR. VAN CLEEF: Yes.

JUDGE SCHROEDER: Please do.

MS. SCHROEDER: You do solemnly swear that the testimony you're about to give in the case before the court

is the truth, the whole truth, and nothing but the truth, so help you God.

MR. HAYDEN: Yes, ma'am.

MR. VAN CLEEF: Shall I proceed, Your Honor?

JUDGE SCHROEDER: You may.

COLLIN GARRETT HAYDEN having been called upon to testify in the form of a trial and having been duly sworn, testified as follows, to wit:

EXAMINATION

BY MR. VAN CLEEF:

Q. Mr. Hayden, have you expressed an intention to me to testify in this case?

A. Yes, sir.

Q. And do you persist in your intention to testify in this case?

A. Yes, sir.

Q. Do you make that decision freely and voluntarily?

A. Yes, sir.

Q. Have I influenced your decision one way or the other?

A. No, sir, you have not.

Q. Do you understand that if you testify in the case, you'll be waiving your right to remain silent, which is an important right?

A. Yes, sir.

Q. Do you understand that if you testify in the case, that you'll be subject to cross-examination by either of the prosecutors here to my right?

A. Yes, sir.
Q. Do you understand that you cannot selectively invoke your right to self -- against self-incrimination, so that once you start, you will be testifying until you get off the stand?
A. Yes, sir.
Q. And do you understand that they can also cross-examine you at length about other matters, including any convictions that you may have that are relevant to this case?
A. I am fully aware.
Q. And have I advised you not to testify?
A. Yes, sir.
Q. You still want to testify?
A. Yes, sir.
Q. Do you understand that you have to testify fully and truthfully?
A. Yes, sir.

MR. VAN CLEEF: Your Honor, I believe that covers it.

JUDGE SCHROEDER: All right. Do you wish the Court to inquire?

MR. VAN CLEEF: If you will, Your Honor, I'd love to have that.

EXAMINATION

BY JUDGE SCHROEDER:

Q. So -- so, Mr. Hayden, I think we're all on the same page here. I've heard Mr. Van Cleef take you through a series of questions

designed to ensure that you understand under the Fifth Amendment right to the United States Constitution that you have a right not to provide testimony against yourself.

A. Yes, sir.

Q. And that you fully understand that right, and you are voluntarily waiving that right, and you are making a decision against the advice of counsel, as I understand it, to testify.

A. Yes, sir.

Q. All right. And you've had a full opportunity to visit with Mr. Van Cleef about this decision, not just in the courtroom before we started this afternoon, but presumably at times previous to today.

A. Yes, sir.

Q. Did you discuss it yesterday at any point?

A. No, sir.

Q. All right. But you --

A. Moments -- moments ago.

Q. All right. But you've discussed it in the past.

A. Yes, sir.

Q. All right. And you understand, given the questions that Mr. Van Cleef asked you and the responses that you gave, that you can't invoke your right against self-incrimination on some questions but not all, and that you have to answer fully and completely and truthfully to all of the questions that are asked, either by your counsel or by counsel for the Government.

A. Yes, sir, I fully understand.

Q. All right. And you understand, given all of those issues, that there are obviously some risks you're taking by getting on the witness stand and testifying in this case.
A. Yes, sir.
Q. All right. And you are aware of those risks, and you are willing to take them in making that determination that you wish to testify. Is that correct?
A. Yes, sir.
JUDGE SCHROEDER: All right. Mr. Hornok, anything?
MR. HORNOK: Your Honor, I wonder if the Court would inquire of him whether he understands that if he made the decision not to testify, that the Court would instruct the jury that they could not use his silence against him.
Q. (Judge Schroeder continued.) We went over this earlier in your change of plea and your entrance of the guilty plea with respect to count 5, which was the possession of a contraband in a jail facility, and I discussed the fact that you were waiving your right to a jury trial with respect to that count, pleading guilty to it. And one of the things you would have, of course, in a jury trial would be an instruction from -- from the judge that the jury could not read anything into the fact that you were not testifying. They could not draw any adverse inference from the fact that you had decided not to testify. And, obviously, that's something that you would need to think about.
Are you -- are you aware that I would give the jury that

instruction and, in fact, in the instructions that we have before us, if you don't testify, I will instruct you, they can't draw any adverse inference from the fact that you have not testified?

A. Yes, sir.

JUDGE SCHROEDER: All right. Anything else, Mr. Hornok?

MR. HORNOK: No, Your Honor, thank you.

JUDGE SCHROEDER: Anything else, Mr. Van Cleef?

MR. VAN CLEEF: No, sir.

JUDGE SCHROEDER: All right. Very well. You may step down.

MR. VAN CLEEF: And, Your Honor, I have one other matter to take up on the heels of that one in the absence of all others, but I do need to make it in the record.

JUDGE SCHROEDER: All right. Let's do that.

Let me ask at this time for the government, government's witnesses, counsel, to excuse themselves, and I'll take up Mr. Van Cleef's ex parte matter.

(SEALED PORTION SAVED IN SEPARATE SEALED TRANSCRIPT)

JUDGE SCHROEDER: All right. You-all be seated. Okay. We have dealt with the matter of whether Mr. Hayden understands his right not to testify, and we have verified that he intends to testify. We have dealt with a matter Mr. Van Cleef needed to bring to my attention.

I think we now -- and we've dealt with the motions for judgment -- or the motion for judgment of acquittal. I think we now need to discuss instructions so that we can be working on those in light of the knowledge that Mr. Hayden is going to testify.

Anything you-all want to say about those?

MR. HORNOK: Your Honor, I've got a couple of things tabbed that I -- were the changes that I noticed that I -- that I thought would be likely.

JUDGE SCHROEDER: Let's go through them.

MR. HORNOK: Okay.

JUDGE SCHROEDER: I'd rather do this now so that we can be working on them and save the time later.

MR. HORNOK: The first one I noticed, impeachment by prior inconsistencies --

JUDGE SCHROEDER: Right.

MR. HORNOK: -- if offered.

JUDGE SCHROEDER: Give me just a moment to get there. Okay.

MR. HORNOK: I don't believe that there have been any

evidence offered.

JUDGE SCHROEDER: I think that's right. Mr. Van Cleef, you agree on that one.

MR. VAN CLEEF: Well, the entire statement's offered in the form of the -- of the video, but I don't recall anyone being impeached by a prior statement, no.

JUDGE SCHROEDER: Well, I mean, I'm happy to leave it in if you-all think it's necessary, but I don't recall any -- any prior testimony.

MR. HORNOK: Yeah, Your Honor, I believe this is -- would be referencing, so there's a -- it's like there's a limited purpose aspect of it. And so all the evidence that's come in has come in as substantive evidence, and so maybe a witness got on the stand and said something different than maybe they had said in a recording, but that recording had already been admitted substantively as opposed to being in the form of an impeachment exhibit.

MR. VAN CLEEF: Your Honor, I guess Defendant's Exhibit 1 was somewhat of an impeachment exhibit insofar as you might recall that's the lengthy -- can I get that report?

JUDGE SCHROEDER: Yes, please. That was the report. That was the -- a supplemental report.

MR. HORNOK: It's one of the police reports.

MR. VAN CLEEF: That's correct, Your Honor. That was

the -- the police report. Right. Or the report. And in that report it -- in fact, actually, now that I think of it the actual -- the intended use of that report, and the way it was used in court was to impeach on the issue of whether my client was --

JUDGE SCHROEDER: Identified early --

MR. VAN CLEEF: -- described as a black male was the person who was there. And the witness had already identified my client as the person who had been there, and I did bring it up there for impeachment purposes, now that I recall.

JUDGE SCHROEDER: Okay.

MR. VAN CLEEF: So I would request that they --

JUDGE SCHROEDER: I'm going to instruct on it.

MR. HORNOK: Perfect. The next one is the next one, impeachment by prior convictions if offered, so I believe that one's going to be good since --

JUDGE SCHROEDER: Right.

MR. HORNOK: -- it looks like he's going to testify.

The next one is impeachment by prior convictions. We've heard that with respect to both Paul Brown and Timothy Harper, I guess and Mr. McLemore.

MR. VAN CLEEF: That's true.

JUDGE SCHROEDER: Is that right? We'll add Mr. McLemore.

MR. VAN CLEEF: Yes.

MR. HORNOK: Yes.

JUDGE SCHROEDER: Okay.

MR. HORNOK: Impeachment evidence of untruthful character. I don't believe we've heard any of that. That's the next page.

JUDGE SCHROEDER: We have not heard any evidence of that?

MR. HORNOK: I do not believe so. Of an untruthful character. We didn't have any character evidence.

JUDGE SCHROEDER: Mr. Van Cleef.

MR. VAN CLEEF: Untruthful character, no, but we have another witness to go. Are you sure you want to take that out yet?

MR. HORNOK: Is he going to testi -- well, I guess he could testify that in his opinion Mr. Harper and Mr. McLemore have a --

JUDGE SCHROEDER: Let's leave it for now.

MR. VAN CLEEF: -- character untruthful.

JUDGE SCHROEDER: Let's bracket that one.

MR. HORNOK: Next one is accomplice and former immunity. Because -- I believe this one applies to Mr. Brown. Because Mr. Brown was not actually offered immunity --

JUDGE SCHROEDER: Can we change the wording?

MR. HORNOK: I think we just change the wording, so I think we strike the wording at the top.

JUDGE SCHROEDER: Okay.

MR. HORNOK: The second line it says, "A defendant as an informer for pay," and then I think we strike from that comma all the way to the "or," so it would say, As an informer for pay or for personal advantage or vindication."

JUDGE SCHROEDER: Is that okay with you, Mr. Van Cleef?

MR. VAN CLEEF: For pay would still be, but for immunity from punishment --

MR. HORNOK: Correct.

MR. VAN CLEEF: -- would not? Yes, that's fine with me, Your Honor.

MR. HORNOK: And then the second to the last sentence, on the line that says "benefits that the witness has received either financially or," and then there's that last clause, "as a result of being immunized from prosecution."

JUDGE SCHROEDER: Correct.

MR. HORNOK: I think we strike that clause.

JUDGE SCHROEDER: Okay.

MR. HORNOK: And just say "or otherwise."

MR. VAN CLEEF: Yeah.

JUDGE SCHROEDER: Or otherwise or -- either

financially or for personal advantage?

MR. HORNOK: Sure. Either way.

JUDGE SCHROEDER: Or vindication.

MR. VAN CLEEF: That's fine with me, Your Honor.

JUDGE SCHROEDER: Okay.

MR. HORNOK: On expert opinion testimony, I think we need to strike Amanda Burns. She did not testify.

JUDGE SCHROEDER: Correct. She did not.

MR. HORNOK: On venue for conspiracy, I believe -- so we've got a number of things listed here, so you are instructed the counties of Titus, Camp, and Morris in the cities of Mount Pleasant, Daingerfield, and Pittsburg. I would also request that we add in portions of Interstate 20 are located within the Eastern District of Texas.

JUDGE SCHROEDER: Mr Van Cleef?

MR. VAN CLEEF: I think that's confusing. Interstate 20 goes both ways. That goes into the Western District of Texas as well. And the Northern District and the Eastern District.

JUDGE SCHROEDER: Well, but certainly portions of Interstate 20 are in the Eastern District of Texas.

MR. VAN CLEEF: True enough, but portions of it are also not in the Eastern District of Texas.

JUDGE SCHROEDER: Well...

MR. VAN CLEEF: I mean --

JUDGE SCHROEDER: I agree with that.

MR. VAN CLEEF: I think it's an argue -- I think he's got a great argument, but I think there's an instruction that would -- could be confusing, Your Honor.

For the record, Interstate 20 intersects the state from east to west.

JUDGE SCHROEDER: It does.

MR. VAN CLEEF: And Sun has rise and sun has set, and we are still in Texas yet.

JUDGE SCHROEDER: I'm going to think about that one a little bit.

What else, Mr. Hornok?

MR. HORNOK: I -- so the next -- the next one I have issue with is striking the similar acts.

JUDGE SCHROEDER: Okay.

MR. HORNOK: I don't believe we've received any evidence that's been limited to -- for 404(b) purposes.

MR. VAN CLEEF: I can't think of any either at the moment, Your Honor.

JUDGE SCHROEDER: We'll take that out.

MR. HORNOK: The next one is with respect to Count 2, and this is the proposed alternate.

JUDGE SCHROEDER: Oh, hold on. I need you to tell me which -- go back a little bit to the transcript of tape recorded conversations.

MR. HORNOK: Yes, sir.

JUDGE SCHROEDER: I have written down -- I had written down which exhibits were actually used as transcripts.

MR. HORNOK: Oh, yes. Let's see, that one is. Let me get that for you. Transcripts in this case are 12B.

JUDGE SCHROEDER: 12B, 57B. What else?

MR. HORNOK: Well, 12B, 12H.

JUDGE SCHROEDER: Okay.

MR. HORNOK: Then 51B is the next one.

JUDGE SCHROEDER: Okay.

MR. HORNOK: 57B.

JUDGE SCHROEDER: Okay.

MR. HORNOK: And I believe that's it.

JUDGE SCHROEDER: Okay. Mr. Van Cleef, is that accurate, do you know?

MR. VAN CLEEF: I didn't hear the question. I'm sorry, Your Honor.

JUDGE SCHROEDER: So I'm just trying to fill in the blank on the instruction on transcripts.

MR. VAN CLEEF: Oh, as to the transcripts?

JUDGE SCHROEDER: Right.

MR. VAN CLEEF: 12B, 12H --

JUDGE SCHROEDER: Mr Hornok's given us four; 12B, 12H, 51B, and 57B.

MR. VAN CLEEF: Yes. Those are the ones I remember as well.

JUDGE SCHROEDER: All right. That's fine. Sorry. Go ahead, Mr. Hornok.

MR. HORNOK: So the next issue is with respect to Count 2, and this is -- when we proposed these exhibits, we provided alternative --

JUDGE SCHROEDER: Correct.

MR. HORNOK: -- Pinkerton instructions.

JUDGE SCHROEDER: Right.

MR. HORNOK: The Pinkerton portions of the instructions really are the same. The difference is between the two paragraphs, I have inserted two -- some statements that are based in 5th Circuit Case Law, and I've provided the citation there for those.

So those statements are -- basically it says, "Because firearms are tools of illegal drug trade in determining whether it was reasonably foreseeable to a conspirator that other conspirators would carry, use, or possess a firearm, you may consider the amount of money and amount of drugs involved. For example, it is permissible for your to conclude that it was reasonably foreseeable to a conspirator involved in a drug transaction that other conspirators would carry, use, or possess a firearm because the drug transaction involved a large amount of money or

currency." And then it just picks up with the remainder of the Pinkerton instruction.

MR. VAN CLEEF: Your Honor, what I suggested is the pattern charge, and I think the -- the additional language suggests the result, and that's why I would rather use the pattern charge.

JUDGE SCHROEDER: I agree with that, Mr. Hornok. I want to follow the pattern charge on that one.

MR. HORNOK: Any -- any concern with me --

JUDGE SCHROEDER: Not at all.

MR. HORNOK: -- making that argument to the jury --

JUDGE SCHROEDER: I think that --

MR. VAN CLEEF: I don't either.

JUDGE SCHROEDER: I think that's an argument you can fairly make based on the evidence that was presented.

MR. HORNOK: Okay. And instruct them that the law would allow that? Or that that's --

MR. VAN CLEEF: May I instruct the jury on what the law is?

JUDGE SCHROEDER: No, I think we'll rely on what the -- what the instructions themselves say. I think you can make those arguments --

MR. HORNOK: Okay.

JUDGE SCHROEDER: -- without -- I mean, it seems to me, Mr. Van Cleef, fairly fair for him to be able to make

those arguments. I don't want him instructing them that that's what the law is. I'm going to instruct on the pattern instruction, but I think he can say -- you know, without saying "here's what the law will let you do," I think you can make the argument.

MR. HORNOK: Okay.

JUDGE SCHROEDER: Is that all right with you?

MR. VAN CLEEF: It is, Your Honor. I mean, I would like to have an instruction that a cooperating individual cannot as a matter of law participate in a conspiracy because he's incapable of making an agreement. And -- and I would like to be able to say that as well, and I would like for that to be in the instructions. But I don't expect it to be in the instructions, and I wouldn't make the argument citing any case.

JUDGE SCHROEDER: I think that's the way I would approach it.

MR. VAN CLEEF: Yes.

MR. HORNOK: The next thing I have is that Count 3 in terms of the instructions should be removed because that count has been dismissed.

JUDGE SCHROEDER: Okay.

MR. VAN CLEEF: All right.

MR. HORNOK: Then Count 5 should be removed.

JUDGE SCHROEDER: Correct.

MR. HORNOK: Then with respect to the verdict form, Count 3 should be removed, count 5 should be removed. And then I -- I just want to also plug at this point that there is a forfeiture issue remaining, and so we kind of forgot to do this in the Moya case, and I don't want to forget, and so that's why I'm bringing up now. After the jury comes back with what their verdict is, that they found the defendant guilty, then we need to roll into a forfeiture hearing. I believe all the evidence that they've heard is sufficient for them to make the forfeiture finding so they don't need to -- we don't need to put on more evidence, but I think at that point then maybe we make -- maybe it's like a brief, a brief kind of statement or argument with respect to the forfeitures, and then they go back with the forfeiture finding which they then come back and tell us what their finding is.

JUDGE SCHROEDER: Mr. Van Cleef.

MR. VAN CLEEF: At the -- we're going to do the forfeiture separate as -- by a special verdict? Or would you -- you're proposing -- I'm sorry.

Is he proposing to put it to the jury all at once?

JUDGE SCHROEDER: I think he's talking about a separate proceeding after an adverse verdict.

MR. VAN CLEEF: Yeah, and I agree.

JUDGE SCHROEDER: That's fine.

MR. VAN CLEEF: And I assume you just want to handle it that way.

JUDGE SCHROEDER: It doesn't take long.

MR. VAN CLEEF: Right.

JUDGE SCHROEDER: I mean, they're not happy about it when they get to that point, but it doesn't take long.

MR. VAN CLEEF: Yeah.

JUDGE SCHROEDER: Any other thoughts about that?

MR. VAN CLEEF: Not about -- not about the forfeiture, no, Your Honor. And if that's --

MR. HORNOK: I'm good.

MR. VAN CLEEF: Your Honor --

JUDGE SCHROEDER: Mr. Van Cleef, what did you have? Anything?

MR. VAN CLEEF: The only thing that I would ask the Court is if in your previous cases you have submitted a question to the jury on the issue of venue as to the various count --

JUDGE SCHROEDER: No, I have not.

MR. VAN CLEEF: -- indictment -- so if they have -- is it the Court's position that if they have found that there is a conspiracy as alleged in Count 1, that they found it within the Eastern District of Texas?

Because the reason I raised it is because I don't know how often venue is actually an issue in trials that

come before the court, but it seems to me that with the instruction and especially the standard preponderance of the evidence being stated, that there should be a verdict question as to each count, whether or not they believe by a preponderance of the evidence that the offense occurred within the Eastern Direct of Texas. Of course, Counts 1 and 2 will go together.

JUDGE SCHROEDER: Right.

MR. VAN CLEEF: But Count 4 would be separate.

JUDGE SCHROEDER: Well, is there any objection by the government to adding the phrase "in" -- "within the Eastern District of Texas" in the verdict form?

MR. VAN CLEEF: Well, that would be --

MR. HORNOK: I believe it's in -- it's in the instructions, so Count 1 says -- Count 1 is superseding indictment, charges of the defendant, Collin Hayden, beginning in or about, blah, blah, blah, in the Eastern District of Texas and elsewhere. And then there's a separate venue charge -- or venue instruction which --

JUDGE SCHROEDER: Which we just went over.

MR. HORNOK: -- which we just went over which says that they have to -- they have to make a finding with respect to venue. So I don't know that it's necessary. It's -- because it's an element of the offense that they have to determine by a preponderance of the evidence.

MR. VAN CLEEF: Well, it says that they have to make a finding but there's nowhere for them to put that finding, I guess is the point that I'm making. If -- I agree that a good compromise might be to include within the Eastern District of Texas as to the various counts. That would be fine with me.

JUDGE SCHROEDER: Let me look at the verdict form, and then I -- after we -- as we're bringing them down, I'll look at the verdict form and make a decision about that.

MR. VAN CLEEF: All right. Thank you, Your Honor.

MR. HORNOK: I would object to a special finding with respect to venue. I think it's a question of guilt or innocens. If they find him guilty, it's because they found that there's venue.

JUDGE SCHROEDER: So I don't have the verdict form in front of me right now, so I'm -- I'm not suggesting, nor do I think Mr. Van Cleef is suggesting, a separate question, it's just whether we want to use the phrase somewhere within the verdict form "within the Eastern District of Texas." But I understand the position you're taking. I understand both of your positions.

MR. VAN CLEEF: That's all I have, Your Honor.

JUDGE SCHROEDER: Okay.

MR. HORNOK: Your Honor, one more just thought as to that. One of my hesitancies in putting one of the elements

of the crime into the verdict form is that it somehow or another elevates that venue -- or that element over other elements of the crime. And so, therefore, kind of draws their attention to it --

JUDGE SCHROEDER: Right.

MR. HORNOK: -- unduly. And so if we --

JUDGE SCHROEDER: And that's kind of the main reason I want to go to the pattern instruction on the firearm conspiracy issue.

MR. HORNOK: Sure.

JUDGE SCHROEDER: I mean, for similar reasons. So I understand that sensitivity. But I also understand your concern. Let me -- let me look at the verdict form.

What else?

MR. HORNOK: Nothing, Your Honor.

MR. VAN CLEEF: (Attorney shakes head.)

JUDGE SCHROEDER: Any other issues for you, Mr. Van Cleef, either on the instructions or the verdict form or anything else you need to raise?

MR. VAN CLEEF: The only other thing would be that before the jury is brought back in, probably the defendant needs to be on the stand.

JUDGE SCHROEDER: He does.

MR. VAN CLEEF: And that he needs to be aware that because of the construction of the witness stand, that

unless he keeps his feet in front of him, the jurors will be able to see, or at least the ones on the end will be able to see that he's in restraints.

JUDGE SCHROEDER: You're two steps ahead of me.

MR. VAN CLEEF: I'm sorry, Your Honor.

JUDGE SCHROEDER: I was getting ready to explain.

Mr. Hayden, when you're on the witness stand, if you move your feet back, the one or two, or perhaps three, jurors on this end of the jury box can see your feet. So you'll need to keep your feet firmly pushed up in front of the box in order for them to avoid seeing the restraints.

MR. HAYDEN: Yes, sir.

JUDGE SCHROEDER: Okay. Anything else?

MR. VAN CLEEF: Your Honor, I will -- I will not be making an opening statement.

JUDGE SCHROEDER: Okay. That's fair enough.

What I will do, Mr. Van Cleef, is to ask you to, you know, introduce him and get all of that --

MR. VAN CLEEF: I will.

JUDGE SCHROEDER: -- going. Okay. What else?

Let's have the jury brought down, please.

(Jury seated.)

JUDGE SCHROEDER: Please be seated. All right, ladies and gentlemen of the jury, welcome back. I hope you enjoyed your lunch. I apologize that it took us a little

longer to get you down back into the courtroom. We had a number of legal and evidentiary matters that we needed to resolve outside your presence.

Before we broke for lunch, you heard the government rest on its case, and at this time the defendant may call his first witness.

MR. VAN CLEEF: Thank you, Your Honor. The defense calls Collin Hayden.

JUDGE SCHROEDER: Mr. Hayden, if you would please stand and be sworn.

MS. SCHROEDER: You do solemnly swear that the testimony you're about to give in the case before the court is the truth, the whole truth, and nothing but the truth, so help you God.

MR. HAYDEN: Yes, ma'am.

COLLIN GARRETT HAYDEN, having been called upon to testify in the form of a trial and having been duly sworn, testified as follows, to wit:

MR. VAN CLEEF: Mr. Hayden, will you state your full name for the record.

THE WITNESS: Collin Garrett Hayden.

MR. VAN CLEEF: How old are you?

THE WITNESS: I'm 28 years old.

MR. VAN CLEEF: How far did you go in school?

THE WITNESS: I made it to 10th grade.

MR. VAN CLEEF: Now is your opportunity to speak with the jury.

THE WITNESS: All right.

MR. VAN CLEEF: Go right ahead.

STATEMENT BY MR. HAYDEN

MR. HAYDEN: Ladies and gentlemen of the jury, I have decided to testify on my behalf today, against my lawyer's personal opinion, because I want you to hear the story straight from my own mouth, my own words, not some secondhand corrupted, convoluted story that's been made up.

So before I start, I want to apologize for if I get a bit emotional, because for three years I've been incarcerated. For three years I've had to deal with corruption, I've had to deal with lies, I've had to deal with hiding evidence, coverups, things that every one of y'all have witnessed. And it's such a relief to be able to talk to people that are on the outside looking in.

So before I start my testimony, I want to go ahead and clear the air, because this has basically become a public smear campaign, and I just want to clear a few things up.

So I wasn't raised in some house on the hill in some fancy suburb. I'm from the hood. I come from the ghettos. I was raised -- I was raised around nothing but black people, so, of course, I speak differently than others. Of

course, when I'm angry, I get upset. Of course, I use slang terminology, but that's how I was raised. That's not the person that I have become. That's not the person that I carry myself in the world. But, unfortunately, when somebody gets mad, of course, you result back to your roots.

So first, I want to -- I want to talk about these tattoos. They say I'm some -- they're going to make me out to be the biggest, baddest man to walk the face of this earth, let's be honest. And I want to explain my tattoos. And they say I'm gang related and all this. I got these tattoos when I was 17 years old. I had no Nazi training. I had no specific information on any of this stuff. And as I later found out -- at 17 years old I've never stepped foot into a prison, so there's no way in hell that I could ever join a prison gang. So I later realized that those tattoos, they don't hold my values, they don't hold my personal morals. They don't describe me as a person.

So I just want to -- as I got older, and I found out what they really meant, I no longer have those tattoos. This is -- I replaced it with Gucci. I'm pretty sure everybody's aware of that. I'm in the public eye 24/7 of my life, so I'm constantly being judged, you know, what kind of guy this is. So I removed the tattoos because it's not who I am. Now, now that it's all -- that's all out of

the way, let's begin where everything started.

October 1st of 2016, I was released from jail on a probation violation. I violated my probation. You know, I don't claim to be perfect, and everybody in this world, no matter who you are, at some point in time in your life, you've fallen weak to temptation, no matter what it is. At one point in your life somebody, anybody, it doesn't matter, nobody in this world is perfect, so you have fallen weak to temptation at some point in your life. And I'm no exception. No exception whatsoever.

So I got out of jail October 1st of 2016. I started living with my dad with weekly probation visits from the probation office here in Texarkana.

My dad lives in Atlanta, Texas, and I had to be at my dad's house in order to complete these weekly visits with my probation. But, of course, you know, I needed money. You know, you're not going to just live anywhere for free. So as the time went on, my probation started to slack up because they -- they did a risk assessment on me and decided that I wasn't a risk. I -- I presented no risk -- risky features. So they lightened up on me. And that was around the beginning of December they finally lightened up on me, and I began to go to Dallas to strip.

I was approached online by one of the managers of the club. His name is Ray Demps. And he said, "Hey, man,

you've got it. Man, you've got the look, you've got the body, you've got the charisma. I think" -- "I think you can make it, and I think you can make it big." So I said, "Hey, you know, I'm willing to give it a try." And this is where my career started.

So upon working this career, I come in contacts with numerous and numerous of people, and I also come -- come in contact with the workers, but I don't know these workers. These are just people that I work with. You're not sitting in the room standing in your underwear, sitting here talking to another man standing -- well, not me. You're not going to sit here and conversate with another man sitting in his underwear because this another man sitting in his underwear is not paying your bills. This guy -- this guy is just a -- he's trying -- he's there for money, just like you are. He's not going to put money in your pocket, so that is not where my goal is. The goal is the people in the audience. They are -- they pay your bills. They're the ones that furnish your life. So I'm not sitting around hanging out with people in the back. I'm hanging out without the crowd, the audience. I'm getting tips, I'm getting money.

So a few weeks go by. Now, I don't know anybody in this conspiracy whatsoever. Nobody. During December I seen a guy at the gym that worked -- you know, we had the

same job, basically, and, you know, you recognize each other from at work.

Now, if you work a job, and you got your co-workers and everything, and you see them out in public in a grocery store, you're going to basically, "Hey, man, what's up?" You know. That's a common reaction. So that is basically what I did at the gym during this -- probably the beginning, maybe middle of December. I think it was mid-December. And I said, "Hey, man, what's up, man? You know, we work together, you know?" "Oh, yeah, you know." Okay. Well, I made a video. "Hey, man, guess who I just seen."

So -- well, a few weeks after that, we became friends on Facebook for the first time ever. You know, we exchanged information after the gym. We said, "Hey," you know, "we can make a lot of money together, man."

People -- they like people with tattoos, they like people with muscles, they -- that's what everybody wants. So we -- "Yeah, man, we can make money together." So one of our mutual friends, Big Mama Dena, or Reva Dena. I don't know the person's real name, but they reached out to us and said, "Hey, y'all should come down her to Waco. Do a show. We'll put you on some promotional pictures," this and that. I say, "Yeah, we'll come down there."

And so we travel down there, we did the show and

everything, and we go our separate ways. Because once again, this is a guy who is just a work partner. That's all he is to me. I don't go to the clubs with this guy, I don't -- I don't hang out with this guy. I don't know nothing about this guy. I just met him a few weeks ago.

So afterwards, you know, we're -- we're conversating. We became friends on Facebook and everything. It rolls around in January, probably mid-January, me and Timothy Harper both have a mutual friend in the real estate business. His name is Jonathan Beck. Now, Jason McLemore I do not know. I've never met the guy. I have no idea what he looks like until the other day he got on the stand. I don't know that guy.

So I was -- this guy says that I came and smoked meth with him numerous of times at this apartment. But once again, I don't know this guy, "so how would I smoke meth with you at this apartment?" Why would I have to come see this apartment that I'm renting if I already know what it looks like? If I already know what this apartment looks like, why do I have to come check this apartment out?

So, well, Timothy Harper moved in through Jonathan Beck, which is why he got the master bedroom, the bigger bedroom, because, well, basically he moved in first. And Jonathan Beck said, "Hey, man, there's this" -- "a guy that you work with. Y'all work together. Makes sense for y'all

to be roommates. He needs help with the bills. He can't pay the bills." I was, like, all right, well, I'll give it a shot. And that is when me and my brother moved into the apartment, roughly late January. We both moved into the apartment, and we had to take the smaller bedroom, unfortunately.

But February 1st rolled around is when I received the electronic payment information from Jonathan Beck to pay the apartment, so I paid the apartment. That was the first payment I made, and then a few weeks later it gets busted. But -- now, I don't recall January 23rd. I don't -- Paul Brown is obviously a very memorable person. If y'all see him later on down the road, you -- you know who he is. Well, I don't recall that guy, but on February 9th, I do recall him. That was me in the video of February 9th.

I don't hang around smoking meth or dealing methamphetamine. There's not one single shred of evidence that I ever touched a piece of methamphetamine. But Paul Brown, he came and knocked on the door, and I answered the door. I said, "What are you here for? Who are you?" He said "I'm here for Tim." I said, "Hold on. Let me go get him." So I opened up the door, and I was careful not to walk in because he had a tranny in there, and I'm not real fond on seeing things like that, but -- so I creeped in there. I tried to wake him up. He didn't wake up.

The guy -- I asked the guy, "What do you want, man? What are you here for? What do you need?" He said, "Timothy has a kilo for me," or to something of that matter. I don't know, because I don't sit in the back room and practice with videos, and I don't need to be prepared. I don't need to be prepped. I don't have to have people prepping me and coaching me on what I have to say.

So the guy asked me, "I'm here to get a kilo" -- he says, "I'm here to get a kilo from Timothy Harper." Okay. Well, to my knowledge a kilo is a lot of drugs, and it's got to cost a lot of money. You know, that's not some small bag.

And the way his body movements, the way he was talking, the way -- it seemed like his head was in the clouds. And in my career I am trained to be able to read people, to be able to know what these people are about, whether they're telling the truth, whether they come in there and they say -- they say they're all millionaires and this and that. They're going to sell you a bunch of dreams. I'm able to see through that. And when I see -- when I saw Paul Brown, that's exactly what I seen, a guy with his head in the clouds, didn't know his -- just wandering through life. And you've got all this money?

He looked to me like a target. That's basically -- I just moved into this apartment. I just paid the bills at

the first of the month. It's now February 9th. It's only a week and a half later, so I'm a little short on cash. I'm sorry, you guys, this -- this is where it gets a bit emotional for me.

My brother, you've heard Timothy Harper say my brother is mentally challenged. He has autistim -- autism and bipolar issues, and most of my family has abandoned him because he's hard to deal with. So every day of my life I try to pick him something that he wants to do. And it's basically dealing with a kid, you know. He's like, you know, "I want to go play laser tag." You know, he's 26 something years old, and he still wants to go play laser tag and -- and things of this nature.

So I seen Paul Brown as a target to be able to fund what my brother needed, because we came from a real poverty stricken area, and that's basically what it was. So I -- I pretended to be a drug dealer for a day. I said, "Yeah, I've got six ounces. Of course. Whatever you need, man." I just threw a random number at the wall. You know, maybe -- maybe he'd buy it.

So he's like, "Ah, yeah, man, I got 9500, but I need a kilo." I say, "Damn, this guy has 9500. The guy with his head in the clouds." So this guy with the head in the clouds has $9500, and I just paid rent. And as you seen from the video, there was no furniture in this house.

There was nothing. I was struggling to put a roof over me and my brother's head.

So I walked downstairs with the guy. He says, "I'll show you the money." I walk downstairs with this guy, and he points out his vehicle. I walked up to the vehicle, and I try to open the door before he got there. I tried to pop this door, as they say. I tried to pop the door before they got to it so I could see what was inside. I couldn't see inside because the tint was so dark. It was an undercover vehicle. The tint was so dark, I couldn't see inside. I didn't know there was somebody else in there waiting.

So I popped the door, and it was locked. The guy locked it on me. And then he rolled down the window. Well, he shows me all this money he has, and I'm, like, dang. Well, the guy has a big baggy jacket on, and there's two of them. I don't know if this guy's got a gun. I'm not willing to risk it, so I was like, "All right. Hold on. Let me go make this call." I was trying to crawfish. I was trying to get out of there without being harmed in any way.

So the guy was, like, "Hold on. Hold on. Do you want my number? You should hurry up and get it down." I said I really didn't care about his number, but for the purpose of saving face, that's exactly what I did. "Yeah,

sure, I'll take your number, man." I typed it in, and I hit send. I immediately hung up, and I went back upstairs.

I went back upstairs and woke my roommate up. I said, "Man, I don't know what you got going downstairs, but there's some dudes out there waiting on you, man, and I got to go." And that's when me and my brother -- I got my brother out of there. I had no intentions to sell this guy anything. I never weighed out anything. I never touched any scales. There's not a single fingerprint on any scale ever. I've never showed anybody any drugs. I never produced any drugs. I never was downstairs with any drugs.

What took place in that apartment after I left, I have no idea, because I was not there. I don't know what happened. But I know there was not six ounces in my room. What I know is I had cocaine. I've fallen weak to cocaine. You know, I'm not perfect. I -- I did fall into addiction, but the cocaine that I was buying was not coming from them. It -- I never bought, sold, agreed, or anything with none of these guys. I was going all the way to Austin, Texas, to buy cocaine through a guy that Timothy Harper introduced me to.

He's like, "Hey, man, I know this guy right here." "Okay. Cool." And I would buy an ounce, ounce and a half, at a time so I wouldn't have to ride around dirty, as they say. I -- there's no point in me going to a dealer, buying

a couple of grams, going home and having to travel back and forth constantly and putting myself at risk as getting pulled -- pulled over and getting stopped and going to jail.

So, yeah, I bought an ounce. I mean, a typical cocaine high lasts approximately 30 minutes maximum. Maybe a little more. Well, yeah, add that up throughout the day, a typical user, you're using two or three -- two or three grams, maybe four grams a day, and nobody wants to have to keep going back and forth, back and forth constantly traveling, constantly riding with drugs. Nobody wants to do that.

So, yeah, I bought an ounce, you know, maybe a little more. Maybe 30 grams. So three grams a day times ten, that's 30. That's 30 grams. That will last me ten days. That's not some substantial huge amounts of kilos and kilos of drugs that I'm not responsible for.

Yeah, I had 16 grams of cocaine. Yeah, that's my cocaine. That's not distribution amount. Those -- that cocaine was not prepackaged. That cocaine was not weighed out to sell. That cocaine was in one single bag. I just get a little bit at a time. I had no packaging, no syringes, no nothing in my room that is even corroborating the story of distribution. I don't have any meth pipes laying around my room. That was not found in my room.

That was in -- throughout the house. And everybody in this courtroom heard this guy say, "We live two separate lifestyles." I stay up seven, eight, nine times a day, and then I pass out. My roommate, on the other hand, he does not live like that. It's because I don't live like that. I shoot steroids, I work out. I do a little bit of coke here and there, and I go to bed and start all over.

After February 9th, after the bust took place in Dallas, Texas, that the drugs have never left the Eastern District of Texas, never left the -- to go through the Eastern District of Texas. I've never touched any kind of methamphetamine. Yeah, there was cups in there with my fingerprints, but there's cups around anybody's house in America. Anybody's house in America, you're going to go to, and you're going to find fingerprints on people's cups. Now, what those cups were used for after I left, that's not on me.

My roommate sits there and weighs out drugs using these cups. He normally takes care of business behind closed doors as to not get robbed, or whatever he's got going on. So every time he has a drug deal going on, "Hey, man, I need you to leave for a few minutes. I want to go ahead and take care of this." "All right, man. That's good." I don't care. Because normally he has four or five, six people in the house at a time, and they're

usually all in his bedroom. So what he did with those cups afterwards, I have no idea. But everybody in this room heard that lady say there was other -- there was three other fingerprints on that cup that she could not identify. So you have my fingerprints, and you have three unidentifiable fingerprints, which I'm pretty sure they were smudged, or whatever happened in the process. I don't know.

But after I left February 9th, I cut all ties with these people. I don't want anything to do with you. I don't even want anything. I don't want to be roommates with you anymore. I don't care about any of that. Yeah, I tried to bond the guy out. I tried to do the friendly thing to do and help the guy out of jail. I couldn't come up with the money. His bond was 110,000. I couldn't come up with that amount of money.

So I was staying at his girlfriend's house for the time being, and all of the sudden the guy pops up out of nowhere. And I answered the door with no shirt on, at his girl's house. He didn't -- he didn't seem too -- too happy with that, but he seemed very, very scared, very, very nervous. I don't know what gotten in this guy. I was like, "How did you get out of jail?" He said, "Well, the police let me out." I was like, "What do you mean? The police don't let you out of jail. That's not how it works.

They take you to jail." He said, "Well, this dude named Agent Daniel Kelly agreed with me that I could be a cooperating individual. I agreed to work for the government to bust all these people."

I said, "All right, man. I guess you got to do what you got to do. I mean, I don't know. I guess that's your life." He's, like, "Yeah, man. They're looking for Jason McLemore, the guy we got the apartment from." Huh. Jason McLemore. I didn't know Jason McLemore, but I knew Jonathan Beck who I went through.

So the guy made me nervous. You know, I'm not too fond of sitting on a stand against somebody and ruining somebody else's life because I got in trouble. I just -- I can't put myself in that position. I have values, I have morals, I have self-respect. I can't sit up here and point at this guy over here, "Oh, he did this." That's not the type person I am. And if you want to do that, that's all right. That's on you. But I do not condone in that.

So you know what I did? I turned around, and I called Jonathan Beck. I said, "Hey, man, can I get the number of that guy that -- that you set us up with the apartment with?" He's like, "Yeah, what happened?" I was, like "Man, old Timothy Harper done" -- "he done turned confidential informant, and he's looking for that guy. He's looking for that guy to bring to the police," or

whatever. I don't know what he's got going on. So I made the call to this guy, Jonathan McLemore. I said, "Hey, man, whatever you're doing, whatever you have going on in your life, man, you better" -- "you better change it real fast, man, because Timothy Harper's looking for you, and Timothy Harper's going to bust you."

Well, so he hangs up the phone, or whatever. He's real scared. He deletes all his Facebook and everything. Now you got Timothy Harper who cannot produce results for Agent Daniel Kelly. He cannot produce results. He cannot produce results like Paul Brown produced results. So Agent Daniel Kelly threatened him to put him in jail. He used the excuse of, you know, "You haven't been approved to be a CI." If he hasn't been approved, why was he let out in the first place? So he's like "Man, I can't deliver this guy. I got to get out of here." So he fled to New York, which he end -- ended up being arrested somewhere in Tennessee after a domestic dispute with his girlfriend.

I moved to Miami with my girl and my brother. My brother goes wherever I go. No matter what, I will always, always take care of my brother. And my brother, he said, "Man, I want to be a witness. I want to tell these people what really went on." But I told him "No, because if they get you on the stand, and" -- I can't -- I can't put my brother on the stand in front of these -- these monsters so

they can sit here, and they can point at him, and they can nitpick. He's not smart enough to be in a position like that. And they will sit here, and they will take advantage of his mental disabilities, and they will take advantage of everything. So I decided no, man, I -- just -- just relax, man.

So Agent Daniel Kelly comes looking for me, which I had no idea he was going to come looking for me. Because essentially, I didn't do nothing wrong. I never touched a piece of methamphetamine, and I told him that. He cannot con -- he goes to my dad's house, and he cannot contact me. So what's he do? He goes on Facebook, and he sees that I'm in a relationship with a Cuban girl that can't speak no English or anything. So he gets her phone number off of her Facebook, because he cannot contact me, he cannot get my information. And he calls her, and she does not understand what he says. So she passes the phone to me, and this is when he's, like, "Hey, man, I need you to tell me where McLemore is," this and that. And I was, like, "Man, I don't know what to tell you, buddy. I don't have nothing to do with that. That's on somebody else. I've got nothing to do with any of those guys. This is" -- "you've got who you wanted. You've got the guy who delivered the drugs. You've got the guy who sold the drugs, and you've got the cooperating informant who -- who

received the drugs." I was never around. I never seen any methamphetamine, I've never seen any guns, I've never seen any of this. That whole box over there, I don't know what it is because I've never seen it. It doesn't pertain anything to do with me at all. Nothing in that box.

So I told him -- and excuse my language, but I told him to fuck off. You know, "I don't want nothing to do with you, buddy. I don't want nothing to do with your operations, I don't want anything to do with you. I'm not cooperating for nothing, because I don't know anything. You've busted everybody that had something to do with it. What do you need me for?" And then I hung up the phone on him. And that's basically all that happened.

Later on, I get arrested in Miami. I get arrested for possession of Xanax, you know. I was using Xanax. I was using cocaine. I would take cocaine, and I would come down with Xanax because Xanax brings you down. Well, I've never sold a drug in my life. I've never -- now, my girlfriend, she said, "Hey, if you're going to continue using these drugs, you've got to" -- "you've got to pick. It's either me or the drugs." And so, yeah, I got on Facebook. I mean, I had 26 grams of cocaine in my room. I got on Facebook, and I said, "Hey, can I" -- I messaged somebody, "Hey, can you get rid of this? I need it gone as fast as possible." Because I didn't want to jeopardize my

relationship because of some drugs, so I decided to get rid of it, and I was unsuccessful. And I didn't want to throw away possibly a thousand something dollars. Who wants to throw away a thousand something dollars? But in the end, I chose to anyways, because I was not prepared to give up my relationship. I was not prepared for any of that. So I'd rather suffer without drugs, suffer without the need of drugs, than to jeopardize my relationship, so I ended up flushing it down the toilet.

Never one time did I sell drugs for anybody. Never did I conspire with anybody. I've never been fronted any drugs. I've never told anybody about anything. I was a drug user. A user. None of this was packaged up for presale. None of this -- it was -- so I ended up going to jail, and I ended up over here in the Eastern District of Texas, a district I know nothing about. I don't know anybody in the Eastern District of Texas.

So essentially, I -- I decided to do what Timothy Harper did. And Timothy Harper, he decided to work for the police, and they let him out of jail. So I was going through my discovery, and I was taking facts out, and I was getting on the kiosk. We have a little kiosk with Internet capabilities there. And I was trying to put together some kind of good factual basis that would allow them to let me out of jail. I've been in here for three years for a crime

I did not commit. So, of course I'm going to write these people, and I'm going to try my damndest to get out of here. But they -- they offered me -- I sat down with this guy over here, Jonathan Hornok. I sat down with Agent Kelly. I sat down with Jonathan Vera -- Joshua Vera. I sat down with these three guys to have this agreement to cooperate with the government.

And they bring out my letters. "Hey, man, this is what you wrote us. Can you explain in further detail?" Well, some of my details were off, so they decided not to use me. I was a confidential informant. And I said, okay. I go back to jail, and I tried again. But I guess after that first meeting, they didn't -- they really didn't have faith in me, so I -- I gave up, and here I am today.

And that is it, Your Honor.

JUDGE SCHROEDER: Is that all?

MR. HAYDEN: Yes, sir.

JUDGE SCHROEDER: Mr. Van Cleef, any follow-up?

MR. VAN CLEEF: I don't have any questions for the witness, but for the Court, did we formally admit Defendant's Exhibit 3? I just wanted to make sure we did that. I'm getting the nod from --

JUDGE SCHROEDER: Mrs. Schroeder, did we?

MR. VAN CLEEF: Yes.

JUDGE SCHROEDER: She tells us we did.

MR. VAN CLEEF: So nothing else, Your Honor.

JUDGE SCHROEDER: All right. Thank you, Mr. Van Cleef. Mr. Hornok.

MR. HORNOK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HORNOK:

Q. Mr. Hayden, when were you born?

A. I was born 9/29/1991.

Q. Where'd you grow up?

A. I grew up in Shreveport, Louisiana.

Q. Where did you go to high school?

A. I went to high school at Airline High School in Bossier City, Louisiana.

Q. Now, you lived in Dallas at some point; right?

A. I did. I lived in Dallas.

Q. And did you ever travel from Dallas to Shreveport?

A. No, sir.

Q. You have never travelled from Dallas to Shreveport?

A. Never one time in my life.

Q. How did you get from Shreveport when you were in high school to Dallas when you lived there in February of 2017?

A. I didn't.

Q. You didn't what?

A. I believe I just answered the question. I never traveled from Shreveport to Dallas.

Q. Well, didn't you just testify that you went to high school in Shreveport?
A. I did.
Q. And didn't you just testify that you lived in Dallas in February of 2017?
A. Yes, sir, I did.
Q. How was it that you got to -- you came to be in Shreveport in high school, and Dallas in 2017?
A. Well, because when I was released from jail, I was released on probation. I had my probation transferred to Texarkana, Texas, which my dad lived down the street from here in Atlanta. So essentially, I've never been from Shreveport to Dallas. I went from Shreveport to Atlanta where I lived with my dad with -- dealing with probation.
Q. And your dad lives in the Eastern District of Texas?
A. Yes, he does.
Q. So when you testified a minute ago that you didn't know anybody in the Eastern District of Texas, that was not correct, was it?
A. Well, I guess you could say so, but...
Q. My question is would you say so.
A. I know --
Q. Which was correct? Do you know somebody in the Eastern District of Texas, or not?
A. I know my dad. That -- that's it. Nobody else.
Q. And he -- and he is in the Eastern District of Texas?

A. He is.
Q. All right. Let me direct your attention to page 47, page 1 -- or Exhibit 47, page 1. This is you, is it not?
A. That appears to be me.
Q. All right. Very well. And you lived in Dallas from fall 2016 through April of 2017?
A. No, sir.
Q. When did you live in Dallas?
A. In '16 and '17. I, essentially, was able to physically move to Dallas in around the middle of December of 2016. Essentially, due to my probation.
Q. And you were in Dallas until April of 2017.
A. No, sir.
Q. When did you leave Dallas?
A. I left the Dallas area to move to Miami, Florida.
Q. When?
A. A few weeks after the bust. Probably beginning of March.
Q. You mentioned that you work out. Did you ever work out at Gold's Gym in Dallas?
A. I have.
Q. And have you ever worked out at the Youfit Health Clubs in Dallas?
A. I have.
Q. And, in fact, you have registered your -- checked into those locations on Facebook in Dallas.

A. From time to time, yes.
Q. And you worked at an entertain -- as an entertainer for BJ's NXS?
A. I did for a short period of time.
Q. And you worked as a stripper at Hung Mansion Male Strip Club?
A. It was called Hunk's Mansion Male Strip Club. It was in Miami, Florida.
Q. And you worked as an entertainer at LaBare, Dallas?
A. I have worked at LaBare, Dallas.
Q. Let me direct your attention to Exhibit 2, page 4270. This is you in the bottom center of this picture, isn't it?
A. Yes, sir, that is me.
Q. And you posted this to your Facebook account?
A. I did.
Q. And that was to the Justin Givenchy Facebook account that you used.
A. Yes.
Q. And how do you say -- what's the proper way that you say that stage name?
A. Justin Givenchy.
Q. And where did you come up with the name Justin Givenchy?
A. It was given to me. I didn't -- I didn't create it.
Q. Who -- who gave it to you?
A. My manager.
Q. Do you know how he came up with it?

A. I have no idea. He just said, "Man, you look like a Justin."
Q. And how did -- where did the Givenchy come from?
A. That came from him as well.
Q. Now, who is Cameron Diggs?
A. Cameron Diggs is a fellow worker that worked at the club with me, a gay Nazi porn star with white supremacist tattoos.
Q. Is he the one who's pictured on the right side of this?
A. He is.
Q. Is his real name Timothy Harper?
A. His real name is Timothy Harper.
Q. And does Timothy Harper have a Facebook account under the name Cameron Diggs?
A. Yes, he does.
Q. And you had a Facebook account under your stage name Justin Givenchy; correct?
A. Yes, I did.
Q. And you had a Facebook under the name of Collin Hayden as well; correct?
A. Yes, I did.
Q. And you -- you were friends with Cameron Diggs on Facebook; correct?
A. Yes, I was, I do believe. I recall the time when I added him.
MR. HORNOK: If we could play Exhibit 6.
(Video plays.)
Q. (Mr. Hornok continued.) That's you and Timothy Harper in that

video; correct?
A. Yes, it is.
Q. And you took that video and posted it to your Facebook account; correct?
A. I did.
Q. Let me direct your attention to Exhibit 2, page 4188. This is a picture of you; correct?
A. That seems to be a picture of me.
Q. I'm asking you. Is it or is it not a picture of you?
A. Yes.
Q. And you have chain link fence -- a chain link fence tattoo on both of your shoulders?
A. Yes.
Q. And you have the phrase, "No pity for a coward" tattooed on your chest; correct?
A. I do.
Q. When did you get these tattoos.
A. Which ones? All of them or --
Q. When did you get the chain link fence tattoos? Let's start there.
A. I think I was about 18 years old.
Q. Where were you at that time?
A. I was in Shreveport.
Q. And when did you get the "no pity for a coward" tattoo?
A. Shortly after the same timeframe.

Q. What does the phrase "No pity for a coward" mean to you?
A. The phrase "no pity for a coward," if you were to go to YouTube and look up "No pity for a coward," it's a heavy metal song that I work out to. It's one of my favorite songs. It's by the band Bring Me the Horizon.
Q. And why did you choose to have that phrase particularly tattooed across your chest?
A. Because I just stated, it's one of my favorite workout songs. It gives me energy. It pumps me up. I like it.
Q. Now, you've said that you removed the lightening bolt tattoos, but at one point you did, in fact, have lightening bolt tattoos on your right forearm; correct?
A. Yes, sir, I did.
Q. And they were square on the top and square on the bottom?
A. Yes, sir.
Q. When did you get those tattoos?
A. When I was approximately 17 years old.
Q. Where did you get them?
A. I got them at some motel room in Shreveport.
Q. Why did you get them?
A. I mean, I was 17 years old. I didn't have any tattoos, and a guy had some cool looking patterns, some skulls, some bricks, some other stuff. I said, "Yeah, man, that looks cool, man. Why not?"
Q. Let me direct your attention to Exhibit 13, page 1. You moved into this apartment in January of 2017; correct?

A. Yes, sir.
Q. And underneath the sign Magnolia at Wycliff there is kind of an entryway and a gate. Is that the security door that would be visible from the -- the parking lot?
A. No, that's the gate that's visible from the street. There is no parking lot.
Q. Let me direct your attention now to page 3. This is the front door to the apartment in which you lived; correct?
A. That is correct.
Q. Let me direct your attention to page 4. This was your roommate at the time, Timothy Harper; correct?
A. That -- that is my roommate, yes.
Q. Let me direct your attention to page 28. Whose fire helmet was this?
A. That was my roommate's, but I acquired it after he lost everything in the apartment, and I returned his stuff.
Q. You had a cell phone at the time; correct?
A. I did.
Q. Do you remember what the phone number was?
A. I cannot remember what a phone number was three years ago. That was activated and deactivated. I have no idea.
Q. You used that cell phone to call Timothy Harper; correct?
A. Yeah. We were roommates. Of course.
Q. And you texted him as roommates would?
A. I texted him as roommates would, as he testified earlier,

Daniel Kelly.
Q. Let me direct your attention to Exhibit 13, page 9. This is your kitchen counter; correct?
A. That is the kitchen counter that was in the apartment that I lived in.
Q. So it's your kitchen counter on February 9th, 2017.
A. It's Timothy Harper's kitchen counter because I was not there at that time.
Q. When you left -- or when you were at the apartment on the morning of February 9, 2017, this was your kitchen counter; correct?
A. As I just said, I left the apartment, so, essentially, it belonged to -- that kitchen counter belongs to Timothy Harper, because I was not around. I'm not there to supervise that kitchen counter.
Q. Let me direct your attention to page 12. This is your laundry basket; correct?
A. No, sir, that looks like some clothes that are on the floor, and the laundry basket looks like it's to the right.
Q. This is your -- your laundry, then; is that correct?
A. It has multiple people's clothes in that laundry basket.
Q. Are your clothes in that pile of laundry?
A. Yes, sir, but you see there's some female socks at the bottom of the screen. There's one of my brother's shirts, there's one of Timothy Harper's shirts. There's multiple items in this laundry basket.

Q. Let me direct your attention now to Page 18. This was a safe in your apartment; correct?
A. That was in the safe of my roommate's bedroom.
Q. So this was not your safe?
A. No, it was not my safe.
Q. Did you keep anything in your safe -- in that safe?
A. I never kept anything in anybody's safe.
Q. Let me direct your attention to Exhibit 58, page 11. If we could focus in on the top right-hand corner, that's a picture of you; correct?
A. That is a picture of me, yes.
Q. If we could zoom out. These are your fingerprints; correct?
A. I do remember taking these fingerprints.
Q. And do you remember putting superglue on your fingers before you took these fingerprints?
A. No, I do not remember putting superglue on my fingers, no, but I do recall fixing a radio in jail where I was trying to glue it back together.
Q. And how is it that you came to possess a radio while in jail?
A. Um, you buy it off the commissary.
Q. And at the time that you provided these fingerprints, you had been informed a few days earlier that you would be -- someone would be coming to take your fingerprints; correct?
A. I believe that's probably a week before.
Q. Isn't it correct that on Thursday, the week before you were

informed that the fingerprints would be taken, and then the fingerprints were taken on that following Monday?

A. No, I was not informed of that. It came at a random time I was not expecting. They woke me up out of my sleep.

Q. You've been to prison before; correct?

A. No, sir, I have not.

Q. You've never been to prison before?

A. I've never been to a actual prison.

Q. Have you ever been incarcerated before?

A. I have been incarcerated, but only county jails.

Q. You've been convicted of multiple felonies; correct?

A. I have been convicted of multiple felonies.

Q. Let me direct your --

MR. HORNOK: Or, Your Honor, at this time I would move to admit Exhibit No. 55. These are certified conviction documents for the defendant.

JUDGE SCHROEDER: Any objection?

MR. VAN CLEEF: I wasn't prepared for that, Your Honor.

JUDGE SCHROEDER: Certainly.

MR. VAN CLEEF: May I look real quick?

JUDGE SCHROEDER: Yes. Of course.

MR. VAN CLEEF: No objection.

JUDGE SCHROEDER: Very well. Those will be received.

(Government's Exhibit 55 was admitted.)

MR. HORNOK: Your Honor, may I have just a brief second?
Q. (Mr. Hornok continued.) Let me direct your attention to page 1 of Exhibit 55.
Now, in the middle there, there is a name. That's your name; correct?
A. That is definitely my name.
Q. And this is a document charging you with illegal possession of stolen things; correct?
A. Yes.
Q. And it was filed on June 27th of 2013; correct? It's in the bottom right-hand corner.
A. Yes.
Q. And that was a felony conviction; correct?
A. Yes, sir.
Q. And up in the top right-hand -- or top left-hand corner there's a date of birth provided on this document. What is that date of birth?
A. That date of birth is 9/29/91.
Q. And that's your date of birth; correct?
A. That is definitely my date of birth.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) And these are your fingerprints related to that conviction; correct?
A. Yes, sir.

MR. HORNOK: Next page, please. And if we could focus in on the paragraph at the bottom.

Q. (Mr. Hornok continued.) If you could, please, just read this paragraph for us.

A. "Collin Garrett Hayden, incarcerated and present in open court with Christopher Brawten withdrew a former plea of not guilty, entered a plea of guilty to felony grade illegal possession of stolen things. The court explained the rights to trial by jury, to confront accusers, to compulsoy" -- "compulsory process, to appeal to court appointed or private counsel, and a privilege against self-incrimination. The defendant indicated he understood and waived these rights. The DA summarized the facts, and the court questioned the defendant and his attorney and determined that the plea was free and voluntary with full understanding of rights. The court then accepted the plea of guilty. Defendant waived all delays and is duly and legally sentenced pursuant to the agreement of five years."

Q. If we could direct your attention to the next page. If you could read the remainder of that paragraph.

A. "At hard labor in the Louisiana Department of Corrections. Credit for time served on this count" -- "time served on this charge and to run concurrent with Docket No. 203955, count 1, but consecutive with any other sentence. Defendant is advised based on this agreement and agreed-upon sentence, there are no rights to appeal. Defendant is advised of two years to apply for a

postconviction relief. Court recommended the defendant for any program available through the Department of Corrections. Doug Stenson is present on behalf of the State."

Q. Thank you. Let me direct your attention to the next page. Now, in this case you were also charged -- this is a different count of illegal -- being charged with illegal possession of stolen things; correct?

A. It's a different count, but it's for the same object.

Q. This was filed in -- on February 18th of 2014; correct?

A. Yeah, I guess.

Q. Yes or no?

A. Yes.

Q. Thank you. Let me direct your attention to the -- well, let's -- let's focus in on count 1 right there in the middle.

Please read the paragraph beginning with "Count 1."

A. "Count 1. Intentionally possessed, procured, received, or concealed 2001 F250 truck with a value of 20,000 which have been the subject of a robbery or theft under circumstances which indicate the defendant knew or had good reason to believe the property was the subject of one of these offenses."

Q. Thank you. If we could focus your attention on the next page, please.

And as result of this conviction, you were sentenced also to five -- is it five years of hard labor?

A. Yes, sir. They were all ran concurrent.

Q. Actually, if we could focus in right in the middle of that paragraph, I believe -- this one is two years of hard labor; correct?
A. Yes.
Q. And after that, you were placed on supervised probation?
A. Yes.
Q. If we could focus on the bottom paragraph. And your probation was revoked; correct?
A. I revoked my probation while I was incarcerated so I could get the concurrent sentence ran from -- because I was essentially charged with the crime in two different counties. So I revoked my probation so it would be ran concurrent with the other charge of the same charge that I got charged with in a different county. Yes, sir.
Q. Can you read that paragraph for us, please?
A. I'm not see what you're getting at, sir. I'm not a --
Q. I just need you to read the paragraph, starting with "The defendant."
A. I'm not a narrator. I mean --

MR. HORNOK: Your Honor.

MR. VAN CLEEF: I think he objects to this. It's not really asking him a question, he's asking him a form for the jury, and I think the jury can read.

JUDGE SCHROEDER: You want to give him an opportunity to read it himself, perhaps, and then ask a follow-up

question?

MR. HORNOK: Sure.

Q. (Mr. Hornok continued.) Please look at the paragraph. Refresh yourself, and I'll ask you a question.

A. All right.

Q. Are you ready?

A. Yeah.

Q. Isn't it true that you admitted the allegations in the petition to revoke your probation in this case?

A. Yes, sir.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) Isn't it true that this is a separate charge for theft of a motor vehicle?

A. It's a separate charge, but it was for the same exact vehicle.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) And as a result of that conviction, you were also sentenced to five years of hard labor in the Louisiana Department of Corrections; correct?

A. Let me -- let me -- let me clear this up because you --

MR. HORNOK: Your Honor, it's a yes or no question.

JUDGE SCHROEDER: Just -- you can answer the question, and then Mr. Van Cleef will have an opportunity to come back up, and you can say anything you want to. Unfortunately --

MR. HAYDEN: Okay, because he's just -- he's just

trying to muddle everything up.
JUDGE SCHROEDER: That -- he -- he's entitled to ask questions on cross-exam --
MR. HAYDEN: Okay.
JUDGE SCHROEDER: -- and you answer those questions, and then Mr. Van Cleef can follow up if he wishes to.
MR. HAYDEN: All right.
MR. VAN CLEEF: May I have a sidebar?
JUDGE SCHROEDER: Yes.
(Bench Conference)
JUDGE SCHROEDER: Okay.
MR. VAN CLEEF: Your Honor, as I understand, I'm not able to assist him in presenting his testimony at all, so I just want to make clear that I wouldn't be following up.
JUDGE SCHROEDER: That's fine. You know, I --
MR. VAN CLEEF: This is uncharted waters for me.
JUDGE SCHROEDER: I understand.
MR. VAN CLEEF: But I'm following advice -- the advice --
JUDGE SCHROEDER: No, that's fine.
MR. VAN CLEEF: -- that you gave me.
JUDGE SCHROEDER: I certainly understand that. I -- I had understood, perhaps, there was a way for you to answer -- to ask certain follow-up questions, but if that's the -- if that's your view of it, that's what we'll follow.

MR. VAN CLEEF: Actually, I would be happy to follow your view of it, Your Honor. I know that I'm in safe territory of following your view.

JUDGE SCHROEDER: Well, I don't know. I guess all I'm saying is to the extent you feel comfortable asking follow-up questions, do that.

MR. VAN CLEEF: Yes, sir. Thank you.

(Bench Conference Ends)

Q. (Mr. Hornok continued.) As a result of this felony conviction, you were sentenced to five years of hard labor in the Louisiana Department of Corrections; correct?

A. Yes, sir.

MR. HORNOK: Next page, please. Next page, please.

Q. (Mr. Hornok continued.) Now, in October -- on October 20th of 2014, you were also charged with simple burglary. Isn't that correct?

A. Yes, sir.

MR. HORNOK: Next page, please. And if we could focus in on that bottom paragraph.

Q. (Mr. Hornok continued.) And as a result of that conviction, you were also sentenced to hard labor for a period of two years; correct?

A. I'm sorry, you're just repeating the same two years that I've already said I was convicted of.

Q. This is a separate charge; correct?

A. No, sir. This is not a separate charge.
Q. As a result of simple burglary, you, in fact, were sentenced to a period of two years and committed to the Louisiana Department of Corrections; correct?
A. Yes, sir.
Q. And some of those may have run concurrently; correct?
A. Yes, sir. They were all essentially caught at this same time period. I was just charged over here in this county, and then I moved to another county. I got put on probation, moved to another county. I pled guilty to the same charges of that same crime instance, that same truck and the stolen property. I pled guilty to that. And then I came back on -- I revoked my probation while I was still in custody, so this was all essentially one thing, you're just going over and over and over and over.
Q. In 2016 you were confined in the Bossier City maximum facility; correct?
A. Yes, sir. County jail.
MR. HORNOK: Next page, please.
Q. (Mr. Hornok continued.) In 2017 you were charged with possession of Alprazolam in Florida; correct?
A. Yes, sir.
Q. And that was a felony conviction?
A. Yes, sir. I -- I pled no contest.
Q. And Alprazolam is the -- kind of the formal name for Xanax; correct?

A. Yes.

MR. HORNOK: Next page, please.

Q. (Mr. Hornok continued.) And these are your fingerprints; correct?

A. Yes, they are.

MR. HORNOK: Next page, please. Thank you. You can take that exhibit down.

Q. (Mr. Hornok continued.) Now, it's your testimony that you were there at the apartment on February 9th, 2017; correct?

A. Yes, I was.

Q. And it's your testimony that you knew that Paul Brown was looking for drugs; correct?

A. I was aware, yes.

Q. And it's your testimony that you offered to sell Paul Brown six ounces of methamphetamine; correct?

A. I offered to trick him into believing I had six ounces of methamphetamine, when, in fact, I did not.

Q. And it is your testimony that after you offered to sell Paul Brown six ounces of methamphetamine, that you went down to look at the money that was located in the car; correct?

A. I did.

Q. And it is your testimony that after viewing the money in the vehicle, that you went and woke up Timothy Harper; correct?

A. I -- I did do that.

Q. Now, you have described that you had cocaine in your room;

correct?
A. Yes, sir.
Q. And that was approximately 16 ounces of cocaine?
A. Nowhere near 16 ounces. It was 16 grams.
Q. Sixteen grams of cocaine. My apologies.
MR. HORNOK: Your Honor, may I approach?
JUDGE SCHROEDER: Yes.
MR. HORNOK: The witness.
JUDGE SCHROEDER: Yes.
Q. (Mr. Hornok continued.) I've placed in front of you Exhibit No. 16. It's the first exhibit there. That is your cocaine; correct?
A. This right here is my cocaine, yes.
Q. Okay. Let me direct your attention to Exhibit No. 13, page 12. Do you see your cocaine in this picture?
A. I am not clear if I see it or not. I don't know if that's...
Q. You would agree with me -- well --
A. Kind of foggy of what it -- what is in that plastic bag.
Q. If you could, hold up Exhibit No. 16.
A. Yes.
Q. And there's a Ziploc bag contained in that; correct?
A. Yes, there is.
Q. And the trim -- the detail trim on that Ziploc bag is green; correct?
A. Yes.

Q. And that's consistent with the Ziploc bag that's on the left side of this picture; correct?
A. Yes.
Q. Now, let me direct your attention now to exhibit -- the next exhibit, which is the one without the cups. I believe that's Exhibit 15.
A. Yes.
Q. That's your methamphetamine; correct?
A. No, sir, this is not my methamphetamine.
Q. Tell me, how many grams are in six ounces?
A. I have no idea.
Q. How many grams are in an ounce?
A. Twenty-eight.
Q. And so if you were to multiply 28 by six, approximately how many grams would you get?
A. 168, I believe. I'm not a mathematician, but I think that's a rough ballpark.
Q. Now, you would agree with me that the exhibit that you're holding in your hand with the methamphetamine that's contained in a Ziploc bag with green detail; correct?
A. Yes, sir.
Q. And you would agree with me that the exhibit with the methamphetamine that you're holding in your hand is consistent with what is depicted on the right side of this image; correct?
A. I -- I don't know. It's upside down. I can't see the trim,

but I do see it's green. A little slice of green right there, yes.
Q. So it is -- what you're holding in your hand is consistent with what is depicted on the right side in this picture; correct?
A. I can't testify to that. I have no idea because it's upside down.
Q. Let me direct your attention now to Exhibit 17 which is the exhibit with the cups in it. And these are the cups with your fingerprints on them; correct?
A. I don't know if these are exact cups, but they look similar to the cups that are in the photos, yes.
Q. You've been in the courtroom during the entirety of the testimony, and you heard the forensic fingerprint examiner testify that your fingerprints were found on these cups; correct?
A. I heard her testify that this thumb and this finger were found on these cups. Also along with three unidentified fingerprints, yes.
Q. And you also heard the testimony establishing that those cups contained methamphetamine; correct?
A. Yes, I did.
Q. Let me direct your attention now --
MR. HORNOK: Let me -- you can take that off.
Q. (Mr. Hornok continued.) You knew McLemore and Harper were selling drugs to each other; correct?
A. I -- I don't know if they were or not, but I have heard Timothy Harper bragging about ripping the guy off.

Q. And you knew that McLemore and Harper had a falling out over a drug deal; correct?
A. Yes. I heard --
Q. And you purchased cocaine from Mr. McLemore. Isn't that correct?
A. No, sir, that is not correct.
Q. Let me direct your attention now to Exhibit No. 52, page 2, with the paragraph titled Jason McLemore. This is a letter that you wrote to me. Isn't that correct?
A. That is definitely a letter I wrote to you, yes.
Q. And in this letter you said, "All I know is Jason and Timothy were selling back and forth to each other, and they had a falling out because Tim gave him a bad kilo"; correct?
A. That is what I understood from Timothy Harper's bragging about he ripped a guy off so --
MR. HORNOK: Your Honor.
A. -- that's what I understood, yes.
MR. HORNOK: This is a yes or no question.
JUDGE SCHROEDER: Yes or no?
MR. HAYDEN: Yes.
Q. (Mr. Hornok continued.) And you also wrote at that time that "Jason and Tim were both" -- "were selling it to the same real estate agent. That's how he came across the apartment on Dickason, because Jason moved off of Harry Hines Boulevard, an uptown area, because I used him from time to time to supply my cocaine

addiction"; correct?
A. That is what I wrote, yes.
Q. And so when you testified just a minute ago that you never purchased cocaine from Mr. McLemore, you, in fact, were not correct.
A. I presented this story to y'all in the -- the -- the proffer, the plea agreement proffer, that I was agreed to cooperate with the government, and y'all deemed my story not accurate.
Q. So it is your testimony that you -- in writing this letter to the federal prosecutor, you were lying?
A. I was just trying to cooperate with the government. That's all.
Q. It is your testimony that in writing this letter to the Federal Prosecutor on your case, you were lying; correct?
A. Yeah, I was -- I was -- I was making up stories trying to get released, yes.
Q. Let me direct your attention now to Exhibit No. 52, page 2, which is the same page if we can just focus on the paragraph "My Dad's house."
And in that same letter, you said the following: "Agent Kelly showed up to my dad's house saying he had a warrant. I immediately called. I had nothing. I was clean. I was stopped several times from speeding. The tickets match all the dates after the bust. I never had any warrants, tickets in Miami Beach, Lacy Lakeview, Texas; Plano, Texas; Carrollton, Texas. I got scared and called an ex-police chief here in Texas. He was selling arms and ammo and was

operating an underground, all nudes men" -- "men's club in Farmers Branch. So I felt he was all right. He said he knew someone close to the investigation and would put ears on the case. Months went by with no mention of my name. Then I found out he was a sex offender, and the club he was running underground was underage nude guys. I hate sex offenders, so I told him to go F himself, and I stopped communicating." That's what you wrote; correct?

A. That is what I wrote, yes.

Q. Let me direct your attention now to page two -- or the Agent Kelly paragraph of that same page.

And in that same letter you wrote, "Agent Kelly. He called me saying I had a warrant, but nothing was coming up. My latest ticket was May 20th, 2017, Miami Beach. No warrants. I told him I had nothing of importance. He" -- isn't that what you wrote; correct?

A. Yes.

Q. Let me direct your attention now to the top of page 3. And you later wrote, "Already knew everything. I had no solid information on meth. I told him I had nothing to do with it. I only knew about the cocaine. I didn't have a warrant until Timothy told Agent Kelly I was in Fort Lauderdale jail"; correct?

A. Yes.

Q. And so in that you admitted that you, in fact, had possessed cocaine.

A. Yes. I have had --

Q. And in it you also lied about the fact that you had no

information about methamphetamine; correct?
A. No, I did not lie. I did not have any information --
Q. Let me direct your attention now to --
MR. VAN CLEEF: Objection, Your Honor.
JUDGE SCHROEDER: Hold on, Mr. Hornok. You have to let him finish his answer.
MR. HORNOK: It was -- yes, Your Honor.
JUDGE SCHROEDER: Were you finished with your answer?
MR. HAYDEN: No, sir, I was not.
JUDGE SCHROEDER: Go ahead.
A. I had nothing on meth. I don't know anybody that deals meth. I don't know any -- anything about the methamphetamine, so I had no information to tell him that he didn't already know.
Q. (Mr. Hornok continued.) Isn't it true that you just testified that you knew that Jason McLemore and Timothy Harper were selling methamphetamine to one another; correct?
A. Yes.
Q. Let me address your attention now to the cocaine paragraph of the same letter that you wrote.
Isn't it true in this paragraph that you described meeting somebody who showed you how to work the black market; correct?
A. Yeah.
Q. And isn't it true that in this you also described -- described buying a couple thousand dollars in coke; correct?
A. Yes, I did.

Q. Let me focus your attention on the bottom portion of this paragraph.

And isn't it true that you -- you met Gulf Cartel members who were in the process -- in the business of moving cocaine?

A. I'm sorry, but that -- that is not true. As you can see from Cartel de Golfo, it's not even spelled correctly.

Q. So it's your testimony that in writing this letter that you were lying to the federal prosecutor.

A. I've already said I was -- I've already said yes.

MR. HORNOK: Your Honor.

A. I've already said that I was trying to get out of jail. I've already said it.

JUDGE SCHROEDER: I'll let him explain that way.

Q. (Mr. Hornok continued.) So is it your testimony that in stating that you knew members of the Gulf Cartel and the Zetas Cartel -- well, you knew members of the Gulf Cartel, that you were, in fact, lying.

A. Yes.

Q. And were you also lying when you described going to a house where members of the Cartel were pressing cocaine into blocks?

A. Yes.

Q. But you were not lying when you described buying thousands of dollars worth of cocaine.

A. This is thousands of dollars worth of cocaine, sir.

Q. Were you lying when you described buying thousands of dollars

of cocaine?
A. No, sir.
Q. Let me direct your attention now to --
MR. HORNOK: Your Honor, at this time I move to admit Exhibit No. 53.
JUDGE SCHROEDER: Any objection?
MR. VAN CLEEF: No objection.
JUDGE SCHROEDER: It will be received.
(Government's Exhibit 53 was admitted.)
Q. (Mr. Hornok continued.) Let me direct your attention to page 1.
Do you recognize this as another letter that you wrote to the Federal Prosecutor in this case?
A. Yes.
Q. Let me direct your attention to the bottom paragraph.
Were you lying in this case when you described "The guy walks in and tells me he was there to see Tim"?
A. I'm -- I'm sorry, when I was writing this letter, I was under the influence of medication prescribed to me by a doctor at the jailhouse.
Q. So are the contents of this letter true or not true?
A. The contents of this letter don't make any sense. They don't even go with the videos.
Q. So is it your testimony that this -- the contents of this letter, as displayed right here, are true or not true?

A. They are not true, no.
Q. Let me direct your attention now to page 2. Let me direct your attention now to the middle -- the middle paragraph.
MR. HORNOK: I'm sorry, if we could back out. Down to the line starting "agreeable deal." It's in the bottom paragraph halfway through.
Q. (Mr. Hornok continued.) And isn't it true that you said "I'm also willing to cooperate with the government in bringing down this sex ring because I hate sex offenders, and bring down the cocaine suppliers that I will talk about at a later point in time"? Did you write that?
A. Where's that say that? "I'm also" -- yeah, I wrote that.
Q. And what information did you have to offer about a sex ring and sex offenders and cocaine suppliers?
A. I didn't have any information to offer. That's why y'all refused my proffer. That's why y'all refused to incorporate me into a cooperating individual deal.
Q. So it is your testimony that in writing this letter, that you were lying to the Federal Prosecutor?
A. It has some truth in there.
Q. These statements specifically about your willingness and ability to take down a sex ring, sex offenders, and cocaine suppliers, did you, in fact, have that ability, or did you not?
A. No, sir, I did not have that ability. I'm a stripper.
Q. Let me direct your attention now to Exhibit 54, page 1. And if

we could focus on the line starting with, "Both knew" -- or both know" and down to "next." It's towards the top.

Isn't it true in this letter that you said, "I have multiple witnesses who will testify" that you knew nothing and had nothing to do with what was going on?

A. Yes, I have multiple witnesses that are ready to testify.

Q. Are we going to hear from those witnesses today?

A. Possibly. I'd have to talk to my attorney.

Q. What kind of preparation have you engaged in, in order to call these witnesses?

A. I haven't prepared any witnesses. I don't need to call and prepare statements, and I don't have to -- I don't have to set my witnesses up, because they know what happened.

Q. What are the names of these witnesses who are prepared to come testify today?

A. My dad, Robert Hayden; and my brother which I've chose -- which who was there present who is in the video sitting on the floor. He's prepared to testify, but the same thing you're trying to do with me, you're trying to attack me and all this, you're going to do the same thing to him, and I will never let you do that.

Q. Isn't it true that in this letter you said, "Now I speak three languages, and I have some pretty good information, information that got me a bullet wound in the foot. Now, if me and you can have a little sit-down, I can bring forth a lot of information. With your power and my knowledge, we can shut down a lot of Cartel movement."

Did you write that?
A. I did write that.
Q. Was that a truth or a lie?
A. It's -- it's all bullshit.
Q. Let me direct your attention now to Exhibit 1, page 2151. If we could focus on the bottom two lines of text.
These are records from your Facebook; correct?
A. I don't know. It just appears --
Q. Well, isn't it true that on your Facebook you wrote the message, "Backpage.com, where all your dreams come true for a certain price"?
A. Yes, I -- yes, I did. That's a joke.
Q. Let me direct your -- do you know what backpage.com is known for?
A. Backpage.com is the same thing as -- when I was out, it was the same thing as Craig's List: Automobiles, relationships, houses.
Q. Isn't it true that backpage.com is known for the facilitation of prostitution?
A. I don't necessarily know that, but I know my roommate was involved in some weird stuff like that. But that's got nothing to do with me.
Q. Did you know that your roommate was using backpage.com to -- in order to find prostitution clients?
A. I was aware. He regularly bragged.
Q. Let me direct your attention now to page 2155. If we could

focus on the third line of text.

Isn't it true that another user in reference to your comment said, "LOL. And who taught me how to rob people off backpage? Thanks, Collin. LMAO."

A. That was a girl who's known for prostitution.

Q. And what did you teach her about robbing people off backpage?

A. Nothing. She was just trying to save face.

Q. So she was lying? Is that your testimony?

A. Yes, she was just trying to save face because she was getting put on public display in front of thousands of people.

Q. Let me direct your attention now to page 6092, the penultimate summary. It's the last -- second to the last one.

Isn't it true that on November 14th of 2016, you used your Facebook to say this: "You got any money saved? I'm fixing to go to Colorado trying to buy a pound, but I need people because you can only legally buy an ounce a day"?

A. Yes, sir, I did say that. Would you like me to explain, or is it just one sided?

Q. In that case you were attempting to purchase a pound of marijuana; correct?

A. I was toying with the idea, but I never went through with it.

Q. Marijuana is what you were speaking about in this specific text; correct?

A. Yes. I was toying with the idea.

Q. Let me direct your attention now to page 7263. You sent a

photo via Facebook on -- in April of 2017; correct?
A. I have -- I have no idea. It's just a bunch of numbers and letters and...
Q. This Facebook record indicates that you, Collin Hayden, sent on February -- or on April 4th of 2017, a photo; correct?
A. I don't know. That's what it says, but I don't know what it is.
Q. Let me direct your attention now to page 7264.
What is depicted in the syringe in this photo?
A. That would be steroids.
Q. Let me direct your attention now to page 7266. Is this you depicted in this image?
A. Yes, that was right after a shot, yes.
Q. And in the comment below, there is a reference to tren. What is "trend"?
A. Tren is Trenbolone Acetate, which is pretty much the high -- the maximum bulking steroid out there. It's the most powerful on the market.
Q. Is it legal to use this kind of steroid without a prescription?
A. It is illegal.
Q. Let me direct your attention now to page 7267. Let me direct your attention to the top.
Isn't it true that you were taking four milliliter shots of steroids every other day at that time?
A. Yes, it was true.

Q. Let me direct your attention now to Exhibit 1, page 7263.
MR. HORNOK: Let's go to the next page.
Q. (Mr. Hornok continued.) Let me direct your attention now to Exhibit 8, page 57. Isn't it true that on April 9th, 2017, you sent -- you took this picture, and you sent that message described there in red?
A. I did do that, but, I mean, who can blame me? I'm angry. I'm aggravated.
Q. So it is your testimony that the chain link fence that's depicted in that image is the chain link fence tattoo on your shoulder.
A. Yes.
Q. And is it your testimony that at that time you were, in fact, holding the device that sent that image?
A. Yes.
Q. Let me direct your attention now to Exhibit 1, page 7270.
Isn't it true that on this date you sent a video which you described as your porn shoot?
A. Yes, but I would not like that video to be played because of the safety of the female.
Q. Let me direct your attention now to the last full comment.
Isn't it true that in April -- on April 18th, 2017, you said, "Moving to Miami"?
A. Yeah, I guess.
Q. So isn't it true that, in fact, you didn't move to Miami until

April 2017, it was not February of 2017?
A. No, I never said I moved to Miami in February 2017. I said I moved shortly after the bust, which was in -- somewhere in March.
Q. Isn't it true that based on this comment, you moved to Miami in April of 2017, not March of 2017?
A. You know, that -- that is not true because you're sitting here trying to show it one sidedly when it's a conversation saying, yeah, I'm moving to Miami.
Q. Let me direct your attention --
A. You're taking it out of context.
Q. Sorry. Do you have anything more you want to say?
A. No.
Q. Let me direct your attention now to page 1460 -- or 79. The fifth summary.
Isn't it true that you wrote the quoted text displayed here on your Facebook on April 3rd, 2017?
A. Yes, but I don't know what it pertains to.
Q. Let me direct your attention now to page 1579. Again, the fifth summary.
MR. HORNOK: Can you back out? I just want a little bit -- there we go.
Q. (Mr. Hornok continued.) Do you see the comment made on January 6th, 2017?
A. I do, but, once again, you're only showing one side of things. You're not showing what the other party sent. I was being sent

pictures of guns and threatening me. Of course I'm going to threaten somebody back. You're taking everything out of context.
Q. So it's your testimony that you were threatening to kill somebody in this -- in this comment?
A. I was responding to their comment of threatening to kill me. They sent me pictures of guns. And you're -- you're only showing one-sided stories.
Q. And it's your testimony that in response to the threat that you testified that you received, that you returned with a threat to kill them.
A. Of course.
Q. And isn't it true that in this you describe yourself as a gangster with a rap sheet?
A. I don't know if I was referring to myself as a gangster with a rap shit.
Q. And isn't it true that in responding to this, the reason you sent this threat is because the other person was saying something you didn't like?
A. No, I just -- I just told you what he said. They were sending me pictures of guns. This was a person that stole from me. This was a person that was sending -- and then threatening me with bodily harm and threatened me that they were going to jump me with their brothers and all that. And I just responded, "Hey, man." I don't have a rap sheet with violent charges. I have felony possession of stolen things."

Q. Do you have any other convictions besides that one instance that you're describing?
A. I do. I don't have any other felony convictions, no.
Q. Let me direct your attention now to page 1586. And if we could focus on the top four groups of information.
Please read these comments. As to the first comment, isn't it true that this is what you wrote on Facebook on January 4th, 2017?
A. Yes, but once again, you're showing all one-sided issues. You're just showing my responses. You're not showing the court. You're not showing the people what really took place.
Q. Did you have access to these Facebook records?
A. No, I do not. I'm in jail.
Q. Was your attorney provided a copy of these records months ago?
A. I have no idea.
Q. Please read the second -- the second phrase starting with "I'll beat."
Isn't it true that you wrote that statement on Facebook on January 4th, 2017?
A. Yes, after he threatened me to jump me with his brothers.
Q. And I want you to read the last comment, please.
MR. VAN CLEEF: Your Honor, I'm going -- I'm going to object. Just having him read out -- read things out loud is not an appropriate question.
JUDGE SCHROEDER: Yeah. I'm --
MR. HAYDEN: I'm not a puppet.

JUDGE SCHROEDER: Can we move it along a little, Mr. Hornok?
Q. (Mr. Hornok continued.) Let me direct your attention now to Exhibit 8. If we could go to page 3. This is your Facebook information; correct?
A. Yes.
Q. Page -- next page. This is a picture that you uploaded to your Facebook; correct?
A. Yes.
Q. Next page. This is a picture of you on your Facebook account; correct?
A. Yes.
Q. Page 7, please. And this is a phrase that you wrote on your Facebook; correct?
A. Yes, I did.
Q. In addition to uploading that picture; correct?
A. Yes.
Q. And, in fact, in that picture you're wearing your watch on your right hand?
A. I don't know if it's my watch. It could have been somebody else's.
Q. In fact --
A. It is --
Q. -- weren't you wearing a watch on your right hand in that picture?

A. Yeah, I was wearing a watch on my right hand.
Q. Let me direct your attention now to page 11. This is the information for your Justin Givenchy page; correct?
A. Yes.
Q. Next page, please. And this is you --- a picture of you in that -- or that you uploaded to that account; correct?
A. Yes.
Q. Page 26, please. This is a picture that you uploaded of yourself and Timothy Harper; correct?
A. Yes. It's unclear. It's some club that we were at. I don't -- no idea. Some women in the background. I don't know.
Q. Page 41, please. This is your phone number calling Paul Brown on February 9th, 2017; correct?
A. Yes.
Q. Page 46, please. We've seen this videos played. That's Timothy Harper's hand in that video; correct?
A. I don't know what Timothy Harper's hand, but everybody has testified that it was his hand. I guess, yeah.
Q. Page --
A. It's his -- it's his video. It came from him.
Q. And you uploaded it to your Facebook; correct?
A. Yes.
Q. Page 49, please. On this date you said that "crystal meth keeps you shredded"; correct?
A. Once again, yes, but you've tooken it out of context. This was

a Meme with the words on a funny picture that my friend sent me.
Q. Would you like for me to provide the entire context of your conversation with Jamie Knighten to this jury?
A. I don't know. Probably not. I don't know.
Q. I'm going to move on. Let me direct your attention now to page 52. You wrote this message to Reva Dena on April 5th, 2017; correct?
A. Yes, I did.
Q. And in this message when you said, "Tim," you were referencing Timothy Harper; correct?
A. Yes, I was.
Q. And you offered to pay $2,000 to find Timothy Harper; correct?
A. Yes, sir, to find Timothy Harper.
Q. And in this message you also said that you had to, quote, Get rid of him; correct?
A. Yes, I did.
Q. Let me direct your attention to page 54. And on April 6th, 2017, you offered $2,000 to Christine Caldwell for the location of Timothy Harper; correct?
A. Yes, on multiple occasions I've did this.
Q. Page 55, please. On April -- or on April 8th, 2017, you posted a message saying you were offering $2,000 cash for the location of Christine Caldwell and Timothy Harper; correct?
A. Once again, yes, for the location.
Q. And you also posted this Meme that is pictured here; correct?

A. Yes. Ice Cube saying, "I can't stand a fucking snitch."
Q. Next page, please. Now, on April 9th, 2017, you wrote this message to Timothy Harper; correct?
A. I did. And every day of my life the hate grows in my heart for a crime I did not commit. The hate grows in my heart every single day I have to sit in here and -- because of somebody else. So, of course, I was mad. Of course I might have wanted to fight the guy, but I never said, "Oh, yeah, I'm gonna to kill you." I never went into any kind of details, "I'm going to go send somebody after you." I never did none of that. I just wanted him to know that, "Hey, man, you betrayed me. You weren't man enough to take your charge, and now I have to pay for your consequences."
Q. What did you expect to do if you found Timothy Harper?
A. Really, nothing at the time. I just wanted him to know what I thought about him, what I thought about the whole situation, what I thought about him ruining my life.
Q. In fact, haven't we heard in the jail call we've heard numerous times during this trial that you intended to get Timothy Harper's, quote, wig split?
A. Yeah.
Q. And isn't it true that you have described your intention to spread information about Timothy Harper to other gang members so that retribution could be paid?
A. I did say that, but who can blame me? I've been in here three years for a crime I did not commit. A crime that's corrupted and

influenced by law enforcement officials, influenced. People have -- have lied on this stand time and time again. And it's all at y'all's direction. All y'all's statements y'all prepared for these people, the jury sees that. It's not fair, man.

There's a camera right there in the corner of this courtroom, and it's facing right there in the center section. And you know who was sitting in the center section today? Law enforcement officials that were shaking their head yes and no, trying to influence Agent Daniel Kelly's testimony. And it's right there on camera. This is insane. This is insane at the lengths that y'all will go to, to ruin somebody's life because they wouldn't cooperate for y'all.

MR. HORNOK: No further questions, Your Honor.

JUDGE SCHROEDER: Anything, Mr. Van Cleef?

MR. VAN CLEEF: Your Honor, can we have a moment for the witness to gather himself?

JUDGE SCHROEDER: Of course. Yes.

MR. VAN CLEEF: And see if he needs any advice at this point.

JUDGE SCHROEDER: Sure. That's fine.

MR. VAN CLEEF: And we probably ought to do that outside the presence of the jury.

JUDGE SCHROEDER: That's fine. Ladies and gentlemen of the jury, let's take a short recess.

(Jury leaves)

JUDGE SCHROEDER: Okay. Be seated.

MR. VAN CLEEF: May I approach the witness?

JUDGE SCHROEDER: Yes. Of course. Yes.

(Jury seated.)

JUDGE SCHROEDER: Please be seated. Mr. Van Cleef.

MR. VAN CLEEF: Mr. Hayden, do you have any more statements to make to the jury? If so, you can do so now.

MR. HAYDEN: I do.

STATEMENT BY MR. HAYDEN

MR. HAYDEN: So there was cocaine and methamphetamine found in my room. I've admitted to this. This is mine. And what he's trying to hit at, the prosecutor, what he's trying to hit at is the type of bag that's used. He wants y'all to see that it's a green top right here. This is what he's trying to point out, this green top. He's trying to make the connection to this bag to this bag. But they're two separate bags. A bag that my fingerprints were not found on. A bag that looks nothing like this.

I don't have to prepare no witnesses. I don't have to have secret multiple meetings with witnesses. I don't have to do none of that. I don't have to have law enforcement officers sitting in the background nodding their head yes or no whenever they want you to say a certain thing. And it's all on camera. And I do want those -- I do want that camera feed. I do want that.

All these messages he's showing y'all, everything

that he's trying to do, he's trying to manipulate every single one of you because he's showing everything that's one sided. I threatened this person, I did this, I did that. But he's not going to show you what the other person said. He's -- like I said in the beginning, they are going to make me look like the biggest and baddest person in the world. The worst charge I have is illegal possession of stolen things.

I mean, this -- this is insane, man, at the lengths that these people will go to. Do you -- do you know -- let me -- let me -- let me explain something.

Jason McLemore got on this stand, and he said he was delivering two to four kilos a day of methamphetamine. A day. You know how much drugs that is? That is -- that is -- that is numerous. That -- I can't even begin to fathom how -- how -- how much that is. And you know how many years in prison he got? The dude got 13 and a half years in prison. My roommate sat up here, and he said on stand that he distributed kilos and kilos. He even signed the deal that he distributed kilos and kilos of methamphetamine. You know how much time he got? Fifteen and a half years. You know how much time they want me to do?

MR. HORNOK: Objection, Your Honor. Punishment is not relevant to the case before the jury.

JUDGE SCHROEDER: Yeah.

MR. VAN CLEEF: That's correct, Your Honor. He's aware of that.

JUDGE SCHROEDER: Mr. Van Cleef will give you advice --

MR. HAYDEN: I'm sorry.

JUDGE SCHROEDER: -- but I will instruct you that's not an issue the jury will need to consider.

MR. HAYDEN: Yeah, I didn't know. I'm not a lawyer.

JUDGE SCHROEDER: That's fine.

MR. HAYDEN: Well, can I rephrase that?

JUDGE SCHROEDER: You can rephrase it as long as you don't talk about what the -- the sentences are that the government potentially could seek or what penalty to do.

MR. HAYDEN: So I can't tell them what they offered me?

JUDGE SCHROEDER: I think -- yes, you can testify about that.

MR. HAYDEN: Okay. These guys, Jason McLemore, 13 and a half years; Timothy Harper, 15 and a half. You know how much time they offered me? These guys offered me 30 years. Thirty years for some drugs I never even seen. That whole stack over there. Jorge Martinez, don't even know. Never seen a gun in my life. I have never touched any of nothing -- anything of that. And they offered me 30

years, and nobody else got these charges. Nobody else got any -- pled guilty to any of those drugs. Nobody but me. I'm the one that has to -- apparently that's all mine. Everything here is all mine. The guns, everything.

These people go through great lengths to bury you in the system, because you won't cooperate for them? Because I refused to cooperate. Because I refused to be less than a human being and cooperate and ruin somebody else's life by sitting up here and trying to pretend like I know something about that person and trying to pretend like I can lie about that person? I -- I can't. I can't do it. I can't do it, man, and I refuse to cooperate for them. And this is what I get for refusing.

You've see -- you've seen the plea agreements that -- that my -- nobody's charged with cocaine. Nobody's charged with any guns. Nobody's charged with any of that over there. But because I refuse to cooperate, they retaliate against me. This is -- this is -- this is what I get for not cooperating.

That's -- that's all I wanted everybody to know.

MR. HORNOK: Your Honor, may we approach?

JUDGE SCHROEDER: Yes.

(Bench Conference)

MR. HORNOK: Your Honor, he's mischaracterized his criminal history, saying that the worst thing he has is a

felony possession of stolen things.

JUDGE SCHROEDER: Okay.

MR. HORNOK: In fact, I have certified criminal conviction documents of things that include misdemeanor carnal knowledge of a juvenile, tattooing a minor, and other things of that nature. I believe that the jury's entitled to know these things.

MR. VAN CLEEF: Your Honor, the worst thing, I think, is the highest level felony, and he's just mentioned some misdemeanors.

JUDGE SCHROEDER: Those are misdemeanors, aren't they?

MR. HORNOK: They are mis --

JUDGE SCHROEDER: I mean, they're awfully -- I mean, they have -- you know, highly egregious sort of titles, but I'm not sure that as a -- as a level of punishment they're necessary -- necessarily as serious.

MR. HORNOK: If that were the statement he had made, sure.

JUDGE SCHROEDER: Tell me what statement he's made.

MR. HORNOK: What he said is the worst thing I have -- the worst conviction I have is felony possession of stolen things. He didn't say the most serious, the most --

JUDGE SCHROEDER: I'm going -- I'm going to let you see if that door gets opened a little bit. If he -- if you

can ask him what he meant by that, if he gives you an answer that you think opens the door, we'll go there.

How's that sound, Mr. Van Cleef? I mean, I don't --

MR. VAN CLEEF: That sounds terrible to me, Judge. I think he said the -- I don't recall the precise question, but "what is the worst thing I've been" -- "the worst thing I've been convicted of."

JUDGE SCHROEDER: Right.

MR. VAN CLEEF: The normal understanding of that would be the highest level felony.

JUDGE SCHROEDER: Mr. Van Cleef, he's testifying to all kinds of things here this afternoon. There was not a single objection to any of the discussion of his criminal history. I think if this had come up on direct, you know, perhaps you would have objected then, but I -- I mean, there were very serious things that were -- that were discussed, and there were no objections to it.

So, no, I'm not -- if you think -- I mean, just tell me why you -- where's the prejudice here because --

MR. VAN CLEEF: Well, these would not otherwise be admissible, and we are not on the border with Louisiana, but already the offenses that he's convicted of have names that are odd to me, but these are extremely odd. And the way that they're worded are as outside to the misdemeanor characterization of a misdemeanor level of what they are.

JUDGE SCHROEDER: So, Mr. Hornok, I'm going to give you just a very, very little bit of latitude, and if you can ask him to clarify or explain what he means by the worst convictions. And if that door gets opened, I'll let you use some of that. But it will need to be very, very brief.

MR. VAN CLEEF: Your Honor, will I -- will I be able to advise him -- or speak with him prior to that questioning?

JUDGE SCHROEDER: Sure, but I'm not going to -- I mean, I -- I hesitate to take the jury out again to do that.

MR. VAN CLEEF: No, no, no, I won't ask for that, but Jonathan needs to be aware I'm going to go tell him that if he -- I mean, it's really this line of questioning. I don't want to make you look bad.

MR. HORNOK: Donnie's made a point, and I think he's right, the door's either open or it's not.

JUDGE SCHROEDER: I don't think that's a door -- I think that's --

MR. VAN CLEEF: I will not go opening doors.

JUDGE SCHROEDER: Let me think about that just a minute.

MR. HORNOK: Yes, sir.

JUDGE SCHROEDER: Well, I guess what I was saying, I

think that probably is right, it's either open or it's not. What I'm saying is I can't tell -- based on what you gentlemen are telling me at the bench here whether it was, in fact, opened or not. So I've heard slightly different things, and I was thinking that that opportunity to sort of inquire into it would give us an opportunity to see whether it was or not, but I think that's probably right.

MR. CARTER: Yes, and if Your Honor isn't confident the door has been opened, then I think it's just an avenue best not traveled.

JUDGE SCHROEDER: Yeah, I'm not convinced it has, so let's -- let's don't do that. I think you've got other things you can raise.

MR. HORNOK: Thank you, Your Honor.

(Bench Conference Ends)

MR. HAYDEN: Your Honor, can I please refer to my attorney before he starts?

JUDGE SCHROEDER: Yes, of course.

(Mr. Van Cleef speaks with the witness.)

MR. VAN CLEEF: Thank you, Your Honor.

JUDGE SCHROEDER: Yes. Mr. Hornok.

MR. HORNOK: Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. HORNOK:

Q. Isn't it true, Mr. Hayden, in October, specifically October

29th of 2018, you were offered a plea agreement by the government that would have allowed you to plea on terms more favorable than Mr. McLemore in this case?
A. On what date?
Q. In October of 2018, isn't it true that the government offered you a plea agreement that was more favorable than the agreement with -- under which Mr. McLemore pled guilty?
A. I do not recall.
Q. You recall receiving a plea agreement in October of 2018, don't you?
A. No, I do not. I'm sorry, that was -- that was two something years ago. I don't know.
Q. You, in fact, recall receiving plea offers in this case; correct?
A. I've received like four or five.
Q. And you remember that those early plea offers were, in fact, more beneficial than later plea offers; correct?
A. I remember -- I don't remember the specifics of the first deal that you offered, but --
Q. Well, let me -- let me refresh your recollection.
Isn't it true that on that date a plea agreement was offered to you in which you would have to stipulate that you were personally responsible for the distribution of at least 500 grams but less than 1.5 kilograms of actual methamphetamine; therefore, that your base offense level would be 34, which is the exact same base offense

level as what Mr. McLemore pled guilty to; correct?
A. In my defense --
MR. HORNOK: Your Honor, it's a yes or no question.
MR. VAN CLEEF: No -- objection, Your Honor. The question was "let me refresh your recollection," and then he read part of the --
MR. HAYDEN: And --
JUDGE SCHROEDER: Okay. Hold on just a second.
MR. HAYDEN: Okay.
JUDGE SCHROEDER: How about you rephrase your question, and we'll see where we are. And let me instruct the witness. If it's a yes or no question, if you can answer it yes or no, please do so.
MR. HAYDEN: Okay.
JUDGE SCHROEDER: If you can't, just say "I can't."
MR. HAYDEN: Okay.
JUDGE SCHROEDER: And I'll give you an opportunity to explain it at a later time. But while in cross --
MR. HAYDEN: Okay.
JUDGE SCHROEDER: -- if you can answer it yes or no, do that. And if you say -- if you can't, just say, "I can't answer with a yes or no."
MR. HAYDEN: Okay.
Q. (Mr. Hornok continued.) Isn't it true that on that date you were offered a plea agreement in which the base offense level would

have been 34, which is the exact same base offense level as which Mr. McLemore pled guilty?
A. I -- I cannot answer in a yes or no.
Q. Would you disagree with me if I told you that you were offered a plea agreement on that date which provided the same base offense level as Mr. McLemore?
A. I was --
MR. VAN CLEEF: Objection.
JUDGE SCHROEDER: I'm going to -- on the basis of his answer, I'm going to give him some latitude.
MR. VAN CLEEF: All right, Your Honor.
MR. HAYDEN: I was offered a plea agreement for me to plea to --
MR. HORNOK: Your Honor, it is --
MR. HAYDEN: -- some drugs that I was not prepared to plead guilty to because it wasn't my drugs.
MR. HORNOK: Your Honor, it was a yes or no question.
JUDGE SCHROEDER: Well --
MR. HORNOK: Is --
JUDGE SCHROEDER: Show it to him if you want to.
MR. HORNOK: All right.
MR. HAYDEN: Yeah, please show me because I -- I have no recollection.
MR. HORNOK: Let's move on.
Q. (Mr. Hornok continued.) Isn't it true that in that -- in that

agreement that you were offered, that the United States would have agreed to recommend that the defendant's sentence not exceed the low end of the applicable sentencing guideline range?
A. No, sir. I don't recall.
Q. You wouldn't disagree with me if I told you that that was, in fact, the case in October of 2018.
A. I do remember receiving a deal from my attorney, but he said "You have to have it in by the next day, or he's going to take it off the table. If you do not -- if you do not plea out today, he's going to take it off the table, and you do not have any time to review the facts."
Q. So it's your testimony that you did, in fact, receive a plea offer that was more beneficial than the one that you've described?
A. It was -- it was more beneficial than the one that I described, the 30 years that you offered me, yes.
Q. It was less than 30 years; correct?
A. It was less than 30 years.
Q. In fact, it was much less than 30 years; correct?
A. Yes, it was.
Q. And so in offering to the -- offering to cooperate with the government, you've -- it's your testimony that you were not found credible; correct?
A. That's what you deemed.
Q. And it is your testimony that, in fact, you were lying to the Federal Prosecutor in numerous occasions over the course of your --

the pendency of this case; correct?
A. No. I didn't lie numerous occasions. I lied a few times, yeah, but only -- only in the letters that I sent to you, lied.
Q. So isn't it your testimony that you lied on multiple instances in the letters that you wrote throughout the course of this pending proceeding; correct?
A. Yes.
Q. And your lie -- you lied in those letters just like you're lying on the stand today; correct?
A. No. You and I both know that's not correct.

MR. HORNOK: No further questions, Your Honor.

MR. VAN CLEEF: Is that all you have to say, Mr. Hayden?

MR. HAYDEN: You know, I -- no. No. No. I want to keep going.

MR. VAN CLEEF: All right. Your Honor, with the Court's permission --

JUDGE SCHROEDER: Okay. You can give him --

MR. VAN CLEEF: -- he'd like to address the jury some more.

JUDGE SCHROEDER: -- a brief -- brief response if you want.

MR. HAYDEN: I'm going to give a brief response about these deals that I was offered.

STATEMENT BY MR. HAYDEN

MR. HAYDEN: So I was offered a deal. The first deal I was offered, I do not recall what it was. The first deal that I was offered, you offered me one day to accept that deal, so I didn't have time to review the facts of the case. And then I denied that deal, and you got mad. And you got mad. You know what the next deal was? Are you aware of the next deal? The next deal was 140 something months, 150 something months. I refused that deal, too, because you went up.

And you want to know what happened after that? You got mad again, and you went up again. Then it was 200 something months. That's 20 years. I refused that offer, and you went up again. You went up again from 210 months to 360 months because I refused your deal. Because I -- I stuck to my innocence.

That's all. That's all, Your Honor.

JUDGE SCHROEDER: All right. Mr. Hornok, anything more?

MR. HAYDEN: Your Honor, I want to be completely honest. I can't go on with this anymore.

JUDGE SCHROEDER: Hold -- hold tight just a minute.

MR. HAYDEN: This is --

JUDGE SCHROEDER: Mr. Hornok, anything more you have?

MR. HORNOK: Your Honor, may I approach?

JUDGE SCHROEDER: Yes.

(Bench Conference)

MR. HORNOK: Your Honor, he's described how his plea agreements got worse and worse over the course of the proceedings.

JUDGE SCHROEDER: Yes.

MR. HORNOK: One of the reasons that the plea agreements got worse is because he had a prohibited weapon in prison.

JUDGE SCHROEDER: Right.

MR. HORNOK: And I think --

JUDGE SCHROEDER: The jury's heard it.

MR. HORNOK: -- I think it opens the door for why -- why the plea agreements got worse.

JUDGE SCHROEDER: Well, I mean, I hate to go down this road, but I do think the door has gotten opened a little bit on this, and the jury's already heard him plead guilty to it.

MR. VAN CLEEF: Your Honor, the pleas -- the plea offers to him did not include -- I mean, did not include a plea to -- none of them -- I've only been here for one, but the last one was the day of the superseding indictment which included that new charge, and he would not have been pleading to the prohibitive weapon.

JUDGE SCHROEDER: Right.

MR. VAN CLEEF: That was not really part of the plea.

That was -- he was still pleading to the conspiracy. He's correct. The offer was to plead every time to the conspiracy, and the offer went up each time. It didn't go up because of the additional charges, that I know of, it just went up because he hadn't changed.

MR. HORNOK: The last offer was the -- what we tried to enter with him was a 911(c)1(c) range. The reason we had to do a range as opposed to what we typically do in a guideline sentence is specifically because he had engaged in that conduct, but we did not believe on the basis of that conduct he would receive acceptance of responsibility, even if we had stipulated to it, and that is specifically -- that was the specific reason we engaged in that specific kind of plea offer and negotiation, and that's a plea agreement that he rejected.

MR. VAN CLEEF: Well, I don't know that he would know that. I mean, I don't -- I'm going to make this real quick, Your Honor.

JUDGE SCHROEDER: Go ahead.

MR. VAN CLEEF: I take your word for it, but I don't even know that, Your Honor. These are --

JUDGE SCHROEDER: Yes.

MR. VAN CLEEF: -- internal machinations --

JUDGE SCHROEDER: Right.

MR. VAN CLEEF: -- of the -- the U.S. Attorney's

office.

JUDGE SCHROEDER: Yeah. So how -- I mean, how's he going to have knowledge of that, Jonathan?

MR. CARTER: Your Honor, if I may, the evidence he has proffered for the jury that the United States has somehow acted in a vindictive manner, and I think the jury would be entitled to hear about his behavior and what -- he's attacked --

JUDGE SCHROEDER: I understand that, but he's --

MR. VAN CLEEF: So I think he can plea --

JUDGE SCHROEDER: But -- I understand that, but he doesn't have any -- I mean, if his lawyer doesn't know it, how's he going to know it? And so what's the -- what's his knowledge here? What's -- I mean, permitting Mr. Hornok to ask him questions that we know the witness doesn't know the answer to.

MR. CARTER: Well, I think -- I think we should be able to get to the underlying facts of the prohibited weapon.

MR. HORNOK: Which occurred -- which he knew occurred, his lawyer knew occurred, and I knew occurred was long before that plea -- plea agreement.

MR. CARTER: It was negotiated.

MR. VAN CLEEF: He still wouldn't know the reasons that -- that they are going up.

MR. CARTER: But the jury's entitled to know the real reasons.

MR. HORNOK: And he has -- he has alleged the reason was that I am a vindictive prosecutor.

JUDGE SCHROEDER: He quite clearly did that.

MR. VAN CLEEF: He did. And that's what anyone would say if the offer goes up, regardless of whether -- the charges.

JUDGE SCHROEDER: But they did have other charges. That's the thing.

MR. VAN CLEEF: But they did, but he wasn't being asked to plead to them.

JUDGE SCHROEDER: Yeah, but, I mean, it's like -- I mean, I understand the argument, but a lot of times, you know -- I mean, all of these cases I see where, you know, there's seven counts in the beginning, and he pleads guilty to one count. So -- and it's all part of the same --

MR. VAN CLEEF: Sure.

JUDGE SCHROEDER: -- negotiation. So --

MR. VAN CLEEF: The -- the additional count was -- became count 1 was added the day that we were supposed -- we had the plea deal.

JUDGE SCHROEDER: Right. And so help me understand why that matters.

MR. VAN CLEEF: Because he -- it was the day that he

was coming to plea. The plea agreement was the day he was arraigned on the superseding indictment. He would have no idea why the offer went up because the superseding indictment was done in the initial appearances that day.

JUDGE SCHROEDER: But the offer went up after that, did it not?

MR. VAN CLEEF: No. That was the last offer.

MR. HORNOK: After the act it went it up.

MR. CARTER: After the act it went up.

MR. VAN CLEEF: After the act, but not after the new indictment.

JUDGE SCHROEDER: Yeah.

MR. VAN CLEEF: The new charge.

JUDGE SCHROEDER: Right.

MR. HORNOK: And it went up. It went up after the act on the basis of the act, and we totally retooled the way that plea agreement was structured because of the act.

JUDGE SCHROEDER: Okay. And you weren't involved in that?

MR. HORNOK: Be was.

MR. VAN CLEEF: Which part?

MR. HORNOK: The last plea agreement when we did the 11(c)1(c).

JUDGE SCHROEDER: I mean, you don't recall any discussions about that?

MR. VAN CLEEF: I mean, I remember that they superseded the indictment and added that charge, and I know why they did it.

MR. HORNOK: But you -- we -- that last plea agreement, the one that he didn't plead guilty to --

JUDGE SCHROEDER: Yeah.

MR. HORNOK: -- it was an 11(c)1(c) to a range. And you remember having discussions with me that the reason we engaged in that range is because we did not believe that if we had stipulations with respect to acceptance of responsibility, that he would actually get the benefit of that acceptance of responsibility because he'd had the weapon in jail.

MR. VAN CLEEF: I did -- there's two conversations there. First, yes, I was concerned about him not getting acceptance of responsibility. That's three points. But the range that was offered, and he's got it wrong, it wasn't 360 months, it was 210 to 327 months, which is about 120 months difference. That's not explained by 327 to responsibility.

JUDGE SCHROEDER: I agree with that.

MR. VAN CLEEF: Additional time.

JUDGE SCHROEDER: I agree with that.

MR. HORNOK: But what is explained by the -- the additional time in the more flex favorable plea agreement

is the fact that the guy had a weapon in prison, in jail.

JUDGE SCHROEDER: All right. Here's the deal.

MR. VAN CLEEF: Yes, sir.

JUDGE SCHROEDER: None of this came up until your client got up on the stand and brought it out, and I am somewhat unsure about the decision I made to let him go into it. As I understand that plea agreements, offers that are made are certainly inadmissible, certainly by the government, but not necessarily inadmissible by the defendant. He -- he opened the door on this. All right?

Jonathan, I'm going to give you a little bit of latitude on this. Let's try to do it in two or three questions and get this jury upstairs.

MR. HORNOK: Fair enough.

MR. VAN CLEEF: That's why I had my book out.

(Bench Conference Ends)

MR. HAYDEN: Your Honor?

JUDGE SCHROEDER: Yes, sir.

MR. HAYDEN: Do they have anymore questions? Because --

JUDGE SCHROEDER: Yes, they've got just a couple of other questions to follow up on some information that you brought up.

MR. HAYDEN: Okay. Because I -- I honestly -- I don't -- I don't feel like sitting here quibbling with

these guys --

JUDGE SCHROEDER: I appreciate that.

MR. HAYDEN: -- for too much longer, you know.

JUDGE SCHROEDER: I think it will be relatively -- it will be relatively short.

MR. HAYDEN: All right. Thank you.

RECROSS-EXAMINATION

BY MR. HORNOK:

Q. Isn't it true that on December 26th, 2019, you were an inmate at the Titus County Jail?

MR. HAYDEN: Your Honor, I don't want to go through with these guys anymore. I can't -- I can't -- I've been through -- I've been through enough.

JUDGE SCHROEDER: Well, you know, one of the -- the -- we had this discussion.

MR. HAYDEN: Yeah.

JUDGE SCHROEDER: -- Mr. Hayden, earlier, that if you were going to testify, you would be subjecting yourself to cross-examination by the government.

MR. HAYDEN: Yeah. Yeah, yeah, I understand, but --

JUDGE SCHROEDER: Right. And so that's where we are. And we've had a discussion at the bench over here. I've had an opportunity to visit with Mr. Hornok and Mr. Van Cleef on your behalf about a series of just a few questions to follow up on some information that you brought up. So I

think it's fair that they are able to --

MR. HAYDEN: Yeah, I understand, but they're just trying to smear me even further.

MR. HORNOK: Objection, Your Honor.

JUDGE SCHROEDER: Just -- just do your best to answer the questions.

Q. (Mr. Hornok continued.) Isn't it true that on December 26th, 2019, you were an inmate at the Titus County Jail?

A. Yes.

Q. And isn't true that on that date while you were in the separation cell, you armored yourself up, and you got ready for a fight?

A. Yes.

Q. And isn't it true that while -- when you armored yourself up, you were wielding a bolt that looked like this?

A. Yes. I've already pled guilty to that, sir.

Q. Yes. And isn't it true that on that date you threatened to kill any officer who came into the cell to get you?

A. Yes.

Q. And that's why you pleaded guilty, isn't it?

A. That's -- they's why I pleaded guilty because it was a charge that I was, in fact, guilty of.

Q. And I --

A. The contraband. I was, in fact, guilty of contraband. I wasn't guilty of all this other stuff. That's why I have not pled

guilty to none of this.
Q. And after that date, your plea agreement got substantially less beneficial to you. Isn't that correct?
A. No, sir, that is not correct.
MR. HORNOK: No further questions, Your Honor.
JUDGE SCHROEDER: Anything you want to add?
MR. HAYDEN: No, I --
JUDGE SCHROEDER: Mr. Van Cleef, anything going on?
MR. HAYDEN: I'm tired, man. I'm tired.
JUDGE SCHROEDER: You may step down.
MR. VAN CLEEF: Your Honor.
JUDGE SCHROEDER: Oh, I'm sorry.
Ladies and gentlemen of the jury, we'll take a short recess. Okay.
(Jury recessed.)
JUDGE SCHROEDER: All right. Thank you. Thank you, Mr. Van Cleef. I appreciate your catching me there.
MR. VAN CLEEF: You're welcome.
JUDGE SCHROEDER: So we have the instructions. We'll circulate those to you, as well as the verdict forms. I think there was a -- there was a question that dealt with impeachment by evidence of untruthful character. I didn't hear anything come up in any of that, that sort of raised that, so we did not include that.
The parties have any objection to that, speak up now.

MR. HORNOK: No objection, Your Honor.

MR. VAN CLEEF: No, Your Honor.

JUDGE SCHROEDER: And then on the -- I've taken a look. We've discussed a way to include the phrase "within the Eastern District of Texas" on the verdict form itself. There's no way to do that in a way that really makes sense, and having reviewed the instructions, particularly on venue, and the instructions on the individual counts, I don't think it's necessary, so I don't intend to include some special reference to the -- you know, the accounts having occurred within the Eastern District of Texas, because I think it's clear from the instructions themselves on both -- on both Counts 1, 2 and 4, and on the instruction on venue.

MR. VAN CLEEF: Understood, Your Honor.

JUDGE SCHROEDER: And I think that was what the --

MR. HORNOK: Yes, Your Honor.

JUDGE SCHROEDER: Okay. So any other concerns? We'll, of course, give you a copy, and you can look at them. And anything we've missed, please point out any remaining objections you-all are more than welcome to make a record on.

MR. HORNOK: Your Honor, it's getting late. What's -- what is your expectation for the evening?

JUDGE SCHROEDER: My expectation is, honestly, I

mean, we told -- my concern about delaying things until Monday morning is we told this jury we would done today. Yesterday or today. I will -- if the parties are agreeable to this, I am willing to ask Mrs. Schroeder to go up and see what the jury's desire is. If their desire is to push on and to do instructions and closings tonight and at least start some deliberations, it is not yet five o'clock. By the time they got it, it would be, of course, significantly later, so that's part of the -- that's part of their -- their consideration. They may prefer to go home and come back on Monday morning and do instructions and closings and then begin deliberations after that then.

It's really -- I am agreeable to doing that if that's what the parties agree to and want to do.

MR. VAN CLEEF: I'm happy with whatever the Court wants to do.

JUDGE SCHROEDER: I don't have a preference one way or the other. I was supposed to be gone the first three days of next week, but it's the type of a commitment that I can, you know, get out of essentially.

MR. VAN CLEEF: Your Honor, I will -- of course, what I see coming is that I need to rest and re-urge my Rule 29 motion, and then the -- we're going to work on the jury instructions; correct? Or just look over them one last time?

JUDGE SCHROEDER: Well, I mean, I think we've worked on them. I need you to look at them again.

MR. VAN CLEEF: Yes, sir.

JUDGE SCHROEDER: You've seen them and I --

MR. VAN CLEEF: I have.

JUDGE SCHROEDER: -- we -- I don't think you're going to find anything, but I sure want you to satisfy yourself that there's nothing there that, you know, got in inadvertently or that we've just really messed up.

MR. VAN CLEEF: Okay.

JUDGE SCHROEDER: So, yeah, I mean, it's going to be, say, 5:30 before we start again.

MR. HORNOK: Your Honor, I'm -- I think our preference is that we just go ahead and get this over with, but we're amenable to whatever the Court...

JUDGE SCHROEDER: So the way it will work is we'll have the jury brought down, Mr. Van Cleef, you can rest. I'll give you the opportunity to put on any witnesses in rebuttal. I'm assuming you don't have rebuttal witnesses.

MR. HORNOK: No.

JUDGE SCHROEDER: I'll ask both of you whether you rest on your entire cases. You'll say that you do. We can -- I will at that point hopefully begin the instructions. And then -- and then you guys can close.

For purposes of preserving your record on your motion

for judgment of acquittal, what I have frequently done, and I'm certainly not requiring this, but I've frequently done is to have the parties agree that nobody's waiving anything by not urging it before it goes to the jury. So that once the jury goes upstairs to begin their deliberations, Mr. Van Cleef, you can present your argument then. The government can respond to it, and by not having done it before the jury retired, you haven't waived anything.

MR. VAN CLEEF: That's entirely agreeable with me.

JUDGE SCHROEDER: Is that --

MR. HORNOK: That's entirely agreeable to the government, Your Honor.

JUDGE SCHROEDER: All right. So we'll have them come down, you'll rest, Mr. Van Cleef. We'll go through that. I'll start instructions, and then you guys can close.

After that, it's the jury's determination about what they do. And so if they get up there and they say, "We want to go home and come back Monday," that's what we'll do.

So I mean, at this point we have a little bit of control, but once the jury's got it for deliberations, frankly, it's entirely up to them what they do.

MR. VAN CLEEF: And, Your Honor --

JUDGE SCHROEDER: What they want to do.

MR. VAN CLEEF: -- I know we're all watching the

clock, but I wonder if we might have three minutes.

JUDGE SCHROEDER: You will get that.

MR. VAN CLEEF: Okay.

JUDGE SCHROEDER: So you go -- you go rest, get a bite to eat if you can. Look at the instructions. You-all take a comfort break, and then we'll proceed when the jury comes down as I've described, and we'll go all the way until they begin their deliberations.

MR. HORNOK: When would you like us to be back in the room ready to discuss any issues with the jury instructions?

JUDGE SCHROEDER: 15 minutes? 10 Minutes? 15 minutes.

MR. HORNOK: Thank you.

JUDGE SCHROEDER: Fairly shortly. Is that okay?

MR. HORNOK: Yes.

JUDGE SCHROEDER: Okay.

(Wherein a break was taken from 4:59 to 5:20 p.m.)

JUDGE SCHROEDER: Okay. Be seated. Okay.

Any issues with respect to the instructions? I know, Mr. Hornok, you had a question -- or you'd made a request about including in one of the instructions on venue, a reference to portions of I-20. And I neglected to tell you, as I decided with the request to include some parenthetical -- or not parenthetical -- some phrase within

the Eastern District of Texas in the -- in the verdict form. I, likewise, don't think it's appropriate to include portions of I-20 in the instruction on venue. I think this jury's well familiar with where I-20 runs. I think -- I think it's probably okay.

MR. HORNOK: Thank you, Your Honor.

MR. VAN CLEEF: Your Honor, for the defendant, just for purposes of the record, I would persist in my request that the Court include a question for the jury to answer on the question of venue. I understand the Court's ruled on that. I'm not quibbling with your ruling, I'm just --

JUDGE SCHROEDER: Sure.

MR. VAN CLEEF: -- re-urging --

JUDGE SCHROEDER: Certainly.

MR. VAN CLEEF: -- my point.

JUDGE SCHROEDER: I understand. Anything else?

MR. CARTER: Not from us, Your Honor.

MR. VAN CLEEF: No, Your Honor.

JUDGE SCHROEDER: Are you ready to have the jury brought down?

MR. HORNOK: Yes, Your Honor.

JUDGE SCHROEDER: All right. Let's have the jury brought down.

All right. I'm going to explain to the jury we're going to move forward with instructions and closings, and

once they get to the jury room to begin deliberations, it will be their decision about how long they deliberate. And if they decide they want to come -- go home and come back on Monday, that's their prerogative to do. Is that agreeable to you.

MR. VAN CLEEF: Yes, Your Honor.

MR. HORNOK: Yes, Your Honor.

JUDGE SCHROEDER: Okay.

(Jury seated.)

JUDGE SCHROEDER: Please be seated. All right.

Mr. Van Cleef, call your next witness.

MR. VAN CLEEF: Your Honor, the defendant rests.

JUDGE SCHROEDER: All right. Thank you, Mr. Van Cleef.

Does the government have any rebuttal witnesses?

MR. HORNOK: No, Your Honor.

JUDGE SCHROEDER: Does the government rest on its entire case?

MR. HORNOK: Yes, Your Honor.

JUDGE SCHROEDER: Does the defendant rest on his entire case?

MR. VAN CLEEF: Yes, Your Honor.

JUDGE SCHROEDER: All right. Very well.

Ladies and gentlemen of the jury, what remains in the trial of this matter are the Court's instruction to you on

the law that you must follow when you begin your deliberations. And then following that, the parties will have an opportunity to present closing argument to you.

I recognize the lateness of the hour, but we have visited, and we think the appropriate thing to do at this point is for me to go ahead and charge you on the law that you are to follow, and then the attorneys will present their closing arguments to you.

You will then go to the jury room to begin your deliberations. And once that occurs, we'll be on your clock. So at that point, it's whatever the jury's wishes are in that regard. You-all can begin your deliberations today and conclude them, if that is where your deliberations take you, or, you know, come back on Monday if that's necessary. We'll just see what happens in that regard. But I did want you to know that we're not ignoring the clock on the wall back there.

So at this time I am going to give the final instructions to the jury.

Members of the jury:

In any jury trial there are, in effect, two judges. I'm one of the judges, and the other is the jury. It's my duty to preside over the trial and to decide what evidence is proper for your consideration. It's also my duty at the end of the trial to explain to you the rules of the law

that you must follow and apply in arriving at your verdict.

First, I'm going to give you some general instructions which apply in every case. For example, instructions about the burden of proof and about how to judge the believability of witnesses, and then I'm going to give you some specific rules of law about this particular case. And finally, I will explain to you the procedures you should follow in your deliberations.

Now, I want you to know when you begin your deliberations, each of you will have your own set of instructions. So as I'm going through the instructions now, you're more than welcome to take whatever notes you want, but you will have your own copy of this when deliberations begin.

You, as the jurors, are the judges of the facts. But in determining what actually happened, that is, in reaching your decision as to the facts, it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It's your duty to apply the law as I explain it to you, regardless of the consequences.

It's also your duty to base your verdict solely upon the evidence, without sympathy or prejudice. That was the promise you made and the oath you took before being accepted by the parties as jurors, and they have the right to expect nothing less.

The indictment or the formal charge against the defendant is not evidence of guilt. Indeed, the defendant is presumed by law to be innocent. And the defendant begins with a clean slate. The law does not require defendant to prove his innocence or produce any evidence at all.

The government has the burden of proving the defendant guilty beyond a reasonable doubt. And if it fails to do so, you must acquit the defendant. While the government's burden of proof is a strict or heavy burden, it's not necessary that the defendant's guilt be proved beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt.

A reasonable doubt is a doubt based upon reason or common sense after careful and impartial consideration of all of the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in making the most important decisions of your

own affairs.

As I told you earlier, it's your duty to determine the facts. And to do so, you must consider only the evidence presented during the trial. Evidence is the sworn testimony of the witnesses, including stipulations and the exhibits. The questions and the statements and the objections and the arguments made by the lawyers are not evidence.

The function of the lawyers is to point out those things that are most significant, or most helpful to their side of the case. And in doing so, to call your attention to certain facts and inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in this case. What the lawyers say is not binding on you.

During the trial I sustained objections to certain questions and exhibits. You must disregard those questions and exhibits entirely. Do not speculate as to what the witness would say or would have said if permitted to testify. Your verdict must be based solely on the legally admissible evidence and testimony.

Also, don't assume from anything I may have done or said during the trial that I have any opinion about any of the issues in the case. Except for the instructions to you

on the law, you should disregard anything that I may have said during the trial, in arriving at your own verdict.

In considering the evidence, you're permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the evidence.

Don't be concerned about whether evidence is direct evidence or circumstantial evidence. You should consider and weigh all of the evidence that was presented to you.

Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of events and circumstances indicating that something is or is not a fact.

And the law makes no distinction between the weights to be given to either direct or circumstantial evidence. What the law requires is that you, after weighing all of the evidence, whether it is direct evidence or circumstantial evidence, be convinced of the guilt of the defendant beyond a reasonable doubt before you can find him guilty.

Now, I want to remind you it is your job to decide

whether the government has proved the guilt of the defendant beyond a reasonable doubt. And in doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgements about the testimony of the witnesses, including the defendant, who testified in this case. You should decide whether you believe all, some, part, or none of what each person had to say, and how important the testimony was. In making that decision, I suggest that you ask yourself a few questions. Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness have any relationship with either the government or the defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he or she testified? Did the witness have the opportunity and the ability to observe and to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? These are a few of the considerations

that will help you determine the accuracy of what each witness said.

The testimony of the defendant should be weighed, and his credibility evaluated in the same way as that of any other witness.

Your job is to think about the testimony of each witness you've heard, and decide how much you believe of what each witness had to say. In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than on the other. Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point. You will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

The testimony of a witness may be discredited by showing that the witness testified falsely, or by evidence that at some other time the witness said or did something or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true. You may not consider the earlier statements to prove the content of an earlier statement is true. You may only

use earlier statements to determine whether you think the earlier statements are consistent or inconsistent with the trial testimony of the witness and, therefore, whether they affect the credibility of that witness.

If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves.

You've been told that the defendant, Collin Hayden, was found guilty of certain crimes. These convictions have been brought to your attention only because you may wish to consider them when you decide, as with any witness, how much of the defendant's testimony you will believe in this trial. The fact that the defendant was previously found guilty of those crimes does not mean that the defendant committed the crimes for which he is on trial here, and you must not use these prior convictions as proof of the crimes charged in the case.

You've been told that the witnesses Paul Brown, Jason McLemore, and Timothy Harper have also been convicted of certain crimes. This information has been brought to your attention only because you may wish to consider it when you decide whether you believe the witness's testimony. It's not evidence of anything else.

The testimony of an alleged accomplice or the

testimony of a one who provides evidence against a defendant as an informer for pay or for personal advantage or vindication must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by these circumstances by the witness's interest in the outcome of the case, by prejudice against the defendant, or by the benefits that the witness has received, either financially or for personal advantage. You should keep in mind that such testimony is always to be received with caution and weighed with great care.

You should never convict any defendant upon the unsupported testimony of such a witness unless you believe the testimony beyond a reasonable doubt.

In this case the government called as witnesses alleged accomplices, named as co-defendants in the indictment, with whom the government has entered into a plea agreement. These agreements provide for various benefits to the co-defendants and the United States. Such plea bargaining, as it's called, has been approved as lawful and proper and is expressly provided for by the rules of this court.

An alleged accomplice, including one who is entered into a plea agreement with the government, is not

prohibited from testifying. On the contrary, the testimony of such a witness may alone be of sufficient weight to sustain a verdict of guilty. You should keep in mind that such testimony is always to be received with caution and weighed with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt.

The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence of the guilt of any other person.

The testimony of a witness who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

During the trial you heard the testimony of DPS forensic scientist Hannah Sigal, David Eckre, Nick Grizzle, and Robert Prince who expressed opinions and provided information regarding forensic chemistry and the testing of controlled substances.

DPS forensic scientist Courtney Wassung, who

expressed opinions and provided information regarding forensic comparison of fingerprints.

ATF special agent Josh Petree, who expressed opinions and provided information regarding firearms.

DPS special agents Daniel Kelly and Josh Vera, who expressed opinions and provided information regarding drug trafficking.

If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training, or education may testify and state an opinion concerning such matters.

Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion. You should judge such testimony like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion and all the other evidence in this case.

You will note that the Indictment charges that the offenses were committed on or about specified date ranges. The government does not have to prove that these crimes were committed on these exact dates or during these exact

date ranges, so long as the government proves beyond a reasonable doubt that the defendant committed these crimes reasonably near the dates stated in the indictment.

The events presented at trial happened in various places. There is no requirement that the entire conspiracy take place within the Eastern District of Texas, but in order for you to return a verdict of guilty, the government must prove by a preponderance of the evidence that either the agreement or an overt act took place in this district, even if the defendant never set foot in the district. An overt act is an act performed to effect the object of a conspiracy, although it remains separate and distinct from the conspiracy itself. Though the overt act need not be of a criminal nature, it must be done in furtherance of the object of the conspiracy.

Unlike the other elements of the offense, this is a fact that the government has to prove only by a preponderance of the evidence. This means the government has to convince you that it is more likely than not that part of the conspiracy took place in the Eastern District of Texas. All other elements of the offense must be proved beyond a reasonable doubt. You are instructed that the counties of Titus, Camp, and Morris, and the cities of Mt. Pleasant, Daingerfield, and Pittsburg are located within the Eastern District of Texas.

You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any conduct, act, or offense not alleged in the indictment. Neither are your called upon to return a verdict as to the guilt of any other person not on trial as a defendant in this case, except as you are otherwise instructed.

If a defendant is found guilty, it will be my duty to decide what the punishment will be. You should not be concerned with punishment in any way. It should not enter your consideration or your discussion.

A separate crime is charged in each count of the indictment. Each count and the evidence pertaining to it should be considered separately. The fact that you may find the defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other.

In determining whether any statement, claimed to have been made by the defendant outside of court and after an alleged crime has been committed, was knowingly and voluntarily made, you should consider the evidence concerning such a statement with caution and great care. You should give such weight to the statement as you feel it deserves under all the circumstances.

You may consider in that regard such factors as the age, sex, training, education, occupation, and physical and mental condition of the defendant, his treatment while under interrogation, and all the other circumstances in evidence surrounding the making of the statement.

In any criminal case the government must prove not only the essential elements of the offense or the offenses charged, as hereafter defined, but must also prove beyond a reasonable doubt the identity of the defendant as the perpetrator of the alleged offenses.

In evaluating the identification testimony of a witness, you should consider all of the factors already mentioned concerning your assessment of the credibility of any witness in general, and you should also consider whether the witness had an adequate opportunity to observe the person in question at the time or times about which the witness testified. You may consider all matters, including the length of time the witness had to observe the person in question, the prevailing conditions at the time in terms of visibility or distance and the like and whether the witness had known or observed the person at earlier times.

You may also consider the circumstances surrounding the identification itself. For example, the manner in which the defendant was presented to the witness for identification. And the length of time that elapsed

between the incident in question and the next opportunity the witness had to observe the defendant.

If, after examining all the testimony and the evidence in the case, you have a reasonable doubt as to the identity of the defendant as the perpetrator of the offense charged, you must find the defendant not guilty.

Possession, as that term is used in these instructions, may be one of two kinds: actual possession or constructive possession.

A person who knowingly has direct physical control over a thing, at a given time, is in actual possession of it.

A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is in constructive possession of it.

Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

You may find that the element of possession is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession, either alone or jointly with others.

The word knowingly as that term has been used from time to time in the instructions, means that the act was done voluntarily and intentionally, not because of an accident or mistake.

Exhibits 12B, 12H, 51B, and 57B have been identified as a typewritten transcript of the oral conversation which can be heard on the tape recording that was received in evidence as Exhibits 12A, 51C, 51D, and 57C. The transcripts also purport to identify the speakers engaged in such conversation.

I have admitted the transcript for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the tape recording, and also to aid you in identifying the speakers.

You are specifically instructed that whether the transcript correctly or incorrect reflects the content of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony you have heard concerning the preparation of the transcript, and from your own examination of the transcript in relation to your hearing of that tape recording itself as the primary evidence of its contents; and, if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. It is what you hear on

the tape that is evidence, not the transcript.

Certain charts and summaries of other records have been received into evidence, and they should be considered like any other evidence in this case. You should give them only such weight as you think they deserve.

With respect to Count 1 of the Second Superseding Indictment, it charges that the defendant Collin Garrett Hayden, beginning in or about June 2016 and continuing through in or about April 2017, in the Eastern District of Texas and elsewhere, conspired with someone else to distribute or possess with intent to distribute, methamphetamine or cocaine, in violation of 18 U.S.C. § 846.

A conspiracy is an agreement between two or more persons to join together to accomplish some lawful purpose. It is a kind of partnership in crime in which each member becomes the agent of every other member.

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: That two or more persons, directly or indirectly, reached an agreement to distribute or to possess with the intent to distribute methamphetamine or cocaine;

Second: That the defendant knew of the unlawful

purpose of the agreement; and

Third: That the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose.

One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identifies of all of the other alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The government need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme. Similarly, the government need not prove that all of the details of the scheme alleged in the Second Superseding Indictment were actually agreed upon or carried out, nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with the knowledge that a crime is being committed, or the mere fact

that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. A person who has no knowledge of a conspiracy, but who happens to act in a way that advances some purpose of a conspiracy, does not thereby become a conspirator.

The government must prove beyond a reasonable doubt that the defendant knew he conspired to distribute or possess a controlled substance, but need not prove that the defendant knew what particular controlled substance was involved.

To possess with intent to distribute simply means to possess with the intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction. It is permissible for you to infer an intent to distribute from a large quantity of illegal narcotics, the value and quality of the drugs, and the possession of drugs paraphernalia.

Count 2 of the Second Superseding Indictment charges that the defendant, Collin Garrett Hayden, beginning in or about June 2016 and continuing through in or about April 2017, in the Eastern District of Texas, used or carried a firearm during and in relation to a drug trafficking crime or possessed a firearm in furtherance of a drug trafficking

crime in violation of 18 U.S.C. § 924(c)(1)(A).

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: That the defendant committed the crime alleged in Count 1. I instruct you that the crime alleged in Count 1 is a drug trafficking crime; and

Second: That the defendant knowingly did one or both of the following:

(a) used or carried a firearm during and in relation to the defendant's commission of the crime charged in Count 1; or

(b) possessed a firearm in furtherance of the defendant's commission of the crime charged in Count 1.

To prove the defendant "used" a firearm during and in relation to a drug trafficking crime, the government must prove that the defendant actively employed the firearm in the commission of Count 1, such as a use that is intended to or brings about a charge in the circumstances of the commission of Count 1. "Active employment" may include brandishing, displaying, referring to, bartering, striking with, firing or attempting to fire the firearm. "Use" is more than mere possession of a firearm or having it available during a crime of violence.

To prove the defendant "carried" a firearm during and

in relation to a drug trafficking crime, the government must proof that the defendant carried the firearm in the ordinary meaning of the word "carry," such as transporting a firearm on the person or in a vehicle. The defendant's carrying of a firearm cannot be merely coincidental or unrelated to the crime of violence.

"In relation to" means the firearm must have some purpose, role or effect with respect to the drug trafficking crime.

To prove the defendant possessed a firearm "in furtherance," the government must prove that the defendant possessed a firearm that furthers, advances or helps forward the drug trafficking crime.

A conspirator is responsible for offenses committed by another conspirator -- by other conspirators if the conspirator was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, or as a reasonable -- or as a foreseeable consequence of the conspiracy.

Therefore, if you found the defendant guilty of the conspiracy charged in Count 1, and if you find beyond a reasonable doubt that during the time the defendant was a member of that conspiracy, other conspirators committed the offense in Count 2 in furtherance of and as a foreseeable consequence of that conspiracy, then you may find the

defendant guilty of Count 2, even though the defendant may not have participated in any of the these acts which constitute the offenses described in Count 2.

Count 4 of the Second Superseding Indictment charges that the defendant, Collin Garrett Hayden, on or about April 9, 2017, in the Eastern District of Texas, attempted to use the threat of physical force against Timothy Harper with the intent to influence, delay, or prevent the testimony of Timothy Harper in this criminal case before the United States District Court for the Eastern District of Texas, in violation of a 18 U.S.C. § 1512(a)(2)(A) and (a)(3)(C).

For you to find the defendant guilty of this crime, you must be convinced that the government has proved the following -- each of the following beyond a reasonable doubt:

First: That the defendant knowingly attempted to use the threat of physical force against Timothy Harper;

Second: That the defendant acted with intent to influence, delay or prevent the testimony of Timothy Harper in this case, an official proceeding;

Third: That the defendant knew or should have known that this case was pending or was likely to be instituted; however, the government does not need to prove that an official proceeding was actually pending or about to be

instituted at the time of the alleged offense; and

Fourth: That this case, this official proceeding, was a federal proceeding; however, the government does not need to prove that the defendant knew that the proceeding was a federal proceeding.

The term "official proceeding" means a proceeding before a judge or court of the United States, a United States magistrate judge, or a Federal Grand Jury.

The government is not required to prove the defendant succeeded in the effort to tamper with the witness. Also, the government is not required to prove that the witness changed or withheld his or her testimony.

Now, to reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the indictment.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. Do not let any bias, any sympathy or any prejudice that you may feel towards one side or the other influence your decision in any way. In particular, do not let racial, ethnic, national origin, or other bias influence your decision in any way. During your deliberations, do not hesitate to re-examine your own

opinions and change your mind if you are convinced that you were wrong, but do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times, you are the judges. You're the judges of the facts. Your duty is to decide whether the government has proved the defendant guilty beyond a reasonable doubt.

When you go to the jury room, the first thing that you should do is select one among your number to serve as your foreperson who will help to guide your deliberations and will speak for you here in the courtroom.

Now, a verdict form has been prepared for your convenience. It's divided into the three counts, and I will go over it with you very briefly.

It's says "As to Count One of the Second Superseding Indictment, we, the jury, find the defendant, Collin Garrett Hayden," and there's a blank for the foreperson to fill in a check, or write in "guilty" or "not guilty."

And then "If, and only if, you find the guilty -- the defendant guilty of Count One, then you have to consider what we call a special issue," which is, "We, the jury, find that the amount of controlled substances attributable to the overall scope of the conspiracy, and that the

defendant knew or reasonably should have known that the overall scope of the conspiracy involved are as follows:" And then the check -- you check the ones that apply.

"Fifty grams or more of methamphetamine or 500 grams or more of a mixture or substance containing methamphetamine." And then there's a space for.

"Five hundred grams or more of a mixture or substance containing cocaine."

And you check both of those if you find that they apply, and you do not check them if you find that they do not apply.

With respect to Count 2, "As to Count Two of the Superseding Indictment, we find the defendant Collin Garret Hayden, guilty or not guilty." Your foreperson should write in or check either guilty or not guilty.

With respect to Count 4, same thing, guilty or not guilty. And then, if, and only if, you find the defendant guilty of the offense charged in Count 4, you must decide the special issue was this -- "We, the jury, find that the official proceeding was the trial of the criminal case."

And then lastly, the last page is for the foreperson to date and sign the verdict form. All right.

If for any reason you need to communicate with me at any time during your deliberations, the foreperson should write a message on some paper that we will have provided

for you in the jury room and give it to the court security officer who will be outside the door, and then I will either reply in writing, or I'll have you brought into the courtroom so that I can answer you orally. I will always discuss with the attorneys what your question is and the answer I am going to give before I do so.

Do bear in mind that you're never to reveal to any person, not even to me, how the jury stands, numerically or otherwise, on any count of the indictment until after you-all have reached a unanimous verdict.

So at this time the parties will present their closing arguments to you.

Mr. Hornok, on behalf of the government, you may proceed.

MR. HORNOK: Thank you, Your Honor.

I know you are all tired. It's been a long week. It's been a long day. There's been a lot of evidence in this case, a lot of testimony, a lot of documents, a lot of pictures. Now's the time where we get to walk through it briefly together to try to focus in on the things that are most important for you as you make your decision.

In the fall of 2016 when Collin Garrett Hayden, the defendant, got out of prison, he wanted to be like his mentor, Timothy Harper: prostitute, stripper, porn star, drug dealer. So what did he do? He moved in with him. He

partnered up with him. They moved into an apartment together. They started dealing drugs together.

Collin Hayden was an aspiring drug trafficker. He succeeded a little bit. He's not some criminal mastermind here who had the U-Haul full of dope. It's what he wanted to be. He wanted to be that gangster that nobody messed with. Wanted to be that drug dealer. Wanted be that tough guy. So what did he do? He found those people, and he started working his way into their organization.

The defendant's been charged in Count 1 with conspiracy to possess with intent to distribute a controlled substance. Drug Conspiracy. The judge has already read these to you, but it's -- it's really quite simple. An agreement. It's an agreement to sell drugs. A partnership in crime to sell drugs. How did Timothy Harper describe their relationship? It's a partnership. To do what? To sell drugs. Out of that apartment.

You need to find only that two or more persons directly or indirectly reached an agreement to do one of these things, to distribute, possess with intent to distribute methamphetamine or cocaine; that the defendant knew of the unlawful purpose, and that the defendant joined in the agreement willfully. That is, with the intent to further its unlawful purpose.

Now, what was the network that the defendant was --

had joined and was working his way into? It was the Jorge Martinez drug distribution network. On the left you have Jorge Martinez. His U-Haul full of dope and guns was seized on February 10th. Jorge Martinez was supplying Daniel Montes-Munoz, the man in the apartment that day on February 9th who brought the kilo of methamphetamine. He had Hugo, the man on the top, working with Daniel Montes-Munoz, you had the defendant, who had been purchasing cocaine from Mr. McLemore and Mr. Montes-Munoz, you had Mr. McLemore there on the bottom who was purchasing from Mr. Montes-Munoz, and you had Timothy Harper there on the top who was also purchasing from Daniel Montes-Munoz. And of course the three of them, we heard lots of testimony about their interactions and their partnership.

Jason McLemore sold Collin Hayden cocaine. Jason McLemore sold methamphetamine to Timothy Harper. Timothy Harper and Collin Hayden worked together to sell methamphetamine to Shreveport. Jason McLemore and Collin Hayden worked together so that Collin Hayden could sell cocaine in the clubs he was working in.

And where did that -- where did that -- where did those drugs go? Those drugs that were supplied from Jorge Martinez to Daniel Montes-Munoz, to the defendant, to Timothy Harper, to Jason McLemore. Where did those things go? Well, they went to Paul Brown in the Eastern District

of Texas; they went to Gerald Davis in the Eastern District of Texas; they went to the Dallas strip clubs that Mr. Hayden and Mr. Harper were working in. And they went to Shreveport down Interstate 20 through the Eastern District of Texas.

How do we know that this is the case? Well, all the drug -- all the drug traffickers have admitted their role in this. Collin Hayden has admitted that he knew about and was involved in drug trafficking with Timothy Harper, Daniel Montes-Munoz, Hugo Pargas, and Jason McLemore.

In those letters, those letters he wanted to walk away from, he described knowing the details of the drug transactions between Timothy Harper and Jason McLemore. He talked about buying cocaine from Jason McLemore. He talked about being there that day, receiving the call, passing on the word, and asking Timothy Harper, "Do I need to take care of this money, or are you going to do it?" That was the partnership they had.

You heard Timothy Harper on the stand. He admitted to trafficking drugs. He took responsibility for his role in this conspiracy. And who did he say was standing there right along with him? The defendant, Collin Hayden.

You saw Jason McLemore on the stand. He admitted. He took responsibility for his part. He described his drug trafficking activity, and he described the cocaine and the

methamphetamine that he was selling to the defendant, Collin Hayden. And the relationship that they built, the partnership that they were working on to make money. You heard Jason McLemore talk about how he did not even have a cocaine supplier until the defendant asked him to develop a supply chain for cocaine.

So what did Jason McLemore do? He went and found a supplier. He found other purchasers because the defendant couldn't purchase enough cocaine for Mr. McLemore to make money. But at the defendant's request, Jason McLemore went out and established a cocaine supply chain. All in further of their partnership to take that cocaine, to break it down, sell it in the clubs, distribute it around Dallas, on and on.

On July -- or January 23rd, 2017, you heard the audio, you heard the defendant's voice. And you got to hear the defendant's voice, and I know that you were listening closely to see how similar his voice sounds to those recordings that we've listened to over and over and over again.

What did he say? Total stranger knocks on the door. Collin Hayden knows that he's looking for Jason McLemore. He knows what Jason McLemore does. He's been buying dope from Jason McLemore for a long time. What does he say? "What do you need, man? How much money you got? You sure

don't need nothing?" Trying to make a deal. It's a new client, wants to supply that client. He knows that client wants drugs. Let's make a deal.

On February 9th, 2017, you've heard the audio, you've heard his voice. What did he say? "I got six-ounces." "I need to see the money before I make a phone call." "If I see the money, man, I'm going to go get it." "I'll get it right now, but all I got is six right now." "I got to go pick it up." "Show me the cash." "All right. Let me make this phone call." He's ready to cut a deal.

Now, on the stand he wanted to explain this away. He admitted that this is his voice. This is not in dispute. He said everything, every single statement on here came out of that man's mouth to Paul Brown. It's all recorded. He's admitted it.

How did he want to explain that? Well, in an effort to care for his younger brother, he wanted to play drug dealer for a day. And then it turned into, well, he was offering the six ounces because he was trying to rob Paul Brown. There was going to be a robbery, evidently, so play drug dealer, then he was actually going to rob Paul Brown. Then when he got down to the car, you heard the conversation. He said he'd get Paul Brown's number, and then just to really make sure that, you know, playing the robber and the drug dealer, however that went, he decided

to call Paul Brown twice and send him a text message a couple of minutes later, and wake up Timothy Harper to tell him that Paul Brown was there to make the connection.

He says, "I didn't actually have six ounces." On the stand, he didn't want to do the math for you, but he admitted that these drugs right here were sitting in his laundry pile in his room right next to his cocaine that he was happy to acknowledge. How much is that? It's about six ounces. The defendant had six ounces. He had six ounces sitting right next to the 16 grams of cocaine. He wasn't pretending to be a drug dealer, he was an actual drug dealer trying to cut a deal.

How about in his jail call? "They won't let me go" -- "let me or my co-defendant go down there because he's ratting on everybody." "We're probably going to plead" -- "plead insanity then." Does that sound like an innocent man? I think you plead not guilty when you're innocent, not insanity. "I'd rather be in prison. That way I can put a hit on my co-defendant." "The dude flashed me $20,000." He was there, saw the money, he's ready to make the deal. Propped the door open. Told Paul Brown to come up to cut a deal, and when Paul Brown didn't, he got mad and took off.

So what about the drugs in the apartment there? Well, we've got the cups, then we've got the cups with the

methamphetamine inside, and we've got the defendant's fingerprints on the cups. The defendant's fingerprints are literally on the drugs. Now, there were some other fingerprints there. They were unable to identify them to Timothy Harper. He was not -- he was excluded as the source of the fingerprints on those cups. Whose fingerprints were on the cups? The defendant. And where were those cups? In the defendant's room. And what was in these cups? Methamphetamine.

And here's that cocaine and that methamphetamine right there in his laundry pile in his bedroom. Six ounces of meth, 16 grams of cocaine, which he described to you as being about thousand dollars worth of cocaine, because cocaine's very powerful. You buy it in gram quantities. That's why -- that's what he was selling it in. Grams of cocaine. So he had 16 grams of cocaine in that -- in that laundry pile right next to his six ounces of methamphetamine. Of course there was the kilo of methamphetamine that was sitting there on his kitchen counter, and seven more kilos of methamphetamine in that U-Haul.

The digital evidence agrees as well that Collin Hayden had conspired with the other people in this case to distribute drugs. The Facebook records show buyers asking for cocaine, at&t records show him calling Paul Brown. The

phone records show Collin Hayden calling Timothy Harper.

How about this message on Facebook. "That's why I don't ride dirty." It's in December of 2016. He doesn't want to drive around with drugs because he doesn't want to get caught. That's what that means. Or how about this -- this guy, Gary Earl, over -- over Facebook. What does he want? He wants some cocaine and he wants some marijuana from the defendant in December of 2016.

Did the defendant respond and say, "Nah, I don't sell" -- "I don't sell cocaine. I don't sell methamphetamine"? He got up on the stand, and he told you he had never sold any kind of drugs at all. Is that what he said to Gary Earl when Gary Earl said, "I want drugs"? No.

Or how about in May of 2017? "I need to get rid of coke and Xanax. I have 300 Xanax and 26 grams of coke. I need it gone. I'm selling it cheap." When somebody offers him 250 -- $250, he says "No way. That's crazy. An ounce of coke and 300 Xanax for $250?" He wants at least 800.

Well, what happened shortly after this in June of 2017? Defendant said he took all these drugs and flushed them down the toilet for the sake of love. But the very next month he was arrested with Xanax, he was convicted, and he spent time in prison in Florida for drugs he'd obviously not flushed down the toilet.

How about this? Timothy Harper receiving messages from somebody who wants to buy a gram of coke from his roommate, Collin Hayden. Because he wants to do some cocaine before he does some methamphetamine. How does Timothy Harper respond? "Okay. Where are you?" He didn't say, "No way, man. My roommate doesn't do that. You know that." He said "Okay. Sure. Let's make it happen."

Now on February 9th, 2017, Timothy Harper, he starts getting phone calls. Paul Brown's at the apartment. He's ready to make a deal. He's calling Harper. No answer. He's calling Harper, no answer. Collin Hayden gets the knock on the door, walks down. He sees the money, and he steps away for a minute. "All right. Let me make this call." Who does he call? Timothy Harper. There's the record right there. 10:51 Collin, missed call, Timothy Harper. So what happened? Collin Hayden goes down to the car, he sees the money, and he immediately calls Timothy Harper to say, "Hey, this guy's ready to make a deal. Get up. Let's do this."

After Timothy Harper doesn't wake up, what does he do? He goes back up to wake him up. What does he say? "Are you going to take care of this money, or do I need to?" And then after that, he calls, so 10:51 they exchange numbers. We heard that. Three minutes later, Collin Hayden calls Paul Brown to say, "Tim's up." You heard that

call. You heard the audio from that, that conversation from Paul Brown who's sitting in the car. He gets the message that Tim's awake. Who woke Tim up? Collin Hayden did. Why did he wake him up? Because as partners in crime, what do you do? When it's time to make a drug deal, you get your partner up, and you make it happen. That's what Collin Hayden did. He was just looking out for his partner to make that drug deal a reality. A couple of text messages are exchanged, and then at 11:05, the defendant responds with another text message.

Now, with respect to Count 1, it's kind of two steps here. The first step that you need to decide is was there an agreement. Was Collin Hayden part of a partnership in crime. Did he partner up with Timothy Harper, did he partner up with Jason McLemore, did he partner up with Daniel Montes-Munoz. That's -- that's the initial decision. You only need to find that he agreed with one other person. You can totally disregard Mr. McLemore, or you can totally disregard Mr. Harper. As long as he made an agreement with one other person, it doesn't matter who, he's guilty.

And then you step into the question of all right, how much. There's two -- two questions. First, you must unanimously find the amount of the controlled substance attributable to the overall scope of the conspiracy. So

that's the big drug distribution network. And that the defendant knew or reasonably should have known that the overall scope of the conspiracy involved. So how big was the drug network, and what did he know, or what should he have known about how big the drug network is. Those are the questions. Okay?

And it's the overall scope of the conspiracy. Okay? So it's not how much methamphetamine did he himself hold. You've heard the instructions from the judge. The defendant never has to hold all the methamphetamine to be involved in the conspiracy. The question here is, how big is the conspiracy, and how big -- how much of that conspiracy did the defendant know about, or should he have been able to reasonably foresee.

In this case the answer is yes to both of these. 50 grams or more of methamphetamine and/or 50 grams or more of a mixture of substance containing methamphetamine. What's the difference there? They sound very similar.

The question is has it been tested for purity. So you heard that this methamphetamine is 81 percent pure. Okay? So 81 percent of 900 some odd grams of methamphetamine is more than 50. This is more than 50 grams of methamphetamine.

Likewise, this is more than 51 grams -- or 50 grams of actual methamphetamine. The methamphetamine found in

the defendant's laundry pile next to his cocaine is more than 50 grams of actual methamphetamine. Or 500 grams or more of a mixture or substance containing methamphetamine, which means it's -- we know there's methamphetamine in there, but we haven't tested the purity.

So this hasn't been tested for purity. You heard that testimony. But this is more than 500 grams. This is a kilo. Almost twice as much as 500 grams of a mixture or substance containing methamphetamine. As is all of these kilos of methamphetamine. So there's about four different ways, five different ways you can come to -- come to reach an agreement that this, in fact -- this first one is, in fact, satisfied.

The second question is 500 grams or more of a mixture or substance containing cocaine. Cocaine's different than methamphetamine. We don't test it for purity. The law doesn't require that. Your -- your job, then, is to find out how many grams -- to determine how many grams of cocaine was involved in the conspiracy. Obviously, at this point, sitting here on the table, that's 16 grams of cocaine. That's not enough to get you there, so what -- how are you going to get there? You're going to rely on the testimony.

So you've seen this chart before with Agent Kelly earlier today. So two different categories of things here.

We've got a summarization of the seized drugs in this case, so that's the drugs sitting here on this table. That's 8,619 grams of methamphetamine and 16 grams of cocaine. But then you've also heard drug testimony. Testimony from Mr. McLemore, testimony from Timothy Harper. And that's 926 grams of methamphetamine and 1275 grams of cocaine. So there's that testimony that gets you over that 500 grams of cocaine number.

Now, with respect to the purity, I've already described for you how this gets you over the 50 grams, as does this. But if you were to take all of the methamphetamine in this case, and you were to apply the average purity, you'd still be over 7600 grams of pure methamphetamine. If you were to apply the lowest purity observed in this case, it'd be over 7100. And if you cut all the way down to 48 percent, which is far, far lower than anything that we've seen in this case, you'd still be at over four and a half kilos of actual methamphetamine evidence in this case.

Now, let's talk about venue. Venue has kind of crept up. Halfway through the trial we started getting some questions about venue. Where is the Eastern District of Texas? Where is Interstate 20? How does one drive from Dallas to Shreveport? These kinds of things. So this is a question that you guys need to make -- or you guys have to

evaluate in determining whether the defendant is or is not guilty of Count 1.

This is the instruction from the judge. There is no requirement that the entire conspiracy take place within the Eastern District of Texas. The conspiracy takes place, the drugs are found in north Tex -- or in the Northern District of Texas, the defendant is in the Northern District of Texas. Insofar as the conspiracies -- the fingers of the conspiracy reached out and touched the Eastern District of Texas, then we're set. Then that is satisfied. And in addition to that, this a -- there was a lower standard of proof associated with determining venue. As to all the other elements, you must decide -- you must believe, be convinced that the defendant is guilty beyond a reasonable doubt as to the agreement, on and on.

As to venue, it's not that high. It's only a preponderance of the evidence. And I'm going to talk about what that means, but it's a lower standard. And all that has to touch is either an overt act or an agreement, even if the defendant never set foot in the Eastern District of Texas.

Now, an overt act is an act performed to affect the object of the conspiracy. Driving drugs from Dallas to Shreveport through the Eastern District of Texas is an overt act in furtherance of the conspiracy. Selling drugs

to Paul Brown who took them to Gerald Davis in the Eastern District of Texas is an overt act in furtherance of the conspiracy. The overt act also need not be criminal in nature. Therefore, driving -- Paul Brown driving from -- so this is before Paul Brown's operating as a CI, Paul Brown driving from the Eastern District of Texas to Dallas to purchase drugs from the drug conspiracy. Nothing criminal about driving from Eastern District of Texas to Dallas without drugs. That in itself is also an overt act because it was done in furtherance of the conspiracy.

So traveling to, traveling from. Doesn't matter if you're carrying drugs. It's an overt act that satisfies the venue in this case.

Preponderance of the evidence. The government has to convince you only that it is more likely than not that part of the conspiracy took place in the Eastern District of Texas. More likely than not. That's all that's required.

Here is a map of the Eastern District of Texas from the court's website. These are the counties in the Eastern District of Texas. And you've heard specifically some of those counties that are described. In looking at this map I know you all know generally where Dallas is. It's there on the left. And you all know generally where Louisiana is, and Shreveport. It's on the right. And on the bottom of the Eastern District of Texas is the Gulf of Mexico.

And on the top of the Eastern District of Texas is the State of Oklahoma. So you either drive through the Eastern District of Texas, or you rent a boat and go through the Gulf, or you have to go through Oklahoma, Arkansas, and then Louisiana in order to avoid the Eastern District of Texas. Use your common sense. It's just more likely than not that it happened.

Harper testified about selling drugs to Hayden, who was at the time living and distributing drugs in Shreveport, Louisiana. Harper testified that he sold drugs to Hayden's brother for distribution in Shreveport, Louisiana. Harper testified that he and Hayden sold drugs to a buyer from Shreveport, Louisiana. And McLemore testified that he sold drugs to Paul Brown who also testified that he was taking those drugs to Mount Pleasant, and the Daingerfield area before he was operating as a CI. Any one of these is sufficient to establish venue. All right. Let's jump to Count 2.

Count 2. Count 2 in this case, with these instructions, it's a little bit odd. Okay? Nobody is alleging, nobody has alleged, that the defendant, that man over there, actually possessed, used, or carried this firearm. Okay? Nobody has said that. Nobody has testified to that. That's not -- that's -- that's not our theory of the case here. But the law doesn't require that

the defendant puts the gun in his hands, that he'd used the gun, or that he carry the gun. That's not what the law requires, and you've heard that from the judge.

All that the law requires is that if the defendant joins a conspiracy, if one of his co-conspirators does these things, possesses the gun during and in furtherance of the conspiracy, or uses or carries the firearm during and in relation to the crime, then the defendant is also responsible.

At the beginning of the case I talked to you about the prison murder scenario, and we talked about the idea of the lookout who would be responsible for possessing the weapon inside of the prison, even though he hadn't been the one who actually put his hand on it. And you all agreed that that was something that if the law said that that person was -- would be held responsible, you all agreed that you could, in fact, do that. Well, that is in fact, the scenario here.

Jorge Martinez possessed this firearm and the other firearms that you saw in this case, the ammo, the body armor, right there with his drugs to protect his drugs. Tools of the trade. You heard that testimony. And the defendant was in conspiracy with Jorge Martinez because Jorge Martinez was his supplier. And so therefore, the defendant himself is also responsible for the firearms.

The law makes him responsible, as described here. Because Jorge Martinez committed the 924(c) violation in furtherance of and as a foreseeable consequence to the conspiracy.

Why was it foreseeable? It was foreseeable because of the large quantity of drugs and the large value of money changing hands. The defendant himself talked about trying to rip off Paul Brown. That's -- that's what he tried to kind of push it off as, about robbing Paul Brown. Right? Defendant knows that robbery in drugs is commonplace. That's why drug dealers use guns. That's why they carry guns. And so when you start dealing in thousands of dollars worth of drugs, kilogram quantities of drugs, it's foreseeable that your co-conspirators are using, carrying, and possessing firearms, and that's exactly what happened in this case.

Here are those firearms. How do we connect those firearms to the defendant? The drugs. You heard the testimony about how these drugs led the investigation straight to the U-Haul and how these drugs are the same type, same quality, the same packaging. The drugs in the U-Haul and the drugs in the apartment are all connected together.

With respect to venue on Count 2, there's venue for Count 1, there's venue for Count 2. Simple as that.

Count 4. Obstruction of justice. That he attempted to use the threat of physical force against Timothy Harper, that he acted with the intent to influence, delay, or prevent the testimony of Timothy Harper in this case. The defendant knew the case was pending or was likely to be instituted. However, the government does not need to show that the official proceeding was actually pending, which is the case here. You heard about that earlier today. The defendant made the threat on April 9th, the case became pending on April 19th. The defendant found out about it ahead of time because the agents went to go find him to see if he would cooperate.

That this case, the official proceeding was a federal proceeding. Then there's a special question, was the official proceeding a criminal trial. Well, here we are, in the federal court in front of a federal judge in a criminal trial. So those last two things you can observe just by being here.

What's the defendant's perspective on this? Tattooed right across his chest, "No pity for a coward." That's his perspective. "No pity for a coward." This is somebody else. Because you're running your mouth about stuff you know nothing about, running your mouth about a gangster with a rap "I will" -- "I'll get you killed." That's what the defendant does when somebody's talking. And this is

somebody else. He represents himself as a gangster with a rap sheet. It's going to get him killed because they're talking.

On April 5th, 2017, the defendant demonstrated his knowledge that he -- that the federal investigation was coming. You heard testimony from Agent Kelly about how he actually talked to the defendant, told him this was coming. What did the defendant -- offered him the ability to cooperate. The defendant on the stand today was talking about how the government was being unfair to him, was being vindictive with him because they didn't give him the opportunity to cooperate. Guess what. Defendant had the opportunity to cooperate in April of 2017. But what did he decide to do? He said to the agent, "FU. I'm going to Cuba." He had that opportunity, and he didn't want it.

April 8th. Again, what's his perspective on snitches? Very unfavorable. What is he doing? He's offering $2,000 to find Timothy Harper and Christine Caldwell. What's he going to do when he finds them? It's not going to be a conversation.

Next day, the defendant admitted to writing this statement to Timothy Harper. "What's going to happen? We're going to see who the last one standing is." He put a price on his head. And why was he so mad? Because he believed Timothy Harper was putting it all off on him. He

was trying to prevent Timothy Harper from continuing to work with the government and from eventually testifying right here earlier this week. How do we know that it was actually the defendant? Well, in addition to the fact that he admitted it, he also happened to take a picture of himself using the IP address that is the one associated with the threat. It's the same tattoo, but he's already admitted this.

And then what did he do in the jail call? The defendant's stripes haven't changed. "I'd rather be in prison. That way I can put a hit on my co-defendant because I'm going to get his wig split." Doesn't sound like a conversation. If you don't die before you get out, he's going to kill him. I'm going to spread that all around the feds. See, the thing is, when you're in a gang, you got head man; right? Every prison's got a head man. You send that word to the head man, and he sends it to the next one, to the next one, to the next one. Therefore, you can't live in -- nowhere in the United States. That's what the defendant threatened to do, and that's what the defendant said he was going to do, again, about Timothy Harper, because Timothy Harper decided to cooperate.

As to venue, because the official proceeding is this official proceeding here in the Eastern District of Texas, there is venue for this crime.

Count 5. At the beginning you heard that the defendant was charged with Count 5. The defendant has pled guilty. And at the end of his testimony today, you saw that bolt that I held up. You heard the testimony. You know what happened. You know why he pled guilty, because he had a weapon in prison. And what did he threaten to do with it?

Now, when you get back to the jury room, you've got the verdict form. The first part of the verdict form is to fill out Count 1. What you're going to do is you're going to write guilty on that line. Then, if and only if you find the defendant guilty, then you're going to step down to the questions as to the amounts.

We've talked about how and why the evidence shows that the overall scope of the conspiracy and that the defendant knew or reasonably should have known the overall scope of the conspiracy involved satisfies 50 grams of methamphetamine, also satisfies 500 grams or more of a mixture of substance containing methamphetamine, and how it satisfies 500 grams or more of a mixture or substance containing cocaine.

As to Count 2, it's very simple. Just write guilty.

As to Count 4, again, the evidence shows that the defendant is guilty.

And as to the special question, "We the jury find the

official proceeding was a trial of a criminal case," you simply write yes. At the very end, you date, and you sign the verdict.

The evidence is overwhelming in this case. The defendant is guilty of conspiring to distribute drugs, conspiring with people who he knew or reasonably should have seen, who possessed, used, and carried firearms, and is threatening to kill a witness in order to prevent that witness from continuing to cooperate with the government and from testifying here before you today -- or this week.

For all these reasons, you should rely on your own recollection of the evidence. You'll have it to review. Go take a look, and you will find that the defendant is, in fact, guilty of all three crimes with which he has been charged. Thank you.

MR. VAN CLEEF: May I proceed, Your Honor?

JUDGE SCHROEDER: Yes.

MR. VAN CLEEF: Ladies and gentlemen, I don't know if it's age or I'm just tired, but I've done something different today getting ready for this closing argument than I normally do. What I would normally do is I would sit there and furiously write and scribble and try to summon the squirrels that make my brain work to run faster and faster. But instead, I actually -- I actually listened and read along with the lawyer in the room who had to read

-- had to read the longest part, which was Judge Schroeder.

And I don't normally read the jury instructions because I've already looked at those a couple of times, or I've seen them maybe a hundred times, and they're very similar in each case. But on just the third page I noticed something that sort of really encapsulated the reason why we have juries, the reason why we have this big courtrooms and this beautiful courthouse that I talked about during voir dire, and the reason that it's so important that the government be held to its burden and that the rules are followed.

One of those rules being that my client still sits here a completely innocent man with a perfect presumption of innocence. And here's what I read that brought that back to me. The judge said "a reasonable doubt is based upon reason and common sense. A reasonable doubt, therefore -- beyond a reasonable doubt, therefore, is proof of such a convincing character that you, you, would rely upon it and act upon it without hesitation in making the most important decision in your affairs. And if you'll recall, I asked you some questions along those lines, and people gave examples of the most important decisions that they make.

That's why we have juries, ladies and gentlemen. It's for common sense. It's supposed to be a cross-section

of the -- of the geography. It's supposed to be a group of peers of the defendant. That's why you're here. For common sense.

There's been some discussion about the law. Usually when we're going over there we're talking about the law. There's been talk about the law when y'all were out of the room and wondering what's going on in here. There's lot of talk about the law. That's for Judge Schroeder, that's for Mr. Hornok and Mr. Carter, and that's for me. The facts, though, they're determined by you, and they're determined within the lens of common sense.

That's why 12 to 14 people like yourselves who've never met each other actually get together to make the decision. It's to get as a broad cross-section and to draw on everyone's common sense. So that's what I want to do. I want to draw on your common sense. I'm not as energetic, and I'm not as good a talker, and I definitely don't have a PowerPoint presentation. I think I made two promises to you during -- at least during the voir dire. I didn't make an opening, so during the voir dire I told you two things. My eye was going to get worse as the day went on, and everybody agreed they wouldn't hold that against the defendant. I think I've got proof of that in front of you. The other thing was I'm not very good with computers. And I'm going to look at papers, and I'm going to remind you of

some things because I think when you think of those things, your common sense is going to dictate the result. And it's not going to be the result that Mr. Hornok told you. And here's what it is.

There were four important witnesses in this case. Four only. In your common sense, does it take four and a half days, and I don't know how many special agents of the Department of Public Safety with their Department of Public Safety experts, does it take four and a half days to convince you using your common sense, does four and a half days to convince you what happened that took place in the space of maybe an hour total on several dates, on three dates? Does it take that long?

You realize the government rested today. The defense case started and stopped today. The difference between our presentations is not only a matter of time, it's a matter of style and substance. But the style was to tell you the truth. What you saw when that young man took the stand, that's what you see when a witness is not thoroughly prepared. That's when you -- that's what you see when someone is telling you what they really think. The good and the bad. But there were four important witnesses in this case. I'm going to go through them with you real quick. And you know what an important witness is to me? It's somebody who actually saw something. Somebody who was

actually there.

Do you remember Paul Brown? He's six-foot eight. Tall Paul? Struggling to form a thought on that witness stand. Now, I told -- I can't remember which witness, but I'm sure y'all heard that I work in reactive mode. You know, there -- it's just different things that we do at this table and that table. Their presentation is set up well in advance. My presentation is sort of, well, let's see what they're going to put on and then what happens with that, and what am I going to say in response.

Tall Paul used drugs three weeks ago. He was using drugs the entire time, but he was a cooperating individual for these DPS officers. And I know I'm not the only one in the courtroom who thought when they heard he was paid money to do that, and then heard how much money he makes, that he was using the money they were giving him to buy drugs for himself, which he continued to take until three weeks ago.

The man who couldn't remember anything. Remember he got to some point, "I don't recall." "I don't recall." "I don't recall." Everything he said was "I don't recall." And what did he finally clam up on? After he admitted buying methamphetamine recently and using methamphetamine, he admitted all of his faults, and he would not answer, and he pled the Fifth. This is a government witness. All right. This is the government's witness. He pled the

Fifth to the question of where he bought his marijuana. He didn't want to give up his source for marijuana at the compound in Mount Pleasant, I think is what he said. He didn't want to give that up. That's how credible tall Paul was. The man was a horrible witness.

Now, part of my job being reactive, it's sort of like -- it's sort of like looking at a hay bale, and the bands came off. And there you are, you're trying to pick up the hay bale. I'm tying to figure it out. Well, we started out, here's the -- here's the neat package that was presented to you with tall Paul was he was going to show you that on January 23rd, 2017, three years ago; January 26th, 2017, three years ago; and February 9th, 2017, three years ago, that my client was involved in drug transactions. Instead, what did you hear? My client did not -- not only did he not distribute any drugs on any of those dates, he wasn't even seen with any drugs on those dates. Not a single date was that young man seen with any controlled substance.

Well, tall Paul, again, struggling to form a thought right there in front of you, he just withered. So what's next? Well, let's go a different direction. Let's try Mr. McLemore. Completely different theory. Mr. McLemore doesn't know anything about January 23rd. He doesn't know anything about January 26th, and he doesn't know anything

about February 9th. He's not here for that purpose. What Mr. McLemore is here to testify is that he was selling cocaine to this young man, who at the time was 25 years old. That's what he was here for.

And he was also here for another reason. Because the government realized, did you notice, about halfway through the case, they started asking witnesses, "Where did this happen? Where was it? Was it in Dallas? Was that in Dallas County? Is that in the Northern District of Texas or is that in the Eastern District of Texas?

About halfway through the case they realized, and I can't imagine this, because I don't know how many defendants have already pled guilty in this case. Several. One died. One took off to Mexico. The events that took place in this case took place in Dallas. That is not here. And the way the law works when you looked in here, you've got an instruction on venue, is that they've got to show -- you've got to find by a preponderance of the credible evidence. The credible evidence, using your common sense. -- that some portion of that offense took place here in the Eastern District of Texas.

Now, Mr. Hornok would have you believe, well, look at this map. You know, that map wasn't in evidence. I could have objected to that, but I don't care about that map, because we all know where I-20 is. We all know where

Louisiana is. We all know where Dallas is. That's not the question. The question is whether my client took a boat or flew a plane over Oklahoma and down through Arkansas. That's not the question. The question is did any drugs ever even go to Shreveport? That's the question. That's what we're -- look. His -- his liberty is at stake. We don't have small trials here in the federal courthouse. We just don't. They're all big. And this is a big one. As you heard when he sat there on the stand and went back and forth with Mr. Hornok about what he thought the consequences of this case were. This is a big case.

So the question is not, as Mr. Hornok would tell you, whether he took a -- you know, went up through Alaska or went down through the Gulf of Mexico, the question is whether it ever happened at all. And here's your common sense comes to play. Mr. McLemore, what did he say when I asked him did he sign a consent for the search of his house? I don't care whether he consented to the search of his house. That's his problem. What'd he say? "I don't remember. I was high." Did y'all catch -- that was -- and he was high all the time. Remember he talked about that? He was high all the time.

Why is that important? Because before that he had just given you in excruciating detail his practiced testimony about my client. Practiced. Mr. McLemore didn't

say anything about my client in 2017. He didn't say anything about my client in 2018. He didn't say anything about my client until August 29th or 30th of 2019. That's the first time he said he met with Mr. Hornok and Mr. Kelly.

That -- that nervous man sitting there on the -- on the stand who couldn't remember things that happened afterwards, yet he could give you precise details that would make it necessary for you to conclude that Interstate 20 is the only way that this could have happened, so it must have been in the Eastern District of Texas because at that point I was asking witnesses, wait a minute, where was this? Dallas? Dallas County? Dallas, Texas? Northern District of Texas. All the sudden Mr. McLemore has this perfect recall from a time before when he didn't recall anything.

Does that satisfy your common sense? Is that the kind of evidence that you would make your most important decisions on and decide your affairs on? Because that's the kind of evidence that's required to find something beyond a reasonable doubt.

Collin Hayden was 25 years old at the time. He did not have a great upbringing, he did not have the benefit of education and the family that spends a lot of time with him like a lot of us did. You -- I thought it was a terrible

idea for him to take the stand. Horrible. You even heard him say that. But in retrospect, maybe it wasn't because you got to see what he is really like. You got to assess him. You know, he doesn't own that suit. That's not his. I bought those pants. I bought that shirt. I bought that tie. And that coat is off the rack downstairs that they give to people if they forget to wear one to court.

This is not a sophisticated person. He is flawed. He admitted to you he used -- he was a user of drugs. He couldn't get a better job than being a stripper. He had to work out all the time. He had to get tattoos. I guess in their preparations when they showed you the tattoo, "No pity for a coward," they put that together before he testified that is the title of his favorite song. But that was supposed to be evidence to you how he really sees things, and it even now was argued to you as evidence about how he really sees things. A tattoo that he's had, I don't even know how long, that's a title of a song.

So Mr. McLemore, he didn't quite work out either. I mean, as a witness, I don't think he passes the smell test. I'll leave it up to you, but I think I've got a pretty good handle on common sense.

Mr. Brown, struggling to form a thought, no good. Mr. McLemore, no good. So now let's try something new. So we've gone from Mr. Brown who -- oh, by the way, who thinks

he's a confidential informant back in 2015 or 2016, just so you know. That's how long he thinks he's been a confidential informant. Meaning, and the reason I think that's important, and I think you should think it is important, when you look at the instruction on a conspiracy, the conspirators have to form an agreement, and they have to mean it.

A confidential informant cannot form an agreement to do something illegal because they don't mean it. So whether or not Detective -- I'm sorry -- Special Agent Kelly here had signed his official agreement that ensures that Paul Brown will not be arrested if he commits a crime while he's working for the government, and if he gets his money, Paul Brown thought he was a confidential informant. So do you think he really agreed to enter into a conspiracy when he thought he was a confidential informant? Because if you don't, then why is this case in the Eastern District of Texas to begin with at this point?

And did you see -- did you see Mr. McLemore, it kind of came over -- the creeping sensation came over him. Two things came over him while he was sitting there. I think you saw it on his face. Number one, he didn't understand until I showed him and showed him and showed him, that the prosecutors have to make a motion. Remember, he thought the judge must make the motion. No. No, that's not how it

works. If you want a reduction in your sentence, the prosecutors have to make the motion. By the way, the guys who came and saw you a week ago, and then a week before that. No good for him.

The second creeping sensation was, he has pled guilty, then sentenced, gone to prison, come here in his orange outfit, for selling drugs somehow to Mount Pleasant. What is -- what do you think he thinks now that Paul Brown has testified that he was a confidential informant in 2015 or 2016, if you can't form an agreement with a confidential informant that would satisfy the conspiracy requirement? What do you think -- what do you think McLemore thinks about that? What do you think he thinks about the lawyer that told him to do that? Or assented to him doing that?

All right. So we've got -- we work with Paul Brown. Tall Paul was going to make the January 23rd, January 26th, February 9th, that -- that conspiracy was going to work. Nope. All right. So Mr. McLemore's going to come testify. Now we're going to shift over to cocaine.

Ah, that didn't quite work out either, and I'll remind you, my client stood there and said, "This was mine. I do. I have used cocaine." I asked Special Agent Kelly what cocaine was found? I want to know all about the cocaine that was found. What was found? Sixteen grams. Sixteen grams of cocaine. I've never had 16 grams of

cocaine. I've never had a speck of cocaine. Sounds like a whole lot of cocaine, doesn't it? But when my client held it up, it's this tiny little -- little baggy of cocaine. And do you recall I asked Special Agent Kelly, he was on the stand, this was today, "Was that a user quantity?" And he honestly said yes. He honestly said yes. What other cocaine in any of these bags do you see? None. None.

And about this time in the trial, before I knew what was happening, because I'm slow, I looked over, and we were -- we were talking about a U-Haul. Some officer testified. We're talking about a U-Haul, and somebody was handing it down here, and honestly, you got -- well, you got to go down here, and then it's got to go up there, and then, nope, that's not enough. Here's another one. Here comes the next one, and here comes the next one, and made sure that your fingerprints were all over this, but then the very next -- the very time that I questioned that witness, which was right after that, here it's almost still going around, making a conga line, where did all this come from? A -- some broken down U-Haul with Mr. Martinez's ID in it and a bunch of guns that the government has destroyed. They're gone. Except for one, which is right here. I'm not afraid of guns. This -- I'm sure they've checked this out. That had -- didn't have my client's fingerprints on it. There was no ID, no nothing to associate my client

with this. Nothing. But they got to have a gun to show you. And it's got to be carried very carefully down here to the end so that everybody can see it. Is it striking any memories here? Because that's exactly how it worked.

And today I came in. I'm sitting way over there. I can't see under the best of circumstances, but I'm also next to a podium which works out because I'm putting eyedrops in my eyes all the time. I'm sure you caught me doing that. I finally walk over here, not only are all the drugs out, but they have been laid out like the pillows in my hotel last night. When did that happen? These are the drugs that are supposed -- that came out of a U-Haul that they tell you with a straight face they're in Garland, Northern District of Texas again, that is supposed to belong to a 25 year old struggling to make a living. Imperfect, yes. All right.

So I'll stick with my theme. There were four. Four important witnesses. We've talked about two.

The next witness was Mr. Harper. Mr. Harper, not too happy. Why is he not happy? Because he also pled guilty to a conspiracy. With who? Paul Brown struggling to form a thought, in the Eastern District of Texas. Mount Pleasant. I showed you on his plea docket. I showed you his plea documents. Mount Pleasant. That's Paul Brown. Does anybody believe Paul Brown? And even if you do, if

you thought he was a confidential informant, he did not enter into a conspiracy with Mr. Harper.

I'll tell you what we did learn from Mr. Harper, though. Well, he -- he -- he was -- he goes a different direction. Now -- now, this is actually where it went. Now we're not concerned about Mount Pleasant, now we're not concerned about Mr. McLemore's alleged cocaine dealings and dealings all over the place. Okay. Now with Mr. Harper we're dealing with my client's brother whose name he does not even know. And if you'll recall earlier in the case, I kept asking, where's the brother live? Where's the brother? Who's the brother? Oh, they're -- you know, we didn't see anybody else there. Nothing. No. Well, then Mr. Harper told you he lived there. And then I asked him, what's his name? "I don't know. I think it's Tyler." "Why do you think it's Tyler?" "Because I heard you say it's Tyler." They lived together, and this is a man that supposedly he's selling drugs to, to send off to Shreveport, I can't remember, in a red or a black Corvette, whatever it was.

My client has two brothers and a sister. He couldn't name any of them. Harper could not name any of those people. And he feels so bad for what he did? Remember, he got caught using methamphetamine in prison recently.

What else do we know about Mr. Harper? Well, like

Mr. McLemore, he was interviewed the day he was arrested. The day. Now, Mr. McLemore, he doesn't remember any of that, but Mr. Harper, he does. He may have been a street -- he may have been awake eight days before that or seven days before that, but he remembers that. And he remembers that he did not mention, he did not mention Collin Hayden, no, no. He didn't mention him in 2017 when he was arrested. He didn't mention him in 2018 when he was in prison. He didn't mention him in 2019 until August when these two gentlemen went to visit him, and all of the sudden he remembers Collin Hayden must be a big drug dealer too. Why? Because it benefits him. He wants to get a lesser sentence. That's why.

And you have an instruction regarding that. I don't think you need an instruction regarding that. Because the main instruction is use your common sense. You don't abandon your common sense when you walk in here. We're not checking off boxes. At the end of the day, you decide who's lying and who's telling the truth. And that's why common sense is so important.

Did Mr. Harper strike you as a person who was telling the truth about selling drugs to a person who lives with him whose name he can't repeat on his own? It makes zero sense. Not just not common sense, but zero sense.

Now, so we went from -- we went from, um, some

transactions on January 23rd, 26th, and February 9th to the U-Haul, to we don't know where it went, but we're just going to tell you that it happened, even though we can't remember the names, we don't know how they traveled. Oh, by the way, we didn't follow them so we don't -- we're not sure which way they went.

I'm telling you, it doesn't matter which way they went because they didn't go anywhere. It didn't happen. And you are entitled to say that. It didn't happen. What did happen? I'll be honest with you, I was trying to think of what to say last night, and I thought, "Hm, I'm going to look at those judgments." This just came to me last night truthfully. Only got three exhibits; right? I used three -- well, four exhibits, I guess. My little piles about that big (indicating). If you saw the true pile of exhibits that comprise the government's exhibits, it's thousands of pages because those thousands of pages of Facebook, which I'll get to in a second.

I looked at those exhibits, and I'm sure you saw them. I know you caught it, because I see the common sense in your eyes. All these defendants -- I had to look. You know why I had to look? Because they're not here. So I don't know their names unless I see it on paper. Let's see, Mr. Montes-Munoz. How many times has his name been dropped? Not here. Mr. Martinez. How many times have we

heard his name? Oh, he's the guy with the U-Haul by the way. Not here. How about Richard Saucedo? He died. He's dead. So now how about Gerald Clinton Davis? He's on the bottom of the list. These are people who are indicted together with my client. Together in the same case. Not here. So they picked the cream of the crop. The cream of the crop was Mr. McLemore and Mr. Harper.

Now, all these people who aren't deceased or gone to Mexico, except for my client, all of them, every single one, pled guilty to one thing, and one thing only. They all -- and big time drug dealers they are. I have no quibble with that. Harper, he's a big time drug dealer. Kilos and kilos a day or a week. I got lost in all those numbers, but Harper's a big time drug dealer. McLemore was a -- was -- or was anyway. McLemore was a big time drug dealer. I don't know anything about these other guys because they're not here. They are big time drug dealers, and they pled guilty to what? Conspiracy concerning methamphetamine.

The word cocaine, nowhere in their stipulations. Nowhere in their factual basis. Nowhere in their judgment. The word firearm. Nowhere in the stipulations. Nowhere in the factual basis. Nowhere. It wasn't even in their indictment. They weren't even accused of that. And, yet, my client stands accused of conspiring with them over

cocaine and guns. You heard the whole presentation here. And guns, with those very same people.

And you saw the timing of it, didn't you? All the sudden these guys two years after the fact think, "I think I got something to say about Collin Hayden," and they talk with the prosecutors, and then just two weeks before the trial, they get their -- they get their testimony straight, and then just, what, four weeks before the trial, there's another exhibit there. The Second Superseding Indictment drops. Boom, it's cocaine. Boom, it's guns. I mean, the timing of it is just incredible. Does that pass the smell test? Does that pass the common sense test? I don't think it does, but I can't just talk about the conspiracy theory. Oh, I'm sorry. I left out one witness. There was one other. There were four witnesses that were important that I told you I thought were important.

Well, there's the videos which are useless. And the audios that go with them that are useless. You saw. I tried to make sense of them. Paul Brown thought my client was a black man. Fortunately, there was one Hispanic officer who testified so I could ask him "Is he Hispanic?" Because, remember, Paul Brown also thought he was Hispanic. Pretty sure about that. Because my client doesn't appear on a video, so we got to rely on Paul Brown for that. Paul Brown, who doesn't even understand his own speech on the

video. So I don't want to leave out the videos. You'll have the videos. You can look at them yourselves, or you can listen to them yourselves. See if you make any sense of that.

But we go on past those witnesses, the last witness that was important -- again, there were only four -- was my client. And he's admitting his imperfections. He's not perfect. You know, I don't use Facebook. I don't have much to say. I'm working all the time. And I don't really care what anybody else has to say either. Does that make me a bad person? I don't know. But I know my kids use Facebook, and my kids use Snapchat, and I'm always telling them, "Don't put that stuff on there. Don't put that. That's there forever. Don't even take pictures of yourself in front of your house because then people know" -- I mean, I'm paranoid. Then people know where you live. I don't know how young people talk on Facebook. Maybe some of you do. But my client's job was to be flamboyant, and appear successful. You know, they show a picture of him in front of a Range Rover. Why don't you look on Craig's List and see what a used Range Rover goes for. But, actually, don't, because he didn't even buy it. He has a stack of money. What is that? One dollar bills? Two dollar bills? Five dollar bills? Hundred dollar bills? Who knows. The object was to, like, just make him look like a drug dealer.

Unfortunately -- and this is unfortunate, unfortunately strippers, male strippers sort of have to appear like you would expect a drug dealer to appear because they're supposed to appear successful. They're supposed to put off that image. And you heard that from Mr. Harper, and you heard that from Special Agent Vera. And that they work for tips. So this is not an odd thing.

Now, I've talked about the conspiracy. You know, I know that they -- they've got a presentation, and just so you don't misunderstand, they put it in big red letters where you're supposed to write guilty. Just picture like blue letters but on the right-hand side, Not Guilty. If I had a PowerPoint, that's what it would say on Count 1.

Count 2 goes together with Count 1. This is -- this is Count 2 right here. Mr. Martinez's gun and the half-burned-down U-Haul. That's -- that's Count 2. I think we've discussed that, except to say that if Collin Hayden had no idea what they were doing, then it certainly wouldn't be reasonably foreseeable.

In fact, I was listening as I usually don't. Mr. Hornok said "Drug dealers carry guns." Yes, they do. Drug dealers do carry guns. Did Mr. Harper have a gun? Was there any testimony about Mr. Harper having a gun? Was there any testimony about Mr. McLemore having a gun? Was there any testimony about Mr. Davis having a gun? These

are all known drug dealers. Was there any testimony about tall Paul struggling to form a thought, having a gun? No. There was none. None. Zero.

If, in fact, Collin Hayden was in conspiracy with those guys, where would he develop the expectation that drug dealers carry guns? Because there was no evidence that they actually do.

Count 2 is that gun count. Count 4 is an interesting count. Count 4 is the -- is the count where Collin Hayden, 25 years old, gets called from Special Agent Kelly. Now, we don't know what the details of that call -- that call wasn't recorded, was it? Or if it was, it wasn't played for us, was it?

Now, what do you think was in that call? We got the goods on you. You better come in and help yourself. You want to help yourself, you got to help me. Your boy Harper, he's told us all about you. If I walked over right now -- this young man likes me. If I poked him three times in the chest hard, he would react. He's young. I wouldn't poke my son three times in the chest.

Special Agent Kelly, though, he is -- remember, he's trained in interrogation. And police officers are entitled to lie as part of their interrogation. They're entitled to. And the truth of the matter is, you poke and poke, and poke, and somebody's going to react. But pay attention to

the timing on that one. The timing. There was no federal case pending. That's why -- that's another reason I made sure you had a copy of the original indictment. You'll see. It's dated up at the top right. It's got a file stamp, April 19th, 2017.

Conversation with Harper was prior to that. Not only that, but you'll also see the word "sealed," in regard to this case. Sealed. Which means at the time it wasn't even available to the public. So when you're considering the elements of Count 4, consider the fact that it was a sealed case, and the indictment was filed after that semi-conversation was held.

I am out of energy, and I'm sure I'm out of time, but I've just got a couple of last thoughts for you.

Your verdict is required to be unanimous. That does not mean that you all have to say the same thing. It just means that if -- your foreperson speaks for you, but you all agree with it. That's one of the rules. That's one of the most important rules, because that's almost the last thing that happens before the case is over.

It's very, very important that you not violate your consciences, and we will stand by whatever decision you reach. But I believe that the decision should be that Collin Garrett Hayden is not guilty of a conspiracy. A flawed person, yes.

When you look at this evidence, it all seems like it just happened. No, it was over a space of years. And it was years ago. When you employ your common sense on those important witnesses, I don't see how you reach another result on Count 1, Count 2, or Count 4.

You know, there's only one bit of evidence here. Remember all those scientists who testified? Oh, they weighed this, and they quantitated that, and the little lady got confused when I asked her one of my confusing questions. Well, I can't even find it. That's how insignificant it appears to be. Thank you. This a one piece of evidence on which my client's fingerprints appear. And there's other fingerprints on them as well. They just can't be identified. Smudge? I don't know what happened to them. I have no idea. When you look through the exhibits, though, it's real interesting. The picture that they have of this sitting on a windowsill, which they can't quite figure out which bedroom that was in, by the way. It was either in the master bedroom which Harper got by -- Harper moved in last, but he got the master bedroom. I want to know how that worked out. That's not normally the way it works.

But, anyway, the master bedroom was the one that Harper was in, and this was sitting on the window. If you'll notice, if you look close, there's a, I don't know,

an officer or a lab technician, or something, and they've got these blue gloves on, and they're doing like this (indicating). You'll see the reflection in the window. What fingerprints might have been on there if the other ones weren't smudged?

I asked Miss Wassung, you know, "What steps do you take to make sure that you don't obscure a fingerprint on a cup?" I also asked her is it odd to find fingerprints for a person in their own home on their cups? Don't you get fingerprints on cups when you take them out of the dishwasher? Or out of the package? Or when you actually take a drink with them? Yes, you do.

They showed you on PowerPoint the other little bit of evidence from the apartment. This is the only one from the apartment that has fingerprints. But the other little thing that the -- that was supposedly going to show you that my client was involved in methamphetamine dealings, what was it? It was a clothes hamper. But if you'll notice on the PowerPoint, it zoomed in a little more. Remember Mr. Hayden when he was looking at it? He said, "See, there's a woman's sock there?" And it was down on the bottom. I won't go further than that. There's a woman's sock there. "This was all of our clothes." And it wasn't in the hamper, it was dumped out. Okay? When they showed you the PowerPoint, it was zoomed in and the woman's

socks were gone. They'd disappeared. And, you know, if these officers told you a couple of things about crime scenes, y'all would know from your own experience, and the SWAT officer, I think his name was Canete, said, "We go in. We secure the scene. We make sure that there's no danger," and then Special Agent Brock comes in and starts collecting and photographing evidence.

But, see, here's the problem. That's all great, and they do that so that the evidence is collected right. Here's the problem. For two hours prior to that, my client was gone. He was gone from that apartment. He left. We even know that from the recordings. He left. What'd he do? He went downstairs, he saw the flash money. Went back upstairs. Came back downstairs. He left with them, and he never came back because he went to Miami.

What does an innocent 25 year old do when there's a three SWAT vans and officers and everything in his apartment where he knows he's living with a drug dealer? I don't know. Does he go to Cuba? I don't know. Cuba's a long way away. I don't think he really went to Cuba, do you? You can check in wherever you want on Facebook. So I don't know that that should be considered indication of his guilt. He panicked. He left. He left all his things, but he didn't have much there anyway.

But for two hours a drug dealer, his girlfriend who

was in bed with him, and his other friend, and now we know, my client's brother, were all milling around, or at least part of that, were milling around in the apartment. How do you know that one of the actual methamphetamine people didn't use his room for something? If you're going to do a deal, are you going to do it in the -- in the room that your girlfriend's trying to sleep in? Or are you going to go in the other -- only other room in the apartment? That wouldn't pass crime scene muster anywhere.

I am so grateful for your attention. I am so grateful for your time. I am spent. And I am so sorry that you still have a job to do, but when you do, I am asking you, please use your common sense. That's why you're here. You've got this job because you've got common sense. Please use it. Because when you do, I think you will return a verdict of not guilty.

Now, Mr. Hornok or Mr. Carter may have to take an opportunity to talk to you some more. Please keep in mind, I can't speak again. Common sense dictates the result. Thank you.

MR. HORNOK: In about five minutes you're going to walk upstairs and go in that room, and you get to decide. You get to decide whether that man's guilty or whether he gets to walk out the front door. It's your decision. Our job is to put the evidence here in front of you, get to

talk a little bit about what we think it means. But at the end of the day, you get to decide who to believe. That's it. That's what it boils down to. You get to decide who to believe.

Now, Mr. Van Cleef and Mr. Hayden have been up here, and what they would like you to believe is that this case is nothing but the consequence of a bunch of monsters getting together and creating a -- conspiring to frame that man, lock him away, on behalf of the government, and in the process roping in a bunch of drug dealers, getting them out early, convincing them to lie. And then beating up on him because he lied to the government. Let's step through that.

What do you have to believe to find that man not guilty? Well, for one, you got to believe that he was telling the truth when he got up on the stand. I think it became very obvious. We all saw him. It became very obvious he wasn't telling the truth. In fact, he admitted to lying multiple times. When it's convenient to write something to the government and talk about wanting to cooperate, he's going to lie. That's what he's -- that's what he wants you to believe. He's trying to convince the government to let him cooperate. It's convenient. So what is he going to do? He's going to lie.

Well, what's convenient here? It's convenient to

lie. Get up on the stand, make something up, flush drugs for love. "I didn't -- I didn't sell them. I never sold drugs." "Oh, yeah, all that stuff I wrote in that letter about how I knew Jason McLemore and Timothy Harper and all of these guys and watched them do drug transactions, and knew Daniel Montes-Munoz, well, that was all a lie. Well, now that I'm up here on the stand telling you I don't know any of these people, I'm telling the truth now."

So that's the first thing you got to believe is that he was actually telling the truth on the stand. And he wasn't.

The second thing you've got to believe is that Paul Brown got up on the stand and lied. Now, Paul Brown is a drug dealer, a drug addict, who lost track of a couple of years because he was on drugs for so long. Right? There's a lot about Paul Brown that should cause you question to believe. In fact, the judge told you about drug addicts. People who use drugs and whether they ought to -- how you should evaluate their testimony.

You should absolutely look at Paul Brown's testimony and take it with a grain of salt. Why? Because he is -- he has to earn your trust. But how did he earn your trust? Told you about his criminal activity, and then you need to rely on the other evidence in this case to figure out whether he's telling the truth. Those recordings that Mr.

Van Cleef has argued to you are absolutely useless. But, yet, the defendant on the stand has admitted its his voice on those recordings.

What's the next thing you have to believe? Well, you have to believe that Timothy Harper came here, cooked up a lie about Mr. Hayden, a lie, which he talked about getting on the stand, could get him killed in prison. That's what he told you. And in fact, the defendant on at least two different occasions, has described trying to kill Timothy Harper if he gets up on the stand.

So Timothy Harper's got to put his life in jeopardy, get up on the stand and lie to you. And he's got to do that hoping that he convinces the judge who's the one who gets to decide if there's any kind of sentencing reduction. Same thing for Jason McLemore. The other thing that you've got to believe in this monstrous conspiracy that they would have you believe, is that both of the attorneys representing Timothy Harper and Jason McLemore were absolutely out of their minds when they allowed them to enter into these guilty pleas and take responsibility for their actions in this case. I mean, that's what he said.

I mean, he -- he was saying you have to believe that those convictions are absolutely problematic because nothing ever happened in Mount Pleasant. That's what you have to believe. You'd have to believe that these two guys

didn't have enough to do in life, didn't have enough other drug actual criminals to go investigate, that they decided to travel to Oklahoma, travel to Seagoville, go collect a bunch of evidence, interview witnesses, put together thousands of pages worth of discovery and exhibits, spend a whole week in court, all to frame some low level stripper from Dallas. Right? That doesn't make sense.

You'd also have to believe that the methamphetamine here that was found with the defendant's fingerprints on the cups was somehow or another -- the defendant was framed for that, too, right, because these were in his room. Somebody -- somebody used some cups, found the cups that he was -- had touched, put some methamphetamine in there, socked him away in his bedroom so that when the police arrived, they'd find that evidence. They socked away the six ounces of methamphetamine that the defendant so conveniently just happened to come up with a number in offering to Paul Brown, that somebody else cooked up that six -- put that six ounces in there and knew that that was going to be an important piece of evidence and threw it in with the defendant's dirty clothes right next to his cocaine, which he on that stand admitted to you was his.

Who are you going to believe? That's the question here. Is it some monstrous conspiracy on the part of the government, on the part of all of these witnesses to get up

here and perjure themselves before you, to frame him? Or is it something that's just a lot more simple?

Collin Hayden's a drug trafficker who got into it with drug traffickers who had guns. And then when it all hit the fan, and he thought somebody was talking about him, he did what he always does, and he threatened to kill him because he didn't want -- didn't like what they were saying.

Use your common sense. Who's telling this truth? Monstrous government conspiracy and coverup, or just some stripper who happened to be dealing drugs with a bunch of other strippers and rug dealers.

JUDGE SCHROEDER: Thank you, Mr. Hornok.

Ladies and gentlemen of the jury, it's now time to -- for you to return to the jury room to begin your deliberations in this case.

As I told you earlier, the first thing that you should do is to select one among your number to serve as the foreperson who will guide your deliberations in the jury room and who will speak for you here in the courtroom.

If you -- again, if you need to communicate with me at any time during the deliberations, the foreperson should write the message and give it to the court security officer, and I will either reply in writing or by having you brought into the courtroom where I can address you

orally. And I would also like to ask at this time if our two alternates, Miss Edwards and Miss Chatman, if you would remain in the courtroom with me, and I'm going to visit with the attorneys very briefly, and then I will visit with you.

At this time, the 12 members of the jury may go to the jury room to begin deliberations.

(Jury excused to deliberate.)

JUDGE SCHROEDER: Counsel approach just one second.

(Bench conference.)

JUDGE SCHROEDER: My normal practice with alternates is to explain to them that they remain under the rules of the Court until we have reached them and told them that the jury has completed their deliberations and returned with a verdict. So I want them to continue to follow everything that I've instructed them on in terms of the procedures, and that in the event something happens and someone has to be excused from the jury, we'll be calling them back and asking them to return.

So anybody got any problem with that practice?

MR. VAN CLEEF: No, sir.

JUDGE SCHROEDER: Is that fine with y'all?

MR. HORNOK: Yes, Your Honor.

JUDGE SCHROEDER: Okay.

(End of bench conference.)

JUDGE SCHROEDER: Okay. You may be seated. Mrs. Edwards and Mrs. Chatham, I -- I want to explain how we treat alternates once the jury has retired to the jury room to begin their deliberations.

I'm going to release you at this time, and so what will happen is if you will continue to observe the rules and the procedures I've asked you to follow during the course of the trial, which is not to talk about anything, not to do any research, not to post anything.

In the event that one of the jurors is unable to complete deliberations all the way to a verdict, we'll be calling you and asking you to come back. And if that were to happen, and we had to call you and have you come back, it would be very important that you'd not had any discussions with anybody or done any investigation of your own, or anything of that nature.

So if -- if you would, bear with us a little bit longer and continue not talking to anybody about the case. Mrs. Schroeder will get your numbers, if she doesn't already, and once the jury, assuming it does, reach a verdict, we will call you and let you know that the jury has reached a verdict.

At that point, you're free to talk about it to whoever you want to talk about it. And by the same token, you're free never to say another word to anybody about it.

The important thing is for you to understand how much we appreciate your spending your week with us. Because if we did not have you here and available, in the event something happened to one of the jurors during the course of this week or during the course of the deliberations, we would be asking you to step in and serve in that juror's role. So that has not happened so far, and for that, we're grateful.

But you have spent your week with us, and I've watched both of you throughout the course of the week. I know how closely you have paid attention and how patient you have been with me and with the attorneys.

So on behalf of the Eastern District of Texas, the parties in this case, and the attorneys, I want you to know how much we appreciate your dedicated service as jurors. Again, I know that you've paid close attention, and we appreciate your time and your effort throughout the course of the week. This is an important case to the government, obviously. It's an important case to Mr. Hayden as well, and it's not been able to get resolved without the assistance of the jury.

So I say this all the time, and I believe it more and more, I think there are three really good pillars to citizenship in America. The first is answering the call of military service, the second is being an active and informed voter, and the third is jury service. And the two

of you clearly responded to that call by being here this week and by being willing to participate as alternates.

So I thank you very much, and you will be hearing from Mrs. Schroeder one way or the other as soon as we have any additional information. And I will excuse you at this time.

(Alternate jurors excused.)

JUDGE SCHROEDER: Okay. Anything?

MR. HORNOK: No, Your Honor.

MR. VAN CLEEF: (Attorney shakes head.)

JUDGE SCHROEDER: Okay. We will wait for the jury's verdict.

(Wherein a break was taken.)

JUDGE SCHROEDER: We are back on the record.

The jury has gone to the jury room to begin their deliberations. Mr. Van Cleef, on behalf of the defendant and Mr. Hornok on behalf of the government are here for purposes of Mr. Van Cleef presenting any additional motion he wants to make for purposes of preserving the record.

MR. VAN CLEEF: Your Honor, if you would permit me since it was not too long ago today, I would just re-urge the Rule 29 motion that I previously made relating to the issues of venue and the individual elements of the three counts that are still in consideration.

JUDGE SCHROEDER: All right. Thank you, Mr. Van

Cleef. Mr. Hornok.

MR. HORNOK: Your Honor, for the reasons described earlier today in response to the Rule 29 motion, I'd ask the Court to deny the motion.

JUDGE SCHROEDER: All right. For the reasons that I previously gave on the record, I'm going to deny the motion, and you've preserved your record. To the extent it's necessary, as I said earlier, for any additional motions to be filed in the event of an adverse verdict, you've preserved your ability to do that.

MR. VAN CLEEF: Thank you, Your Honor.

JUDGE SCHROEDER: Anything further?

MR. HORNOK: No, Your Honor. Thank you.

MR. VAN CLEEF: No, sir.

JUDGE SCHROEDER: All right. We're off the record.

(Wherein a break was taken.)

JUDGE SCHROEDER: We are on the record at 9:28.

Present in the courtroom are counsel for the government, counsel for the defendant, and note for the record the presence of the defendant here in the courtroom.

We have received a note, time 9:20, signed by the foreperson of the jury indicating that the jury has reached a.

Verdict. I've had a conversation with the attorneys for the parties regarding the matter of a forfeiture in the

event there is not an acquittal on the first or second counts or both counts, and we have distributed a proposed set of instructions to the parties with respect to the forfeiture matter, and I think both counsel have had an opportunity to look at those. And if you would, indicate whether they are agreeable to you or you suggest any changes.

MR. HORNOK: Your Honor, they're agreeable to the government.

MR. VAN CLEEF: And they are to the defendant as well, Your Honor.

JUDGE SCHROEDER: All right. Very well. Anything further we need to address before we have the jury brought in?

MR. HORNOK: No, Your Honor. Thank you.

MR. VAN CLEEF: No, Your Honor.

JUDGE SCHROEDER: Okay. Very well. We'll wait for the jury.

(Jury seated.)

JUDGE SCHROEDER: Please be seated. Will the foreperson of the jury please stand.

Mr. Bracamontes, I understand you're our foreperson. Is that correct?

MR. BRACAMONTES: Yes, that's fair.

JUDGE SCHROEDER: All right. Mr. Bracamontes, has

the jury reached a verdict?

MR. BRACAMONTES: Yes, we have.

JUDGE SCHROEDER: Is the verdict unanimous?

MR. BRACAMONTES: Yes, it is.

JUDGE SCHROEDER: All right. I would ask you to hand the verdict form to Mr. Haltom who will give it to Mrs. Schroeder to hand to me. Okay.

I am going to pass the verdict form back to Mrs. Schroeder, and ladies and gentlemen of the jury, Mrs. Schroeder is going to read the verdict. Mr. Bracamontes, you may sit down.

Mrs. Schroeder's going to read the verdict at this time, and I would ask that each you listen carefully to her as she does that, because after she is finished reading the verdict, I'm going to ask each of you if this is, indeed, your verdict so that we can confirm your verdict was unanimous. Mrs. Schroeder.

MS. SCHROEDER: As to Count 1 of the Second Superseding Indictment, we the jury find the defendant Collin Garrett Hayden, not guilty.

As to Count 2 of the Second Superseding Indictment, we the jury find the defendant, Collin Garrett Hayden, not guilty.

As to Count 4 of the Second Superseding Indictment, we the jury find the defendant, Collin Garrett Hayden,

guilty.

We the jury find that the official proceeding was a trial of a criminal case. Signed and dated by the foreperson.

JUDGE SCHROEDER: Counsel, if you would, please approach?

(Bench conference.)

JUDGE SCHROEDER: I think in our earlier discussion we said we were going to poll the jury at this time.

MR. HORNOK: I think you were.

MR. VAN CLEEF: I think so.

(End of bench conference.)

JUDGE SCHROEDER: All right. Ladies and gentlemen of the jury, you heard the verdict as it was read by Mrs. Schroeder. Let me poll you at this time and make sure that this the unanimous verdict of the entire 12 members of the jury.

Will all of you who voted for this verdict as Mrs. Schroeder has read it, please stand at this time.

All right. You may be seated. And let the record reflect that all 12 members of the jury immediately rose and stood in response to my request to poll the jury. The verdict will be filed with the clerk of the court.

This now completes the trial of this case. And from the very beginning I instructed you repeatedly about not

discussing the case with anyone, including among yourselves until you had retired to the jury room at the end of the case to deliberate and then to only discuss it among yourselves.

I'm now releasing you from those obligations, and you are free to talk about this among yourselves, your friends, your family, anybody you want to. Likewise, you are perfectly free not to say a word about it to anybody. You're under no obligation to discuss this one way or the other.

I do have a practice in my court that I want to ask you to wait very briefly in the jury room for me. Once I've excused you, I'll visit with the attorneys very briefly. It won't take very long, and I will be up there to say a word of thanks, and also I want to ask you if there's anything you think we can do better to improve the way we operate our processes around here and to find out if there's anything I can do to be a better judge.

If you wouldn't mind waiting for me for just a few moments, and I will be up into -- up in the jury room. I do want to tell you how deeply I appreciate your work as jurors on behalf of the Eastern District of Texas in this matter. I know how much I, the parties, and the attorneys appreciate all of the time and the effort and the attention you have given all of us during the trial of this case.

This is an important case to both parties, and they have been unable to resolve it without the assistance of the jury. I told the two alternates who were here and who sat with you for the entire week, and who I have released before you began your deliberations that there are three good pillars to citizenship in America. The first is answering the call of military service when our nation needs you; the second is being an active and informed voter; and the third is jury service. And you-all clearly responded to that call this week as good citizens by serving as jurors in this case.

Our Constitution depends on having active citizens who are willing to participate as jurors so that disputes like this one can we be resolved. So I really can't tell you how important your service is and how much the Court appreciates it.

So on behalf of the parties, the lawyers, and the Eastern District of Texas, I thank you for your service in this matter.

So at this time you're excused. If you'll wait for me just a few moments in the jury room, I'll be up to visit with you.

(Jury released.)

JUDGE SCHROEDER: Counsel, would you approach.

(Bench conference.)

JUDGE SCHROEDER: So he's got quite a ways I mean even a low end guideline range.

MR. VAN CLEEF: Right.

JUDGE SCHROEDER: So I will be glad to give you a hearing. On the basis of what I've seen, and again without going through the factors I can I think there are a number of them that concern me, particularly one of flight. More than that, I don't know where he would go, I don't -- I mean, I know at one point during the testimony, the hearing he -- I think his father, he may have testified that he has a place to stay. I haven't seen any family or friends here all week long, so I don't know whether he would.

MR. VAN CLEEF: Judge, what I would propose is that you set a hearing.

JUDGE SCHROEDER: What I'll do is I'll set a hearing -- we can set a hearing, you know, fairly quickly. We need date about two weeks from now.

MR. VAN CLEEF: Yes.

JUDGE SCHROEDER: The date about two weeks from now when we can set a sentencing hearing. I may have to actually ask Judge Craven to take it because we've got a trial in Tyler, but I'll give you a date two weeks from now.

MR. VAN CLEEF: All right.

JUDGE SCHROEDER: Is that fair enough?

MR. VAN CLEEF: It is.

JUDGE SCHROEDER: Okay. Let me give you a date real quick.

MR. VAN CLEEF: Okay.

MS. SCHROEDER: Is the 25th okay?

MR. VAN CLEEF: Fine, Your Honor.

JUDGE SCHROEDER: The 25th. Is that okay for the government?

MR. HORNOK: That's fine Your Honor.

JUDGE SCHROEDER: March 25th at ten o'clock. Okay. That's fine we'll do that. Why don't you visit with him before we go back on.

MR. VAN CLEEF: Could I have one minute?

JUDGE SCHROEDER: Yeah.

(End of bench conference.)

JUDGE SCHROEDER: Okay. You-all sit down, please. Mr. Hayden, you've been found guilty by the jury on one of the counts.

MR. HAYDEN: Yes, sir.

JUDGE SCHROEDER: You were acquitted on two of the counts. As you know, prior to the Court imposing a sentence, the probation department will complete a presentence investigation report. Your cooperation will be necessary for that, and I encourage you to cooperate with them in every way possible during that process so that that

report is -- is accurately and completely done.

You and Mr. Van Cleef will have an opportunity to review and fully discuss the presentence report before the sentencing hearing, and you may make any objections that you deem necessary. You'll have an opportunity to address the Court at the sentencing hearing, and so, again, I do want you to encourage -- I do want to encourage you to cooperate in every way possible.

Mr. Van Cleef has made a request for a hearing regarding your detention, and I am going to set a hearing with respect to that for Wednesday, March 25th at 10:00 a.m. And the probation office will do an updated report on, you know, how you have done on pretrial supervision so far and the various factors they must consider, like where you would live and things of that nature. So you'll need to cooperate with them in that regard as well. But we will set that hearing for March 25th.

MR. HAYDEN: Yes, sir.

JUDGE SCHROEDER: Do you understand that?

MR. HAYDEN: Yes, sir.

JUDGE SCHROEDER: Okay. Any issues that the government needs to raise?

MR. HORNOK: No, Your Honor. Thank you.

JUDGE SCHROEDER: Mr. Van Cleef, any issues?

MR. VAN CLEEF: No, sir.

JUDGE SCHROEDER: Okay. You-all did a good job trying this case. Compliment you on your hard work and your professionalism.

And at this time the defendant will be remanded back into the custody of the United States Marshal.

MR. VAN CLEEF: Thank you, Your Honor.

(Court was adjourned at 9:45 p.m.)

C E R T I F I C A T E

STATE OF ARKANSAS )
) ss
COUNTY OF WASHINGTON )

I, CYNTHIA A. DONALD, Certified Court Reporter, in and for the aforesaid county and state, do hereby certify that the within transcript was reduced to typewritten form by me or under my direction and supervision; that the foregoing transcript is a true and accurate record to the best of my understanding and ability.

I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 2nd day of October, 2020.

CYNTHIA A. DONALD, CCR, LS #183
Certified Court Reporter
Arkansas Supreme Court
License No. 183